GRETCHEN A. HOFF VARNER (Bar No. 284980)
SYLVIA HUANG (Bar No. 313358)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
ghoffvarner@cov.com; syhuang@cov.com

ANNA ENGH (*pro hac vice*)
SHANNON TUCKER (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
aengh@cov.com; srtucker@cov.com

DAVID LUTTINGER (*pro hac vice*)
CLÉA P.M. LIQUARD (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
dluttinger@cov.com; cliquard@cov.com

*Attorneys for Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff, and Third Party Counterclaim Defendant McKesson Corporation*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO

| | |
|---|---|
| AIU INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. | Civil Case Nos.: 3:20-cv-07469-JSC; <br> 3:20-cv-09356-JSC <br> (*pending consolidation*) <br><br> **McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKESSON CORPORATION f/k/a
MCKESSON HBOC, INC.,

      Defendant, Counterclaim Plaintiff, Third
      Party Plaintiff, and Third Party
      Counterclaim Defendant,


          v.

ACE PROPERTY AND CASUALTY
INSURANCE COMPANY,

      Third Party Defendant and Third Party
      Counterclaim Plaintiff.

Date and Time: TBD
Courtroom:  Courtroom E, 15th Fl.
Judge:  Honorable Jacqueline Scott Corley
Action Filed:  October 23, 2020

1

## TABLE OF CONTENTS

ISSUES PRESENTED.................................................................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................2

BACKGROUND ........................................................................................................................3

I.      McKesson Was Sued In Multiple Opioid Lawsuits........................................................3

        A.      The Track One Lawsuits In The MDL – Exemplars # 1 and 2............................4

        B.      The Oklahoma AG Suit – Exemplar # 3...............................................................5

II.     AIG And ACE Sold McKesson General Liability Insurance Policies Covering Damages
        Because of Bodily Injury. .......................................................................................................6

III.    ACE and AIG Denied Coverage. ....................................................................................8

ARGUMENT .............................................................................................................................8

I.      Insurers Have A Duty To Defend Any Suit That Is Potentially Covered Under the
        Policies. ...............................................................................................................................8

II.     The Exemplar Suits Are at Least *Potentially* Covered By The Policies and Thus Trigger
        the Duty to Defend............................................................................................................10

        A.      The Exemplar Suits Assert Damages "Because Of Bodily Injury."...................10

        B.      The Exemplar Suits Allege Injuries Taking Place During the Policy Periods. .................16

        C.      The Exemplar Suits Allege An "Occurrence." ..................................................17

        D.      Because The Exemplar Suits Arise From A Single Occurrence, McKesson Has
                Satisfied The Policies' $5 Million Retention......................................................21

III.    AIG and ACE Have A Duty To Provide A Complete Defense Against The Exemplar
        Suits....................................................................................................................................25

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acuity v. Masters Pharm. Inc.*,
2020 WL 3446652 (Ohio Ct. App. June 24, 2020)........................................................15, 16

*AIU Ins. Co. v. Super. Ct.*,
51 Cal. 3d 807 (1990) ................................................................................3, 11, 12, 14

*Am. Mfrs. Mut. Ins. Co. v. Den-Mat Cerinate Dental Lab'ys.*,
2001 WL 69176 (Ohio Ct. App. Jan. 24, 2001)..................................................................12

*AmerisourceBergen Drug Corp.v. ACE American Insurance Co.*
2020 W.V. Cir. LEXIS 3 (W. Va. Cir. Ct. Nov. 23, 2020).................................................15

*Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*,
302 F.3d 1049 (9th Cir. 2002) ...........................................................................................9

*Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*,
45 Cal. App. 4th 1 (1996) ................................................................................................25

*Beretta U.S.A. Corp. v. Fed. Ins. Co.*,
117 F. Supp. 2d 489 (D. Md. 2000) .................................................................................16

*Century Indem. Co. v. Marine Grp., LLC*,
131 F. Supp. 3d 1018, 1030 (D. Or. 2015) ......................................................................13

*Chemstar, Inc. v. Liberty Mut. Ins. Co.*,
797 F. Supp. 1541 (C.D. Cal. 1992), *aff'd*, 41 F.3d 429 (9th Cir. 1994)................................22, 23, 24

*Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*,
2020 WL 6706791 (Ohio Ct. Com. Pl. Sept. 9, 2020)...................................................16, 19

*Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*,
829 F.3d 771 (7th Cir. 2016) ....................................................................................13, 15

*Conway v. Northfield Ins. Co.*,
399 F. Supp. 3d 950 (N.D. Cal. 2019) ..............................................................................18

*D.R. Horton L.A. Holding Co. v. Am. Safety Indemn. Co.*,
2011 WL 4403974 (S.D. Cal. Sept, 21, 2011).................................................................9, 10

*Endurance Am. Specialty Ins. Co. v. WFP Sec. Corp.*,
2012 WL 7808097 (S.D. Cal. Sept. 28, 2012) .................................................................9, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*EOTT Energy Corp. v. Storebrand Int'l Ins. Co.*,
    45 Cal. App. 4th 565 (1996) ...........................................................................................23

*Gen. Accident Ins. Co. v. W. Am. Ins. Co.*,
    42 Cal. App. 4th 95 (1996) .............................................................................................9

*Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.*,
    ---F. Supp. ---, 3d 2020 WL 6565272 (W.D. Pa. Nov. 9, 2020)............................15, 19, 24

*Globe Indem. Co. v. California*,
    43 Cal. App. 3d 745 (1974) ..........................................................................................12

*Haskel, Inc. v. Super. Ct.*,
    33 Cal. App. 4th 963 (1995) ........................................................................................8, 9

*In re Nat'l Prescription Opiate Litig.*,
    2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) .............................................................12

*In re: Nat'l Prescription Opiate Litig.*,
    290 F. Supp. 3d 1375 (J.P.M.L. 2017)........................................................................4, 24

*La Roca Christian Cmtys. Int'l, Inc. v. Church Mut. Ins. Co.*,
    2020 WL 6684917 (S.D. Cal. Nov. 12, 2020) ..............................................................19

*Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*,
    602 F. App'x. 115 (4th Cir. 2015) ...............................................................................19

*Liberty Surplus Ins. Corp. v. Fed. Ins. Co.*,
    2013 WL 12132024 (C.D. Cal. Dec. 12, 2013) ...........................................................24

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*,
    5 Cal. 5th 216 (2018) ............................................................................................3, 18, 21

*Mead Reins. v. Granite State Ins. Co.*,
    873 F.2d 1185 (9th Cir. 1988) ......................................................................................24

*Mesa Underwriters Specialty Ins. Co. v. Blackboard Ins. Specialty Co.*,
    400 F. Supp. 3d 928 (N.D. Cal. 2019) ..................................................................9, 18, 20

*Montrose Chem. Corp. v. Super. Ct.*,
    6 Cal. 4th 287 (1993) ..................................................................................................8, 17

*Owens-Ill., Inc. v. United Ins. Co.*,
    264 N.J. Super. 460 (1993), *rev'd on other grounds* 138 N.J. 437 (1994) .........................14

*Riddell, Inc. v. Super. Ct.*,
    14 Cal. App. 5th 755 (2017) ...........................................................................................9

*Rite Aid Corp. v. ACE Am. Ins. Co.*,
   2020 WL 5640817 (Del. Super. Ct. Sept. 22, 2020)................................................14, 15, 24

*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*,
   148 Cal. App. 4th 620 (2007) ........................................................................................23

*Safeco Ins. Co. of Am. v. Robert S.*,
   26 Cal. 4th 758 (2001) ...................................................................................................14

*Scott v. Cont'l Ins. Co.*,
   44 Cal. App. 4th 24 (1996) ............................................................................................11

*Scottsdale Ins. Co. v. Moreno*,
   2006 WL 618315 (E.D. Cal. Mar. 9, 2006) ...................................................................19

*Scottsdale Ins. Co. v. Nat'l Shooting Sports Found., Inc.*,
   2000 WL 1029091 (5th Cir. 2000) .................................................................................16

*SIG Arms, Inc. v. Emps .Ins. of Wausau*,
   122 F. Supp. 2d 255 (D.N.H. 2000)...............................................................................16

*Sleeping Well, LLC v. Travelers Indem. Co.*,
   2011 WL 996202 (N.D. Cal. Mar. 21, 2011)..................................................................10

*State Farm Fire & Cas. Co. v. Eddy*,
   218 Cal. App. 3d 958 (1990) ..........................................................................................19

*State Farm Fire & Cas. Co. v. Elizabeth N.*,
   9 Cal. App. 4th 1232 (1992) ..........................................................................................24

*Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*,
   658 F. App'x 955 (11th Cir. 2016) .................................................................................21

*The Travelers Property Casualty Co. of Am. v. Actavis, Inc.*,
   16 Cal. App. 5th 1026 (2017) .............................................................................19, 20, 21

*Travelers Property Casualty Co. of Am. v. Actavis*
   410 P.3d 1221 (Cal. 2018) ..............................................................................................21

*Travelers Property Casualty Co. of Am. v. Actavis*
   427 P.3d 744 (Cal. 2018) ................................................................................................21

*Vann v. Travelers Cos.*,
   39 Cal. App. 4th 1610 (1995) ...........................................................................................9

*Watts Indus., Inc. v. Zurich Am. Ins. Co.*,
   121 Cal. App. 4th 1029 (2004) ...........................................................................9, 11, 17

iv

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT ON THE DUTY TO DEFEND, Case No.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

*Wint v. Fid. & Cas. Co. of N.Y.,*
 9 Cal. 3d 257 (1973) ................................................................................................25

**Federal and State Rules**

Cal. Rule of Court 8.1115(e)(2).................................................................................21

Fed. R. Civ. P. 56......................................................................................................1

**Other Authorities**

Merriam-Webster.com Dictionary, Merriam-Webster Inc., https://www.merriam-
 webster.com/dictionary/because%20of ....................................................................11

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that pursuant to Fed. R. Civ. P. 56, McKesson Corporation

("McKesson") will and hereby does move for partial summary judgment on the duty to defend of

Plaintiff and Counterclaim Defendant National Union Fire Insurance Company of Pittsburgh, Pa.

