# EXHIBIT I

FILED
BRYAN COUNTY, OKLAHOMA
DISTRICT COURT CLERK

**IN THE DISTRICT COURT OF BRYAN COUNTY**
**STATE OF OKLAHOMA**

MAY 01 2020

DONNA ALEXANDER
COURT CLERK

BY_____ Deputy

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel., | § | |
| MIKE HUNTER, | § | |
| ATTORNEY GENERAL OF OKLAHOMA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. CJ-2020-84 |
| | § | JURY TRIAL DEMANDED |
| MCKESSON CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**ORIGINAL PETITION**

## I.     **INTRODUCTION**

1.     Oklahoma is in crisis. A crisis that has wreaked more havoc than any oil spill or polluted stream. A crisis that rips families apart, causes people to lose their jobs, their homes and even their lives and destroys communities. A crisis that affects every aspect of life and does not discriminate based on socioeconomic status, race, gender or age. The source of this crisis is the flood of prescription opioids that has inundated Oklahoma for the past two decades. It is a man-made crisis, brought into being by the pharmaceutical industry. The harm it has wrought, and the threat it continues to pose to the health, safety and welfare of the State and its citizens, make it the worst man-made crisis in Oklahoma history.

2.     Opioids are highly-addictive, habit-forming drugs. They always have been. For years, the practice of narcotic conservatism protected our society from the inevitable harms that result when a large supply of opium-based drugs is introduced into a society.

3.     The Defendant in this case is a major drug distributor, McKesson Corporation ("McKesson" or "Defendant"). McKesson is a major prescription drug distributor who acts as a middleman in the pharmaceutical drug supply chain. However, the title of "middle-man" does not fully convey the size and role of Defendant. Collectively, McKesson along with two other drug distributors, supplied 47 billion opioid pills throughout the United States from 2006 to 2014. The collective worth of these companies is in the billions.

4.     Defendant substantially contributed to fueling the opioid crisis by supplying massive and patently unreasonable quantities of opioids to communities throughout the United States, including Oklahoma. Defendant ignored its duties and responsibility to prevent oversupply and diversion of opioids for illicit and non-medical uses. Defendant did so for one reason: greed.

5.      As the opioid crisis grew in Oklahoma, so did Defendant's bank accounts.  Not wanting to kill the golden goose (a highly addictive product), Defendant did not stop or report suspicious orders of opioids that were clearly far too large and/or not for legitimate medical uses. Supplying these orders contributed to a massive oversupply of opioids in Oklahoma.

6.      When it comes to opioids, history has taught one clear and simple lesson for centuries: If you oversupply, people die.  Defendant ignored this and distributed what can only be called a major oversupply of opioids into Oklahoma. As a foreseeable result, Oklahomans have suffered and died, and the State has been harmed.  In short, Defendant, did not act reasonably under the circumstances and acted in reckless disregard for Oklahoma and its citizens.

7.      The State of Oklahoma seeks to recover for the damages caused by Defendant's wrongdoing.

## II.      JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction by grant of authority under Art. VII, § 7 of the Oklahoma Constitution.

9.      Further, this Court has jurisdiction over Defendant because Defendant conducts business in Bryan County and throughout Oklahoma and has deliberately engaged in significant acts and omissions within Oklahoma that have injured the State and its citizens.  Defendant purposefully directed its activities at Oklahoma and its citizens, and the claims arise out of those activities.

10.     Venue is proper in this Court under Okla. Stat. tit. 12, § 137.

## III.   PARTIES

### A.   Plaintiff

11.   The State of Oklahoma is a sovereign state of the United States.  This action is brought for and on behalf of the State of Oklahoma, by and through Mike Hunter, the Attorney General and chief law officer for the State and all its departments and agencies. *See* 74 O.S. § 18 *et seq.*

### B.   Defendant

12.   Defendant McKesson Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in San Francisco, CA. McKesson is authorized to conduct business in Oklahoma. During all relevant times, McKesson by and through itself and/or its DEA registrant subsidiaries and affiliates distributed substantial amounts of prescription opioids to providers and retailers in Oklahoma. McKesson engaged in consensual commercial dealings with Oklahoma and its citizens and purposefully availed itself of the advantages of conducting business with and within Oklahoma. McKesson is registered in the State of Oklahoma as a foreign corporation where it may be served with process of this Court upon its registered agent, Corporation Service Company, at 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159.

## IV.   FACTUAL ALLEGATIONS

### A.   McKesson's Conduct Contributed to the Creation of a Devastating Opioid Crisis in Oklahoma

13.   Oklahoma is suffering from a devastating opioid crisis.

14.   From 1994 to 2006, prescription opioid sales increased four-fold. From 1997 to 2013, there was a nine-fold increase in the rate of morphine milligram equivalents ("MMEs") distributed per Oklahoman for combined sales of oxycodone, hydromorphone, hydrocodone,

3

meperidine, methadone, morphine, fentanyl and codeine.   In 2001, 5 pounds of prescription

fentanyl came into Oklahoma.  From 2010 to 2015, that number soared to over 19 pounds *annually*:



For the last 6 years, more prescription fentanyl has come into Oklahoma per 100,000 people than

in any other state.

15.     Over that same time, the rate of hydrocodone sales in Oklahoma has been nearly

double that of the national average.  According to the CDC, from 2006 through 2017, Oklahoma

ranked between 4th and 8th in the nation in total opioid prescribing rates each year.  In 2017, there

were 479 opioid prescriptions dispensed every hour across the State.   Enough opioids were

prescribed that year for every adult in Oklahoma to have the equivalent of 156 ten-milligram

hydrocodone tablets.   Meanwhile, evidence shows that over 65% of opioids prescribed and

dispensed in Oklahoma go unused and often end up being diverted.

16.     Death soon followed this oversupply of prescription opioids.  Since 2000, more

than 6,000 Oklahomans have lost their lives from a prescription-opioid overdose.

