GRETCHEN A. HOFF VARNER (Bar No. 284980)
SYLVIA HUANG (Bar No. 313358)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
ghoffvarner@cov.com; syhuang@cov.com

ANNA ENGH (*pro hac vice*)
SHANNON TUCKER (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
aengh@cov.com; srtucker@cov.com

DAVID LUTTINGER (*pro hac vice*)
CLÉA P.M. LIQUARD (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
dluttinger@cov.com; cliquard@cov.com

*Attorneys for Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff, and Third Party Counterclaim Defendant McKesson Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO

| | |
|---|---|
| AIU INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>    Plaintiffs and Counterclaim Defendants,<br><br>    v. | Civil Case Nos.: 3:20-cv-07469-JSC<br>                          3:20-cv-09356-JSC<br><br>**McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS** |

McKESSON CORPORATION f/k/a
MCKESSON HBOC, INC.,

      Defendant, Counterclaim Plaintiff, Third
      Party Plaintiff, and Third Party
      Counterclaim Defendant,

           v.

ACE PROPERTY AND CASUALTY
INSURANCE COMPANY,

      Third Party Defendant and Third Party
      Counterclaim Plaintiff.

Date:  August 12, 2021
Time:  9:00 a.m.
Courtroom:  Courtroom E, 15th Fl.
Judge:  Honorable Jacqueline Scott Corley
Action Filed:  October 23, 2020

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND ........................................................................................... 3

    A.     The Underlying Opioid Lawsuits........................................................ 3

    B.     This Insurance Coverage Litigation................................................... 5

    C.     McKesson's Motion for Partial Summary Judgment and Insurers' Discovery Requests ............................................................................. 6

III.   ARGUMENT.................................................................................................. 8

    A.     Legal Standard .................................................................................... 8

    B.     A Stay of Overlapping Discovery and Proceedings is "Mandatory" Under California Law. ......................................................................... 9

        1.     Insurers' defenses and discovery overlap with issues being litigated in underlying Opioid Lawsuits.......................................... 10

        2.     McKesson will be prejudiced by overlapping proceedings and discovery. ................................................................................... 13

    C.     Insurers' Arguments Are Contrary to California Law. ......................... 16

        1.     The discovery Insurers demand is not permissible "extrinsic evidence."  17

        2.     The fact that Insurers are in possession of some material they request in discovery does not make it permissible "extrinsic evidence."................. 19

        3.     Settlement of the Track One and West Virginia AG Lawsuits does not eliminate prejudice to McKesson........................................................ 22

    D.     The *Landis* Factors Also Weigh In Favor of a Stay.............................. 24

IV.    CONCLUSION................................................................................................. 25

i

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AIG Prop. & Cas. Co. v. Cosby*,
   2016 WL 6662733 (C.D. Cal. July 15, 2016) ................................................................13, 14

*Allied Property and Cas. Ins. Co. v. Roberts*,
   2011 WL 2495691 (E.D. Cal. June 21, 2011) ................................................................12, 16

*Allstate Ins. Co. v. Harris*,
   445 F. Supp. 847 (N.D. Cal. 1978) ....................................................................................9

*Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*,
   302 F.3d 1049 (9th Cir. 2002) ...........................................................................................17

*Atain Specialty Ins. Co. v. 20 Parkridge, LLC*,
   2015 WL 2226356 (N.D. Cal. May 11, 2015) ................................................................8, 14

*Atain Specialty Ins. Co. v. Zenisco, Inc.*,
   2020 WL 3640011 (N.D. Cal. July 6, 2020) ......................................................................24

*CMAX, Inc. v. Hall*,
   300 F.2d 265 (9th Cir. 1962) ..........................................................................................9, 24

*Colony Ins. Co. v. Vantaggio Farming Corp.*,
   2017 WL 3478998 (E.D. Cal. Aug. 14, 2017) ..........................................................8, 12, 13

*Gonzalez v. Fire Insurance Exchange*,
   234 Cal. App. 4th 1220 (2015) ..........................................................................................19

*Genesis Ins. Co. v. Univ. of S. Cal.*,
   2012 WL 13009003 (C.D. Cal. Mar. 28, 2012) ................................................................13

*Haskel, Inc. v. Superior Court*,
   33 Cal. App. 4th 963 (1995) ........................................................................................ *passim*

*Ironshore Specialty Ins. Co. v. 23andMe, Inc.*,
   2015 WL 2265900 (N.D. Cal. May 14, 2015) ..........................................................8, 10, 13

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936).........................................................................................................9, 24

*Montrose Chem. Corp. of Cal. v. Superior Court*,
   25 Cal. App. 4th 902 (1994) ........................................................................................ *passim*

*Montrose Chem. Corp. of Cal. v. Superior Court,*
    6 Cal. 4th 287 (1993) ................................................................ *passim*

*Ms Amlin Corp. Member, Ltd. v. Bottini,*
    2020 WL 5966612 (S.D. Cal. Oct. 8, 2020) ......................................24, 25

*In re: Nat'l Prescription Opiate Litig.,*
    290 F. Supp. 3d 1375 (J.P.M.L. 2017)..................................................3

*Phila. Indem. Ins. Co. v. Skating Edge, Inc.,*
    2018 WL 5099705 (C.D. Cal. May 24, 2018) ...................8, 12, 16, 25

*Riddell, Inc. v. Superior Court,*
    14 Cal. App. 5th 755 (2017) .................................................... *passim*

*RLI Ins. Co. v. ACE Am. Ins. Co.,*
    2020 WL 1322955 (N.D. Cal. Mar. 20, 2020)...................................25

*Sleeping Well, LLC v. Travelers Indem. Co.,*
    2011 WL 996202 (N.D. Cal. Mar. 21, 2011)..............................8, 17, 18

*State Farm Fire & Cas. Co. v. BTB, Inc.,*
    2011 WL 284974 (E.D. Cal. 2011)....................................................14

*Stevens v. Corelogic, Inc.,*
    899 F.3d 666 (9th Cir. 2018) ...............................................................8

*Stonington Ins. Co. v. Adams,*
    2017 WL 3009206 (E.D. Cal. July 14, 2017) ................................ *passim*

*Tokio Marine Specialty Ins. Co. v. City of Laguna Beach,*
    2017 WL 6512226 (C.D. Cal. Dec. 18, 2017) ..................................10

*Tower Ins. Co. of N.Y. v. Capurro Enters. Inc.,*
    2011 WL 6294485 (N.D. Cal. Dec. 15, 2011) .............................17, 18

*Travelers Indem. Co. of Conn. v. Centex Homes,*
    2015 WL 5836947 (N.D. Cal. Oct. 7, 2015)...............................17, 21

*Travelers Indem. Co. of Ill. v. Ins. Co. of N. Am.,*
    886 F. Supp. 1520 (S.D. Cal. 1995)..................................................17

*Travelers Prop. Cas. Co. of Am. v. Salesforce.com, Inc.,*
    2021 WL 1376575 (N.D. Cal. Apr. 13, 2021) ..............................8, 15

*United Enterprise, Inc. v. Sup. Ct.,*
    183 Cal. App. 4th 1004 (2010) .........................................................10

iii

*Zurich Am. Ins. Co. v. Omnicell, Inc.*,
    2019 WL 570760 (N.D Cal. Feb. 12, 2019) .................................................................24, 25

**Other Authorities**

Federal Rule of Civil Procedure 56(d) ..............................................................................2, 7

<u>**NOTICE OF MOTION AND MOTION**</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that on August 12, 2021, at 9:00 a.m., Defendant McKesson Corporation ("McKesson") will and hereby does move the Court for an order staying all discovery and proceedings at this stage in the litigation other than McKesson's pending motion for partial summary judgment on the duty to defend and the limited discovery relevant to deciding that motion (*viz.*, the insurance policies, underlying complaints, and evidence of defense costs sufficient to satisfy the $5 million self-insured retention).

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

It is black letter law in California that all discovery and proceedings in an insurance coverage action "*must*" be stayed where the disputed coverage issues overlap with issues affecting the policyholder's liability in ongoing underlying litigation.  *Riddell, Inc. v. Superior Court*, 14 Cal. App. 5th 755, 765 (2017) (emphasis in original) (internal quotations omitted).  California law imposes this mandatory stay to avoid the prejudice a policyholder would face by an insurer attempting to prove in coverage litigation the very facts that the policyholder is contesting in the underlying litigation, a scenario that "effectively undercuts one of the primary reasons for purchasing liability insurance." *Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 979 (1995).  Where, on the other hand, "the coverage question is logically unrelated to the issues of consequence in the underlying case, the declaratory relief action may properly proceed to judgment."  *Montrose Chem. Corp. of Cal. v. Superior Court* ("*Montrose I*"), 6 Cal. 4th 287, 302 (1993).