("AIG") and Third Party Defendant and Third Party Counterclaim Plaintiff ACE Property and Casualty

Company ("ACE") (together, "Insurers").

This Motion solely seeks relief on McKesson's Third Claim for Relief (*see* Dkt. No. 9 ¶¶ 49-54),

in which McKesson seeks a declaratory judgment that Insurers have a duty to defend McKesson against

lawsuits filed against McKesson seeking damages for injury allegedly arising out of McKesson's

allegedly improper distribution of prescription opioid pharmaceutical products (the "Opioid Lawsuits").

AIG and ACE together sold liability insurance policies to McKesson over a nearly two decade period,

and the Opioid Lawsuits number in the thousands.  For purposes of streamlining a ruling on the duty to

defend, this Motion focuses on two such insurance policies—the 2008-09 AIG Policy[1] and the 2015-16

ACE Policy[2] (together, "the Policies")—and three specific Opioid Lawsuits—the Track One Lawsuits[3]

and the Oklahoma AG Suit[4] (together the "Exemplar Suits"), which are representative of allegations in

the general run of Opioid Lawsuits against McKesson.[5]  McKesson seeks a ruling in this Motion that

Insurers have a duty to defend the Exemplar Suits and all similarly pled Opioid Lawsuits, under the

---

[1] "AIG Policy" refers to Policy No. 5443284 for the period July 1, 2008 through July 1, 2009 issued to McKesson by AIG.

[2] "ACE Policy" refers to Policy No. XOO G27610390 001 for the period July 1, 2015 through July 1, 2016 issued to McKesson by ACE.

[3] "Track One Lawsuits" refers to *County of Cuyahoga, Ohio v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004 (N.D. Ohio) and *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-OP-45090 (N.D. Ohio).

[4] "Oklahoma AG Suit" refers to *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84 (Bryan Cnty, Okla.).

[5] McKesson's focus on these Policies is not a waiver of its claims with respect to any other policies issued by Insurers or others, and McKesson expressly reserves all rights to pursue coverage, including a duty to defend, under all policies issued by AIG and ACE and any and all other insurers.

Policies.  This Motion is based on the accompanying Memorandum, the record in this action, and on

such other matters as may be presented to the Court including at or before the hearing of this Motion.

## ISSUES PRESENTED

1. Whether the Track One Lawsuits, Oklahoma AG Suit, and all Opioid Lawsuits alleging similar
   claims are potentially covered by the 2008-09 AIG Policy and the 2015-16 ACE Policy;

2. Whether such suits arise from a single "occurrence," which is McKesson's alleged failure to
   maintain effective controls for opioid distribution;

3. Whether McKesson's defense cost payments for such suits have satisfied the Policies' "per
   occurrence" Retained Limits; and

4. Whether AIG and ACE thus have a present obligation to pay or reimburse defense costs for the
   Track One Lawsuits, Oklahoma AG Suit, and all similarly pled Opioid Lawsuits.

## MEMORANDUM OF POINTS AND AUTHORITIES

For nearly two decades, Insurers sold liability insurance policies to McKesson, promising to

defend it against all suits seeking damages because of bodily injury.  But when McKesson, a wholesale

opioid distributor, was faced with thousands of lawsuits alleging opioid-related bodily injuries, Insurers

broke their promise and refused to acknowledge their duty to defend, forcing McKesson alone to bear

steadily mounting defense costs now in the hundreds of millions of dollars.  McKesson asks this Court

to find, based on three Exemplar Suits that are representative of the Opioid Lawsuits as a whole, that

Insurers have a duty to defend these suits and all similarly pled Opioid Lawsuits under the AIG and

ACE Policies.

An insurer's duty to defend is considerably broader than its obligation to indemnify, such that

Insurers must defend McKesson if there is but a "bare possibility" of coverage.  The analysis under

California law is straightforward:  An insurer must defend if a comparison of the allegations in the

underlying complaints with the coverage terms of the Policies suggests even a potential for coverage.

Here, that comparison establishes that allegations in the Exemplar Suits fall squarely within the broad

insurance protection McKesson purchased.  *First*, claimants in the Exemplar Suits allege that

McKesson's alleged failure to maintain effective controls for opioid distribution caused opioid-related

bodily injuries beginning in the late 1990s and spanning over the last two decades.  The suits thus at

least potentially fall within the scope of coverage under the Policies because they (i) seek damages

2

because of bodily injury, (ii) allege injury during Insurers' policy periods, and (iii) allege an "occurrence" as defined in the Policies and construed under California law. *Second*, there is no material question of fact that McKesson has spent more than $5 million defending these suits and thus has satisfied the applicable $5 million per occurrence retention under each of the Policies.

Insurers have nevertheless refused to acknowledge their duty to defend McKesson and have failed to pay any amounts toward McKesson's mounting defense costs, arguing in the main that the Opioid Lawsuits do not seek "damages because of bodily injury" and that the conduct alleged in the underlying Opioid Lawsuits does not constitute an "occurrence." The California Supreme Court, however, has emphatically rejected both of those arguments, has given a broad reading to the "damages because of" policy language, *see AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 842-43 (1990), and has rejected Insurers' interpretation of "occurrence," *see Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 220-21 (2018).

McKesson's entitlement to a defense from its Insurers is consistent with California authority and reflects the consensus of courts nationwide that have found a duty to defend in cases involving the same policy language, the same Opioid Lawsuits, the same types of distributors, and in some cases, the same Insurers. Those courts have rejected the same arguments Insurers repeat here, and this Court should do the same.

## BACKGROUND

### I.     McKesson Was Sued In Multiple Opioid Lawsuits.

McKesson has been named as a defendant in more than 3,200 Opioid Lawsuits, the majority of which have been brought by governmental entities (*e.g.*, cities, counties, states). The underlying plaintiffs allege that McKesson's distribution and sale of prescription opioid products caused opioid-related addiction, abuse, and death, resulting in damages for which the plaintiffs seek to hold McKesson liable. Declaration of James R. Brigman ("Brigman Decl.") ¶ 3.

For purposes of streamlining a ruling on the duty to defend, this Motion focuses on the Track One Lawsuits and the Oklahoma AG Suit as concrete exemplars of the Opioid Lawsuits filed against McKesson. However, thousands of other Opioid Lawsuits are pending against McKesson, virtually all of which involve similar allegations as to McKesson's conduct. The more than 2,800 Opioid Lawsuits

3

that were filed in or removed to federal court were consolidated into multidistrict litigation in the

Northern District of Ohio, captioned *In Re: National Prescription Opiate Litigation*, Case No. 1:17-md-

02804-DAP (the "Opioid MDL").  Over the objection of numerous parties, the Judicial Panel on

Multidistrict Litigation created the Opioid MDL on the basis that the Opioid Lawsuits "involve common

questions of fact" and all involve core allegations that "distributors [including McKesson] failed to

monitor, detect, investigate, refuse and report suspicious orders of prescription opiates."  *In re: Nat'l*

*Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017).  Indeed, AIG's own

correspondence acknowledges that the general run of Opioid Lawsuits contain substantially similar

allegations.  *See* Brigman Decl. Ex. H at 1, 4, 5-6 (AIG's Oct. 19, 2018 letter describing 201 Opioid

Lawsuits filed by individuals, Tribes, hospitals, States, and political subdivisions as "substantially

similar" to initial opioid lawsuit filed by the State of West Virginia against McKesson, and describing

allegations in newly filed opioid lawsuits as "similar" to allegations in previously filed suits).

A.      **The Track One Lawsuits In The MDL – Exemplars # 1 and 2.**

On April 11, 2018, certain lawsuits in the Opioid MDL were identified as "Track One"

bellwether suits.  Brigman Decl. ¶ 9.  Two of these lawsuits, *County of Cuyahoga, Ohio v. Purdue*

*Pharma L.P., et al.*, Case No. 17-OP-45004 (N.D. Ohio), and *County of Summit, Ohio v. Purdue*

*Pharma L.P., et al.*, Case No. 18-OP-45090 (N.D. Ohio) named McKesson as a defendant and pled

counts based on statutory public nuisance, common law absolute public nuisance, and negligence.