17.     From 1994 to 1996, six of the most common prescription drugs involved in

overdose fatalities were prescription opioids including, methadone, hydrocodone, oxycodone,

4

morphine, propoxyphene, and fentanyl.   From 1994 to 2006, the number of fatal overdoses increased for all of the above-mentioned prescription opioids.

18.     There was a parallel increase in prescription opioid sales for each of these opioids from 1997-2006. The increase in deaths in Oklahoma paralleled the increase in prescribing of opioids and as opioid prescribing decreased starting around 2014, deaths decreased as well.

19.     From 1994 to 2006, unintentional opioid overdose rates increased seven-fold, while prescription opioid sales increased four-fold.

20.     Between 2013 and 2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid overdose.   From 1994 to 1996, there was only 1 unintentional overdose involving oxycodone.   From 2012 to 2014, there were 484.   From 2007 to 2012, two-thirds of all children who died from an unintentional poisoning died from a prescription opioid. Since 2011, more people have died from opioids in Oklahoma than from car accidents.

21.     The trend is clear:



5

22.    As the supply of prescription opioids increased, the number of people dying from unintentional overdose also increased:



*Piercefield et al / Am J Prev Med 2010;39(4):357–363*

**Figure 1.** Unintentional medication-related overdose death rates and total sales of prescription opioids by year, Oklahoma, 1994–2006

**Table 2.** Individual substances involved in unintentional medication overdose deaths: Oklahoma, 1994–2006, *n* (%)

| Substance | Overall[a] | 1994–1996[b] | 2004–2006[c] |
|---|---|---|---|
| Methadone | 653 (30.9) | 21 (16.0) | 377 (36.6) |
| Hydrocodone | 407 (19.3) | 9 (6.9) | 220 (21.4) |
| Alprazolam | 320 (15.2) | 8 (6.1) | 219 (21.3) |
| Oxycodone | 311 (14.7) | 1 (0.8) | 174 (16.9) |
| Morphine | 263 (12.5) | 31 (23.7) | 101 (9.8) |
| Alcohol | 260 (12.3) | 25 (19.1) | 115 (11.2) |
| Propoxyphene | 140 (6.6) | 14 (10.7) | 46 (4.5) |
| Fentanyl | 124 (5.9) | 2 (1.5) | 78 (7.6) |
| Carisoprodol | 97 (4.6) | 8 (6.1) | 40 (3.9) |
| Diazepam | 94 (4.5) | 8 (6.1) | 37 (3.6) |
| Amitriptyline | 87 (4.1) | 8 (6.1) | 33 (3.2) |
| Cocaine | 85 (4.0) | 10 (7.6) | 45 (4.4) |
| Acetaminophen | 76 (3.6) | 8 (6.1) | 33 (3.2) |
| Cyclobenzaprine | 74 (3.5) | 0 | 43 (4.2) |
| Methamphetamine | 72 (3.4) | 4 (3.1) | 43 (4.2) |
| Olanzapine | 37 (1.8) | 0 | 16 (1.6) |
| Codeine | 34 (1.6) | 2 (1.5) | 15 (1.5) |
| Other substance[d] | 609 (28.8) | 58 (44.3) | 229 (22.3) |

6

23.    From 2007-2012, adults aged 35-54 had the highest overdose death rates, particularly women over age 45:





24.     And for every Oklahoman who died from opioids, there are countless others in their

wake suffering from addiction and other devastating effects of these drugs. In 2009, for example,

45 out of every 100,000 Oklahomans had to be admitted for opioid use disorder treatment.

25.     McKesson's conduct is affecting even Oklahoma's youngest and most vulnerable

citizens. Oklahoma hospitals report increasing numbers of newborns testing positive for drugs or

alcohol. In 2014, the number of newborns testing positive for prescription medications doubled

from 2013. Babies born with opioid related neonatal abstinence syndrome ("NAS"), require

lengthy hospital stays and intense medical treatment, dramatically increasing health care costs for

the State.

26.     In 2017, upwards of 500 Oklahoma babies were born suffering from the symptoms

of NAS, including withdrawal symptoms:



27.     That same year, 16.4 percent of Oklahoma high school students reported misusing

prescription opioids within the past year—that is a number roughly equal to one in six.

28.     A 2019 study showed that a child born to a parent who uses opioids for more than

a year is twice as likely to attempt suicide.

8

29.     The accessibility and availability of prescription opioids also is fueling illicit opioid addiction.  According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person to start and continue using heroin.  Between 2000 and 2014, overdose deaths from heroin nationwide quintupled.  "According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers."[1]  As the State passes stricter legislation to combat opioid oversupply, Oklahomans addicted to prescription opioids are turning to illicit opioids such as heroin as a cheaper and more accessible alternative.  From 2007 to 2012, heroin deaths in Oklahoma increased *ten-fold*.  Nationally, opioid overdose deaths and heroin use have increased in lockstep with opioid sales volumes:[2]



Figure 1

Rates of OPR sales, OPR-related unintentional overdose deaths, and OPR addiction treatment admissions, 1999–2010. Abbreviation: OPR, opioid pain reliever. Source: 10.

---

[1] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, THE NEW YORKER (Oct. 30, 2017 issue) https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.
[2] Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, ANNU. REV. PUBLIC HEALTH 2015, 36:559–74, *available at* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957, at Figure 1.

9

30.     Each week, Oklahomans are overdosing, becoming incarcerated, going into the foster care system, and being born dependent on opioids. This is what happens when opioids are oversupplied.

31.     Based on 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed with approximately 877 milligrams of opioids distributed per adult resident.

32.     McKesson's massive and patently unreasonable supply of opioids fueled Oklahoma's opioid crisis causing enormous health care, criminal justice, foster care, NAS, and lost productivity costs, among others.