Those principles squarely apply here to require a stay of Insurers' discovery and all other proceedings other than McKesson's pending motion on the duty to defend.  Insurers[1] filed these preemptory lawsuits seeking declaratory judgments that they owe no defense or indemnity obligations to

---

[1] "Insurers" refers to AIU Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa., (both referred to as "AIG") together with ACE Property and Casualty Insurance Company (referred to as "ACE").

McKesson in connection with Opioid Lawsuits under liability insurance policies they sold to McKesson. Insurers have asserted coverage defenses and propounded discovery requests that on their face implicate facts and information that are at issue in the ongoing underlying Opioid Lawsuits.  Indeed, Insurers make no secret of the fact that they "want material" to try to support their "knowledge"-based coverage defenses in an effort to get "off the hook" from fulfilling their promises to McKesson under the policies. As the California Supreme Court held nearly thirty years ago, that is the "classic situation" where a stay of coverage proceedings is required to avoid prejudicing the insured.  *Montrose I*, 6 Cal. 4th at 302.

Not only would the discovery demanded by Insurers prejudice McKesson, Insurers cannot establish that the discovery they demand is relevant to or necessary for deciding McKesson's pending motion for partial summary judgment on the duty to defend.  It is axiomatic that an insurer's duty to defend "usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* at 295.  Although an insurer is sometimes permitted to rely on undisputed extrinsic evidence, any such undisputed facts must have been known to the insurer "at the inception" of the underlying litigation. *Haskel*, 33 Cal. App. 4th at 974.  Consequently, an insurer cannot use discovery to "delay an adjudication of their defense obligation" in an attempt to "develop sufficient evidence to retroactively justify their refusal to provide that defense." *Id.* at 977.  Here, the discovery that Insurers demand in this coverage litigation was not known at the outset of the Opioid Lawsuits and thus is "irrelevant" to evaluating their duty to defend. *Id.* at 976.  McKesson is therefore entitled to a prompt adjudication of its motion on the duty to defend because none of the disputed issues relevant to deciding that motion overlap with issues being litigated in ongoing underlying litigation.  Indeed, McKesson already has produced to the Insurers information that is more than sufficient for resolution of its motion on the duty to defend.  Declaration of Cléa P.M. Liquard ("Decl.") ¶¶ 31-32.  Simply put, Insurers have not begun to meet their burden under Federal Rule of Civil Procedure 56(d) of demonstrating the "specified reasons" why they "cannot present facts essential to justify their opposition" to McKesson's pending motion on the duty to defend absent the discovery they seek.

In accord with well-settled California law, McKesson requests that the Court stay all discovery and proceedings at this stage in the litigation other than McKesson's pending motion for partial summary judgment on the duty to defend and the limited discovery relevant to deciding that motion,

namely, the ACE and AIG insurance policies, the underlying complaints, and evidence of defense costs sufficient to satisfy the $5 million self-insured retention.

## II.    BACKGROUND

### A.    The Underlying Opioid Lawsuits

Beginning in 2016, McKesson has been named as a defendant in more than 3,200 Opioid Lawsuits pending in federal and state courts around the country brought by governmental entities, other entities, and individuals, relating to losses and injuries allegedly arising out of McKesson's distribution and sale of prescription opioid pharmaceuticals (the "Opioid Lawsuits").  Most cases have been transferred for pre-trial proceedings to a federal multidistrict litigation pending in the Northern District of Ohio captioned *In re: National Prescription Opiate Litigation*, Case No. 17-md-2804 (N.D. Ohio) (the "Opioid MDL").  Two lawsuits brought by Ohio counties were identified as "Track One" bellwether suits in the Opioid MDL.  Decl. ¶¶ 5, 7-8.  Outside of the federal MDL, about 350 Opioid Lawsuits remain pending in state court.  Decl. ¶ 6.  Among the Opioid Lawsuits that were litigated in state court was a lawsuit brought by the State of West Virginia captioned, *State of West Virginia ex rel. Patrick Morrisey, et al. v. McKesson Corp.*, No. 16-C-1 (Cir. Ct. Boone Cnty. W. Va.) (the "West Virginia AG Lawsuit").  The West Virginia AG Lawsuit was the first of the Opioid Lawsuits to be filed against McKesson.  Decl. ¶ 3.

The Opioid Lawsuits generally allege that McKesson and other "distributors failed to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates."  *In re: Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017).  Thus, for example, the Track One Lawsuits, which exemplify the common allegations at the heart of the Opioid Lawsuits, alleged that McKesson "fail[ed] to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids."  *E.g.*, Third Am. Compl., *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-OP-45090 (N.D. Ohio Dec. 19, 2019), ¶¶ 14, 518.  Among the numerous disputed factual issues being litigated in the Opioid Lawsuits is McKesson's alleged knowledge of harm caused by its distribution of opioid products.  *See, e.g.*, *id.*; Original Pet., *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84 (Bryan Cnty. Dist. Ct. May 1, 2020), ¶ 60 (alleging that

McKesson "fail[ed] to… halt shipments of opioids in quantities it knew or should have known could not be justified and were indicative of serious oversupply of opioids").[2]

In May 2019, McKesson reached agreement to settle the West Virginia AG Lawsuit.  Decl. ¶ 9. Several months later, in October 2019, McKesson agreed to a settlement of the Track One Lawsuits. Decl. ¶ 10.  McKesson's settlement with the Track One plaintiffs and State of West Virginia has not precluded other entities in those jurisdictions from pursuing claims against McKesson.  Consequently, there are more than 95 other lawsuits currently pending against McKesson brought by West Virginia claimants.  Decl. ¶ 11.  Two such lawsuits brought by West Virginia political subdivisions, Cabell County and City of Huntington, were remanded from the MDL court to the U.S. District Court for the Southern District of West Virginia for further proceedings (the "Cabell County/Huntington Lawsuit"). Decl. ¶ 12.  Trial began in the Cabell County/Huntington Lawsuit on May 3, 2021, in Charleston, West Virginia and is expected to continue through August 2021.  Decl. ¶ 13.  Similarly, the State of Ohio continues to pursue its claims against McKesson in a proceeding that is scheduled to begin trial in September 2021 ("Ohio AG Lawsuit"), and dozens of other suits brought by Ohio entities remain pending against McKesson.  Decl. ¶¶ 14-15.

---

[2] *See also* Master Long Form Compl., *In re Opioid Litig.*, Index No. 400000/2017 (N.Y. Sup. Ct. Oct. 6, 2017), ¶ 744 ("The Defendants knew or should have known that they were supplying vast amounts of dangerous drugs [to] Plaintiffs' counties that were already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic."); Compl., *State of Ohio v. McKesson Corporation et al.*, No. CVH20180055 (Ct. Com. Pl. Madison Cnty. Feb. 20, 2018), ¶ 101 ("Each Defendant knew or should have known that the amount of opioids that it allowed to flow into Ohio far exceeded what could be consumed for medically necessary purposes in the relevant communities[.]"); Second Am. Compl., *Puerto Rico v. Cardinal Health, Inc. et al.*, No. SJ 2018-cv-03958 (San Juan Part Super. Ct. June 6, 2018), ¶ 5 ("Defendants shipped orders that they knew or should have known were being diverted or used for other than legitimate medical purposes."); Compl., *Alabama v. Purdue Pharma L.P., et al.*, No. 03-CV-2019-901174.00 (Montgomery Cnty. Cir. Ct. June 20, 2019), ¶ 232 ("McKesson owes a duty under both federal law and Alabama law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating in the State of Alabama as well as those orders which McKesson knew or should have known were likely to be diverted into Alabama."); Compl., *New Hampshire v. Cardinal Health Inc. et al.*, No. 18-cv-217-2019-CV-00220 (Merrimack Super. Ct. Apr. 3, 2019), ¶ 24 (McKesson's "failure to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, breached both their statutory and common law duties and worsened and failed to prevent the opioid epidemic in New Hampshire.").