*Summit* TAC ¶¶ 975–1072; *Cuyahoga* TAC ¶¶ 1017-15.

The Track One complaints specifically alleged that McKesson "fail[ed] to: (a) control the supply

chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities

they knew or should have known could not be justified and were indicative of serious problems of

overuse of opioids."  Brigman Decl. Ex. G (*Summit County* Third Amended Complaint (hereinafter

"*Summit* TAC")) ¶¶ 14, 518; Ex. E (hereinafter "*Cuyahoga* TAC") ¶¶ 14, 502.  The Track One plaintiffs

alleged that McKesson and other defendants are liable for a "public health epidemic" that has caused

"extraordinary costs" for overdose deaths, medical care, and other public health, safety, and criminal

justice services, for which the plaintiffs sought redress.  *Summit* TAC ¶¶ 1, 18, 20-21; *Cuyahoga* TAC

¶¶ 1, 17, 19-20.  Specifically, the plaintiffs alleged that "[f]rom 1999 through 2016, more than 350,000

people died from an overdose involving any opioids," including "20,000 in 2009, and over 33,000 in 2015." *Summit* TAC ¶¶ 4-5; *see also Cuyahoga* TAC ¶¶ 4-5. Cuyahoga alleged that "[i]n 2009, more than 13,000 infants in the United States were born with [neonatal opioid withdrawal syndrome,]" a condition plaintiffs alleged is painful and potentially life-threatening. *Cuyahoga* TAC ¶ 689. Summit alleged that the City of Akron experienced "2,114 overdoses in 2016 and the first six months of 2017 alone." *Summit* TAC ¶ 719. The Track One complaints alleged that McKesson's allegedly improper conduct began in the late 1990s, *Summit* TAC ¶ 4; *Cuyahoga* TAC ¶ 4, was "ongoing and persistent," and "do[es] not concern a discrete event," *Summit* TAC ¶¶ 992-93; *Cuyahoga* TAC ¶¶ 1033-34. The Track One complaints further alleged that the "necessary and costly responses to the opioid crisis include," among other things, "handling of emergency responses to overdoses," "providing addiction treatment," "treating opioid-addicted newborns in neonatal intensive care units," and "burying the dead." *Summit* TAC ¶ 20; *Cuyahoga* TAC ¶ 19.

The Track One Lawsuits were set for trial on October 21, 2019, and settled at the outset of trial. Brigman Decl. ¶¶ 9, 12. Between July 2018 (when deposition discovery began) and October 21, 2019 (the date the Track One Lawsuits settled), McKesson paid more than $60 million in attorneys' fees and expenses to defend against the lawsuits in the Opioid MDL (exclusive of certain expert, consulting, and other covered costs), substantially all of which fees and expenses were incurred to defend against the Track One Lawsuits. Brigman Decl. ¶ 19.

**B.      The Oklahoma AG Suit – Exemplar # 3.**

McKesson was sued by the State of Oklahoma on May 1, 2020 in the opioid lawsuit styled *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84. The Oklahoma AG Suit, like the Track One Lawsuits, alleges that McKesson "fail[ed] to (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and were indicative of serious oversupply of opioids." Brigman Decl. Ex. I (*Oklahoma* Original Petition (hereinafter "*Oklahoma* Compl.")) ¶ 60. Oklahoma alleges that McKesson's conduct caused a "public health crisis" that has given rise to "enormous costs," *id.* ¶ 48, including the costs of caring for babies born with opioid-related neonatal abstinence syndrome who require "lengthy hospital stays and intense medical treatment," for which Oklahoma seeks redress. *Id.*

5

¶¶ 25, 40, 127, Prayer.  Oklahoma alleges that "the flood of prescription opioids" has "inundated Oklahoma for the past two decades," and that "McKesson's conduct has injured and continues to injure Oklahomans." *Id.* ¶¶ 1, 101.  Specifically, Oklahoma alleges that "[f]rom 1994 to 2006, the number of fatal overdoses increased for … prescription opioids," "[f]rom 2007 to 2012, two-thirds of all children who died from an unintentional poisoning died from a prescription opioid[,]" and "[b]etween 2013 and 2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid overdose." *Id.* ¶¶ 17, 20.

Oklahoma alleges that its "substantial costs and losses for prescription opioid-dependency-related health care" include "opioid use disorder treatment services, ambulatory services, inpatient hospital services and emergency department services, among others." *Id.* ¶ 40.  Like the Track One Complaints, Oklahoma includes causes of action for negligence and public nuisance.  *Id.* ¶¶ 120-33.

## II.  AIG And ACE Sold McKesson General Liability Insurance Policies Covering Damages Because of Bodily Injury.

The ACE and AIG Policies at issue in this motion are substantially identical in relevant part. Each policy promises that the issuing Insurer will "pay ... those sums ... that [McKesson] becomes legally obligated to pay as damages ... because of Bodily Injury ... to which this insurance applies …[.]" Declaration of Gretchen A. Hoff Varner ("Hoff Varner Decl."), Ex. A (AIG Policy) at I.A (p. 3 of 86); *id.*, Ex. B (ACE Policy) at I.A (p. 8 of 99).[6]  The Policies define "Bodily Injury" as "bodily injury, sickness or disease sustained by any person, including death ... resulting from any of these at any time." AIG Policy at VII.C (p. 19 of 86); ACE Policy at VII.C (p. 22 of 99).  The Policies state that "[d]amages because of Bodily Injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the Bodily Injury."  AIG Policy at I.E (p. 4 of 86); ACE Policy at I.D (p. 9 of 99).

The Policies provide that upon payment of the "Retained Limit," each insurer has a "duty to defend" McKesson against "any Suit" that seeks "damages for Bodily Injury" covered by the Policies. AIG Policy at End. 1 (p. 32 of 86); ACE Policy at End. 25 (p. 68 of 99).

---

[6] Because the AIG and ACE Policies contain substantially the same language in all material respects, McKesson will address them collectively, noting substantive distinctions as appropriate.

1    The Policies apply to bodily injury that "occurs during the Policy Period" and "is caused by an

2   Occurrence." AIG Policy at I.B.1 (p. 3 of 86); ACE Policy at I.A.1 (p. 8 of 99).  The AIG Policy has a

3   policy period of July 1, 2008 to July 1, 2009, and the ACE Policy has a policy period of July 1, 2015 to

4   July 1, 2016.  The Policies define "Occurrence" with respect to "Bodily Injury," as "an accident,

5   including continuous or repeated exposure to substantially the same general harmful conditions."  AIG

6   Policy at VII.S.1 (p. 23 of 86); ACE Policy at VII.O.1 (p. 24 of 99).  The AIG Policy provides that "[a]ll

7   such exposure to substantially the same general harmful conditions will be deemed to arise out of one

8   Occurrence."[7]  AIG Policy at VII.S.1 (p. 23 of 86).

9    Under the Policies, Insurers' duty to defend McKesson is triggered upon payment of a $5 million

10  Retained Limit, which can be eroded by defense costs.  The Policies define "Retained Limit" as the

11  applicable "limit(s) listed in the Schedule of Retained Limits."  AIG Policy at End. 1 (p. 34 of 86); ACE

12  Policy at End. 25 (p. 69 of 99).  Both Policies' Schedule of Retained Limits include a limit of $5 million

13  per occurrence retention.  AIG Policy at End. 1 (p. 36 of 86); ACE Policy at End. 25 (p. 70 of 99).  The

14  ACE Policy also includes an aggregate retention of $5 million that applies to "Products Liability"

15  claims.[8]

16   The AIG Policy provides that the "Retained Limit" is "exhausted by payment of Loss to which

17  this policy applies … [.]" AIG Policy at End. 1 (p. 32 of 86).  The AIG Policy defines "Loss" to include

18  "Defense Expenses" as long as "the applicable Retained Limit is specifically designated in the Schedule

19  of Retained Limits as including Defense Expenses."  *Id.*  The AIG Policy's Schedule of Retained Limits

20  confirms that "defense costs are included" within the "retained limit."  *Id.*  Likewise, the ACE Policy

21  provides that McKesson's defense costs are included in—and therefore erode—the "Retained Limit":

22  "The defense and supplemental payment expenses will be included within the 'retained limit' and within

23

24  [7] The ACE Policy likewise provides that "[a]ll such exposure to substantially the same general
    conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or
25  repetition thereof, or the number of claimants."  ACE Policy at VII.O.1 (p. 24 of 99).

26  [8] The ACE Policy defines "Products-completed operations hazard" to include, in relevant part, "all
    'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of
27  'your product …[.]"  ACE Policy at VII.T (p. 25 of 99).  "Your product" is defined in relevant part as
    "[a]ny goods or products, other than real property … distributed … by [] You" and includes "[t]he
28  providing of or failure to provide warnings or instructions."  *Id.* at VII.AA (p. 26 of 99).