33.     Confronted with this crisis, Oklahoma state agencies have been forced to allocate significant State resources to addressing the effects of McKesson's unlawful conduct and that of others in the industry.  In 2012, Oklahoma Governor Mary Fallin, confronting "one of the most serious public health and safety threats to [the] state," commissioned a workgroup to develop a state plan with the goal to reduce opioid abuse. The initial plan was released in 2013, with the goal of reducing unintentional opioid overdose deaths in the State by 15% in five years. The plan requires coordination between health care providers, law enforcement, public health, regulatory boards, state legislature and community-based organizations.

34.     A sample of the extensive State effort expended to implement that initial plan includes, among other things:

> a.  employing a statewide media campaign that included PSAs reaching over 1.3 million Oklahomans, establishing a website, TakeasPrescribed.com, digital advertising, social-media outreach and press engagements;
> b.  developing statewide delivery of overdose prevention and community training presentations and continuing medical education programs regarding pain and opioid management;
> c.  updating the opioid prescribing guidelines and distributing and promoting the guidelines to regulatory boards, hospitals and prescribers;
> d.  developing a practice facilitation toolkit to provide onsite training and consultation services in Medicaid contracted practices;

e.   creating 175 drop-boxes across the state for safe disposal and destruction of unused prescription opioids;

f.   educating pharmacies, prescribers and nursing staff regarding proper medication storage and disposal;

g.   establishing prescription drug "take-back" programs;

h.   enhancing the State's prescription monitoring program ("PMP"); and

i.   expanding the availability of Naloxone—an opioid-overdose antidote—for first responders and implementing Statewide over-the-counter access to Naloxone.

35.   The Oklahoma Legislature also passed legislation to form the Oklahoma Commission on Opioid Abuse to study and evaluate the crisis and recommend changes to State policy to address it. The Commission's mission is to "study, evaluate and make recommendations for any changes to state policy, rules or statutes to better combat opioid abuse in Oklahoma."[3] The Opioid Commission conducts large-scale meetings and over the last three years, has heard, and continues to hear, from numerous medical professionals, addiction experts, law enforcement agencies, and Oklahomans whose lives and families have been negatively affected by the oversupply of opioids.   The Opioid Commission issued its first Report on January 23, 2018 outlining its numerous recommendations to address the crisis. Its second report was submitted to the Oklahoma Legislature on December 31, 2019.

36.   McKesson's conduct and the resulting opioid crisis caused, and continues to cause, the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

37.   As Oklahomans aged 35-54 have the highest death rate of any age group for prescription opioid-related overdoses, McKesson's conduct caused Oklahoma businesses, communities, workers and families to incur substantial costs and losses of poor work performance,

---

[3] Initially authorized in 2017 by Senate Concurrent Resolution 12, the Oklahoma Legislature in 2019 enacted 74 O.S.Supp.2019, § 30.1 and 30.2 creating the Oklahoma Commission on Opioid Abuse.

injuries, absenteeism, unemployment and lack of economic productivity.

38.     McKesson's conduct caused Oklahoma private insurers, businesses and consumers to pay millions of dollars for unnecessary or excessive opioid prescriptions.

39.     McKesson's conduct, including their massive and unreasonable oversupply of opioids, caused Oklahoma and its consumers to bear other substantial health care costs related to prescription opioid use disorder.

40.     McKesson's conduct caused the State of Oklahoma to incur substantial costs and losses for prescription opioid-dependency-related health care costs including opioid use disorder treatment services, ambulatory services, inpatient hospital services and emergency department services, among others.

41.     Oklahomans with opioid use disorder are more likely to utilize medical services, such as emergency departments, physician outpatient visits, and inpatient hospital stays.

42.     According to the CDC, every day, over 1,000 people are treated in emergency departments for misusing prescription opioids. In 2014 alone, there were 1.27 million emergency room visits or hospital inpatient stays for opioid-related issues, a 64 percent increase for inpatient care and a 99 percent jump for emergency room treatment compared from 2005.

43.     The opioid crisis also is overwhelming Oklahoma's criminal justice system. The opioid crisis costs Oklahoma millions of dollars a year on criminal justice-related costs. Oklahoma spends 50 percent of its annual criminal justice system budget on substance use disorder-related costs. And a 2016 CDC study reported the prescription opioid epidemic caused $7.7 billion in criminal justice-related costs borne directly by states and local government.

44.     McKesson's conduct also caused Oklahoma to expend substantial resources on education and prevention programs to combat an escalating crisis of non-medical opioid use. The

12

State's public education efforts include a statewide comprehensive media campaign to reduce prescription substance use disorder in Oklahoma, the development and delivery of comprehensive presentations on prescription substance use disorder, and funding to high-needs counties to implement community-based prescription drug misuse prevention, among other programs.

45.     The State of Oklahoma worked to provide information to the public on appropriate disposal and storage of prescription opioids. The State also initiated programs and expended significant resources to educate prescribers and dispensers of prescription opioids including working to develop an online pain management curriculum and creating and distributing opioid prescribing and dispensing guidelines.  The State also worked to educate providers on the PMP which requires dispensers of Schedule II, III, IV and V controlled substances to submit prescription dispensing information to the Oklahoma Bureau of Narcotics and Dangerous Drugs Control ("OBN") within 24 hours of dispensing a scheduled narcotic and allows prescribers to check the prescription history of their patients.  The State also developed and distributed education materials and educated providers and dispensers on proper storage and disposal of prescription opioids.

46.     Oklahoma also spent significant resources and funds to enhance its PMP and coordinate the sharing of data among state agencies.  In 2015, the Oklahoma Legislature passed a bill requiring prescribers to check the PMP the first time they prescribe opiate painkillers and two other classes of drugs and to check the PMP every 180 days thereafter.  The State also is working to establish hospital emergency department discharge databases and implement public health surveillance of NAS.