---

4

1    Thousands of other Opioid Lawsuits remain pending in the MDL, with hundreds of others being

2    litigated in courts across the country.  Decl. ¶ 6.  In addition to the trial that is currently proceeding in

3    the Cabell County/Huntington Lawsuit and the trial scheduled for September 2021 in the Ohio AG

4    Lawsuit, McKesson is a defendant in at least four other Opioid Lawsuits that are scheduled to begin trial

5    in 2021 alone, with at least a dozen other trials in other Opioid Lawsuits scheduled for 2022 and 2023.

6    Decl. ¶ 16.  Any one of the thousands of Opioid Lawsuits could present significant exposure to

7    McKesson.  Decl. ¶ 18.

8        **B.**     **This Insurance Coverage Litigation**

9    Shortly after the West Virginia AG Lawsuit was filed against McKesson in early 2016,

10    McKesson tendered that Opioid Lawsuit to AIG, ACE, and other of its insurers for defense and

11    indemnity coverage.  Decl. ¶ 3.  McKesson has continued to report new Opioid Lawsuits to AIG and

12    ACE on an ongoing basis as the lawsuits are filed against McKesson.  Decl. ¶ 4.  Neither AIG nor ACE

13    has ever acknowledged their defense obligations to McKesson, nor has either Insurer paid any amounts

14    towards McKesson's defense in the Opioid Lawsuits.  *Id.*

15    On October 23, 2020, AIG filed a lawsuit in this Court, seeking a declaration that it is not

16    obligated to defend or indemnify McKesson against the Opioid Lawsuits under umbrella liability

17    insurance policies issued by AIG to McKesson.  *See* Case No. 3:20-cv-07469 ("AIG Action"), Dkt. 1.

18    Ten days later, on November 2, 2020, ACE brought a separate action against McKesson in the Superior

19    Court for the State of California, County of Orange, seeking substantially the same declaratory relief as

20    AIG—namely, that McKesson is not entitled to defense or indemnity coverage for the Opioid Lawsuits

21    under umbrella liability insurance policies ACE issued to McKesson.  *See* Case No. 3:20-cv-09356

22    ("ACE Action"), Dkts. 1-3.  McKesson removed the ACE Action to federal court, ACE Action, Dkt. 1,

23    and, following this Court's denial of ACE's motion to remand, ACE Action, Dkt. 138, the two coverage

24    lawsuits were consolidated, AIG Action, Dkt. 84.

25    In their pleadings, Insurers assert numerous of purported defenses to coverage for the Opioid

26    Lawsuits, including that:  "McKesson expected or intended Bodily Injury to occur"; the Opioid Lawsuits

27    do not arise from an "occurrence" or "accident"; McKesson "knew about the injuries alleged ... prior to

28    the policy period[s]"; "the Opioid Lawsuits seek damages arising out of intentional and other willful acts

5

on the part of McKesson"; and the bodily injuries "did not occur" during the Insurers' policy periods, among others.  ACE Action, Dkt. 86, at 25-27, 29 (AIG's Affirmative Defenses); Dkt. 154, at 8-14 (ACE's Affirmative Defenses).

### C.    McKesson's Motion for Partial Summary Judgment and Insurers' Discovery Requests

On April 30, 2021, McKesson filed a motion for partial summary judgment seeking a declaration that AIG and ACE each owe McKesson a duty to defend against the Opioid Lawsuits.  AIG Action, Dkt. 79.  On March 25, 2021, in anticipation of McKesson's forthcoming motion on the duty to defend, ACE propounded a First Set of Requests for Production of Documents (the "ACE Requests for Production") demanding voluminous materials from the Opioid Lawsuits, including:

1.    "All operative pleadings, briefs, and motions in each of the Opioid Lawsuits";

2.    "All proposed or executed settlement agreements" in the Opioid Lawsuits;

3.    "All documents relating to or reflecting" such settlement agreements;

4.    "All Documents upon which McKesson will rely" to demonstrate coverage under "each and every" ACE policy;

5.    "All deposition transcripts, including deposition exhibits" of McKesson witnesses "from each of the Opioid Lawsuits";

6.    "All expert reports, including exhibits, produced in each of the Opioid Lawsuits"; and

7.    "All documents that McKesson has produced in the Opioid Lawsuits."

Decl. ¶ 22, Ex. D.

On May 14, 2021, Insurers jointly propounded a list of documents they seek purportedly "in connection with McKesson's motion for partial summary judgment" on the duty to defend (the "Joint Requests for Production"), in the following categories:

1.    "Written discovery served on McKesson in Track One Cases and West Virginia AG Case and McKesson's responses" to such discovery;

2.    "Written discovery served on Plaintiffs in Track One Cases and West Virginia AG Case and Plaintiffs' responses" to such discovery;

6

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

3.  "Transcripts of depositions, including exhibits" of plaintiffs and third party witnesses from the Track One Lawsuits and West Virginia AG Lawsuit;

4.  "Transcripts of depositions, including exhibits, of McKesson fact witnesses in Track One Cases and West Virginia AG Case";

5.  "Expert reports and transcripts of depositions, including exhibits, of certain expert witnesses"; and

6.  "Documents, including, but not limited to, bills and invoices, relating to the $60 million in attorneys' fees and expenses McKesson alleges it paid to defend against the Track One Cases"; as well as a deposition of a witness to testify on those topics.

Decl. ¶ 23, Ex. E.

On May 18, 2021, McKesson produced to Insurers a significant amount of material well beyond that needed to evaluate Insurers' duty to defend, including:  Copies of the thousands of operative underlying complaints; excerpts of McKesson accounting records identifying line-by-line fees and expenses paid by McKesson to defend the Opioid Lawsuits; copies of certain defense invoices totaling tens of millions of dollars paid by McKesson in connection with defending the Track One Lawsuits; an index listing the docket number, case caption, and jurisdiction of the thousands of Opioid Lawsuits; copies of general/product liability insurance policies issued to McKesson by other insurers; and copies of the frequent written updates provided by McKesson to its insurers reporting on developments and incurred defense costs in the underlying Opioid Lawsuits.  Decl. ¶¶ 31-32.  McKesson has also agreed to a deposition of a witness to testify on the defense costs incurred as described in the declaration accompanying McKesson's duty to defend motion.  Decl. ¶ 31.

Notwithstanding this robust production, Insurers contend they are entitled to the materials outlined in the Joint Requests for Production because the materials "relate to one or more of the questions put at issue by McKesson in its motion for partial summary judgment."  Decl. ¶ 23, Ex. E. Under Rule 56(d), however, Insurers are required to meet a much more stringent burden; establishing "for *specified reasons*, [that they] cannot present facts *essential* to justify [their] opposition" to McKesson's summary judgment motion without the discovery they seek.  Fed. R. Civ. P. 56(d) (emphasis added).  Thus, at a minimum, Insurers have the burden of "stat[ing] what other *specific*

7

evidence [they] hope[] to discover [and] *the relevance of that evidence to [their] claims*." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (emphasis added).

Insurers have not attempted to meet that standard (which is reason alone to foreclose their efforts to pursue discovery), but their pleadings and statements make clear that among the evidence Insurers hope to develop are "facts" tending to show that McKesson knew about the bodily injuries alleged in the Opioid Lawsuits and that McKesson's conduct was intentional.  As Insurer counsel candidly told the Court:  "One of our arguments, both *on defense* and indemnity, *will be knowledge.  And we want material*."  Apr. 1, 2021 Hr'g Tr. 18:24-19:1 (emphasis added).  Elaborating on the point, Insurer counsel explained:  "[T]here are questions about:  Was there an accident?  Was there an occurrence?  When was there an occurrence? ... Did McKesson have knowledge?  Did McKesson have knowledge before I wrote any policies?  Because if it did, I'm off the hook."  Feb. 25, 2021 Hr'g Tr. 21:9-14.  Similarly, when explaining to the Court why Insurers seek this discovery material, Insurer counsel told the Court they are trying to show that "these [Opioid Lawsuits] are not cases about accidental conduct."  May 19, 2021 Hr'g Tr. 11:19; 10:7.