7

1  the applicable Limits of Insurance of this policy."  ACE Policy at End. 25 (p. 68 of 99).  Both Policies

2  provide that the "'retained limits' will apply whether or not there is any available …'other insurance,'"

3  AIG Policy at End. 1 (p. 34 of 86); ACE Policy at End. 25 (p. 69 of 99), meaning that the Policies'

4  retained limits are satisfied whether or not other insurance is available to defend or pay for the defense

5  of any suit.

6  **III.    ACE and AIG Denied Coverage.**

7  McKesson gave Insurers timely notice of the Exemplar Suits and other Opioid Lawsuits and

8  demanded that Insurers provide coverage.  *See* Brigman Decl. ¶¶ 4, 6, 8, 15, 22.  McKesson has

9  routinely advised Insurers of the substantial defense costs it has incurred and continues to incur to

10  defend against the Opioid Lawsuits, including by notifying Insurers on August 31, 2018 that it

11  incurred approximately $25 million in defense costs, and notifying Insurers on March 10, 2021 that it

12  had incurred more than $*270 million* in defense costs.  *See id.* ¶ 21.  Notwithstanding these mounting

13  defense costs, which unquestionably exceed the $5 million Retained Limits under the Policies, Insurers

14  refuse to acknowledge their defense obligations for any of the Opioid Lawsuits and have neither

15  defended nor paid any money for McKesson's defense.  *See id*. ¶ 22.

16  **ARGUMENT**

17  **I.    Insurers Have A Duty To Defend Any Suit That Is Potentially Covered Under the Policies.**

18  In California, a "liability insurer owes a broad duty to defend its insured against claims that

19  create a potential for indemnity."[9]  *Montrose Chem. Corp. v. Super. Ct.*, 6 Cal. 4th 287, 295 (1993).[10]

20  "[T]he duty to defend is a continuing one" that arises when the insured first tenders its claim to insurers

21  for defense.  *Haskel, Inc. v. Super. Ct.*, 33 Cal. App. 4th 963, 978 (1995).  "The insured and the insurer

22  bear sharply differing burdens in an action regarding the duty to defend.  To prevail, the insured must

23  prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such*

24  *potential*.  In other words, the insured need only show that the underlying claim *may* fall within policy

25

26  ───────────────

27  [9] The parties agree that California law governs this action.  *See* Dkt. No. 1 ¶ 8 (AIG Complaint
describing coverage defenses "under California law"), *see also* Dkt. No. 54 at 3:5-7 (ACE motion
recognizing that this litigation involves "questions of insurance coverage under California law").

28  [10] Citations and internal quotations are omitted herein unless otherwise noted.

8

1   coverage; the insurer must prove it *cannot*."  *Watts Indus., Inc. v. Zurich Am. Ins. Co.*, 121 Cal. App. 4th

2   1029, 1039 (2004) (emphasis in original); *see also Gen. Accident Ins. Co. v. W. Am. Ins. Co.*, 42 Cal.

3   App. 4th 95, 102 (1996) ("[T]he insured need only show the *bare possibility* of coverage to trigger a

4   defense duty" (emphasis added)).  "Any doubt as to whether the facts establish the existence of the

5   defense duty must be resolved in the insured's favor."  *Mesa Underwriters Specialty Ins. Co. v.*

6   *Blackboard Ins. Specialty Co.*, 400 F. Supp. 3d 928, 936 (N.D. Cal. 2019).  The scope of the duty to

7   defend is likewise broad: "If even a single claim in a multiple-claim complaint is potentially covered,

8   the insurer has a duty to defend the entire action."  *Id.*

9        "The determination whether the insurer owes a duty to defend usually is made in the first

10  instance by comparing the allegations of the complaint with the terms of the policy."  *Riddell, Inc. v.*

11  *Super. Ct.*, 14 Cal. App. 5th 755, 765 (2017).  Once the insured makes a *prima facie* showing that the

12  underlying action falls within the policy's coverage grant, "an insurer may defeat a motion for summary

13  judgment on the duty to defend only by producing *undisputed* extrinsic evidence *conclusively*

14  *eliminating* the potential for coverage under the policy."  *Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*, 302

15  F.3d 1049, 1060 (9th Cir. 2002) (emphasis added).  Because "the duty to defend turns upon the 'facts

16  known by the insurer at the inception of a third party lawsuit,'" *Endurance Am. Specialty Ins. Co. v.*

17  *WFP Sec. Corp.*, 2012 WL 7808097, at *3 (S.D. Cal. Sept. 28, 2012) (quoting *Haskel*, 33 Cal. App. 4th

18  at 974), the only extrinsic facts even *potentially* relevant to McKesson's motion are those that were

19  known by Insurers at the time the underlying lawsuits were tendered to them.  *See, e.g.*, *Vann v.*

20  *Travelers Cos.*, 39 Cal. App. 4th 1610, 1614 (1995) ("In determining whether a duty to defend exists,

21  courts look to all the facts available to the insurer *at the time the insured tenders its claim for a*

22  *defense*.") (emphasis added).

23        Accordingly, California courts regularly resolve the insurers' duty to defend as a matter of law at

24  the outset of the litigation, without significant (or any) discovery, based on the allegations in the

25  complaint and the policy terms.  *See General Accident*, 42 Cal. App. 4th at 99 (granting summary

26  judgment on the duty to defend based on policy language and complaint allegations, refusing to consider

27  insurer's newly discovered evidence on the basis that "[t]he duty to defend is based on information

28  available at the time of tender and cannot be adjudged on hindsight"); *see also D.R. Horton L.A.*

9

*Holding Co. v. Am. Safety Indem. Co.*, 2011 WL 4403974, *3 (S.D. Cal. Sept, 21, 2011) ("California law provides for the insured to have its motion for summary adjudication of the insurer's duty to defend determined shortly after it files an action and even before the insurer engages in discovery."); *Sleeping Well, LLC v. Travelers Indem. Co.*, 2011 WL 996202, at *1 (N.D. Cal. Mar. 21, 2011) (same); *Endurance*, 2012 WL 7808097, at *3 ("Because the duty to defend is assessed at the outset of the litigation against the insured, the duty to defend is not analyzed after discovery.").

## II.   The Exemplar Suits Are at Least *Potentially* Covered By The Policies and Thus Trigger the Duty to Defend.

### A.   The Exemplar Suits Assert Damages "Because Of Bodily Injury."

The Policies provide coverage for damages "because of Bodily Injury," defined as "bodily injury, sickness or disease sustained by a person, including death … resulting from any of these at any time."  AIG Policy at I.A (p. 3 of 86), VII.C (p. 19 of 86); ACE Policy at I.A (p. 8 of 99), VII.C (p. 22 of 99).  That is precisely what the Exemplar Suits allege.  The complaints allege a variety of opioid-related bodily harms caused by opioids, including "a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States," increases in emergency room visits and treatment, "Hepatitis C," and "opioid-addicted newborns."  *Summit* TAC ¶¶ 18, 20, 729, 733-34, 736, 741-44 (describing deaths and injuries, including overdose death of a mother of three, overdose death of an 18-month old, and 2,174 opioid-exposed infants admitted to inpatient settings); *See Cuyahoga* TAC ¶¶ 19, 661, 675, 679, 681, 689, 700 (alleging that "[e]very week in 2016, an average of twelve Cuyahoga County residents lost their lives to a drug overdose"); *Oklahoma* Compl. ¶¶ 16-26, 40-42 ("Since 2000, more than 6,000 Oklahomans have lost their lives from a prescription-opioid overdose."); *see also* Background, Sect. I, *supra*.

Despite these plain allegations of sickness, disease, and death, Insurers argue that the Policies do not even potentially cover the Exemplar Suits because the governmental entities did not *themselves* suffer bodily injury and are merely seeking damages for their own economic harm.  That argument is foreclosed by California Supreme Court precedent, has no basis in the policy language, and has been rejected by numerous courts analyzing the same facts and policy language at issue here.

10

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND, Case No.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

*First*, the plain meaning of "because of" calls only for some causal connection between the alleged damages claimed by plaintiffs and the alleged bodily injury.  *See The Merriam-Webster.com Dictionary* (defining "because of" as "by reason of: on account of"). [11]  California courts give "broad construction" to the phrase "because of," including in cases where governmental entities are the claimants.  *Watts*, 121 Cal. App. 4th at 1040-41 (governmental entity suing to recoup environmental response costs to protect public health sought "damages because of property damage" under similar commercial general liability (CGL) policy language).

This causal connection is easily met here, as the California Supreme Court explained in *AIU*.  *AIU* involved an underlying litigation brought by the United States against the insured to recover the costs of cleaning up a hazardous waste site.  51 Cal. 3d at 813-15.  The AIG policies at issue in *AIU*[12] covered "damages because of … bodily injury or property damage …[.]"  *Id.* at 814.  Just as it does here, AIG argued that the costs and injunctive relief sought by the government were not "damages because of" property damage because the government itself did not incur the damage.  The California Supreme Court squarely rejected that argument, holding that the government's claim for "reimbursement of response costs and the costs of injunctive relief … are incurred 'because of' property damage" and thus were covered.  *Id.* at 842.  The Court reasoned that "the mere fact that the governments may seek reimbursement of response costs or injunctive relief without *themselves* having suffered any tangible harm … does not exclude the recovery of cleanup costs from coverage under the 'damages' provision of CGL policies."  *Id.* (emphasis added).