47.     The State of Oklahoma would not have needed to spend substantial public resources and funding on opioid use, misuse and addiction education, prevention and intervention programs but for McKesson's massive and patently unreasonable supply of opioids in Oklahoma.

13

48.     The State's efforts are significant. But these efforts alone will not undo the decades of harm McKesson has inflicted on the State of Oklahoma and its citizens—harm that will continue for years to come. Oklahoma is left bearing the enormous costs of the resulting public health crisis wreaking havoc in its communities.  More must be done.

**B.     McKesson Substantially Contributed to the Opioid Crisis in Oklahoma**

49.     McKesson admits that the opioid crisis is a significant interference with the public health. McKesson stated in a presentation that the opioid crisis is the "deadliest drug epidemic on record in our nation's history":



50.     In that presentation, McKesson described how on the *average day* more than 650,000 opioid prescriptions are dispensed, 3,900 people initiate non-medical use of prescription opioids, and 78 people die from an opioid-related overdose. McKesson has admitted that prescription opioids are the predominate gateway to heroin use, observing how persons addicted to prescription opioids are forty times more likely to become addicted to heroin, and that 45% of heroin users are also addicted to prescription opioids.

51.     McKesson distributes opioids in the State of Oklahoma.

52.     McKesson has no fewer than 18 separate distribution facilities located throughout the country that hold Oklahoma licenses as wholesale drug distribution facilities. On information

14

and belief, McKesson has used some or all of those facilities to distribute opioids in the State of Oklahoma.

53.     McKesson contributed to fueling this devastating opioid crisis in Oklahoma through its reprehensible conduct in driving up the supply of highly addictive narcotics all for the sake of lining their pockets.

54.     Multiple sources impose duties on McKesson to report suspicious orders and further to not ship those orders unless due diligence disproves those suspicions.

55.     McKesson has a common law duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding Oklahoma generally with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have known were likely being diverted for illicit and/or non-medical uses, McKesson breached that duty. In doing so, McKesson not only failed to prevent foreseeable harm, but *caused* foreseeable and preventable harm to Oklahoma and its citizens.

56.     In addition, McKesson assumed a duty, when it chose to speak publicly about opioids and its efforts to combat diversion, to speak accurately and truthfully.

57.     Moreover, Oklahoma laws and regulations impose duties on McKesson and create a standard of conduct to which McKesson must adhere.

58.     These statutes and regulations were designed to protect society from the harms of drug diversion by creating a legal framework for distributing and dispensing controlled substances and monitoring and controlling them from manufacture through delivery to the patient. These statutes and regulations include Oklahoma's Uniform Controlled Dangerous Substances Act (63 O.S. Chapter 2), and numerous professional regulations related to persons who handle, prescribe,

and dispense controlled substances, (collectively the "Oklahoma CSA"). The Oklahoma CSA provides strict controls and requirements throughout the opioid distribution chain.

59.     McKesson has a duty to be vigilant, in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

60.     McKesson breached this duty by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and were indicative of serious oversupply of opioids.

61.     Despite ignoring its own duties related to the distribution of opioids, McKesson blames manufacturers for fueling the opioid crisis:



### i. McKesson's Duties Under Oklahoma Law

62.     In addition to having common law duties, the Oklahoma CSA requires distributors of controlled substances to take precautions to ensure a safe system for distribution of controlled substances, including opioids, and to prevent diversion of those controlled substances into

16

illegitimate channels. McKesson's violation of these requirements shows that it failed to meet the relevant standard of conduct society expects from it.

63.   The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. McKesson's violation of these laws constitutes negligence.

64.   The Oklahoma CSA provides a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the ultimate user. Every person or entity who manufactures, distributes, or dispenses opioids must obtain a "registration" from the Director of OBN. 63 O.S. § 2-303. Registrants at every level of the prescription opioid supply chain must fulfill their obligations under the Oklahoma CSA. And participation in the opioid supply chain comes along with statutory, regulatory, and common-law duties of care. Otherwise there is great potential for harm to Oklahomans.

65.   Under the Oklahoma CSA and the Oklahoma administrative code, manufacturers and distributors must maintain effective controls against prescription opioid diversion. They must also create and use a system to identify and report suspicious orders of controlled substances to law enforcement. OAC § 475:20-1-5. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. *Id.* To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders that suggest diversion.

66.   To prevent unauthorized users from obtaining opioids, Oklahoma law creates a distribution monitoring system for controlled substances. The Oklahoma CSA requires distributors and dispensers of controlled dangerous substances to keep records and maintain inventories in conformance with applicable laws and regulations. 63 O.S. § 2-307.

17

67.     Likewise, the Oklahoma administrative code requires that distributors notify OBN of any theft or significant loss of any controlled dangerous substances. OAC § 475:20-1-5. Thefts must be reported whether or not the controlled dangerous substances are subsequently recovered and/or the responsible parties are identified, and action is taken against them. *Id.*

68.     McKesson is also required to maintain records, reports, and inventory in accordance with Oklahoma law, including by complying with opioid tracking and monitoring requirements. McKesson also has a duty to maintain effective controls against diversion of controlled substances.

69.     Again, in addition to specific regulatory obligations, distributors are also bound by common law duties to use reasonable care in conducting their business operations. And because their business is distributing highly addictive and deadly prescription drugs, distributors also have an Oklahoma common-law duty of reasonable care to, among other things, monitor for over-supply, prevent illegitimate orders from being filled, and notify appropriate authorities of suspicious behavior.

ii. **McKesson Understood and Acknowledged Its Duties**

70.     The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Distributors handle massive volumes of controlled substances and possess valuable knowledge of their customers and orders. As such, McKesson is uniquely positioned as the first line of defense to prevent oversupply and the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market.