## III.    ARGUMENT

### A.    Legal Standard

"A federal court sitting in diversity over a state law claim applies the law of the state where it is located in order to determine whether a stay is appropriate."  *Atain Specialty Ins. Co. v. 20 Parkridge, LLC*, 2015 WL 2226356, at *5 (N.D. Cal. May 11, 2015) (citation omitted).  Accordingly, this Court should apply the analysis set out in *Montrose I* and its progeny to decide this Motion as numerous other federal courts in this Circuit have done.  *See, e.g.*, *id.*[3]

Even were this Court to apply federal procedural law to evaluate this Motion, the three-factor analysis that governs a stay of proceedings yields the same outcome.  Courts in the Ninth Circuit apply

---

[3] *See also Travelers Prop. Cas. Co. of Am. v. Salesforce.com, Inc.*, 2021 WL 1376575, at *1 (N.D. Cal. Apr. 13, 2021); *Phila. Indem. Ins. Co. v. Skating Edge, Inc.*, 2018 WL 5099705 (C.D. Cal. May 24, 2018); *Colony Ins. Co. v. Vantaggio Farming Corp.*, 2017 WL 3478998 (E.D. Cal. Aug. 14, 2017); *Stonington Ins. Co. v. Adams*, 2017 WL 3009206 (E.D. Cal. July 14, 2017); *Ironshore Specialty Ins. Co. v. 23andMe, Inc.*, 2015 WL 2265900, at *2 (N.D. Cal. May 14, 2015); *Sleeping Well, LLC v. Travelers Indem. Co.*, 2011 WL 996202 (N.D. Cal. Mar. 21, 2011).

the framework articulated by the U.S. Supreme Court in *Landis* to determine whether a stay is appropriate:  (1) "the possible damage which may result from the granting of a stay," (2) "the hardship or inequity which a party may suffer in being required to go forward," and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).  Under each of those factors, a stay of discovery and proceedings, except as to McKesson's duty to defend motion, is warranted.

B.     **A Stay of Overlapping Discovery and Proceedings is "Mandatory" Under California Law.**

California law has long recognized that proceedings in an insurance coverage action can prejudice a policyholder's defense in ongoing underlying litigation where the disputed coverage issues relate to facts being litigated in the underlying actions.  *See, e.g.*, *Montrose I*, 6 Cal. 4th at 301-02; *Riddell*, 14 Cal. App. 5th at 765 ("Litigation of the declaratory relief action when the underlying action is pending may, however, create a risk of prejudice to the insured.").  Thus, for example, an insurer might effectively "join forces with the plaintiffs in the underlying actions as a means to defeat coverage[,]" and "the insured may be collaterally estopped from relitigating any adverse factual findings in the third party action[.]"  *Montrose Chem. Corp. of Cal. v. Superior Court* ("*Montrose II*"), 25 Cal. App. 4th 902, 909-10 (1994); *accord Haskel*, 33 Cal. App. 4th at 979; *Riddell*, 14 Cal. App. 5th at 765-66.  In other words, an insurer's attempt to defeat its coverage obligations could have the perverse effect of not only leaving the insured without resources to defend itself against underlying litigation, but would also affirmatively undermine the insured's effort to defend itself against liability, defeating the very purpose of the insurance in the first place.  *See Allstate Ins. Co. v. Harris*, 445 F. Supp. 847, 851 (N.D. Cal. 1978) ("the insured could not possibly have anticipated that the very resources for which he bargained would be turned against him and used to establish his liability...").

To prevent those consequences, and protect the promise of the insurance bargained for, California law imposes "a stay of all discovery in the declaratory relief action which is *logically related* to issues affecting [the insured's] liability in the underlying action."  *Riddell*, 14 Cal. App. 5th at 766 (emphasis in original).  Thus, where "the factual issues to be resolved in the declaratory relief action

9

overlap with issues to be resolved in the underlying litigation, the trial court *must* stay the declaratory relief action." *Id.* at 765 (emphasis in original) (internal quotations omitted); *see also Montrose I*, 6 Cal. 4th at 301-02 ("a stay of the declaratory relief action pending resolution of the third party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action"). A stay is required even without "a separate finding of prejudice" to the insured and without considering what (if any) prejudice there might be to the insurer. *Riddell*, 14 Cal. App. 5th at 770-71 (California law "does not require a separate finding of prejudice" and a stay of overlapping proceedings "is mandatory, not discretionary, so no balancing [of prejudice] is necessary or appropriate."); *see also Stonington Ins. Co.*, 2017 WL 3009206, at *4 ("Put differently, it is only when there is no overlap of issues that the Court has discretion to not order a stay.").[4]

Here, there is no question that Insurers' coverage defenses and the discovery they seek overlap with issues being litigated in the underlying Opioid Lawsuits and therefore must be stayed under settled California law. And while a stay is "mandatory" even without a separate finding of prejudice, as explained below, McKesson would suffer significant harm if such overlapping discovery and proceedings were allowed.

### 1. Insurers' defenses and discovery overlap with issues being litigated in underlying Opioid Lawsuits.

Insurers' coverage defenses clearly implicate disputed facts that are at issue in the ongoing Opioid Lawsuits. For example, Insurers purport to deny coverage on the basis that "McKesson expected or intended Bodily Injury to occur," that McKesson's conduct was not "accidental," and that McKesson "knew about the injuries alleged ... prior to the policy periods." ACE Action, Dkt. 86, at 25-27, 29 (AIG's Affirmative Defenses); Dkt. 154, at 8-14 (ACE's Affirmative Defenses). Similarly, Insurers' discovery demands expressly seek material that is being developed and used in the underlying Opioid Lawsuits. For example, ACE's Requests for Production demand "all documents that McKesson has

---

[4] *See also 23andMe, Inc.*, 2015 WL 2265900, at *2 ("A stay is required in the first and third type of prejudice involving factual overlap.") (quoting *United Enterprise, Inc. v. Sup. Ct.*, 183 Cal. App. 4th 1004, 1012 (2010)); *Tokio Marine Specialty Ins. Co. v. City of Laguna Beach*, 2017 WL 6512226, at *5-6 (C.D. Cal. Dec. 18, 2017) ("because of this factual overlap, the Court must grant a stay in the coverage action"; noting that a "stay is mandatory").

produced in the Opioid Lawsuits," "all" "pleadings, briefs," "deposition transcripts," "exhibits," and "expert reports" from the Opioid Lawsuits, "[a]ll proposed or executed settlement agreements" in the Opioid Lawsuits, and "all documents relating to or reflecting" such settlement agreements.  Decl. ¶ 22, Ex. D.  Insurers' Joint Requests for Production target the same types of material, including written discovery, deposition transcripts and exhibits, and expert reports and testimony from the underlying Opioid Lawsuits.  Decl. ¶ 23, Ex. E.

These coverage defenses and categories of discovery mirror those that California courts have held are "straightforwardly related to issues affecting [the insured's] liability in the third party actions" and therefore must be stayed under longstanding California law.  *Riddell*, 14 Cal. App. 5th at 767; *see id.* at 762, 768 (staying insurers' requests for "all documents relating to the defense of prior bodily injury claims"; "all documents relating to the settlement or resolution of prior bodily injury claims"; and "all documents relating to the defense" of specific underlying claims and their settlement).  Indeed, Insurers here candidly admit that they want discovery from the underlying Opioid Lawsuits precisely to mine it for facts about McKesson's "knowledge" and "intent."  *See, e.g.*, Apr. 1, 2021 Hr'g Tr. 18:24-19:1 ("[o]ne of [Insurers'] arguments, both on defense and indemnity, will be knowledge.  And we want material.").[5]  Of course, facts as to McKesson's knowledge and intent are disputed and being actively litigated in the ongoing Opioid Lawsuits.  *See, e.g.*, Original Pet., *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84, at ¶ 60 (alleging that McKesson failed to halt shipments of prescription opioids "in quantities it knew or should have known could not be justified and were indicative of serious oversupply of opioids."); *supra* n.2 and accompanying text.  This is precisely the type of factual overlap that California courts have recognized demands a stay of discovery and proceedings in coverage litigation pending resolution of the underlying matters.  *See, e.g.*, *Riddell*, 14 Cal. App. 5th at 767 (factual overlap where insurers sought evidence of "what Riddell knew about the risks of playing football ... and when Riddell knew it," and where "the extent and timing of Riddell's knowledge of those risks are, of course,

---

[5] *See also* May 19, 2021 Hr'g Tr. 11:19; 10:7 (Insurer counsel explaining they seek material to show that the Opioid Lawsuits "are not cases about accidental conduct").

facts at issue in the third party actions—the MDL plaintiffs allege that Riddell 'knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the helmets'").[6]