The Court in *AIU* also rejected AIG's argument that the damages were not covered because they were motivated by concerns unrelated to property damage, reasoning that "[w]hatever [the government's] dominant motive, the event precipitating their legal action is contamination of property.  The costs that result from such action are therefore incurred 'because of' property damage."  *Id.* at 842-

---

[11] "Because of."  The Merriam-Webster.com Dictionary, Merriam-Webster Inc., https://www.merriam-webster.com/dictionary/because%20of (last visited Apr. 25, 2021).  *See Scott v. Cont'l Ins. Co.*, 44 Cal. App. 4th 24, 29 (1996) ("In seeking to ascertain the ordinary sense of words, California courts in insurance cases regularly turn to general dictionaries.").

[12] AIU (like National Union) is an AIG affiliate and plaintiff in the instant coverage action.

1    43.  The Court also rejected the notion that the identity of the person suffering the property damage

2    mattered to the coverage analysis, holding that regardless of whether the damaged property was that of

3    "[the insured], the state or federal government, or third parties," the policies "encompass damages

4    because of property damage in general, *regardless of by whom it is suffered*."  *Id.* at 843 (emphasis

5    added).[13]

6         The Court's analysis in *AIU* applies equally here, and compels a finding that the alleged damages

7    are "because of" bodily injury.[14]  The Exemplar Suits against McKesson were precipitated by bodily

8    injury—*i.e.*, opioid-related injuries allegedly suffered by thousands of individuals across the country.

9    The governmental entities allege that, as a result, they have paid and will pay costs to treat and address

10   these bodily injuries.

11        For instance, the Track One plaintiffs contended that they "allocate[d] substantial portions of

12   [their] budgets to prevent, treat, and assist in recovery from opioid addiction," *Cuyahoga* TAC ¶ 751;

13   *see also Summit* TAC ¶ 21.  Oklahoma likewise contends that "McKesson's conduct caused the State of

14   Oklahoma to incur substantial costs and losses for prescription opioid-dependency-related health care

15   costs including … ambulatory services, inpatient hospital services and emergency department services,

16   among others."  *Oklahoma* Compl. ¶ 40.  The governmental entities are suing McKesson to recover

17   those sums spent on emergency medical care, addiction treatment, and recovery services, among other

18   things.  *See Cuyahoga* TAC ¶¶ 730-51; *Summit* TAC ¶ 20; *Oklahoma* Compl. ¶¶ 40, 48, 132, Prayer.

19   The MDL court itself recognized this causal connection.  *See In re Nat'l Prescription Opiate Litig.*,

20   2018 WL 6628898, at *9 (N.D. Ohio Dec. 19, 2018) ("Perhaps it can be said that … the provision of

21   medical treatment and emergency response services[] arise directly out of the personal injury of the

22   citizens because they are effectively claims to recoup the costs of medical expenses.").  Just as the

23

24   [13] *See also Globe Indem. Co. v. California*, 43 Cal. App. 3d 745, 751-53 (1974) (finding that the phrase
     "because of" required coverage for state's claims against insured, not for state's own property damage,
25   but for state's fire suppression costs undertaken to prevent further property damage); *Am. Mfrs. Mut. Ins.
     Co. v. Den-Mat Cerinate Dental Lab'ys.*, 2001 WL 69176, at *3-*4 (Ohio Ct. App. Jan. 24, 2001)
26   (applying California law).

27   [14] While *AIU* dealt with property damage, not bodily injury, we are aware of no California decision that
     distinguishes between the use of the term "because of" in the bodily injury context as opposed to the
28   property damage context.

California Supreme Court found that the costs sought by the government were "because of" property damage, so too should this Court conclude that the damages sought here are "because of" bodily injury.

*Second*, the language of the Policies undermines Insurers' strained argument that the governmental plaintiffs themselves must suffer bodily injury to trigger defense coverage.  The Policies expressly state that "damages because of 'Bodily Injury' include damages *claimed by any … organization* for care, loss of services or death resulting at any time from the 'Bodily Injury.'"  AIG Policy at I.E (p. 4 of 86) (emphasis added); ACE Policy at I.D (p. 9 of 99) (emphasis added).  Of course, an organization cannot itself sustain a bodily injury; thus, this policy language makes clear that the Policies provide coverage if an organization incurs damages because *persons other than the claimant* sustain such injuries—the precise situation presented here. *See Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774-75 (7th Cir. 2016) (finding duty to defend opioid lawsuit brought by governmental entity claiming damages for costs spent on "medical care, facilities, and services for treatment of citizens" under similar CGL policy, reasoning that a mother's costs to care for her son would be covered and "[l]egally, the result is no different merely because the plaintiff is a state instead of a mother").

Even setting aside the "organization" language, nothing in the language of the AIG and ACE Policies requires that the underlying claimant be seeking to recover costs of *its own* bodily injury.  Had Insurers wanted to limit coverage in that manner, they could have done so by including such language in their Policies, which they plainly know how to do.  Indeed, in a CGL policy AIG issued to another insured for the policy periods 1985-87, AIG included an exclusion for certain suits brought by governmental entities—exactly the type of provision that AIG did *not* bargain for in the policy it sold to McKesson and which it is now trying to retroactively read into its policy. *See Century Indem. Co. v. Marine Grp., LLC*, 131 F. Supp. 3d 1018, 1030 (D. Or. 2015) (AIG's exclusion read, "The Policy does not apply to the liability of the Insured … resulting from any suit … brought … by or on behalf of any Federal, State or local government authority seeking [certain relief]").  Similarly, starting in 2017, ACE insisted that the policies issued to McKesson (and other opioid defendants) going forward must contain an endorsement excluding liabilities arising out of opioids and other controlled substances. *See* Hoff Varner Decl. Ex. C (excerpt from ACE 2017-18 Policy), End. 39 ("Opioids and Narcotics Exclusion").

13

1    The endorsement states that it "CHANGES THE POLICY" and thus instructs McKesson to "PLEASE

2    READ IT CAREFULLY."  *Id.*  A court assessing a similar opioid exclusion in a 2018 ACE policy

3    issued to another opioid distributor-insured found that the new endorsement "'changes' the scope of

4    coverage provided under ACE's standardized insuring agreement" and that the existence of the

5    endorsement in later policies "supports [the distributor-insured's] understanding of the [earlier] 2015

6    Policy's coverage."  *Rite Aid Corp. v. ACE Am. Ins. Co.*, 2020 WL 5640817, at *4 (Del. Super. Ct. Sept.

7    22, 2020).

8            In contrast with the exclusions in the ACE and AIG policies discussed above, neither of the

9    Policies at issue here exclude the types of government entity and opioid suits for which McKesson seeks

10   coverage.  Insurers cannot rewrite the terms of their Policies to exclude such coverage after the fact.  *See*

11   *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763-64 (2001) ("Had [the insurer] wanted to

12   exclude criminal acts from coverage, it could have easily done so ….  Because [the insurer] chose not to

13   have a criminal act exclusion … we cannot read into the policy what [the insurer] has omitted.  To do so

14   would violate the fundamental principle that in interpreting contracts, including insurance contracts,

15   courts are not to insert what has been omitted."); *see also Owens-Ill., Inc. v. United Ins. Co.*, 264 N.J.

16   Super. 460, 493-94 (1993), *rev'd on other grounds and in non-pertinent part by* 138 N.J. 437 (1994)

17   (rejecting argument that policy excluded asbestos coverage, reasoning in part that insurers' insertion of

18   an asbestos exclusion in later policy period "would not have been necessary" had policy at issue

19   "already fulfilled that aim" of excluding asbestos coverage).

20           Here, not only did Insurers fail to *exclude* coverage for damages claimed by organizations for the

21   bodily injury of another—they *expressly provided* for such coverage.  Accordingly, a straightforward

22   comparison of the coverage grant for "damages … because of bodily injury" to the allegations in the

23   Exemplar Suits compels the conclusion that the damages sought by the governmental entities are

24   "because of" the alleged opioid-related bodily injuries.

25           *Third*, California law as set forth in *AIU* is fully consistent with the decisions of courts

26   nationwide who have concluded that the same policy language compels the same insurers to defend

27   other similarly-situated defendants against the same Opioid Lawsuits.  In at least six decisions (five

28   issued in the last year alone), courts have recognized a duty to defend claims by governmental entities

14

seeking to recover the sums spent on emergency medical treatment, morgues, and other services because of bodily injury and deaths sustained by others.  These cases specifically found that the governmental plaintiffs assert damages "because of" or "for" "bodily injury."  In *H.D. Smith*, for instance, the Seventh Circuit held that policy language covering damages "because of 'bodily injury'" required the insurer to defend a lawsuit brought by West Virginia alleging that an opioid distributor (like McKesson) improperly distributed prescription opioids, causing the State to incur costs "addressing and combatting the prescription drug abuse epidemic."  829 F.3d at 774-75.  The court construed the same policy language relevant here and found a duty to defend even though the State sought reimbursement of *its own costs* rather than seeking damages on behalf of its citizens.  *Id.*

In *Rite Aid*, a case involving AIG, ACE, and a distributor-insured, the court granted the distributor-insured's motion for partial summary judgment on the duty to defend over ACE's opposition, and, upon assessing some of the same opioid lawsuits and substantially the same policy language as here, found that "the plaintiffs in the [Opioid MDL] Track One Lawsuits seek damages 'because of bodily injury.'" 2020 WL 5640817, at *12-13, *21 (appeal pending).