71.     Distributors' obligation to maintain effective controls to prevent diversion and to monitor the supply of controlled substances is critical. Should a distributor deviate from these

checks and balances, the closed system of distribution collapses.  McKesson was well aware it had

an important role to play in the State's system, and also knew or should have known that its failure

to comply with its obligations under state law would have serious consequences for Oklahoma and

its citizens.

72.     Trade organizations to which McKesson belongs have acknowledged that

wholesale distributors have been responsible for reporting suspicious orders for more than 40

years.  The Healthcare Distribution Alliance ("HDA," formerly known as the Healthcare

Distribution Management Association ("HDMA")) has long taken the position that distributors

have responsibilities to "prevent diversion of controlled prescription drugs" not only because they

have statutory and regulatory obligations to do so, but "as responsible members of society."[4]

73.     Guidelines established by the HDA also explain that distributors, "[a]t the center of

a sophisticated supply chain . . . are uniquely situated to perform due diligence in order to help

support the security of the controlled substances they deliver to their customers."[5]  In other words,

under the circumstances, the standard of ordinary and reasonable care requires distributors like

McKesson to perform such due diligence and exercise safeguards.  And McKesson knew it.

### iii.   McKesson Carefully Tracked Distribution and Prescription Data and Knew About Suspicious Orders and Prescribers.

74.     McKesson was required to track distribution data and prescription data.  As such,

though it did not disclose it to the public, McKesson was aware of suspicious orders and the

dramatic increase of opioids entering Oklahoma's borders.  That is, McKesson was acutely aware

---

[4] See Infra at n. 15.

[5] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B at I).

of the oversupply. Alternatively, to the extent McKesson failed to properly monitor and track prescription data and/or distribution data, such failures constitute reckless disregard and gross negligence.

75.     McKesson funneled far more opioids into communities across the United States, including Oklahoma, than could have been expected to serve legitimate medical use. It ignored other red flags of suspicious orders. This information, along with the information known and/or knowable only to McKesson and its business partners, would have alerted it to potentially suspicious orders of opioids.

76.     This information includes the following facts:

    a.  McKesson regularly visited pharmacies and doctors in Oklahoma to promote and provide their products and services, which allows them to observe red flags of oversupply and diversion; and

    b.  McKesson and the other major distributors together account for approximately 90% of all revenues from prescription drug distribution in the United States[6], and each plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area.

77.     In its January 2017 settlement with the DEA, McKesson acknowledged that from 2009-2017 "it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious . . ."[7] This came less than a decade after DEA and DOJ, in 2008, punished McKesson for its flagrant noncompliance with the CSA.

---

[6] *2018 MDM Market Leaders, Top Pharmaceutical Distributors*, Fein, Adam J., Ph.D. https://www.mdm.com/2017-top-pharmaceuticals-distributors.
[7] 2017 McKesson Settlement Agreement and Release with Department of Justice and Drug Enforcement Administration at 5, available at https://www.justice.gov/opa/press-release/file/928471/download.

78.     Upon information and belief, the system McKesson had in place prior to 2009 did not flag true suspicious orders either.

79.     At one point, McKesson stated that "McKesson does not use the word 'suspicious', but rather questionable or (sometimes) noteworthy." McKesson had earlier instructed its employees not to use the term "suspicious orders" since that could trigger legal obligations:

> With the recent fines and ongoing attention being paid to this issue, it is quite possible that wholesalers will be under scrutiny for quite some time.  All communications regarding controlled substances will be subject to subpoena and discovery. . . . Refrain from using the word 'suspicious' in communications.  Once we deem an order and/or customer suspicious, McKesson is required to act. This mean all controlled substances sales to that customer must cease and the DEA must be notified.

80.     The conclusion that McKesson was on notice of the problems of abuse and diversion follows inescapably from the fact that it flooded communities with opioids in quantities that it knew or should have known exceeded any legitimate market for opioids.

81.     At all relevant times, McKesson was in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time. It obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

82.     As discussed above, McKesson failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into communities across America. Despite the notice described above, and in disregard of its duties, McKesson continued to pump massive quantities of opioids into the Oklahoma supply chain despite its obligations to control the supply, prevent diversion, report and take steps to halt suspicious orders.

21

83.     Despite knowing the risks of oversupply and diversion and its broad assurances to regulators, states, and the public, McKesson has recklessly or negligently allowed oversupply and diversion in Oklahoma. Its misconduct has resulted in numerous civil fines and other penalties recovered by government agencies.

### iv.  **McKesson Violated its Duties in Oklahoma**

84.     Despite being repeatedly penalized by law enforcement authorities, McKesson has not changed its conduct. McKesson has engaged in a consistent, nationwide pattern and practice of illegally distributing opioids. That pattern and practice has also affected the State of Oklahoma and its citizens.

85.     In fact, McKesson has supplied and continue to supply quantities of prescription opioids in and around Oklahoma with the actual or constructive knowledge that many of the opioids were ultimately consumed by Oklahoma citizens for illicit and/or non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but McKesson negligently or recklessly failed to do so.

86.     From 2006-2014, there were over 1.8 billion prescription pain pills distributed in the State of Oklahoma. McKesson was responsible for distributing over 442 million, or 23%, of those pills; the most by any distributor.[8]

87.     During this same time period, the rate of Oklahomans dying from unintentional prescription drug-related overdoses was at an all-time high and increasing each year. *See, e.g.,* *supra* ¶¶18-19.

---

[8]  *Drilling  into  the  DEA's  Pain  Pill  Database,*  The  Washington  Post, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (last accessed 2/18/2020).

88.     McKesson knew, or should have known, that the amount of opioids that it delivered into Oklahoma was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that McKesson knew it was not the only opioid distributor servicing those communities).

89.     McKesson negligently or recklessly failed to control its supply lines to prevent diversion. A reasonably-prudent distributor of controlled substances would have anticipated the danger of opioid oversupply and diversion and protected against it by, for example (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts much greater than appropriate, given the size of the local populations; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Oklahoma; (e) informing pharmacies and retailers about opioid diversion; and (f) in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies.