The only category of documents Insurers have requested that is even potentially unrelated to disputed facts in the underlying litigation is information related to exhaustion of the $5 million retention. *See* Decl. ¶ 23, Ex. E (requesting "bills and invoices[] relating to the $60 million in attorneys' fees and expenses McKesson" paid in the Track One Lawsuits). But McKesson has already provided more than sufficient information to establish exhaustion (and, as this Court recognized, there can be no serious dispute that McKesson has spent far more than $5 million in connection with the Opioid Lawsuits). The declaration and exhibits accompanying McKesson's motion for partial summary judgment on the duty to defend provide all necessary evidence to prove exhaustion of the retention. *See* AIG Action, Dkt. 79-7, ¶¶ 18-19 (confirming that McKesson has paid more than $230 million solely in attorneys' fees and expenses in defense of the Opioid Lawsuits, including more than $60 million in attorneys' fees and expenses incurred in the Opioid MDL solely in the 16-month period before trial of the Track One Lawsuits). Moreover, McKesson provided Insurers with additional material including excerpts of accounting records identifying line-by-line fees and expenses paid by McKesson to defend the Opioid Lawsuits and copies of certain defense invoices collectively totaling tens of millions of dollars paid by McKesson in defending against the Opioid MDL. Decl. ¶ 31. McKesson has also agreed to a deposition of a witness to testify on the defense costs incurred as described in the declaration accompanying McKesson's duty to defend motion. *Id.*

Aside from this category of information relating to the retention—which has been more than adequately addressed by McKesson—all other discovery that Insurers request overlaps with issues being

---

[6] *See also Allied Property and Cas. Ins. Co. v. Roberts*, 2011 WL 2495691, at *4 (E.D. Cal. June 21, 2011) (factual overlap and stay granted where insured's "knowledge of the activities taking place within the warehouse is clearly a fact in controversy in both the present action and the underlying third-party lawsuits"); *Colony Ins. Co.*, 2017 WL 3478998, at *8 (factual overlap and stay granted where insurer argued that insured acted "intentionally"); *Stonington Ins. Co.*, 2017 WL 3009206, at *4 (stay warranted because insured's "knowledge of the allegations is therefore clearly a fact at issue in both the present action and the underlying lawsuits"); *Skating Edge*, 2018 WL 5099705, at *3 ("A stay is therefore appropriate because the coverage issue of whether Skating Edge's conduct was expected or intended turns on facts to be litigated in the underlying" action.).

litigated in the underlying Opioid Lawsuits.  A stay of all such discovery, as well as proceedings other than a determination of McKesson's motion on the duty to defend, is therefore "required" under California law.  *See, e.g.*, *23andMe, Inc.*, 2015 WL 2265900, at *2 ("A stay is required in the first and third type of prejudice involving factual overlap.") (internal quotations omitted).

### 2.   McKesson will be prejudiced by overlapping proceedings and discovery.

Although a stay is "required" under California law even without a separate finding of prejudice, were the Court to undertake such an analysis, it would find that the facts here present what the California Supreme Court called the "classic situation" in which a policyholder is prejudiced.  *Montrose I*, 6 Cal. 4th at 302.  Courts have identified at least three primary ways a policyholder is prejudiced by proceeding with overlapping coverage litigation while the underlying lawsuits are ongoing, each of which applies here.

*First*, by pursuing overlapping discovery that Insurers hope to use against McKesson, Insurers are effectively "join[ing] forces with the plaintiffs in the underlying actions as a means to defeat coverage."  *Montrose II*, 25 Cal. App. 4th at 909-10.  Thus, "the insurer, who is supposed to be on the side of the insured and with whom there is a special relationship, effectively attacks its insured and thus gives aid and comfort to the claimant in the underlying suit."  *Haskel*, 33 Cal. App. 4th at 979; *see also AIG Prop. & Cas. Co. v. Cosby*, 2016 WL 6662733, at *5 (C.D. Cal. July 15, 2016) ("To limit prejudice to the insured '[an] insurer must not be permitted to join forces with the plaintiffs in the underlying actions as a means to defeat coverage.'") (quoting *Montrose II*, 25 Cal. App. 4th at 909-10); *Stonington*, 2017 WL 3009206, at *3 (same).[7]

Here, Insurers are seeking discovery in an attempt to prove the same allegations of intentional conduct that would potentially undermine coverage (according to Insurers) and at the same time would potentially create liability for McKesson in the underlying litigation (according to the plaintiffs).

---

[7] *See also Genesis Ins. Co. v. Univ. of S. Cal.*, 2012 WL 13009003, at *2 (C.D. Cal. Mar. 28, 2012) (stay granted where disputed coverage issues meant that insurer's "interests [were aligned] with those of [underlying plaintiff's] on this issue rather than with Genesis's insured.... This is the kind of alignment of insurer and insured's foes, creating a 'two front war,' that *Montrose* and its progeny are concerned with."); *Colony Ins. Co.*, 2017 WL 3478998, at *8 (insurer "is arguing that the pesticides were applied intentionally, thus potentially aiding [plaintiffs] in the underlying suit").

13

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND
PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

Instead of assisting McKesson in vigorously defending against the underlying allegations, Insurers seek to discover "facts" they hope will establish just the opposite. As one court put it: The insurer "who is supposed to defend the Insureds in the underlying tort actions ... is effectively attacking the Insureds' defenses [against the underlying allegations] in the present [coverage] action." *Stonington*, 2017 WL 3009206, at *4. Indeed, Insurers go so far as to suggest that by drawing on its contractual right to insurance coverage, McKesson "seeks to escape the consequences of its actions" and that McKesson "was well aware of the damage that its distribution of opioids inflicted on the communities to which it distributed." Mot. to Remand, ACE Action, Dkt. 90, at 4. This is precisely the type of "venom with which the carriers attack their insured" that "explains why the courts are concerned" about prejudice in the case of overlapping proceedings. *Montrose II*, 25 Cal. App. 4th at 910 n.7; *see also id.* ("That the plaintiffs in the third party actions would thus describe a defendant is to be expected. That an insurer should jump on the bandwagon while the third party actions are still pending is not.").

*Second,* McKesson will suffer prejudice by being forced to "fight a two-front war, litigating not only with the underlying claimant[s], but also expending precious resources fighting an insurer over coverage questions"; a dynamic that "effectively undercuts one of the primary reasons for purchasing liability insurance." *Haskel*, 33 Cal. App. 4th at 979; *accord 20 Parkridge, LLC*, 2015 WL 2226356, at *10 (finding that "[d]efendants should not have to fight both in this action and the Underlying Action, expending significant resources.").[8] In the case at bar, McKesson is not facing just a "two front war," but is defending thousands of Opioid Lawsuits in more than 100 courts across the country, including cases currently being tried in West Virginia, with six other trials scheduled this year alone. Decl. ¶¶ 13, 15-16; *see also Cosby*, 2016 WL 6662733, at *6 (stay of coverage proceedings warranted where insured "facing a seven-front war in jurisdictions 3,000 miles apart"); *State Farm Fire & Cas. Co. v. BTB, Inc.*, 2011 WL 284974, at *7 (E.D. Cal. 2011) ("BTB would be prejudiced if it is required to defend both [the underlying and coverage] actions at the same time.").

---

[8] *See also Stonington*, 2017 WL 3009206, at *3 (same); *Montrose II*, 25 Cal. App. 4th at 910 (describing the "prejudice" that "occurs when the insured is compelled to fight a two-front war, doing battle with the plaintiffs in the third party litigation while at the same time devoting its money and its human resources to litigating coverage issues with its carriers").

14

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND
PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

1        *Third*, if Insurers were allowed to use overlapping discovery in this coverage action against

2 McKesson, McKesson "may be collaterally estopped from relitigating any adverse factual findings in

3 the [underlying] action, notwithstanding that any fact found in [McKesson's] favor could not be used to

4 its advantage." *Montrose II*, 25 Cal. App. 4th at 910.  This concern is particularly acute where an insurer

5 looks to prove intentional conduct on the part of the insured.  As the California Supreme Court

6 explained:  "[W]hen the third party seeks damages on account of the insured's negligence, and the

7 insurer seeks to avoid providing a defense by arguing that its insured harmed the third party by

8 intentional conduct, the potential that the insurer's proof will prejudice its insured in the underlying

9 litigation is obvious.  *This is the classic situation* in which the declaratory relief action should be

10 stayed."  *Montrose I*, at 302 (emphasis added).