In *AmerisourceBergen Drug Corp., et al. v. ACE American Insurance Co., et al.*, another recent case involving ACE and a distributor-insured, the court denied the insurer's motion for summary judgment, reasoning that "the [West Virginia AG] Lawsuit seeks damages for 'bodily injury' because, among other things, the [underlying] Complaint expressly seeks as damages compensation for the costs the State incurred 'related to diagnosis, treatment and cure of addiction' including costs the State incurred 'by having to provide necessary medical care, facilities and services for treatment of citizens of West Virginia who are unable to afford or otherwise obtain such necessary medical care, facilities and services.'"  2020 W.V. Cir. LEXIS 3, at *15 (W. Va. Cir. Ct. Nov. 23, 2020).  *See also Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.*, ---F. Supp. 3d ----, 2020 WL 6565272, at *14 (W.D. Pa. Nov. 9, 2020) (granting insured-distributor's motion for partial summary judgment under similar policy language and the same Track One lawsuits, noting that "[s]everal courts have interpreted materially identical 'because of bodily injury' insurance policy provisions in conjunction with similar or identical lawsuits related to the opioid epidemic brought by governmental entities and found that the similar or identical underlying lawsuits seek damages because of bodily injury.");  *Acuity v. Masters Pharm. Inc.*,

15

2020 WL 3446652, at *6 (Ohio Ct. App. June 24, 2020) (appeal pending) (holding that distributor-insured was entitled to summary judgment on duty to defend and that "the trial court erred in ruling that [insurer] has no duty to defend under the 'because of bodily injury' provision[]"); *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, 2020 WL 6706791, at *10 (Ohio Ct. Com. Pl. Sept. 9, 2020) (appeal pending) (granting distributor-insured's summary judgment motion on duty to defend in case involving the Track One Lawsuits and an insurance policy providing coverage for damages "because of bodily injury").

These decisions align with a substantial body of coverage law outside the opioid context in which courts have concluded that underlying suits brought by governmental entities to recoup the costs of addressing physical harms allege damages "because of bodily injury."  For instance, courts have found a duty to defend suits by governmental entities seeking to recover from gun distributors and others the increased costs associated with police, emergency services, medical care, nuisance abatement, or other damages because of bodily injuries sustained by their citizens.  *See, e.g.*, *Scottsdale Ins. Co. v. Nat'l Shooting Sports Found., Inc.*, 2000 WL 1029091, at *2 & n.3 (5th Cir. 2000) (finding duty to defend where "[t]he complaint alleges that because of the bodily injuries to its citizens, the City of New Orleans had to incur additional costs[,]" and "reject[ing] [the insurer's] contention that the 'because of bodily injury' provision requires that the plaintiff seeking damages be the one who suffered the bodily injury[]"; the insurer "could have explicitly limited coverage to 'claims for damages incurred because of bodily injury to the plaintiff seeking damages,' but it did not"); *SIG Arms, Inc. v. Emps .Ins. of Wausau*, 122 F. Supp. 2d 255, 260-61 & n.4 (D.N.H. 2000); *Beretta U.S.A. Corp. v. Fed. Ins. Co.*, 117 F. Supp. 2d 489, 496 (D. Md. 2000) ("damages because of bodily injury" includes government costs of providing medical care and emergency services to victims of gun violence).

Here, as in all these cases, the allegations in the Exemplar Suits reflect a causal nexus between the bodily injuries and the damages the governmental entities allegedly incurred to address and treat those injuries.

### B.     The Exemplar Suits Allege Injuries Taking Place During the Policy Periods.

In addition to seeking "damages because of bodily injury," the Exemplar Suits trigger Insurers' duty to defend under the Policies because they allege injury during the policy periods of the Policies. The Policies provide that they "appl[y] … only if: [t]he 'Bodily Injury' … occurs during the 'policy

1  period.'"  AIG Policy at I.B.1 (p. 3 of 86); ACE Policy at I.A.1 (p. 8 of 99).  The AIG Policy has a

2  policy period of July 1, 2008 to July 1, 2009, and the ACE Policy has a policy period of July 1, 2015 to

3  July 1, 2016.  The Exemplar Suits allege bodily injuries during these policy periods, as well as alleging

4  more generally bodily injuries that took place beginning in the late 1990s and continuing through to the

5  date of suit.[15]  *See, e.g.*, *Summit* TAC ¶¶ 4-5 ("[f]rom 1999 through 2016, more than 350,000 people

6  died from an overdose involving any opioids," including "20,000 in 2009, and over 33,000 in 2015");

7  *Cuyahoga* TAC ¶¶ 4-5 (same); *Summit* TAC ¶ 719 ("In the City of Akron, the Police Department

8  responded to 2,114 overdoses in 2016 and the first six months of 2017 alone."); *Cuyahoga TAC* ¶ 689

9  ("In 2009, more than 13,000 infants in the United States were born with [neonatal abstinence syndrome],

10  or about one every hour."); *Oklahoma* Compl. ¶ 16 ("[s]ince 2000, more than 6,000 Oklahomans have

11  lost their lives from a prescription-opioid overdose"); *id.* ¶¶ 17, 20 ("[f]rom 1994 to 2006, the number of

12  fatal overdoses increased for … prescription opioids," "[f]rom 2007 to 2012, two-thirds of all children

13  who died from an unintentional poisoning died from a prescription opioid," and "[b]etween 2013 and

14  2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid

15  overdose").

16      Under California law, Insurers are obligated to defend these suits unless they can definitively

17  show that *no portion* of the alleged injuries took place during their respective policy periods.  *Watts*, 121

18  Cal. App. 4th at 1039 ("[T]he insurer must establish that the third party complaint *can by no conceivable*

19  *theory raise a single issue which could bring it within the policy coverage.*") (emphasis in original); *see*

20  *also Montrose*, 6 Cal. 4th at 300 ("[T]he insured need only show that the underlying claim *may* fall

21  within policy coverage; the insurer must prove it *cannot*.") (emphasis in original).  Insurers cannot meet

22  this burden.  The allegations in the Exemplar Suits potentially occurred during the policy periods and at

23  any or all times from the 1990s through the present, thus triggering the duty to defend under the Policies.

24      **C.      The Exemplar Suits Allege An "Occurrence."**

25      Finally, the Exemplar Suits meet the requirement in the Policies' coverage grant that they arise

26  out of an "occurrence."  The Policies cover damages because of bodily injury that is "caused by an

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[15] McKesson believes it has valid statute of limitation defenses in the general run of Opioid Lawsuits;
28  underlying plaintiffs, however, dispute that position.

'Occurrence,'" which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  AIG Policy at I.B.1 (p. 3 of 86), VII.S.1 (p. 23 of 86); ACE Policy at I.A.1 (p. 8 of 99), VII.O.1 (p. 24 of 99).  It is "settled in California" that "the term 'accident'" and "occurrence" in a CGL policy (like those at issue here) means "an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." *Ledesma*, 5 Cal. 5th at 220-21.  The California Supreme Court confirmed in *Ledesma* that "the term 'accident' is more comprehensive than the term 'negligence' and thus includes negligence."  *Id.* "Accordingly," the Court held that "a policy providing a defense and indemnification for bodily injury caused by 'an accident' promise[s] coverage for liability resulting from the insured's negligent acts."  *Id.* at 221-22.  Applying *Ledesma*, a California federal court recently found that negligence and nuisance-based allegations against an insured "alleged a potential for a covered occurrence."  *Mesa*, 400 F. Supp. 3d at 937-39.  The Court reasoned that "[t]he Underlying Action alleged 'actions or omissions' by [the insured] which 'allow[ed] conditions to exist' which resulted in injury.  While [the insured] might ultimately have been liable for intentionally causing some of the injuries alleged, much of the conduct in the Underlying Action is not alleged to have been undertaken with the knowledge that it would cause all the injuries alleged."  *Id.* at 938.