90.     Under Oklahoma law, distributors have a duty to detect, investigate, refuse to fill, and report suspicious orders of opioids. To that end, the OBN requires that drug distributors "shall keep records and maintain inventories in conformance with the record-keeping and inventory requirements of federal law and with the additional rules the Director issues." 63 O.S. § 2-307.

91.     As mentioned above, Oklahoma regulations further mandate that suspicious orders, defined as unusual in size or frequency or deviation from buying patterns, be reported to OBN. OAC § 475:20-1-5. "The registrant shall inform the OBN of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially

23

from a normal pattern, and orders of unusual frequency." *Id.* Any of the red flags identified by law trigger a duty to report, but this list is not exhaustive. Other factors—such as whether the order is skewed toward high dose pills, or orders that are skewed towards drugs valued for abuse, rather than other high-volume drugs, such as cholesterol medicines—also should alert distributors to potential problems.

92.     Upon information and belief, McKesson worked with pharmacies to help them avoid their duties and to evade detection. For example, McKesson provided early warnings to its chain pharmacy customers that they were approaching suspicious order thresholds so that the chains could avoid triggering warnings and adjust ordering patterns by, for example, delaying orders or obtaining a threshold increase.

93.     McKesson wanted to avoid having customers trigger threshold warnings because it was bad for business. The DEA had instructed that, if an order "triggered the threshold," then "the entire order" should be "held and not released, even if part of it came in under the threshold."

94.     Distributors also have a duty to know their customers and the communities they serve. To the extent that, through this process of customer due diligence, a distributor observes suspicious circumstances—such as cash transactions or young and seemingly healthy patients filling prescriptions for opioids at a pharmacy they supply—those observations can also trigger reasonable suspicion. A single order can warrant scrutiny, or it may be a pattern of orders, or an order that is unusual given the customer's history or its comparison to other customers in the area.

95.     Given this, and the additional red flags described below, McKesson was on notice and should have known that oversupply and diversion of opioids was likely occurring in Oklahoma communities, and that it should have investigated, ceased filling orders for opioids, and/or reported

potential diversion to law enforcement. Anything other than the "do nothing and keep making money" approach it chose.

96.     Publicly available ARCOS data suggests distribution of opioids in Oklahoma communities exceeded reasonable supply for appropriate medical use and that opioids were likely diverted in these areas. For example, from 2006 to 2014[9], there were:

   a.  409,170,588 prescription pain pills, enough for 63 pills per person per year, supplied to Oklahoma County, Oklahoma. 90,776,840 of those pills were distributed by McKesson.

   b.  366,939,684 prescription pain pills, enough for 68 pills per person per year, supplied to Tulsa County, Oklahoma. 67,094,190 of those pills were distributed by McKesson.

   c.  24,192,780 prescription pain pills, enough for 64 pills per person per year, supplied to Bryan County, Oklahoma. 9,765,270 of those pills were distributed by McKesson.

   d.  94,124,901 prescription pain pills, enough for 42 pills per person per year, supplied to Cleveland County, Oklahoma. 19,345,790 of those pills were distributed by McKesson.

   e.  39,045,820 prescription pain pills, enough for 61 pills per person per year, supplied to Muskogee County, Oklahoma. 7,713,950 of the pills were distributed by McKesson.

---

[9] *Drilling into the DEA's Pain Pill Database*, The Washington Post, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (last accessed 2/18/2020).

      f.   34,580,680 prescription pain pills, enough for 86 pills per person per year, supplied to Stephens County, Oklahoma. 17,924,210 were distributed by McKesson; and

      g.   5,459,870 prescription pain pills, enough for 94 pills per person per year, supplied to Jefferson County, Oklahoma. 1,987,550 of the pills were distributed by McKesson.

During the same time, across the United States the equivalent of 28 pills per person were distributed in 2006 and 37 pills per person in 2014.

97.     The foregoing figures support the inference that there was a greater distribution of opioids than could be justified by legitimate medical need. The volume of opioids distributed in Oklahoma communities, including, but not limited to those described above, was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

98.     Further, prescribers and pharmacists in Oklahoma have been convicted of crimes involving drug diversion. Upon information and belief, these prescribers, and the pharmacies at which their patients filled prescriptions for opioids, yielded orders of unusual size, frequency, or deviation, or raised other warning signs that should have alerted McKesson not only to an overall oversupply in the State, but specific instances of diversion.

99.     In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years. Oklahoma, in particular, has faced a spike in fatal drug overdoses, the majority of which are attributable to the illicit opioids that patients often began abusing after becoming addicted to prescription opioids. The CDC estimates that for every opioid-related death, there are 733 non-medical users. McKesson thus had every reason to believe that illegal diversion was occurring in the State of Oklahoma.

100.   Based upon all of these red flags, McKesson had information about suspicious orders that it did not report, and also failed to exercise due diligence before filling orders from which drugs were diverted into illicit uses in communities across Oklahoma.

101.   McKesson disregarded its reporting and due diligence obligations under Oklahoma law. It consistently failed to report or suspend illicit orders, deepening the crisis of opioid abuse, addiction, and death in Oklahoma.

### v.   McKesson's Conduct Has Injured and Continues to Injure Oklahomans

102.   As discussed above, the impact of the opioid crisis on Oklahoma has been catastrophic.

103.   It was reasonably foreseeable to McKesson that its violations of its duties under Oklahoma laws and regulations would allow name-brand and generic prescription opioids to be oversupplied and diverted.

104.   It was reasonably foreseeable to McKesson that its failure to prevent oversupply and diversion would cause injuries, including addiction, overdoses, and death. It was also reasonably foreseeable that many of these injuries would be suffered by the State of Oklahoma and its citizens, and that the costs of these injuries would be shouldered by the State of Oklahoma.