11        That is precisely the case here, as reflected in Insurers' numerous affirmative defenses to

12 McKesson's counterclaims and Insurer counsel's own statements.  Insurers aim to defeat coverage on

13 the purported basis that "McKesson expected or intended Bodily Injury to occur," that the Opioid

14 Lawsuits do not arise from an "occurrence" or "accident," that McKesson "knew about the injuries

15 alleged ... prior to the policy periods," and "the Opioid Lawsuits seek damages arising out of intentional

16 and other willful acts on the part of McKesson."  ACE Action, Dkt. 86, at 25-27, 29 (AIG's Affirmative

17 Defenses); Dkt. 154, at 8-14 (ACE's Affirmative Defenses).  As Insurer counsel bluntly put it to the

18 Court:  "[o]ne of [Insurers'] arguments, both *on defense* and indemnity, *will be knowledge*," Apr. 1,

19 2021 Hr'g Tr. 18:24-19:1 (emphasis added); *see also* Feb. 25, 2021 Hr'g Tr. 21:9-14 (stating that

20 Insurers intended to defend on the basis of whether "there an accident?  Was there an occurrence?

21 When was there an occurrence? ... Did McKesson have knowledge?  Did McKesson have knowledge

22 before [ACE] wrote any policies?").  If these facts are developed and adjudicated against McKesson in

23 this coverage litigation while the thousands of underlying Opioid Lawsuits are ongoing, the prejudice to

24 McKesson "is obvious."  *Montrose I*, 6 Cal. 4th at 302.  Numerous state and federal courts have come to

25 the same conclusion on similar facts.  *See, e.g., Salesforce.com, Inc.*, 2021 WL 1376575, at *1

26 ("Salesforce would be entitled to a stay of Travelers' indemnification claim because the factual question

27 of whether Salesforce acted negligently, which is conduct covered under the insurance policy, or

28 intentionally and knowingly, which is conduct not covered under the insurance policy, is at the heart of

15

both this lawsuit and the Texas state court litigation."); *Riddell*, 14 Cal. App. 5th at 770 n.6 (discovery sought by insurers "likely to include evidence showing what Riddell knew about the risks of playing football wearing Riddell helmets, and when Riddell knew it," and "[i]f the Insurers use that evidence in support of their affirmative defense that Riddell 'expected or intended' the injuries suffered by the MDL plaintiffs, then Riddell will suffer prejudice by being collaterally estopped from relitigating any adverse findings in the third party actions").[9]

### C.    Insurers' Arguments Are Contrary to California Law.

Although this Court "must" stay Insurers' discovery, as well as other proceedings that overlap with issues being litigated in ongoing Opioid Lawsuits, the Court can and should promptly adjudicate McKesson's pending motion for summary judgment on the duty to defend because a ruling on Insurers' duty to defend does not depend on resolving any facts that are at issue in the underlying Opioid Lawsuits. On the contrary, it is well settled that "a duty to defend usually is made in the first instance by comparing the allegations of the [underlying] complaint with the terms of the policy." *Montrose I*, 6 Cal. 4th at 295; *see also id.* at 306 ("If the trial court determines that the facts on which the insurer relies, although disputed, will not be litigated in the liability action, the trial court should proceed to consider the motion for summary judgment.") (Kennard, J., concurrence).

Implicitly acknowledging this well-settled jurisprudence, Insurers suggest that this case can be distinguished from decades-long established California law, but none of Insurers' arguments are availing.

---

[9] *See also Stonington*, 2017 WL 3009206, at *4 ("Adams's knowledge of the allegations is therefore clearly a fact at issue in both the present action and the underlying lawsuits. Thus, making a factual determination of Adams's knowledge in the present action could be binding in the underlying action to the disadvantage of the Insureds."); *Roberts*, 2011 WL 2495691, at *4 (stay granted where "[m]aking a factual determination of [the insureds'] knowledge in the present action could be binding in the third-party action to the disadvantage of [the insureds]"); *Skating Edge*, 2018 5099705, at *3 ("Courts have found that if an insurer relies on the definition of 'occurrence' to preclude coverage, a trial of the insurer's declaratory relief action cannot proceed ahead of the underlying action.").

### 1.    The discovery Insurers demand is not permissible "extrinsic evidence."

Insurers incorrectly contend that they are entitled to pursue discovery at this stage of the coverage litigation because an insurer can rely on "extrinsic evidence" to disprove its defense obligations.  That argument is foreclosed by California law on the facts here.  The duty to defend is evaluated by comparing the underlying allegations with the policy terms; if the underlying claims even "*potentially*" fall within the scope of coverage, the insurer must immediately defend.  *Montrose I*, 6 Cal. 4th at 295 (emphasis in original).[10]  An insurer is sometimes permitted to rely on so-called "extrinsic evidence"—that is, facts outside of the policy and the underlying complaint—to disprove its defense obligations, but only where such facts are undisputed, conclusively eliminate the potential for coverage, and were "known by the insurer *at the inception of the underlying lawsuit*."  *Sleeping Well*, 2011 WL 996202, at *1 (emphasis added) (alteration omitted); *Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*, 302 F.3d 1049, 1060 (9th Cir. 2002).  In other words, the duty to defend "must be assessed at the outset of the litigation against the insured"; it is "not analyzed after discovery" in the coverage litigation.  *Tower Ins. Co. of N.Y. v. Capurro Enters. Inc.*, 2011 WL 6294485, at *7 (N.D. Cal. Dec. 15, 2011) (quotation omitted); *see also Montrose I*, 6 Cal. 4th at 295 (quotation omitted) ("[T]he existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit.").[11]  This rule flows from the very nature of the duty to defend itself:  "If the courts did not impose an immediate defense obligation upon a showing of a potential for coverage, thereby relieving the insured from the burden of financing his own defense and then having to sue the insurer for reimbursement, the premiums paid by the insured would purchase nothing more than a lawsuit."  *Haskel*, 33 Cal. App. 4th at 979 n.14 (internal quotations omitted); *accord Montrose I*, 6 Cal. 4th at 295 ("Imposition of an immediate duty to defend is necessary

---

[10] *See also Travelers Indem. Co. of Conn. v. Centex Homes*, 2015 WL 5836947, at *5 (N.D. Cal. Oct. 7, 2015) ("failure to provide counsel or to guarantee the payment of legal fees *immediately* after an insurer's duty to defend has been triggered constitutes a breach of the duty to defend") (emphasis added).

[11] *See also Travelers Indem. Co. of Ill. v. Ins. Co. of N. Am.*, 886 F. Supp. 1520, 1525 (S.D. Cal. 1995) ("California law is clear that the duty to defend is measured at the outset of the litigation, not by hindsight.").

17

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

to afford the insured what it is entitled to: the full protection of a defense on its behalf."). For that reason, courts have consistently recognized that an insurer cannot pursue discovery to look for "extrinsic evidence" to oppose a policyholder's duty to defend claim.

The California Court of Appeal's analysis in *Haskel* is particularly instructive. In *Haskel*, as here, the insurers argued that they could not oppose the policyholder's duty to defend motion until after the policyholder "had fully responded to all of their discovery requests." *Haskel*, 33 Cal. App. 4th at 972-73. As the court observed, "[a]t the heart of the insurers' argument is the unstated proposition that they should be permitted to delay an adjudication of their defense obligation until they develop sufficient evidence to retroactively justify their refusal to provide that defense." *Id.* at 977. The court flatly rejected that argument, holding that "the discovery for which the insurers sought priority was *necessarily irrelevant*" to the insured's motion on the duty to defend because the duty to defend depends on "those facts known by the insurer at the inception of [the underlying] lawsuit." *Id.* at 976 (emphasis added). As the court put it: "The insurers were either aware of such evidence at the time of the tender or they were not; they did not need discovery from [the insured] to determine the existence of that evidence." *Id.* at 977.

That same analysis applies equally here. Insurers demand production of core discovery generated in the underlying Opioid Lawsuits—document productions, depositions, expert reports—that Insurers necessarily did not have "at the inception" of those lawsuits and which is therefore "irrelevant" to determining whether they owe McKesson a duty to defend. *Haskel*, 33 Cal. App. 4th at 976; *see also Tower Ins. Co. of N.Y.*, 2011 WL 6294485, at *7 ("An insurer cannot 'wait out' discovery before determining its duty to defend; that is precisely why the California Supreme Court requires defense even on the basis of potential coverage.") (citing *Montrose I*, 6 Cal. 4th at 299); *Sleeping Well*, 2011 WL 996202, at *1 ("Under state law, plaintiff [policyholder] has a right to have had its motion for summary adjudication of the insurer's duty to defend determined shortly after it filed this action and before defendant [insurer] engaged in discovery.").