Here, the Exemplar Suits are likewise filled with allegations that McKesson engaged in negligence or otherwise unintentional conduct.  The Exemplar Suits include negligence and nuisance counts, *see Summit* TAC ¶¶ 975-1072; *Cuyahoga* TAC ¶¶ 1017–1115; *Oklahoma* Compl. ¶¶ 120-33, and repeatedly allege that McKesson "should have known" its acts or omissions in distributing opioids would lead to harm, *see Summit* TAC ¶¶ 493, 518, 520, 557, 986, 990, 1012, 1020, 1046, 1054, 1062; *Cuyahoga* TAC ¶¶ 480, 502, 504, 540, 1027, 1031, 1053, 1062, 1089, 1105; *Oklahoma* Compl. ¶¶ 55, 60, 71, 80, 88, 95, 105-07, 109, 126.  The Exemplar Suits also allege that McKesson failed to maintain effective controls for opioid distribution, including by failing to investigate, report, or halt opioid orders, which allegedly led to a diversion of prescription opioids for non-medical purposes by intervening third parties.  *See Summit* TAC ¶¶ 1012, 1045, 1050; *Cuyahoga* TAC ¶¶ 1053, 1089, 1093; *Oklahoma* Compl. ¶¶ 60, 80, 82-83, 98-99.  This type of allegation constitutes an "accident" under California law.  *See Conway v. Northfield Ins. Co.*, 399 F. Supp. 3d 950, 962 (N.D. Cal. 2019) (finding an "accident" where

18

"a finder of fact could plausibly conclude that [the insured's] negligence was the starting point in a series of events leading to the" damage); *La Roca Christian Cmtys. Int'l, Inc. v. Church Mut. Ins. Co.*, 2020 WL 6684917, at *4 (S.D. Cal. Nov. 12, 2020) (same); *Scottsdale Ins. Co. v. Moreno*, 2006 WL 618315, at *2 (E.D. Cal. Mar. 9, 2006).[16]

The Exemplar Suits thus squarely allege "an accident" and "occurrence" under the Policies. Courts in other jurisdictions have likewise concluded that alleged breaches of purported duties of care in distributing prescription opioids during a "drug abuse epidemic" indicated "preventable but unintentional harm"—*i.e.*, "accidental" injuries—triggering a duty to defend.  *See Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*, 602 F. App'x. 115, 118, 120–21 (4th Cir. 2015); *see also Giant Eagle*, 2020 WL 6565272, at *16-17 (finding that the same allegations in the same Track One complaints against a similarly-situated opioid distributor "allege[] an 'accident,' and thus and [sic] 'occurrence,' under the [insurers'] policies, and the arguments to the contrary raised by [insurers] lack merit at this juncture"); *Discount Drug Mart*, 2020 WL 6706791, at *6 ("The MDL claim [in the Track One Lawsuits] for Absolute Public Nuisance repeatedly uses the phrase 'knew or should have known.'  This language is the language of negligence. … Therefore, there is a pending claim for an 'occurrence' even looking only at the Absolute Public Nuisance claim.").

Insurers have relied on *The Travelers Property Casualty Co. of America v. Actavis, Inc.*, 16 Cal. App. 5th 1026 (2017) to support a denial of coverage, but such reliance is wholly misplaced, because the facts and analysis in that case are readily distinguished.  *Actavis* did not address the question here: Whether allegations in opioid litigation against a distributor defendant like McKesson trigger a duty to defend under product liability policies.  Rather, *Actavis* was in the different context of allegations against a pharmaceutical manufacturer that it intentionally engaged in a fraudulent marketing campaign expressly designed to increase opioid sales, under policies that *excluded* products coverage.  *Id*. at 1030. *Actavis* does not apply here for at least three reasons.

---

[16] Mixed allegations of negligent and intentional conduct do not change this result.  *See, e.g.*, *State Farm Fire & Cas. Co. v. Eddy*, 218 Cal. App. 3d 958, 965 (1990) ("although a determination on the merits might show that there was intentional conduct for which [the insurer] need not indemnify [the insured], the complaint alleged both negligent and intentional torts; therefore, [the insurer] must defend").

19

*First*, *Actavis* is inapposite because, as the California Court of Appeal recognized in *Actavis* itself, the allegations against pharmaceutical *distributors*—like McKesson—are "appreciably different" from the fraud-based claims levied against the opioid *manufacturer* defendant in *Actavis*. *Id.* at 1043. Indeed, the two underlying complaints at issue in *Actavis* were premised on fraudulent marketing (*intentional*) allegations and did not contain negligence and other causes of action based on unintentional conduct like those levied against McKesson. *Id.* at 1040-44. *Compare* the underlying complaints at issue in *Actavis*, attached as Exhibits D and E to the Hoff Varner Declaration (alleging that opioid manufacturers "engaged in fraudulent and deceptive acts and practices in their promotion of opioids," Ex. D ¶ 24, and alleging counts of consumer fraud, misrepresentation, false claims, false statements, and conspiracy to defraud, among others), *with* the Exemplar Suits against McKesson (making negligence-based allegations such as "fail[ure] to (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities [it] knew or should have known could not be justified") *Summit* TAC ¶ 518; *Cuyahoga* TAC ¶ 502; *Oklahoma* Compl. ¶ 60. For this reason, the *Actavis* court expressly distinguished its holding from other cases where courts held that opioid lawsuits against *distributor*-insureds *did* allege an "occurrence" under CGL policies. *Actavis,* 16 Cal. App. 5th at 1043.

Moreover, the court in *Actavis* found that *all* the allegations and facts in the underlying suits arose out of the manufacturer's intentional conduct with "no potential for liability based on negligence"—and that, "to the extent the complaints create a potential for liability … based on unintentional conduct, the claims fall within the Products Exclusions." *Id.* at 1043-44. Here, by contrast, the Exemplar Suits undeniably contain one or more allegations of non-intentional tortious conduct, including express negligence counts, and therefore create the potential for liability against McKesson based on non-intentional, negligent conduct. Under California law, "[i]f even a single claim in a multiple-claim complaint is potentially covered, the insurer has a duty to defend the entire action." *Mesa*, 400 F. Supp. 3d. at 936.

*Second*, the manufacturer-insured in *Actavis*, unlike McKesson, purchased liability insurance policies that specifically *excluded* coverage for claims arising out of its products. *Actavis*, 16 Cal. App. 5th at 1044. The court in *Actavis* held that the harm alleged in the opioid lawsuits arose out of the

20

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND, Case No.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

manufacturer's opioid products, and that the underlying claims thus fell within the policies' products exclusions.  *Id*.[17]  In contrast, it is undisputed here that the Policies *include* products coverage.  The products exclusions in the *Actavis* policies, an independent basis for the court's holding, is reason alone why *Actavis* is not on point.

*Third*, the holding and reasoning of *Actavis* on the "occurrence" issue is no longer good law following the California Supreme Court's decision in *Ledesma*.  Both *Actavis* and *Ledesma* went before the California Supreme Court around the same time and raised critical questions about the "occurrence" issue.  The Court deferred a decision in *Actavis* pending the disposition of *Ledesma*.  *Actavis*, 410 P.3d 1221, 1222 (Cal. 2018).  In 2018, the Court confirmed in *Ledesma* that negligent conduct by an insured that leads to unintentional consequences constitutes an "occurrence" under a liability policy.  *Ledesma*, 5 Cal. 5th at 221-22.  This ruling had a substantial impact on the reasoning of *Actavis*—a case where the insurer refused to defend on the theory that there was no occurrence as long as the insured's conduct was deliberate, whether or not the insured intended the resulting harm.  *See Actavis,* 16 Cal. App. 5th at 1039.  Following the Court's ruling in *Ledesma*, the Court dismissed and remanded *Actavis*.  *Actavis,* 427 P.3d 744, 744 (Cal. 2018).  At that point, pursuant to Cal. Rule of Court 8.1115(e)(2), *Actavis* lost its binding and precedential effect "to the extent it is inconsistent with" the California Supreme Court's opinion in the master case, *Ledesma*.  On remand, the court in *Actavis* did not need to change its opinion because the policies' product exclusions served as an independent and sufficient ground for the court's ruling.  But the "occurrence" holding in *Actavis*, while not explicitly overturned by *Ledesma*, cannot be reconciled with it, and is thus no longer good law.

### D.   Because The Exemplar Suits Arise From A Single Occurrence, McKesson Has Satisfied The Policies' $5 Million Retention.

As explained above, the Exemplar Suits fall within the coverage grants under the Policies.  Consequently, Insurers' duty to defend is triggered upon exhaustion of the $5 million per occurrence

---

[17] The Eleventh Circuit in *Anda* likewise found that the insurer had no duty to defend, solely on the basis of the policies' product exclusions.  *See Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*, 658 F. App'x 955, 958 (11th Cir. 2016) ("We decline to reach the question of whether the State's claims in the West Virginia Action are 'for' or 'because of' bodily injury.  We think the better conclusion is that the [insurers'] policies do not afford coverage because of the policies' Products Exclusions[.]").

retention under each Policy,[18] which McKesson long ago satisfied through payment of covered defense costs far in excess of those sums.  Brigman Decl. ¶¶ 18, 19, 21.  There can be no legitimate dispute that McKesson has exhausted the retentions; indeed, as of January 2021 McKesson has paid at least *$230 million* solely in attorneys' fees and expenses (exclusive of certain expert, consulting, and other covered costs), including at least $60 million just as to the Track One Lawsuits.  *Id*. ¶¶ 18-19.  Insurers nevertheless contend that McKesson has not established that the retentions have been satisfied on the theory that the Opioid Lawsuits, if covered, arise out of multiple occurrences and thus McKesson must satisfy multiple $5 million retentions.  *See id.* Ex. L at 8.  That position is inconsistent with the policy language and California law.