105.   McKesson knew or should have known that the opioids it was oversupplying, and which were being diverted from its supply chains, would contribute to the state's opioid crisis, and would create access to opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

106.   McKesson knew or should have known that a substantial amount of the opioids dispensed in and around the State of Oklahoma were being dispensed based on invalid or suspicious prescriptions. Yet, McKesson continued to oversupply.  It was foreseeable that filling

27

suspicious orders for opioids and continuing to oversupply them would harm the State of Oklahoma and its citizens.

107.   McKesson knew of widespread prescription opioid use disorder in and around the State of Oklahoma, but nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in places—and in such quantities, and with such frequency—that it knew or should have known these opioids were being over-prescribed and consumed for non-medical purposes.

108.   The use of opioids by Oklahomans who were addicted or who did not have a medically appropriate purpose for using opioids could not have occurred without the actions of McKesson. Due to the oversupply, opioids were and still are far too available in Oklahoma, leading to deadly outcomes, including consumption by unknowing children and teens.  If McKesson had monitored supply and guarded against diversion as required by Oklahoma law, the State and its citizens would have avoided significant injury.

109.   McKesson profited substantially from the illegal oversupply and diversion of prescription opioids in the State of Oklahoma. McKesson knew or should have known that the State would be unjustly forced to bear the costs of these injuries.

110.   McKesson's distribution of excessive amounts of prescription opioids in the State of Oklahoma showed a reckless disregard for the safety of the State and its citizens. McKesson's conduct poses a continuing threat to the health, safety, and welfare of the State and its citizens.

111.   At all relevant times, McKesson engaged in these activities, and continued to do so, knowing that the State, in its role of providing protection and care for its citizens, would incur additional costs to its healthcare, criminal justice, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

28

112.     It was reasonably foreseeable to McKesson that the State of Oklahoma would be forced to bear substantial expenses as a result of its acts.

113.     The conduct of McKesson, its agents, and its employees was, at the very least, negligent.

## C.     McKesson Concealed the Truth About Its Conduct

114.     When a distributor does not report or stop excessive and suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who misuse them or who sell them to others to misuse. This, in turn, fuels and expands the illegal market and results in opioid-related addiction and overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

115.     After being caught for failing to comply with particular obligations at particular facilities, McKesson made broad promises to change its ways and insisted that it sought to be a good corporate citizen. More generally, McKesson publicly portrayed itself as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.

116.     McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent oversupply and diversion. McKesson has also publicly stated that it has a "best-in-class controlled

substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[10]

117.    Moreover, in furtherance of its effort to affirmatively conceal its conduct and avoid detection, McKesson, through its associations, HDMA and the National Association of Chain Drug Stores ("NACDS"), filed an amicus brief in *Masters Pharmaceuticals*, which made the following statements:[11]

a.  "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

b.  "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

118.    Through the above statements made on its behalf by its trade associations, and other similar statements assuring its continued compliance with its legal obligations, McKesson not only acknowledged that it understood its obligations under the law, but it further affirmed that its conduct was in compliance with those obligations.

119.    Public statements by McKesson and its associates created the false and misleading impression to regulators, prescribers, and the public that McKesson rigorously carried out its legal duties, including its duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that McKesson also worked

---

[10] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, http://wapo.st/2uR2FDy.

[11] Brief for HDMA and NACDS, *Masters Pharms., Inc. v. U.S. Drug Enf't Admin.*, Case No 15-1335, 2016 WL 1321983, (D.C. Cir. April 4, 2016) at *3-4, *25, a lawsuit wherein Masters Pharmaceuticals challenged the DEA's decision to revoke the company's certificate of registration, without which it could not sell controlled substances.

voluntarily to prevent diversion as a matter of corporate responsibility to the communities its business practices would necessarily impact.

## V.    CAUSES OF ACTION

### A.    Negligence

120.    The allegations set forth above are incorporated by reference herein.

121.    The State brings these claims against McKesson for its failure to exercise ordinary and reasonable care.

122.    At all times relevant hereto, McKesson had a duty to act reasonably under the circumstances and owed such duties to the State. McKesson had a duty to act reasonably in, among other things: monitoring and/or reporting suspicious orders of opioids; guarding against diversion of opioids; training its employees related to the distribution of opioids; supplying the market of opioids; and providing effective controls and procedures for guarding against theft and diversion.

123.    McKesson negligently and carelessly fell below the standard of care and failed to act reasonably. McKesson's negligent acts include, among other things: failing to monitor and/or report suspicious orders of opioids; failing to guard against diversion of opioids; failing to reasonably and properly train its employees related to the distribution of opioids; supplying the market of opioids in an unreasonable and unsafe way; and failing to provide effective controls and procedures for guarding against theft and diversion.

124.    Despite its knowledge of the dangers of opioids and the substantial likelihood that sales in such volumes were for abuse, non-medical use, and/or being diverted, McKesson continued to supply the opioid market and sell opioids into the supply chain.

125.   McKesson breached its duty to exercise the reasonable care and prudence appropriate when selling and distributing opioids, which are highly dangerous and addictive narcotics.

126.   McKesson knew or should have known that Oklahoma would foreseeably suffer injury as a result of its failure to exercise ordinary care as described above.