Insurers have suggested that this longstanding rule does not apply here because the policies they issued to McKesson sit above a $5 million self-insured retention. On the contrary, courts have applied the same standard—looking at the facts known to the insurer "at the inception of the lawsuit"—even

18

when evaluating the defense obligations of excess insurers.  Thus, for example, in *Gonzalez v. Fire Insurance Exchange*, the court held that later-developed extrinsic evidence was "irrelevant to [its] analysis" of an umbrella liability insurer's defense obligations because "[e]xtrinsic facts negating an insurer's duty to defend must have been known to the insurer at the time of tender or at the inception of the lawsuit."  234 Cal. App. 4th 1220, 1239 (2015) (citing *Montrose I*, 6 Cal. 4th at 295).  The umbrella policy at issue in *Gonzalez* provided coverage "excess of the retained limit."  *Id.* at 1236.  But even assuming for the sake of argument that the Court may consider the extrinsic evidence known to Insurers at the point of exhaustion of the self-insured retention (and we are aware of no case announcing such a rule), that still does not entitle Insurers to the materials they seek.  By August 2018, McKesson had incurred more than $25 million in defense costs in the Opioid Lawsuits—five times more than the $5 million retention.  Decl. ¶ 31, Ex. F.  At least by that point (indeed, much earlier), Insurers had an immediate duty to defend based on the allegations, the policy terms, and the facts known to Insurers at that point.  *Montrose I*, 6 Cal. 4th at 295.  Insurers did not have knowledge as of August 2018 of the information they now seek to extract from McKesson in this coverage action—indeed, the majority of the documentation Insurers demand did not even exist as of August 2018.  All such material is therefore "irrelevant" to determining Insurers' duty to defend.  *Haskel*, 33 Cal. App. 4th at 976.

Finally, it bears repeating that, in addition to the fact that the "extrinsic evidence" Insurers now seek to discover was not known to them at the outset of the Opioid Lawsuits, that discovery still overlaps with issues being litigated in the underlying Opioid Lawsuits and therefore must necessarily be stayed for the reasons explained above.  Indeed, in the very same decision that the California Supreme Court first permitted the narrow reliance on extrinsic evidence, that Court simultaneously recognized the potential mischief it could bring and thus articulated the mandatory stay rule.  *See Montrose I*, 6 Cal. 4th at 301.

### 2.   The fact that Insurers are in possession of some material they request in discovery does not make it permissible "extrinsic evidence."

Insurers also miss the mark when they claim they should be able to oppose McKesson's duty to defend motion using the materials in Categories 1-3 of their Joint Requests because those documents

19

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

were previously provided by McKesson to AIG.  *See* Decl. ¶ 23, Ex. E.  That argument is flawed for at least three reasons.

*First*, the discovery materials listed in Categories 1-3 in Insurers' Joint Requests were not "known" to Insurers "at the inception of [the underlying] lawsuit[s]" and are therefore "irrelevant" to evaluating Insurers' duties to defend.  *Haskel*, 33 Cal. App. 4th at 976.  Categories 1-3 of Insurers' Joint Requests list certain discovery material from the West Virginia AG Lawsuit—which was filed against McKesson in *early 2016* and tendered to Insurers shortly thereafter in February 2016—and the Track One Lawsuits—which were filed in late *2017* and tendered to Insurers no later than December 2017. Decl. ¶¶ 3, 5, 7-8.  The written discovery and deposition transcripts listed in Categories 1-3 were necessarily generated in those lawsuits well after their "inception" and after they were tendered to Insurers, and thus could not have been "known" by Insurers at that point.  Nor (for the sake of argument), did Insurers have knowledge or possession of the materials listed in Categories 1-3 at the time that the $5 million retention was exhausted.  By August *2018* McKesson had incurred more than $25 million in covered defenses costs; the materials identified in Categories 1-3 were provided by McKesson to AIG in *2019*.[12]  Decl. ¶¶ 24, 31.  These materials were provided to Insurers under the terms of confidentiality agreements that were agreed to with McKesson, as well as the protective orders entered in those Opioid Lawsuits, both of which protect the confidential nature of the materials.  Decl. ¶ 24.  Accordingly, the material in Categories 1-3 is "irrelevant" to Insurers' duty to defend because it was not known to Insurers at the outset of the underlying lawsuits.  *Haskel*, 33 Cal. App. 4th at 976.

*Second*, AIG acquired the materials from McKesson through what is now clear was a sham claims investigation designed to improperly exploit the narrow scope allowed for extrinsic evidence and to circumvent the prohibition against using discovery to disadvantage a policyholder.  AIG had an "immediate" obligation to defend McKesson at the outset of the Opioid Lawsuits; if it contested that obligation, it ought to have promptly sought declaratory relief.  *Cf. Montrose I*, 6 Cal. 4th at 301 ("In

---

[12] A first tranche was provided to AIG in January 2019, followed by a second tranche in March 2019, and a third in April 2019.  A subset of these materials were also provided to ACE in March 2019.  Decl. ¶ 24.

order to avoid any possibility that a refusal to defend may subject it to eventual liability for bad faith, the insurer is well advised to seek a judicial determination that it owes no defense.").  Of course, had Insurers sought a declaration of no coverage at the outset of the Opioid Lawsuits, there would have been no question that the duty to defend would have been evaluated solely based on the allegations in the Opioid Lawsuits and the terms of the insurance policies, without any of the extrinsic evidence Insurers seek here (which did not exist at that point), and any discovery demanded by Insurers from the underlying Opioid Lawsuits would have been stayed under the well-established principles of *Montrose*, *Haskel*, and the like.  Instead of filing for declaratory relief, however, AIG purported to conduct a five-year long "investigation" of the claims and insisted that McKesson provide voluminous information about the Opioid Lawsuits, while at the same time breaching its duty to "immediately" provide a defense.[13]  Decl. ¶¶ 24-27.  Indeed, AIG repeatedly indicated that it was interested in a potential commercial resolution of McKesson's coverage claims and in that regard requested reams of information from the underlying Opioid Lawsuits as part of its purported ongoing dialogue toward such a resolution.  Decl. ¶ 26.  It is now apparent that AIG had no intention of assuming any coverage obligations for the Opioid Lawsuits and instead used its "investigation" as a guise for insisting that McKesson provide material that it hoped to later use as "extrinsic evidence" to disprove coverage, all the while accusing McKesson of failing to cooperate by not providing more information.  Nothing under California law permits an insurer to use a sham investigation as a means of circumventing the broad scope of its duty to defend.[14]  To the extent Insurers continue to insist that they can use these materials against McKesson to defeat their duty to defend, it calls into serious question their good faith handling of these matters.

---

[13] *See Centex Homes*, 2015 WL 5836947, at *5 ("failure to provide counsel or to guarantee the payment of legal fees *immediately* after an insurer's duty to defend has been triggered *constitutes a breach of the duty to defend*") (emphasis added).

[14] *Cf. Centex Homes*, 2015 WL 5836947, at *5 ("insurer is free to conduct an investigation beyond the points at which its duty to defend has been triggered ... *insurer may not, however, deprive an insured of the security implicit in the duty to defend*—specifically, the right to immediately call on the insurer's superior resources as opposed to having to marshal its own resources to mount a defense against a claim that possibly falls within the policy's coverage) (emphasis added) (internal quotations and alterations omitted).

*Third*, regardless of the fact that McKesson previously provided certain materials to AIG under strict confidentiality undertakings, Insurers' use of that material against McKesson in this coverage litigation still exposes McKesson to the same aspects of prejudice that California courts have repeatedly held requires a stay. By using the discovery from Opioid Lawsuits to ostensibly try to prove McKesson's "knowledge," Insurers would still effectively "join forces with the plaintiffs in the underlying actions as a means to defeat coverage"; McKesson would face a "two front war," fighting against the very insurers that ought to be defending it against the Opioid Lawsuits; and McKesson would still be at risk of being "collaterally estopped from relitigating" any factual determinations in the underlying lawsuits. *Montrose II*, 25 Cal. App. 4th at 909-10.

### 3. Settlement of the Track One and West Virginia AG Lawsuits does not eliminate prejudice to McKesson.

Insurers disingenuously suggest that McKesson is not "prejudiced" by the discovery they seek because some of the material they demand was generated in the Track One Lawsuits and the West Virginia AG Lawsuit, which McKesson has settled. That argument is legally flawed and factually incorrect. It also ignores the fact that ACE's Requests for Production are not limited to the Track One Lawsuits and the West Virginia AG Lawsuit. *See* Decl. ¶ 22, Ex. D.