The Policies define "occurrence" as "an accident, *including continuous or repeated exposure to substantially the same general harmful conditions*."  AIG Policy at VII.S.1 (p. 23 of 86); ACE Policy at VII.O.1 (p. 24 of 99).  The AIG Policy provides that "[a]ll such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence," and the ACE Policy likewise provides that "[a]ll such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof, or the number of claimants."  AIG Policy at VII.S.1 (p. 23 of 86); ACE Policy at VII.O.1 (p. 24 of 99).  Applied here, the Exemplar Suits involve thousands of plaintiffs and tens of thousands of alleged injuries, all of which — according to plaintiffs—allegedly arise from the same general harmful condition with respect to McKesson:  its alleged failure to maintain effective controls for opioid distribution.

In determining whether this underlying cause—McKesson's alleged failure to maintain effective controls—constitutes one occurrence, "[t]he policies at issue answer this question."  *Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 797 F. Supp. 1541, 1547-48 (C.D. Cal. 1992), *aff'd*, 41 F.3d 429, 433 (9th Cir. 1994).  In *Chemstar*, as here, the policies provided that a single occurrence may include "continuous or repeated exposure" to "substantially the same general conditions."  *Id.* at 1548.  The court found that "[t]his is a broad definition:  Even *repeated* exposure to *multiple* conditions may constitute just one occurrence."  *Id.*  Finding that "[t]his broad definition of occurrence is not difficult to apply in this

---

[18] As set forth in the Background, Section II, *supra*, the Policies' retained limits are exhausted by McKesson's payment of defense costs.

1  instance," the court ruled that 28 different homeowner's claims all arose from one occurrence—the

2  insured-distributor's failure to warn.  *Id.*  The same is true here.  Since the "broad" language of these

3  Policies, like those in *Chemstar*, define such "repeated exposure" as a single occurrence, the Exemplar

4  Suits arise from one occurrence.

5         To the extent this "broad" policy language leaves any room for doubt about the Policies' intent to

6  batch multiple claims as a single occurrence, the Policies here *also* include so-called "batching" or

7  "deemer" clauses that explicitly demonstrate the intent to batch multiple claims as a single occurrence.

8  In addition to the "continuous or repeated exposure" language analyzed in *Chemstar*, the AIG Policy

9  provides that "*All such exposure* to substantially the same general harmful conditions will be deemed to

10  arise out of *one Occurrence*," and the ACE Policy likewise provides that "*All such exposure* to

11  substantially the same general conditions shall be considered as arising out of *the same 'occurrence',*

12  *regardless of the frequency or repetition thereof, or the number of claimants*."  AIG Policy at VII.S.1 (p.

13  23 of 86) (emphasis added); ACE Policy at VII.O.1 (p. 24 of 99) (emphasis added).  This clause by its

14  plain language confirms that "all such exposure" to "the same general conditions"— *i.e.*, McKesson's

15  alleged failure to maintain effective controls—is "considered as arising out of one occurrence,"

16  regardless of the frequency of McKesson's alleged conduct, the number of plaintiffs, or the number of

17  alleged opioid-related injuries.

18         That conclusion is consistent with California law, which applies the so-called "cause test" and

19  holds that if the alleged injuries or harm arise from a common cause, there is one occurrence, regardless

20  of the number of injuries.  *See Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620,

21  633 (2007) ("When all injuries emanate from a common source …, there is only a single occurrence for

22  purposes of policy coverage.  It is irrelevant that there are multiple injuries or injuries of different

23  magnitudes, or that the injuries extend over a period of time.").  California state and federal courts have

24  applied the cause test to find a single occurrence in many cases asserting claims for harm to multiple

25  claimants, or concerning multiple different types of injuries, damage, or loss.  *Id.* at 633–34 (landslide

26  was one occurrence despite causing different types of injuries and property damage); *EOTT Energy*

27  *Corp. v. Storebrand Int'l Ins. Co.*, 45 Cal. 4th 565, 578 (1996) (653 separate thefts of diesel fuel

28  potentially arose from a single occurrence: the systematic and organized scheme to steal the diesel fuel);

*State Farm Fire & Cas. Co. v. Elizabeth N.*, 9 Cal. App. 4th 1232, 1237-38 (1992) (repeated acts of child abuse arose from a single occurrence: the insured's alleged negligent failure to provide adequate care); *Chemstar*, 41 F.3d at 433 (affirming finding of single occurrence and reasoning that "the fact that the 28 incidents of pitting involved different homes, claimants, sources of lime, and times does not preclude a finding that the incidents arose from the same underlying cause"); *Mead Reins. v. Granite State Ins. Co.*, 873 F.2d 1185, 1188 (9th Cir. 1988) (police department's "policy of condoning police brutality constitutes a 'single occurrence'"); *Liberty Surplus Ins. Corp. v. Fed. Ins. Co.*, 2013 WL 12132024, at *5 (C.D. Cal. Dec. 12, 2013) (three lawsuits brought by different tenants all arose from a single occurrence: the landlord's discriminatory conduct, finding that "[s]uch a pattern of conduct constitutes one occurrence for insurance policy purposes").

Courts in other jurisdictions assessing coverage for opioid lawsuits have likewise found a single occurrence. *See Rite Aid*, 2020 WL 5640817, at *16-*18 (finding one occurrence, holding that the "Track One Lawsuits and all Opioid Lawsuits alleging similar claims are potentially covered under the Policy, triggering ACE's duty to defend"); *Giant Eagle*, 2020 WL 6565272, at *17 (granting summary judgment on duty to defend, finding that allegations of opioid distributor-insured's "comprehensive failure to maintain effective controls over its opioid distribution and sales" "potentially support a finding of a single occurrence").

Here, with respect to McKesson's alleged conduct, the core theme of the Exemplar Suits is that McKesson and others "fail[ed] to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified … [.]" *Summit* TAC ¶¶ 9, 518; *Cuyahoga* TAC ¶¶ 9, 502; *Oklahoma* Compl. ¶ 60.  This core theme—McKesson's alleged failure to maintain effective controls for opioid distribution—is the specific wrongful conduct alleged to support the negligence and nuisance claims asserted against McKesson.  *See Summit* TAC ¶¶ 986, 1012, 1046, 1050, 1062; *Cuyahoga* TAC ¶¶ 1027, 1053, 1089, 1093, 1105; *Oklahoma* Compl. ¶¶ 123, 130-31.  Thousands of Opioid Lawsuits were transferred to the MDL because they all share a common alleged cause potentially giving rise to McKesson's liability. *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d at 1378 (common allegations that "distributors [including McKesson] failed to monitor, detect, investigate, refuse and report suspicious

orders of prescription opiates" implicate "common factual questions" regarding conduct). AIG's correspondence to McKesson confirms as much. *See* Brigman Decl. Ex. H (AIG's Oct. 19, 2018 letter asserting that "[t]he West Virginia Local Actions [against McKesson] appear to allege damages arising from the same actions and omissions in the distribution and sale of the same doses of narcotics alleged in the West Virginia State Action" and that "actions filed by governmental plaintiffs outside of West Virginia … generally contain allegations similar to those contained in the West Virginia State Action and West Virginia Local Actions").

Because the Exemplar Suits arise from one occurrence, McKesson's payment of more than $5 million defending against these suits demonstrates the Policies' "per occurrence" retention has been satisfied, triggering Insurers' duty to defend.

## III.   AIG and ACE Have A Duty To Provide A Complete Defense Against The Exemplar Suits.

Each Insurer is obligated to provide McKesson with a complete defense, regardless of whether another insurer may also owe a duty to defend. *Wint v. Fid. & Cas. Co. of N.Y.*, 9 Cal. 3d 257, 263 (1973) (en banc) ("[W]here more than one insurer owes a duty to defend, a defense by one constitutes no excuse of the failure of any other insurer to perform."); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 52 (1996) ("a policyholder may obtain full indemnification and defense from one insurer, leaving the targeted insurer to seek contribution from other insurers covering the same loss"). Accordingly, the Court should enter partial summary judgment that AIG and ACE each are obligated to fully defend McKesson against the Exemplar Suits and all similarly pled Opioid Lawsuits until they can demonstrate that their policies are exhausted.

## CONCLUSION

For all the foregoing reasons, McKesson respectfully requests that this Court grant McKesson's motion for partial summary judgment and issue a declaration that (1) the Exemplar Suits and all Opioid Lawsuits alleging similar claims are potentially covered by the Policies; (2) such suits arise from a single "occurrence," which is McKesson's alleged failure to maintain effective controls for opioid distribution; (3) McKesson's defense cost payments for such suits have satisfied the Policies' "per occurrence" Retained Limits; and thus, (4) Insurers have a present obligation to pay or reimburse defense costs for the Exemplar Suits and all similarly pled Opioid Lawsuits.

DATED: April 30, 2021                    COVINGTON & BURLING LLP


                                         By:     */s/ Gretchen A. Hoff Varner*
                                                 Gretchen A. Hoff Varner

                                         *Attorney for Defendant, Counterclaim Plaintiff,*
                                         *Third-Party Plaintiff, and Third Party Counterclaim*
                                         *Defendant McKesson Corporation*