127.   As a direct and proximate result of the negligence of McKesson, the State suffers and continues to suffer from the injuries and damages set forth in this Petition. The direct, proximate and foreseeable harm McKesson caused to the State is demonstrated in the below non-exhaustive statistics:

- Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009;

- Since 2000, more than 6,000 Oklahomans have lost their lives from a prescription-opioid overdose;

- From 1994 to 2006, unintentional opioid overdose rates increased seven-fold, while prescription opioid sales increased four-fold;

- In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of those deaths;

- Between 2013 and 2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid overdose;

- In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate;

- In 2016, Oklahoma ranked number one in the nation in milligrams of opioids distributed with approximately 877 milligrams of opioids distributed per adult

32

resident;

- For the last 6 years, more prescription fentanyl has come into Oklahoma per 100,000 people than in any other state. From 2010 to 2015, over 19 pounds of prescription fentanyl came into Oklahoma *annually*;

- Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers;

- From 2006 through 2017, Oklahoma ranked between 4th and 8th in the nation in total opioid prescribing rates each year;

- In 2017, there were 479 opioid prescriptions dispensed every hour across the State—enough for every adult in Oklahoma to have the equivalent of 156 ten-milligram hydrocodone tablets;

- Prescription opioid addiction often leads to illicit opioid use and addiction;

- According to the CDC, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

- From 2007 to 2012, the number of heroin deaths in Oklahoma increased tenfold;

- In 2009, forty-five out of every 100,000 Oklahomans had to be admitted for opioid use disorder treatment;

- Oklahoma hospitals are reporting an increasing number of newborns testing positive for prescription medications. For example, in 2017, upwards of 500 Oklahoma babies were born suffering from the symptoms of opioid related NAS, including withdrawal symptoms;

- In 2017, roughly one in six—or 16.4 percent—of Oklahoma high school students reported misusing prescription opioids within the past year; and

- McKesson's massive and unreasonable distribution of opioids and the resulting opioid abuse and addiction crisis caused the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

128.    McKesson's conduct was willful and/or in reckless disregard to the rights of the State. As such, the State seeks an award of punitive damages.

**B.     Public Nuisance, 50 OKLA. STAT. § 2**

129.    The allegations set forth above are incorporated by reference herein.

130.    McKesson's massive and unreasonable distribution of opioids, as set forth above, has contributed to the creation of the opioid crisis in Oklahoma that constitutes a public nuisance. McKesson contributed to the creation of a condition that affects entire communities, neighborhoods, and considerable numbers of persons.

131.    McKesson's massive and unreasonable distributions of opioids, as set forth above, constitute unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others. The annoyance, injury and danger to the comfort, repose, health, and safety of Oklahoma citizens includes, but is not limited to the statistics listed above. *See, e.g., supra* ¶127.

132.    The State seeks to recover damages for the public nuisance McKesson contributed to creating.

133.    McKesson's conduct was willful and/or in reckless disregard to the rights of the State. As such, the State seeks an award of punitive damages.

34

## C.    Unjust Enrichment

134.    Due to McKesson's conduct as described herein, McKesson was unjustly enriched at the expense of the State.

135.    For years, McKesson has distributed its opioids while knowing full well that they were being abused and sold for non-medical use and, in doing so, have siphoned millions of dollars from the State's coffers into its corporate bank accounts.  While many Oklahomans' lives are ravaged by opioid use disorder and addiction, McKesson has lined its pockets with State monies paid for opioids and other related medical services and products that, but for McKesson's above-described conduct, would never have been sold.

136.    The State is entitled to recover McKesson's ill-gotten gains.

137.    The Court should impose a constructive trust under the doctrine of unjust enrichment.

## VI.    DISAVOWAL OF FEDERAL CLAIMS

138.    For the sake of clarity, and in the event McKesson seeks to remove this case and/or claims that any federal claim or question is raised by this Petition or any other paper, the State expressly disavows any and all federal claims or questions related to opioids distributed by McKesson as being a part of this lawsuit.  Specifically, the State hereby expressly disavows any cause of action or claim for recovery related to opioids distributed by McKesson that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442, subdivision (a)(1) (federal officer). The State also disavows any cause of action or claim for recovery related to opioids McKesson distributed to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract.

35

## I.    **PRAYER**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Award the State of Oklahoma compensatory damages caused by McKesson's actions;

B.    Award the State of Oklahoma restitution of its costs caused by McKesson's actions;

C.    Disgorge McKesson of all amounts it has unjustly obtained;

D.    Reasonable expenses and investigation fees, including attorneys' fees;

E.    Punitive damages;

F.    All other relief to which the State is entitled.

Dated:  May 1, 2020

Mike Hunter, OBA No. 4503
ATTORNEY GENERAL FOR
  THE STATE OF OKLAHOMA
Abby Dillsaver, OBA No. 20675
GENERAL COUNSEL TO
  THE ATTORNEY GENERAL
Ethan A. Shaner, OBA No. 30916
DEPUTY GENERAL COUNSEL
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone:    (405) 521-3921
Facsimile:    (405) 521-6246
Emails:    abby.dillsaver@oag.ok.gov
       ethan.shaner@oag.ok.gov

Michael Burrage, OBA No. 1350
Reggie Whitten, OBA No. 9576
Randa Reeves, OBA No. 30695
WHITTEN BURRAGE
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Emails:    mburrage@whittenburragelaw.com
       rwhitten@whittenburragelaw.com
       rreeves@whittenburragelaw.com

36

Bradley E. Beckworth, OBA No. 19982
Jeffrey J. Angelovich, OBA No. 19981
Lisa P. Baldwin, OBA No. 32947
Trey Duck, OBA No. 33347
Drew Pate, *pro hac vice*
Nathan B. Hall, OBA No. 32790
Ross Leonoudakis, *pro hac vice*
Robert Winn Cutler, *pro hac vice*
James E. Warner III, OBA No. 19593
NIX, PATTERSON, LLP
512 N. Broadway Avenue, Suite 200
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Emails:        bbeckworth@nixlaw.com
               jangelovich@nixlaw.com
               lbaldwin@nixlaw.com
               tduck@nixlaw.com
               dpate@nixlaw.com
               nhall@nixlaw.com
               rossl@nixlaw.com
               winncutler@nixlaw.com
               jwarner@nixlaw.com

**ATTORNEYS FOR PLAINTIFF**