As an initial matter, a separate finding of prejudice is not required. Rather, if, as is the case here, "there are overlapping factual disputes" in the coverage and underlying litigations, "then a stay is mandatory." *Riddell*, 14 Cal. App. 5th at 771. That is because the prejudice from overlapping litigation, particularly as to issues of knowledge and intent, "is obvious." *Montrose I*, 6 Cal. 4th at 302. That conclusion is all the more true here, notwithstanding the settlements of the Track One Lawsuits and West Virginia AG Lawsuit, because there is significant overlap between the discovery used in one Opioid Lawsuit and what is permitted by courts or demanded by plaintiffs in other Opioid Lawsuits. The discovery in the Track One Lawsuits involved, for example, information about McKesson's controlled substance monitoring policies and procedures generally and included numerous document custodians with national or regional roles that go far beyond the counties involved in the Track One Lawsuits. Decl. ¶¶ 17. Indeed, the discovery generated in the Track One Lawsuits has been reproduced in numerous Opioid Lawsuits, including, for example, in the Opioid Lawsuits proceeding in New York,

22

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

which begin jury selection for trial on June 8, 2021.  Decl. ¶ 17; *see* Case Mgmt. Order, *In re Opioid Litig.*, Index No. 400000/2017 (N.Y. Sup. Ct. Sept. 5, 2018), ¶ 15 ("The parties agree to treat document productions made in *In re: National Prescription Opiate Litigation*, MDL No. 2804 as if produced in this coordinated litigation.").  The same is true in numerous other Opioid Lawsuits that are being actively litigated and defended.  Decl. ¶ 17.

The materials generated in the Track One Lawsuits and West Virginia AG Lawsuit indisputably bear on McKesson's liability in the ongoing Opioid Lawsuits across the country.  Most obviously, the Ohio AG Lawsuit against McKesson is set for trial in September 2021 and there are dozens of other Ohio plaintiffs with pending lawsuits against McKesson.  Decl. ¶¶ 14-15.  And McKesson is currently in the middle of a trial in the Cabell County/Huntington Lawsuits in West Virginia, with dozens of other lawsuits pending against McKesson brought by West Virginia claimants.  Decl. ¶¶ 11, 13.  Indeed, Insurers' Joint Requests for Production ask for the deposition transcripts of fact and expert witnesses who are testifying in ongoing trial right now, such as Michael Oriente, who was deposed as a McKesson witness in the Track One Lawsuits and was called as a witness by plaintiffs in the Cabell County/Huntington Lawsuit trial barely more than a week ago.  Decl. ¶ 28.  Similarly, Insurers ask for the deposition transcript and expert reports from plaintiffs' experts Dr. Craig McCann and James Rafalski, both of whom testified in the Track One Lawsuits as plaintiffs' proffered experts and both of whom just testified against McKesson in the Cabell County/Huntington trial.  Joint Requests, Decl. ¶ 23, Ex. E, at 25-26; Decl. ¶ 29.  These and numerous other fact and expert witnesses from the Track One and West Virginia AG Lawsuits have been or may be identified as witnesses to testify in one or more of the five other trials McKesson is facing this year alone.  Decl. ¶ 30.  It blinks reality to suggest that Insurers' use of the discovery generated in the Ohio county lawsuits that made up Track One and the West Virginia AG Lawsuit to prove McKesson's "knowledge" would not prejudice McKesson in these and the thousands of other Opioid Lawsuits that remain ongoing and present significant potential exposure to McKesson.  *See* Apr. 1, 2021 Hr'g Tr. 18:24-19:1 ("One of our arguments, both on defense and indemnity, will be knowledge.  And we want material.").

Finally, even apart from the prejudice analysis, for the reasons stated above, the discovery Insurers seek from the Track One Lawsuits and West Virginia AG Lawsuit is "irrelevant" to the

23

McKESSON'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY DISCOVERY AND PROCEEDINGS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

1
2
3

question of whether they had a duty to defend at the outset of the Opioid Lawsuits, and Insurers are not "permitted to delay an adjudication of their defense obligation until they develop sufficient evidence to retroactively justify their refusal to provide that defense."  *Haskel*, 33 Cal. App. 4th at 977.

4

**D.     The *Landis* Factors Also Weigh In Favor of a Stay.**

5
6
7
8
9
10
11
12
13
14
15

As explained above, this motion is governed by substantive California law and the analysis described above.  Even were this Court to apply federal procedural law to decide this Motion, the three factors that govern a stay under federal law result in the same outcome because McKesson would suffer significant prejudice without a stay; whatever prejudice Insurers may sustain from a stay does not outweigh the prejudice to McKesson; and staying overlapping discovery and proceedings in this coverage litigation would promote judicial efficiency.  *See Atain Specialty Ins. Co. v. Zenisco, Inc.*, 2020 WL 3640011, at *2 (N.D. Cal. July 6, 2020) (stay evaluated on the basis of "(1) 'possible damage which may result from the granting of a stay, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'") (quoting *CMAX*, 300 F.2d at 268).

16
17
18
19
20
21
22
23
24

As discussed above, McKesson would suffer significant prejudice were discovery and other proceedings permitted to proceed that overlap with issues being litigated in the underlying opioid lawsuits.  *See supra* at 13-16; *see also Ms Amlin Corp. Member, Ltd. v. Bottini*, 2020 WL 5966612, at *7 (S.D. Cal. Oct. 8, 2020) (stay warranted under *Landis* where insureds "demonstrated that they will be compelled to fight a two-front war ... and they may be collaterally estopped from relitigating any adverse factual findings in the third party action") (quoting *Montrose II*, 25 Cal. App. 4th at 910); *Zurich Am. Ins. Co. v. Omnicell, Inc.*, 2019 WL 570760, at *6 (N.D Cal. Feb. 12, 2019) (policyholder prejudiced and stay warranted under *Landis* where policyholder would be forced "to fight a two-front war") (citing *Montrose II*, 25 Cal. App. 4th at 910).

25
26
27
28

By contrast, Insurers here would not be damaged if a stay were imposed.  Courts routinely conclude that there is no prejudice to an insurer from staying a coverage action when it overlaps with ongoing underlying litigation, *even where an insurer is actually honoring its defense obligation* in the underlying action—which is not the case here.  *See, e.g., Zurich*, 2019 WL 570760, at *4 (granting a

24

stay of the coverage action and rejecting the argument that a stay would prejudice the insurer by forcing it to continue providing defense costs and delaying a potential no-coverage determination).  As those courts have concluded, any prejudice (if at all) to an insurer in having to pay defense costs while the underlying case is pending is outweighed by prejudice to the insured.  *See, e.g.*, *MS Amlin Corp.*, 2020 WL 5966612, at *5 ("Delaying a determination of whether an insurer owes an insured party coverage does not substantially harm the insurer.") (internal quotations omitted); *RLI Ins. Co. v. ACE Am. Ins. Co.*, 2020 WL 1322955, at *4 (N.D. Cal. Mar. 20, 2020) (stay of coverage litigation does not damage insurer because "advancing defense costs is part of an insurer's obligation and costs of doing business.") (internal quotations omitted); *Skating Edge, Inc.*, 2018 WL 5099705, at *4 (no prejudice to defending insurer from stay).

Finally, a stay will serve to promote judicial efficiency by simplifying issues of fact and questions of law.  Where, as is the case here, coverage issues turn on facts being litigated in the underlying lawsuits, courts have routinely found that a stay of the coverage action would serve the orderly administration of justice by avoiding "parallel proceedings over largely overlapping issues" and allowing the court "to better manage its limited resources until the underling [actions are] resolved." *Zurich*, 2019 WL 570760, at *6; *accord MS Amlin Corp. Member, Ltd.*, 2020 WL 596612, at *8; *RLI Ins. Co.*, 2020 WL 1322955, at *7; *Skating Edge*, 2018 WL 5099705, at *4.

## IV.  CONCLUSION

For all the foregoing reasons, McKesson respectfully requests that this Court grant its Motion and stay all discovery and proceedings at this stage in the litigation other than McKesson's pending motion for partial summary judgment on the duty to defend and the limited discovery relevant to that motion that has already been produced or agreed to by McKesson (*viz.*, the insurance policies, underlying complaints, and evidence of defense costs sufficient to satisfy the $5 million self-insured retention).

DATED: June 4, 2021                    COVINGTON & BURLING LLP


                                       By:    /s/     Cléa P.M. Liquard
                                              Cléa P.M. Liquard

                                       *Attorneys for Defendant, Counterclaim Plaintiff,
                                       Third-Party Plaintiff, and Third Party Counterclaim
                                       Defendant McKesson Corporation*