GIBSON, DUNN & CRUTCHER LLP
RICHARD J. DOREN, SBN 124666
    rdoren@gibsondunn.com
MATTHEW A. HOFFMAN, SBN 227351
    mhoffman@gibsondunn.com
MADELEINE F. MCKENNA, SBN 316088
    mmckenna@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213-229-7000
Facsimile:   213-229-7520

WILLKIE FARR & GALLAGHER LLP
CHRISTOPHER J. ST. JEANOS (*pro hac vice*)
    cstjeanos@willkie.com
JOCELYN SHER (*pro hac vice*)
    jsher@willkie.com
787 Seventh Avenue
New York, NY 10019
Telephone:   212-728-8000
Facsimile:   212-728-8100

*Attorneys for Plaintiffs and Counterclaim
Defendants AIU Insurance Company and
National Union Fire Insurance Company of Pittsburgh, Pa.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AIU INSURANCE COMPANY; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> MCKESSON CORPORATION f/k/a MCKESSON HBOC, INC., <br><br> Defendant, Counterclaim Plaintiff, Third Party Plaintiff, and Third Party Counterclaim Defendant, <br><br> v. <br><br> ACE PROPERTY AND CASUALTY INSURANCE COMPANY, | Case Nos.:   3:20-cv-07469-JSC; <br> 3:20-cv-09356-JSC <br><br> **PLAINTIFF NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND, AND MEMORANDUM IN SUPPORT THEREOF AND IN OPPOSITION TO MCKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND** <br><br> Honorable Judge Jacqueline Scott Corley <br><br> *[Declaration of Christopher J. St. Jeanos and [Proposed] Order filed concurrently herewith]* |

1

2

3

4

5

6

7

8

9

Third Party Defendant and Third Party
Counterclaim Plaintiff.

Hearing Date: January 27, 2022
Hearing Time: 9:00 a.m.
Courtroom: Courtroom E, 15th Fl.
Judge: Honorable Jacqueline Scott Corley
Action Filed: October 23, 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

3          NOTICE IS HEREBY GIVEN that, pursuant to Fed. R. Civ. P. 56, National Union Fire

4   Insurance Company of Pittsburgh, Pa. ("National Union") will and hereby does cross-move for partial

5   summary judgment on its duty to defend McKesson Corporation ("McKesson") in the lawsuits

6   identified as "Exemplar Suits" in McKesson's Motion for Partial Summary Judgment On The Duty

7   To Defend.  In National Union's Cross-Motion For Partial Summary Judgment On The Duty To

8   Defend (the "Cross-Motion"), National Union seeks a declaration that it owes McKesson no duty to

9   defend the "Exemplar Suits," or, in the alternative, that if National Union's duty to defend was

10  triggered, its duty to defend terminated by no later than December 18, 2019.  This Cross-Motion is

11  based on the accompanying Memorandum of Law, the Declaration of Christopher J. St. Jeanos, Esq.,

12  dated October 20, 2021, and supporting documents, the record in this action, and on such other

13  matters as may be presented to the Court, including at or before the hearing of the Cross-Motion.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.     ISSUES PRESENTED ............................................................................1

II.    PRELIMINARY STATEMENT ............................................................1

III.   BACKGROUND ...................................................................................5

    **A.**   The Opioid Crisis And Opioid Lawsuits. ............................................5

    **B.**   McKesson Provides Notice Of The Opioid Lawsuits...........................6

    **C.**   AIG's Investigation And McKesson's Claims Of Exhaustion. ...........7

    **D.**   The Declaratory Judgment Actions. ...................................................10

IV.    ARGUMENT........................................................................................10

    **A.**   McKesson Has Not Exhausted The Retained Limits And
            Triggered The Potential For Coverage Under The 08/09 NU
            Policy. ................................................................................................11

            1.   The 08/09 NU Policy Has An  "Each Occurrence"
                   Retained Limit That Is Not Subject To An Aggregate
                   Limit. ........................................................................................11

            2.   Under California Law, A Common Business Plan Or
                   Policy Does Not Turn Discrete Causes Of Bodily Injury
                   Into A Single Occurrence. .........................................................11

            3.   The Claims Against McKesson In The Opioid Lawsuits
                   Arise Out Of Multiple Purported Occurrences. ........................14

    **B.**   The "Exemplar Suits" Do Not Arise From An Occurrence At
            All. ......................................................................................................18

            1.   A Deliberate Act By The Insured, Even If The Insured
                   Did Not Intend To Cause Any Specific Injury, Is Not An
                   "Accident" Under California Law. .......................................18

            2.   The California Court Of Appeal's Decision in *Actavis*
                   Establishes That The Bodily Injury Asserted In The
                   "Exemplar Suits" Did Not Result From An Accident. .........19

            3.   *Actavis* Is Still Good Law And Is Binding Precedent
                   Here..........................................................................................19

            4.   The Complaints In The "Exemplar Suits," Like *Actavis*,
                   Allege Intentional Conduct That Is Not Covered By The
                   08/09 NU Policy. .....................................................................23

            5.   The Extrinsic Evidence Confirms The Claims Against
                   McKesson Are Not Based On Accidental Conduct...............28

i

| | | |
|---|---|---|
| **C.** | There Is No Coverage Under The 08/09 NU Policy Because McKesson Had Prior Knowledge Of The Bodily Injury Alleged In The "Exemplar Suits." | 39 |
| **D.** | There Is No Coverage Under The 08/09 NU Policy Because The "Exemplar Suits" Do Not Seek Damages For Bodily Injury | 39 |
| V. | CONCLUSION | 40 |

ii

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN  OPPOSITION TO MCKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

1

## TABLE OF AUTHORITIES

2

3

**Cases**                                                                                                          **Page(s)**

4    *Albert v. Mid-Century Ins. Co.,*
         236 Cal. App. 4th 1281 (2015) ............................................................................. 24
5

6    *Buss v. TransAmerica Ins. Co.,*
         939 P.2d 766 (Cal. 1997) .............................................................................. 10, 11

7    *Chemstar, Inc. v. Liberty Mut. Ins. Co.,*
8         41 F. 3d 429 (9th Cir. 1994).................................................................................. 16

9    *Chemstar, Inc. v. Liberty Mut. Ins. Co.,*
         797 F. Supp. 1541 (C.D. Cal. 1992). (*See* Mot. .)............................................... 16
10

11   *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.,*
         2020 WL 6706791 (Ohio Ct. Com. Pl. Sept. 9, 2020).......................................... 25

12   *Cincinnati Ins. Co. v. Richie Enters. LLC,*
         Civ. A. No. 1:12-CV-00186-JHM-HBB, 2014 U.S. Dist. Lexis 27306 (W.D. Ky.
13        Mar. 4, 2014)..................................................................................................... 23, 24

14   *Daniel v. Ford Motor Co.,*
15        806 F.3d 1217 (9th Cir. 2015)............................................................................... 23

16   *Delgado v. Interinsurance Exch. Club,*
         211 P.3d 1083 (Cal. 2009) ..................................................................... 3, 18, 22
17

18   *EOTT Energy Corp. v. Storebrand Int'l Ins. Co.,*
         45 Cal. App. 4th 565 (1996) ................................................................................. 17
19

20   *Eureka Federal Savings & Loan Ass'n v. American Casualty Co. of Reading,*
         873 F.2d 229 (9th Cir. 1989).................................................................... 12, 14, 16

21   *Evanston Ins. Co. v. Ghillie Suits.com, Inc.,*
         No. C 08-2099 JF (HRL), 2009 WL 734691 (N.D. Cal. Mar. 19, 2009).................. 13, 14, 15
22

23   *Farmers Ins. Exch. v. Hurley,*
         76 Cal. App. 4th 797, 90 Cal. Rptr. 2d 697 (1999*), as modified on denial of reh'g*
24        (Dec. 17, 1999)....................................................................................................... 29

25   *Giant Eagle, Inc. v. Am. Guarantee and Liab. Ins. Co.,*
         499 F. Supp. 3d 147 (W.D. Pa. 2020)........................................................... 17, 25
26

27

28

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN  OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

*Gonzales v. Raich,*
    545 U.S. 1 (2005) ................................................................ 31

*Gonzalez v. Fire Ins. Exch.,*
    234 Cal. App. 4th 1220 (2015) ........................................... 25

*Hartford Cas. Ins. Co. v. Swift Distrib., Inc.,*
    59 Cal. 4th 277 (2014) ....................................................... 10

*Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd's London,*
    2001 Cal. Super. LEXIS 220 (Cal. Super. Ct. Sept. 25, 2001) ............. 30

*Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*
    602 F. App'x 115 (4th Cir. 2015) ................................ 23, 24

*Liberty Surplus Ins. Corp. v. Fed. Ins.,*
    No. CV 11-2241 DSF (EX), 2013 WL 12132024 (C.D. Cal. Dec. 12, 2013) ....... 17

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Corp.,*
    418 P.3d 400 (Cal. 2018) .......................................... *passim*

*Lone Star Sec. & Video, Inc. v. City of Los Angeles,*
    827 F.3d 1192 (9th Cir. 2016) ........................................... 22

*Maples v. Aetna Cas. & Surety Co.,*
    83 Cal. App. 3d 641 (Cal. Ct. App. 1978) ...................... 12, 16

*Mesa Underwriters Specialty Ins. Co. v. Blackboard Ins. Specialty Co.,*
    400 F. Supp. 3d 928 (N.D. Cal. 2019) ................................ 23

*Montrose Chemical Corp. v. Superior Ct.,*
    6 Cal.4th 287 (N.D. Cal. 1993) .................................... 30, 31

*Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.,*
    6 Cal. App. 5th 1258 (2016) ........................................... 3, 18

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.,*
    805 F. Supp. 2d 945 (C.D. Cal. 2011) ................................ 29

*In re Prudential Lines Inc.,*
    158 F.3d 65 (2d Cir. 1998) ............................................. 12

*Rite Aid Corp. v. ACE Am. Ins. Co.,*
    No. CVN19C04150EMDCCLD, 2020 WL 5640817 (Del. Super. Ct. Sept. 22, 2020) .... 17

*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.,*
    148 Cal. App. 4th 620, 634 (2007) ................................... 17

iv

*Swain v. Cal. Cas. Ins. Co.,*
  99 Cal. App. 4th 1 (Cal. Ct. App. 2002) ..................................................................... 26

*The Purdy Co. of Cal. v. the Travelers Ins. Co.,*
  No. 97- 56106, 1999 WL 68628 (9th Cir. Feb. 11, 1999) ...................................... 40

*Traveler's Prop. Cas. Co. of Am. v. Actavis,*
  410 P.3d 1221 (Cal. 2018) ......................................................................................... 20

*Traveler's Prop. Cas. Co. of Am. v. Actavis,*
  427 P.3d 744 (Cal. 2018) ...................................................................................... 4, 20

*Traveler's Property Casualty Co. of America v. Actavis, Inc.,*
  16 Cal. App. 5th 1026 (2017), review dismissed ........................................... *passim*

*West Virginia v. Purdue Pharma L.P. et al.,*
  No. 01-cv-00557 (S.D. W.V. Jun. 21, 2001) ........................................................... 31

*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.,*
  65 F. Supp. 3d 1402 (J.P.M.L. 2014) ....................................................................... 17

**Statutes**

21 U.S.C. § 826 ................................................................................................................ 31

28 U.S.C. § 1407(a) ......................................................................................................... 17

**Other Authorities**

Cal. Rules of Court, rule 8.528(b)(1) ............................................................................ 20

Cal. Rules of Court, rule 8.1115(e) ................................................................................ 20

1   National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") submits this

2   memorandum of law in opposition to the Motion For Partial Summary Judgment On The Duty To

3   Defend ("Motion" or "Mot.") filed by the McKesson Corporation ("McKesson"), and in support of its

4   Cross-Motion For Partial Summary Judgment On The Duty To Defend ("Cross-Motion").

5   **I.   <u>ISSUES PRESENTED</u>**

6   1)   Has McKesson established exhaustion of the "Each Occurrence" Retained Limit set

7   forth in the policy National Union issued to McKesson covering the period July 1, 2008-July 1,

8   2009 (the "08/09 NU Policy")?

9   2)   Has McKesson established the allegations against it in the opioid lawsuits it refers to

10   as "Exemplar Suits" in its Motion arise from an "Occurrence," which is defined as an "accident" in

11   the 08/09 NU Policy?

12   3)   Did McKesson have prior knowledge of the bodily injuries alleged in the "Exemplar

13   Suits" before the July 1, 2008 inception date of the 08/09 NU Policy?

14   4)   Has McKesson established that the government plaintiffs in the "Exemplar Suits" are

15   seeking to recover damages "for bodily injury" as defined in the 08/09 NU Policy?

16   **II.   <u>PRELIMINARY STATEMENT</u>**

17   McKesson, the leading distributor of prescription opioids in the United States, has been sued

18   by more than 3,000 states, cities and counties across the country for its alleged role in helping to

19   cause the opioid crisis that has ravaged the nation (the "Opioid Lawsuits").  The government

20   plaintiffs in those lawsuits allege that over a period of many years, McKesson intentionally failed to

21   monitor, report to the proper authorities, and refrain from filling suspicious orders of opioids, all in

22   violation of the federal Controlled Substances Act ("CSA") and its own Suspicious Order Monitoring

23   Systems ("SOMS").  The government plaintiffs also allege that McKesson distributed such massive

24   amounts of opioids that it could have had no doubt there would be diversion of those opioids for

25   illicit uses, and it did so even though it was on notice diversion was causing addiction, overdoses, and

26   deaths.

27

28

1

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC</u>

1   Nevertheless, McKesson now seeks an order declaring National Union has a duty to

2   reimburse McKesson under the 08/09 NU Policy for the amounts it claims to have spent to defend the

3   "Exemplar Suits."  For the following independent reasons, McKesson is not entitled to recovery and

4   National Union is entitled to summary judgment.[1]

5   *First*, McKesson has not satisfied the $5 million "Each Occurrence" Retained Limit

6   underlying the 08/09 NU Policy.  The 08/09 NU Policy provides coverage to McKesson only for

7   "those sums in excess of the Retained Limit that [McKesson] becomes legally obligated to pay as

8   damages … caused by an Occurrence . . . ."  (*See* ECF No. 79-2, Declaration of Gretchen A. Hoff

9   Varner Ex. A, 08/09 NU Policy, at § 1(A-B).)  The Retained Limit is $5 million for "*Each*

10  *Occurrence*," and while the Retained Limit for General Liability claims is subject to a $7.5 million

11  aggregate limit, there is no aggregate limit on the Retained Limit for Products claims, such as those in

12  the Opioid Lawsuits.[2]  (*See id.*, at End. No. 1, § 12(VII)(Z), and Schedule of Retained Limits

13  (emphasis added).)

14  Aware of this hurdle to coverage, McKesson asserts that in the thousands of Opioid Lawsuits

15  it faces allegations of misconduct spanning decades that nevertheless amount to a single Occurrence.

16  According to McKesson, therefore, it need only establish the exhaustion of a single $5 million

17  Retained Limit.  (*See* Mot. at 21-25.)  Not so.  California courts focus on the "cause" of the alleged

18  bodily injury at issue when determining the number of purported Occurrences, not a remote corporate

19  policy or failure that permitted the "cause" to occur, even if that failure is the basis for the insured's

20  potential liability.  While, as noted below, there is no accidental "Occurrence" alleged at all against

21  McKesson, the allegations and extrinsic evidence in the Opioid Lawsuits establish the claims against

22  McKesson arise out of hundreds of discrete acts that allegedly caused the bodily injuries at issue.

23

24  [1]  McKesson also seeks a declaration with respect to all suits "similarly pled" as the "Exemplar
25  Suits," but McKesson is not entitled to such relief because it does not even attempt to identify
    those suits or provide the Court with any guidance as which suits are "similarly pled."
26
27  [2]  Capitalized terms not otherwise defined in the Preliminary Statement shall have the meaning
    ascribed to them in the body of this brief.
28

1    For example, McKesson's decision in 2005 to ship over two million doses of Hydrocodone in

2  just twelve days to internet pharmacies in Florida that McKesson was warned were engaged in

3  diversion, and its decision in 2008 not to block any suspicious opioid orders at its Colorado

4  distribution center, are discrete causes of the diversion and resulting opioid addiction described in the

5  Opioid Lawsuits, even though both may fit within an alleged corporate policy to choose profits over

6  safety.  As McKesson itself explained to Judge Polster, who is overseeing the opioids multidistrict

7  litigation in the Northern District of Ohio ("MDL"), the "alleged injuries" in the Track One Lawsuits

8  "arose not from a 'continuing violation' but from alleged 'repetitive discrete violations' …."  (Ex. 1 at

9  41.)[3]  Accordingly, McKesson's payment of defense costs to date, though significant, has not

10  exhausted the separate Each Occurrence Retained Limits applicable to each of those discrete causes

11  of the bodily injury alleged in the Opioid Lawsuits.

12    *Second*, even if McKesson could establish its potential liability in the Opioid Lawsuits arises

13  from just a single Occurrence—according to McKesson, a decades-long failure to comply with its

14  legal obligations under the CSA—McKesson still cannot show that twenty-year failure arises from

15  *accidental* conduct.  Pursuant to the plain language of the 08/09 NU Policy, and California law,

16  McKesson is entitled to coverage only if it can establish the "Exemplar Suits" seek damages that

17  were "caused by an Occurrence," which, in relevant part, is defined as an "*accident*."  (08/09 NU

18  Policy, §§ I(B), VII(S)(1) (emphasis added)); *see also Liberty Surplus Ins. Corp. v. Ledesma &*

19  *Meyer Constr. Corp.*, 418 P.3d 400, 403 (Cal. 2018).

20    Under California law, "an accident is an unexpected, unforeseen, or undesigned happening or

21  consequence from either a known or an unknown cause" and "refers to the conduct of the insured for

22  which liability is sought to be imposed …."  *Delgado v. Interinsurance Exch. Club*, 211 P.3d 1083,

23  1086, 1088 (Cal. 2009) (internal quotations omitted).  "Where the insured intended all of the acts that

24  resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured

25

26  [3]   Citations to "Ex. __" are to the documents and testimony attached to the Declaration of

27    Christopher J. St. Jeanos, dated October 20, 2021 ("CJS Decl.").

28

did not intend to cause injury." *Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.*, 6 Cal. App. 5th 1258, 1275 (2016) (internal quotations omitted).

In *Traveler's Property Casualty Co. of America v. Actavis, Inc.*, 16 Cal. App. 5th 1026 (2017), review dismissed, cause remanded *sub nom. Traveler's Prop. Cas. Co. of Am. v. Actavis*, 427 P.3d 744 (Cal. 2018), the California Court of Appeal held that the allegations in the Opioid Lawsuits—there, against opioid manufacturer Watson Pharmaceuticals—"do not create a potential for liability for an accident because they are based, and can only be read as being based, on the deliberate and intentional conduct of Watson ...." *Id.* at 1030. McKesson's scattershot efforts to establish *Actavis* is no longer binding precedent are contrary to California law. *Actavis* remains the last word on whether the Opioid Lawsuits assert accidental conduct.

Nor does McKesson succeed in its efforts to distinguish the factual allegations asserted against it in the "Exemplar Suits" from the factual allegations asserted against Watson in the Opioid Lawsuits. Instead, the allegations in the "Exemplar Suits" establish that McKesson's purported misconduct over two decades also was no accident, and can only be read as being based on intentional conduct. According to Summit County, for example, "few realize that this crisis arose from the ... distributors' ... deliberate efforts to evade restrictions on opioid distribution [and who] acted without regard for the lives that would be trammeled in pursuit of profit"; indeed, "McKesson's conscious and deliberate disregard of its [CSA] obligations was especially flagrant." (*See* ECF No. 79-7, Declaration of James R. Brigman In Support Of McKesson's Motion ("Brigman Decl."), Ex. G, Third Amended Summit County Complaint, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Dec. 19, 2019) ("Summit TAC") ¶¶ 3, 798.)

The extrinsic evidence the Court is entitled to rely upon also conclusively establishes McKesson's alleged disregard of its CSA obligations, and its massive over-distribution of opioids, was no accident. For example, the evidence shows that as part of its "Distributor Initiative," the Drug Enforcement Administration ("DEA") sent letters, had calls, and held multiple meetings with McKesson between 2005 and 2007 to specifically warn McKesson to take seriously its obligation to guard against the over-distribution and diversion of opioids. (*See infra* § IV.B.5.) Yet, according to

4

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

the DEA, McKesson repeatedly and intentionally ignored those warnings for more than a decade—conduct that led to multiple investigations by and settlements with the DEA, and McKesson's payment of more than $160 million in penalties.  (*Id.*)

*Third*, the 08/09 NU Policy applies "only if … prior to" July 1, 2008, McKesson did not "kn[o]w that the Bodily Injury … had occurred in whole or in part.  If such an Insured … knew, prior to the Policy Period, that the Bodily Injury … had occurred, then any continuation, change, or resumption of such Bodily Injury … during or after the Policy Period will be deemed to have been known prior to the Policy Period."  (08/09 NU Policy, §I(C)(1).)  The extrinsic evidence conclusively establishes McKesson had knowledge of—indeed, was specifically warned by the DEA about—the very bodily injury McKesson now asserts triggers coverage.

*Fourth*, McKesson cannot establish the increased budget expenditures claimed by the government plaintiffs in the Opioid Lawsuits, and that the plaintiffs sought to recover from McKesson, were "damages … for Bodily Injury" as required by the clear and unambiguous terms of the 08/09 NU Policy.  (08/09 NU Policy, End. I, § 3.III(A).)  Instead, the damages sought by the government plaintiffs are for economic injury, which is not covered by a liability policy.  McKesson is not entitled to coverage.

## III.    **BACKGROUND**

### A.    **The Opioid Crisis And Opioid Lawsuits.**

For most of the 20th century, the consensus among medical professionals was that opioids were not suitable for the management of chronic pain due to the risk of addiction.  (*See* Summit TAC ¶¶ 140-49.)  Purdue, the manufacturer of the opioid OxyContin, with the help of distributors like McKesson, was determined to change that consensus, and increase its profits.  (*See id.*, ¶¶ 169-492.)  By all accounts, these efforts were extremely successful—in 2006, OxyContin sales totaled roughly $800 million per year; since 2009, sales have reached as high as $2.47-3.01 *billion* per year.  (*Id.* ¶ 47.)

As opioid consumption increased, so too did illicit drug use, overdoses, and death.  In Ohio alone, where two of the "Exemplar Suits" at issue in McKesson's Motion were filed, overdose deaths

5

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

increased 20.5% in 2015 and 30% in 2016.  (Brigman Decl. Ex. E, Third Amended Cuyahoga County

Complaint, No. 1:17-MD-2804 (N.D. Ohio Dec. 19, 2019) ("Cuyahoga TAC") ¶ 671.)  The public

health crisis resulting from the over-distribution of opioids became so dire that opioid addiction and

overdoses became the leading cause of death for Americans under age 50 and Americans' life

expectancy decreased in 2016 for the first time in decades.  (*Id.,* ¶ 7.)

       In addition to the significant loss of life, the opioid crisis resulted in tremendous economic

injury to state and local governments.  (*See, e.g.*, Summit TAC ¶¶ 20-21.)  As a result, states, cities,

and counties filed lawsuits against opioid manufacturers, distributors, and retailers, alleging those

entities were responsible for the opioid crisis and resulting economic losses (the "Opioid

Lawsuits").  (ECF No. 9, McKesson Counterclaims ("Counterclaims"), ¶¶ 19-20.)  The majority of

the Opioid Lawsuits have been consolidated for pre-trial proceedings in the MDL in the Northern

District of Ohio.  (*See id.*, ¶ 22.)  In addition to the cases brought by the government plaintiffs,

hundreds of lawsuits have also been brought by Indian tribes, hospitals, pension funds, and

unions.  (*See id.*, ¶ 19.)

### B.      McKesson Provides Notice Of The Opioid Lawsuits.

       McKesson first provided notice of one of the Opioid Lawsuits to National Union on February

8, 2016, when it noticed a case filed by the Attorney General of West Virginia (the "WV AG

Action") to policies issued by National Union covering July 1, 2006 to July 1, 2009.  (*See* Brigman

Decl. ¶ 4.)  McKesson subsequently noticed thousands of additional Opioid Lawsuits, expanded the

time period of noticed policies to 1999 to 2018, and included both domestic and foreign companies

affiliated with National Union's parent, American International Group, Inc., as well as other insurers,

including ACE Property and Casualty Insurance Company ("ACE").  (*See id.*)

       Among the policies McKesson noticed were two excess liability policies issued by AIG

subsidiary AIU Insurance Company, covering July 1, 1999 to July 1, 2001, and eight excess liability

policies issued by National Union, covering July 1, 2001 to July 1, 2009 (collectively, the "AIG

6

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

1  Policies").[4]  (*See* Brigman Decl. ¶¶ 6, 8 and Exs. D, F; Counterclaims, ¶¶ 11-12, 27.)  Subject to their

2  terms, definitions, conditions and exclusions, the AIG Policies generally afford coverage for losses

3  that McKesson is legally obligated to pay as damages because of "Bodily Injury" that took place

4  during the policy periods and was caused by an "Occurrence."  (*See* 08/09 NU Policy, at § 1(A-B).)

5          The AIG Policies apply excess of a $5 million "Retained Limit" for "Each Occurrence."  (*See*

6  *id.* § I; *id.* End. 1, § (12)(VII)(Z) and Schedule of Retained Limits.)  While the Each Occurrence

7  Retained Limit for General Liability claims is subject to an aggregate limit of $7.5 million, the Each

8  Occurrence Retained Limit for Products claims (which includes all claims related to the distribution

9  of products) is not subject to an aggregate.  (*See id.*; *see also id.*, § VII(X) and (DD).)  This means

10  National Union has an obligation to provide a defense for products claims only "*when*" McKesson

11  establishes that each and every $5 million Each Occurrence Retained Limit has been exhausted "by

12  *payment of Loss* to which [the] policy applies."  (*See, e.g. id.*, End. No. 1, §§ (3)(III)(A) &

13  (10)(VII)(P) (emphasis added).)

14          **C.      AIG's Investigation And McKesson's Claims Of Exhaustion.**

15          The investigation of McKesson's claims by AIG Claims, Inc. ("AIG") began soon after

16  McKesson provided notice of the WV AG Action in February 2016.  (*See, e.g.*, Ex. 2.)  The

17  allegations from that complaint, and the public information available at the time, raised significant

18  questions regarding whether the allegations against McKesson related to accidental conduct.  (*See*

19  *infra* § IV.B.4-5.)  In December 2017, McKesson provided notice of Opioid Lawsuits filed by

20  Summit County and Cuyahoga County, Ohio—the MDL "Track One Lawsuits" and two of the three

21  "Exemplar Suits" at issue in the Motion.  (*See* Brigman Decl. ¶¶ 6, 8.)  As discussed below, the

22  government plaintiffs in those suits also alleged McKesson intentionally over-distributed opioids,

23  which led diversion, and resulted in addiction, overdoses, and death.

24

25

26  [4]   McKesson also noticed nine excess liability policies issued by ACE covering July 1, 2009
         through July 1, 2017.  (*See* Brigman Decl. ¶¶ 6, 8 and Exs. D, F.)  ACE has filed its own
27       opposition to McKesson's Motion and a cross-motion as well.

28

1    Because McKesson had not yet claimed the Retained Limits of the AIG Policies had been

2    exhausted (*see* Brigman Decl. ¶ 18), AIG continued to request information to gain a better

3    understanding of why McKesson believed the intentional conduct alleged in those lawsuits triggered

4    coverage for accidents under the AIG Policies.  For example, AIG sent correspondence requesting

5    information on May 5, 2017, June 26, 2017, July 10, 2017, November 6, 2017, and January 17, 2018,

6    March 8, 22, and 26, 2018, and June 13, 2018.  (CJS Decl. ¶ 5.)  Rather than provide the information,

7    McKesson complained about the purported burden of doing so and stated it would follow up with a

8    proposal to provide AIG access to certain unspecified litigation materials that were not publicly

9    available.  (*Id.*)

10    On August 31, 2018, McKesson sent an email to AIG stating that, "as of August 28, 2018,

11    McKesson has received defense invoices totaling approximately $25 million in connection with the

12    opioid lawsuits."  (Ex. 3.)  The email, however, made no mention of the payment of any such costs—

13    National Union owes a duty to defend only "when" McKesson has established that "Retained Limits

14    have been exhausted by payment of Loss …."  (*See* 08/09 NU Policy End. No. 1, §§(3)(III)(A) &

15    (10)(VII)(P).)  McKesson's email also did not identify whether McKesson believed the allegations in

16    the Opioid Lawsuits arose from a single or multiple Occurrences, or which Each Occurrence Retained

17    Limits, for which policy—out of the dozens of policies McKesson had noticed—purportedly had

18    been exhausted.  (*See* Ex. 3*.)*

19    As a result, on October 19, 2018 and November 7, 2018, AIG requested that McKesson "(i)

20    provide … documentation sufficient to show the amount of defense costs *paid by* McKesson in

21    connection with the opioid lawsuits to date and (ii) identify the Policies that McKesson contends have

22    been triggered through exhaustion of their applicable Retained Limits and provide the basis for any

23    such contention."  (Brigman Decl., Ex. H, October 19, 2018 Letter from Laura Blumenthal to Kristi

24    Lawson; Ex. 4 (emphasis added).)  McKesson did not do so.  Instead, on January 31, 2019,

25    McKesson sent an email stating only that, "[a]s of January 17, 2019, McKesson has received defense

26    invoices totaling approximately $56 million in connection with the opioid lawsuits."  (Ex. 5.)  The

27

28

1  email attached a chart that included a list of invoices received to date, but that did not include proof

2  of payments made for those invoices, if any.  (*Id.*)

3      On January 29, 2019, after multiple requests, McKesson finally provided certain written

4  discovery from the WV AG Action and Track One Lawsuits (Category 1 and 2 materials).  (*See* CJS

5  Decl. ¶ 9.)  In the ensuing months, McKesson made available transcripts from the depositions of

6  certain plaintiffs and non-parties (Category 3 materials).  (*See* CJS Decl. ¶ 10; Ex. 6.)  Although

7  transcripts from the depositions of McKesson employees and expert reports (Category 4 and 5

8  materials) were in McKesson's possession as early as July 2018 (*see* Brigman Decl. ¶ 19 n.3),

9  McKesson did not provide copies of those depositions or reports to AIG.  (*See* CJS Decl.  ¶ 12.)

10  Instead, AIG was not able to review those materials until they became available on the public docket

11  beginning in June 2019.  (*Id.*)  As discussed below, these materials too suggested the claims against

12  McKesson were not covered by the AIG Policies.

13      McKesson, however, still had not provided the information necessary to establish the Each

14  Occurrence Retained Limits had been exhausted by the payment of defense costs and that coverage

15  under the AIG Policies had potentially been triggered.  As a result, on September 9, 2019, AIG again

16  asked McKesson to provide its position on the number of Occurrences at issue in the more than 3,000

17  Opioid Lawsuits, and pointed out that McKesson's statements about the dollar value of invoices

18  received were "insufficient to demonstrate exhaustion of the applicable retained limits."  (Ex. 8.)

19  Accordingly, AIG requested copies of the referenced invoices and "proof of payment corresponding

20  to each such invoice."  (*Id.*)

21      On October 21, 2019, McKesson settled the Track One Lawsuits.  (Brigman Decl. ¶ 12.)

22  Months later, in June 2020, McKesson provided notice of *Oklahoma v. McKesson Corp.,* Case No.

23  CJ-2020-84 (Bryan Cnty., Okla. May 1, 2020) ("Oklahoma AG Action"), the third "Exemplar Suit"

24  in the Motion.  (*See id*. ¶ 15.)  Despite AIG's repeated requests, McKesson continued to refuse to

25  produce additional information relating to exhaustion, or to support its position that the claims against

26  McKesson in the Opioid Lawsuits triggered coverage under the AIG Policies.  (*See* CJS Decl. ¶ 12.)

27  On October 22, 2020, AIG sent McKesson a letter denying coverage.  (Brigman Decl. ¶ 12; Ex. L.)

28

1

      **D.**     **The Declaratory Judgment Actions.**

2

      On October 23, 2020, AIU and National Union filed this action seeking a declaration they

3

have no duty under the AIG Policies to defend or indemnify McKesson for the Opioid

4

Lawsuits. (ECF No. 1, AIU and National Union Complaint, ¶¶ 49-56.) AIG asserts there is no

5

coverage for the Opioid Lawsuits because, among other reasons, the allegations against McKesson do

6

not arise from accidental conduct; the government plaintiffs in the Opioid Lawsuits do not seek

7

recovery for damages because of or for bodily injury; and McKesson had knowledge of the claimed

8

bodily injuries prior to the policy periods of the AIG Policies. (*See id.,* ¶ 8.) ACE also filed a

9

declaratory judgment action that has been consolidated with this action. (*See* ECF No. 163.)

10

McKesson filed a Counterclaims and Third Party Complaint, seeking, among other relief, a

11

declaration that AIU, National Union, and ACE owe a duty to defend and indemnify McKesson for

12

the Opioid Lawsuits. (*See* ECF No. 9, Counterclaims, ¶¶ 49-60.)

13

      On April 30, 2021, McKesson filed a motion for summary judgment on just a portion of the

14

third claim for relief in its Counterclaims, seeking a declaration that it is entitled to defense costs for

15

the three "Exemplar Suits" under the 08/09 NU Policy as well as a policy issued by ACE covering

16

July 1, 2015 through July 1, 2016. (Mot. at 1.) For the reasons set forth below, AIU and National

17

Union oppose that Motion, which should be denied. National Union has also filed a Cross-Motion

18

requesting a declaration that (i) National Union does not owe McKesson a duty to defend the

19

"Exemplar Suits"; or, in the alternative, (ii) if National Union's duty to defend was triggered on July

20

25, 2019, its duty to defend terminated no later October 21, 2019.

21

**IV.**   <u>**ARGUMENT**</u>

22

      Although the duty to defend is broader than the duty to indemnify (*see* Mot. at 8-9), the

23

California Supreme Court has made clear "the duty to defend … is 'not unlimited.'" *Hartford Cas.*

24

*Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 288 (2014) (quoting *Waller v. Truck Ins. Exch., Inc.*,

25

11 Cal. 4th 1, 19 (1995)); *see also Buss v. TransAmerica Ins. Co.*, 939 P.2d 766, 774 (Cal. 1997)

26

("The insurer has not contracted to pay defense costs for claims that are not even potentially

27

covered.") (internal quotations omitted). For the reasons set forth below, McKesson's claims for the

28

1  recovery of the cost of defending the allegations in the "Exemplar Suits" that its conduct helped fuel

2  the opioids crisis is not within even the potential scope of coverage of the 08/09 NU Policy.

3      **A.**     **McKesson Has Not Exhausted The Retained Limits And Triggered The Potential**

4      **For Coverage Under The 08/09 NU Policy.**

5          1.    The 08/09 NU Policy Has An  "Each Occurrence" Retained Limit That Is Not

6             Subject To An Aggregate Limit.

7       The 08/09 NU Policy provides coverage to McKesson for "those sums *in excess of the*

8  *Retained Limit* that [McKesson] becomes legally obligated to pay as damages … because of Bodily

9  Injury … [that] is caused by an Occurrence …."  (08/09 NU Policy, § I(A-B) (emphasis added).)  The

10  Retained Limit is $5 million for "*Each Occurrence*."  (*Id.* End. 1, § (12)(VII)(Z) and Schedule of

11  Retained Limits (emphasis added).)  While the Each Occurrence Retained Limit for General Liability

12  claims is subject to an aggregate limit of $7.5 million, the Each Occurrence Retained Limit for

13  Products claims is *not* subject to an aggregate.  (*See id.*)  Products claims include all claims related to

14  the distribution of products by McKesson (*see id.*, § VII(X) and (DD)), such as those at issue in the

15  Opioid Lawsuits.

16       To provide an illustration, if there are 100 Occurrences that fall under McKesson's General

17  Liability coverage in a given policy period, the most McKesson must pay to exhaust the Retained

18  Limit is an aggregate of $7.5 million.  However, if there are 100 Occurrences that fall under

19  McKesson's Products coverage—like the opioids claims—then McKesson must pay $5 million for

20  each and every one of those 100 Occurrences before it can exhaust the "Each Occurrence" Retained

21  Limit and trigger coverage for any one of those Occurrences under the 08/09 NU Policy.  (*See* 08/09

22  NU Policy, § I(A-B).)

23          2.    Under California Law, A Common Business Plan Or Policy Does Not Turn

24             Discrete Causes Of Bodily Injury Into A Single Occurrence.

25       The 08/09 NU Policy defines an "Occurrence" as "an accident, including continuous or

26  repeated exposure to conditions."  (*Id.*, at § V(S)(1).)  California courts apply the "cause" test when

27  determining the number of Occurrences at issue in connection with a coverage action:  "[a] seemingly

28

11

NATIONAL UNION'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

unbroken line of [California] authority find[s] that the term 'accident' unambiguously refers to the event *causing* damage," when determining the number of Occurrences, "not [an] earlier event creating the potential for future injury …."  *Maples v. Aetna Cas. & Surety Co.*, 83 Cal. App. 3d 641, 647-48 (Cal. Ct. App. 1978) (emphasis added); *see also In re Prudential Lines Inc.*, 158 F.3d 65, 82 (2d Cir. 1998) ("The common thread running through the California cases is that an 'occurrence' or 'accident' is associated with the time of injury," meaning "that the 'cause' of injury … undoubtedly refers to the immediate rather than the remote cause of injury.") (internal quotations omitted).

Thus, when there are several potential causes of the injuries or damages at issue, even if those causes are part of a larger policy or plan, there are multiple Occurrences.  For example, in *Eureka Federal Savings & Loan Ass'n v. American Casualty Co. of Reading*, 873 F.2d 229 (9th Cir. 1989), the policy at issue provided $20 million of coverage for "each loss" and, like here, stated that "'[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts … shall be considered a single loss....'"  *Id.* at 234-35.  The alleged breaches of duty "include[d] funding loans without approval, failing to complete proper loan documents, failing to perfect security interests or obtain adequate collateral, funding loans in excess of approval limits to one borrower, selling participation interests with recourse to Eureka, and funding speculative loans without adequate sources of repayment or adequate risk analysis."  *Id.*

For purposes of summary judgment, it was assumed that each of those discrete events were carried out as part of "a common business plan."  *Id.*  Nevertheless, in affirming summary judgment, the Ninth Circuit held "that the fact that all loan losses arguably originated from one loan policy does not require finding only one loss [because] there were numerous intervening business decisions that took place *after the loan policy was initiated* that required the exercise of independent business judgment. … Thus, the decision to implement the aggressive loan policy did not cause the losses, rather it was the alleged negligence on the part of the … defendants in making or approving the individual transactions" as part of that "common business plan" that led to the injuries at issue.  *Id.* (emphasis added); *see also id.* ("[T]he mere existence of an aggressive loan policy is insufficient as a

1    matter of law to transform disparate acts and omissions made by five directors in connection with

2    issuance of loans to over 200 unrelated borrowers into a single loss.')

3            The Northern District of California's decision in *Evanston Ins. Co. v. Ghillie Suits.com, Inc.*,

4    No. C 08-2099 JF (HRL), 2009 WL 734691 (N.D. Cal. Mar. 19, 2009) is also instructive.  In

5    *Evanston*, the policyholder sought coverage for liability it incurred after defective garments it

6    manufactured and sold—"ghillie" suits worn by Marine snipers as camouflage—caught fire and

7    caused severe burns to two Marines in related incidents during a training exercise.  *Id.* at *1-2.  GSC,

8    the manufacturer of the ghillie suits, had a "website that advertise[d] its ghillie suits with a fire-

9    retardant spray."  *Id.* at *1.  Apparently, because of the materials GSC used for the ghillie suits,

10   adding the spray actually made them more prone to catching fire.  *Id.* at *1-2.

11           The liability policy in *Evanston*, like the 08/09 NU Policy, defined an Occurrence to mean "an

12   accident, including repeated or continuous exposure to substantially the same general harmful

13   conditions."  *Id.* at *4.  The policyholder in *Evanston* argued that the relevant "Occurrence," for

14   purposes of determining the number of Occurrences, was the "common manufacturing defect" in the

15   ghillie suits that increased the potential for future injury when the fire retardant spray was added.  *Id.*

16   The court rejected that argument:

17           [A] nonexclusive list of remote causes [for both injuries] *could include a failure to warn*,

18           the decision by [GSC] to bundle its ghillie suits with a defective fireproof spray, or

19           misapplication of the spray to the suits.  Once the analysis looks behind the immediate and

20           proximate cause of an injury, any number of preceding events could be said to be the

21           underlying cause of a person's injuries.  Such an interpretation is inconsistent with the

22           terms of the policy and established rules of contract interpretation.  Allowing … [the]

23           number of occurrences to [be limited to a] remote cause would effectively eviscerate the

24           purpose of having a per-occurrence limitation as opposed to an aggregate limit.

25   *Id.* at *11 (emphasis added).

26           Instead, even though *GSC's potential liability* stemmed from the common manufacturing

27   defect, the court determined the Marines' injuries arose from separate Occurrences because there

28

1    were two separate *causes* of those injuries:  the first resulting from the ignition of the defective ghillie

2    suit worn by the first Marine caused by the firing of his weapon; and the second resulting from the

3    ignition of the defective ghillie suit worn by the second Marine when he attempted to rescue the first

4    Marine.  *Id.* at *9.  Although the court acknowledged each fire could be traced back to the common

5    manufacturing defect, it explained there were still two Occurrences because "[t]he two accidents did

6    not occur simultaneously and under the same precise conditions.  Nor can it be said that [the first

7    Marine's] injuries were so closely linked temporally and spatially so as to be part of the same

8    occurrence that caused [the second Marine's] burns."  *Id.* at 9.

9                    3.    The Claims Against McKesson In The Opioid Lawsuits Arise Out Of Multiple

10                        Purported Occurrences.

11          McKesson asserts the claims against it in the thousands of Opioid Lawsuits arise from just one

12   Occurrence:  "[T]he Track One Lawsuits, Oklahoma AG Suit, and all Opioid Lawsuits alleging

13   similar claims … arise from a single 'occurrence,' which is *McKesson's alleged failure to maintain*

14   *effective controls for opioid distribution* …."  (Mot. at 2 (emphasis added); *see also id.* at 24

15   (asserting failure to maintain effective controls is the "core theme" of the "Exemplar Suits")).)

16   McKesson's position is incorrect under the language of the 08/09 NU Policy and California law.

17          In each of the Opioid Lawsuits, the immediate cause of the alleged bodily injuries is addiction

18   that resulted from separate instances of opioid diversion, which allegedly resulted from discrete

19   breaches of McKesson's CSA's obligations to detect and stop suspicious orders of opioids.  (*See infra*

20   § IV.B.4; *see, e.g.*, Summit TAC ¶ 595 (when a "distributor does not report or stop suspicious orders"

21   this "fuels and expands the illegal market and results in opioid-related overdoses")).)  Thus, while

22   McKesson's potential liability may stem from a business plan that led to its failure to maintain

23   effective controls for opioid distribution, that is not the "cause" of the bodily injuries alleged in the

24   Opioid Lawsuits and thus not the Occurrence under California law for purposes of determining the

25   number of purported Occurrences under the 08/09 NU Policy.  *See Eureka*, 873 F.2d at 234-35

26   ("[T]he fact that all loan losses arguably originated from one loan policy does not require finding

27

28

1    only one loss," because "there were numerous intervening business decisions that took place after the

2    loan policy was initiated ….").

3          Instead, in addition to the allegations in the "Exemplar Suits," the extrinsic evidence the Court

4    is entitled to consider (*see* ECF No. 101, Order Re: Motion to Stay Discovery and Proceedings ("Stay

5    Order") at 6) establishes McKesson's failures to detect and stop suspicious orders of opioids between

6    the late 1990s and 2018 (*see* Mot. at 2; *see* Brigman Decl., Ex. I)—which occurred hundreds of

7    times—arose from multiple, discrete instances of alleged misconduct.  For example, as discussed

8    more fully below, McKesson's alleged misconduct included, among many other things, shipping over

9    two million doses of Hydrocodone to internet pharmacies in Florida in 2005 that the DEA had

10   warned McKesson were engaged in diversion; setting artificially high thresholds for order sizes that

11   would trigger a Suspicious Order Report ("SOR") under its new Suspicious Order Monitoring System

12   in 2008; and partnering with Purdue in 2009 to ensure it was "business as usual" in terms of

13   McKesson's distribution of Purdue's opioids, even though Purdue had recently pled guilty and

14   McKesson paid a $13 million fine in connection with their opioid practices.  (*See infra* § IV.B.5.)

15         Even McKesson, at least prior to filing its Motion, agreed allegations like those in the Opioid

16   Lawsuits were discrete events that "did not occur simultaneously and under the same precise

17   conditions."  *See Evanston*,  2009 WL 734691, at *9.  For example, McKesson told Judge Polster the

18   "Plaintiffs' alleged injuries" in the Track One Lawsuits "arose not from a 'continuing violation' but

19   from alleged '*repetitive discrete violations*.' …  For instance, *each time that a Distributor allegedly*

20   *shipped an improper order to a County pharmacy, that alleged conduct was a discrete wrong.*"  (Ex.

21   1 at 41-42 (emphasis added).)  Similarly, McKesson told the New York court presiding over certain

22   Opioid Lawsuits that the government plaintiffs allege "Distributors shipped too many pills and failed

23   to prevent 'diversion.'  This is not a 'continuing' wrong, *but instead a series of separate and discrete*

24   *alleged violations*."  (Ex. 9 at 16-17 (emphasis added).)

25         McKesson nevertheless argues now that those separate and distinct alleged causes of bodily

26   injuries give rise to just one Occurrence because they can be grouped under a common, yet remote,

27   cause—"McKesson's alleged failure to maintain effective controls for opioid distribution …."  (Mot.

28

15

1   at 2; *see also id.* at 21-25.)  But McKesson's focus now on an earlier, remote business plan that,

2   rather than causing the alleged injuries, simply "creat[ed] the potential for future injury" is

3   inconsistent with California law regarding the proper focus on the immediate "cause" of the injury

4   when determining the number of Occurrences.  *See Maples*, 83 Cal. App. 3d at 647-48; *see also*

5   *Eureka*, 873 F.2d at 234-35 ("[T]he fact that all loan losses arguably originated from one loan policy

6   does not require finding only one loss," because "there were numerous intervening business decisions

7   that took place after the loan policy was initiated ….").

8          Nor do the cases McKesson cites establish otherwise.  For example, McKesson cites

9   *Chemstar*, *Inc. v. Liberty Mut. Ins. Co.*, 797  F. Supp. 1541 (C.D. Cal. 1992).  (*See* Mot. at 22.)  In

10   *Chemstar*, the Central District of California endorsed the "cause test" for determining the number of

11   Occurrences, but found on the "undisputed facts" of that case that the final and proximate "cause" of

12   the property damage at issue was the manufacturer's "failure sufficiently to warn that lime with high

13   periclase concentrations should not be used for indoor use."  *Id.* at 1547; *see also Chemstar*, *Inc. v.*

14   *Liberty Mut. Ins. Co.*, 41 F. 3d 429, 432 (9th Cir. 1994) (because there was no intervening, proximate

15   cause between insured's failure to warn about use of certain product indoors, and the property

16   damage, the failure to warn was properly deemed to be the cause).

17          Here, however, as McKesson itself asserts, "[e]ach shipment of medicines [by a distributor] is

18   a discrete and separate event, made in response to discrete and separate orders placed by pharmacies,

19   whose characteristics and ordering histories themselves changed over time.  Moreover, the decisions

20   to make (or to report to regulators) such shipments were made by Distributors using policies and

21   procedures that changed over time."  (Ex. 48 at 21.)  Thus, as McKesson has explained to three

22   separate courts, the allegations and evidence in the Opioid Lawsuits identify numerous intervening

23   acts that led to the purported improper shipments of suspicious orders of opioids by McKesson from

24   multiple distribution centers, in dozens of states, under multiple SOMS, and over a period of roughly

25   two decades.  *Chemstar* is inapposite.[5]

26   _____
    [5]   The other cases cited by McKesson, including those relating to the Opioid Lawsuits (*see* Mot. at
27   23-24), fare no better.  *See, e.g.*, *Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co*., 148 Cal. App.
    4th 620, 634 (2007) (single "event," a landslide, "resulted in all the damage" at issue); *EOTT*
28

McKesson's argument that certain Opioid Lawsuits—including the "Exemplar Suits"—were transferred to the MDL "because they all share a common alleged *cause* potentially giving rise to McKesson's liability" (Mot. at 24 (emphasis added)) is incorrect.  Under the MDL statute, 28 U.S.C. § 1407(a), actions may be transferred to an MDL "[w]hen [those] actions involve[e] one or more *common questions of fact* …."  28 U.S.C. § 1407(a) (emphasis added); *see also* Ex. 10 at 3 ("After considering the arguments of counsel, we find that the actions in this litigation involve *common questions of fact* ….") (emphasis added).).  While the Opioid Lawsuits undoubtedly contain common questions of fact, that does not mean the factual allegations of misconduct against McKesson in the Opioid Lawsuits arise out of a single *cause* and thus a single Occurrence.  *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014) (centralization of cases in an MDL is proper "where common questions of fact predominate" even if claims are based on different causes).

Finally, McKesson asserts that National Union's multiple occurrences argument is premised on injuries to multiple individuals (*see* Mot. at 22), but that too is a red herring.  National Union does not contend that a single decision to send a suspicious order of prescription opioids to an internet pharmacy in Florida that is a known diverter of such narcotics, and which results in a single instance of diversion, nevertheless results in multiple Occurrences because multiple individuals may have been injured by those diverted opioids.  Instead, National Union's position is that a decision in 2005 by an individual McKesson employee in Florida to ship a suspicious order to a rogue internet pharmacy, and a decision in 2008 by an individual McKesson employee in Colorado not to submit

---

*Energy Corp. v. Storebrand Int'l Ins. Co.*, 45 Cal. App. 4th 565, 578 (1996) ("systemic and organized scheme" was the single cause of injuries at issue); *Liberty Surplus Ins. Corp. v. Fed. Ins*., No. CV 11-2241 DSF (EX), 2013 WL 12132024, at *5 (C.D. Cal. Dec. 12, 2013) (same); *Rite Aid Corp. v. ACE Am. Ins. Co.*, No. CVN19C04150EMDCCLD, 2020 WL 5640817, at *16-8 (Del. Super. Ct. Sept. 22, 2020) (addressing only whether Rite Aid's roles as distributor and retailer of opioids gives rise to two occurrences); *Giant Eagle, Inc. v. Am. Guarantee and Liab. Ins. Co.*, 499 F. Supp. 3d 147, 169 (W.D. Pa. 2020) (court agreed with the insured's position "that [insurers'] arguments … essentially concede" those opioid complaints "potentially allege a single occurrence" ).

1    SORs to the DEA, cannot be a single Occurrence simply because both decisions relate to McKesson's

2    practice or policy of ignoring its CSA obligations.

3         In sum, McKesson has failed to establish the claims asserted against it in the "Exemplar

4    Suits," and certainly in all of the thousands of Opioid Lawsuits, arise from a single Occurrence.[6]  As a

5    result, McKesson also has failed to establish that its payment of defense costs has exhausted the Each

6    Occurrence Retained Limits underlying the 08/09 NU Policy.

7         **B.    The "Exemplar Suits" Do Not Arise From An Occurrence At All.**

8         Even if McKesson could somehow establish its potential liability arises from a single cause—

9    according to McKesson, a decades-long failure to comply with its legal obligation to detect and stop

10   suspicious orders of opioids—McKesson is entitled to coverage *only if* it can establish that the

11   "Exemplar Suits" seek damages that were caused by an "*accident*."  (*See* 08/09 NU Policy, §§ I,

12   VII(S)(1) (emphasis added).)  Settled California law, the factual allegations of the "Exemplar Suits,"

13   and the undisputed extrinsic evidence establish McKesson cannot do so.

14             1.    A Deliberate Act By The Insured, Even If The Insured Did Not Intend To

15                   Cause Any Specific Injury, Is Not An "Accident" Under California Law.

16        Under California law, "an accident is 'an unexpected, unforeseen, or undesigned happening or

17   consequence from either a known or an unknown cause" and "refers to the conduct of the insured

18   …."  *Delgado*, 211 P. 3d at 1086, 1088.  "An accident does not occur when the insured performs a

19   deliberate act *unless some additional, unexpected, independent, and unforeseen happening occurs*

20   *that produces the damage*."  *Navigators*, 6 Cal. App. 5th at 1275 (emphasis added) ("Where the

21   insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an

22   'accident' merely because the insured did not intend to cause injury.")  Importantly, while the focus

23   of the "cause" test used to determine the *number of Occurrences* is the cause of the alleged bodily

---

[6]    Even if the Court were to conclude that there was potentially only a single Occurrence for the purpose of determining whether there is a duty to defend, it would be improper before discovery has been taken to find as a matter of law, or hold for purposes of indemnity coverage, that the conduct alleged in the "Exemplar Suits," and all Opioid Lawsuits, constitute a single Occurrence.

1    injury regardless of whether it was undertaken by the insured (*see supra* § IV.A), when considering

2    whether an Occurrence happened at all, the focus of the inquiry is the conduct of the insured itself.

3    *See Liberty Surplus Ins. Cop. v. Ledesma & Meyer Constr. Corp.*, 418 P.3d 400, 403 (Cal. 2018).

4                    2.    The California Court Of Appeal's Decision in *Actavis* Establishes That The

5                          Bodily Injury Asserted In The "Exemplar Suits" Did Not Result From An

6                          Accident.

7            In *Actavis,* manufacturer Watson Pharmaceuticals sought defense costs for certain Opioid

8    Lawsuits.  *See Actavis,* 16 Cal. App. 5th at 1041.  Travelers sought a declaration it had no obligation

9    to defend Watson because the allegations against it in the Opioid Lawsuits did not arise from

10   accidental conduct.  *Id.*  Like the 08/09 NU Policy, Travelers' policies provided coverage for an

11   "Occurrence," which was defined as "an accident …."  *Id.* at 1038.  Applying settled California law,

12   the Court of Appeal held the claims against Watson "do not create a potential for liability for an

13   accident because they are based, and can only be read as being based, on the deliberate and

14   intentional conduct of Watson …."  *Id*. at 1030.

15           The court "emphasize[d] that whether Watson intended to cause injury or mistakenly believed

16   its deliberate conduct would not or could not produce injury is irrelevant to determining whether an

17   insurable accident occurred."  *Id.*  Instead, the court must "look to whether the [complaints] allege,

18   directly or by inference, it was Watson's deliberate conduct, *or an additional, unexpected,*

19   *independent, and unforeseen happening*, that produced the alleged injuries."  *Id.* at 1041 (emphasis

20   added).  The Court of Appeal explained the injuries purportedly caused by Watson were "a

21   nationwide 'opioid-induced 'public health epidemic' [and] increased public health care costs imposed

22   by long-term opioid use, abuse, and addiction ….  None of those injuries was … unexpected,

23   independent, or unforeseen" given the purported misconduct alleged in the Opioid Lawsuits, and thus

24   Watson's conduct was not an "accident."  *Id.*

25                    3.    *Actavis* Is Still Good Law And Is Binding Precedent Here.

26           Aware of the importance of the Court of Appeal's decision, McKesson argues "the holding

27   and reasoning of *Actavis* on the 'occurrence' issue is no longer good law following the California

28

                                                    19

1     Supreme Court's decision in *Ledesma*." (Mot. at 21.)  McKesson's effort to brush *Actavis* aside, and

2     suggest this Court should ignore it, is incorrect both as a matter of law and fact.

3              On November 6, 2017, the California Court of Appeal affirmed a decision finding the

4     allegations asserted against Watson in two Opioid Lawsuits did not arise from an accident.  *See*

5     *Actavis,* 16 Cal.App.5th at 1041.  Watson sought review from the California Supreme Court, and

6     asserted "the 'occurrence' issue in [*Actavis*] is related to issues currently before the Court in *Liberty*

7     *Surplus Insurance v. Ledesma & Meyer Construction* …." (*See* Ex. 11 at 3-4.)  On February 21,

8     2018, the Supreme Court granted Watson's Petition, but ordered that "[f]urther action in this matter is

9     deferred pending consideration and disposition of related issues in *Liberty Surplus Insurance Corp. v.*

10    *Ledesma and Meyer Construction Co. ....*"  *See Traveler's Prop. Cas. Co. of Am. v. Actavis*, 410 P.3d

11    1221, 1222 (Cal. 2018)*.*

12             On July 25, 2018, the Supreme Court issued its final Opinion in *Ledesma*.  *Ledesma.*, 418

13    P.3d at 403.  Two months later, on September 26, 2018, the Supreme Court issued an order in *Actavis*

14    that stated "[r]eview in [this matter], which was granted and held for *Liberty* …, is dismissed," and

15    remanded the case to the Court of Appeal.  *Traveler's Prop. Cas. Co. of Am. v. Actavis*, 427 P.3d 744

16    (Cal. 2018) (citing California Rules of Court, rule 8.528(b)(1)).  The California Court of Appeal

17    issued a remittitur, noting the trial court's November 2017 opinion finding no coverage for Watson's

18    conduct in the Opioid Lawsuits "*has now become final*."  (Ex. 12 (emphasis added).)

19             Pursuant to Rule 8.528(b)(1) of the California Rules of Court, "[a]n order dismissing review

20    does not affect the publication status of the Court of Appeal opinion unless the Supreme Court orders

21    otherwise."  *See also* Cal. Rules of Court, rule 8.1115(e).  In addition, "upon dismissal of review, any

22    published Court of Appeal opinion regains binding or precedential effect under Rule 8.1115(e)(2)

23    *unless the court orders otherwise* …." *Id.* cmt. to Subdivision (e)(3) (emphasis added).  Despite its

24    "disposition of related issues" in *Ledesma*, *see* 410 P.3d at 1221, the California Supreme Court's

25    Order dismissing its review of *Actavis* said nothing about altering publication of that Opinion or

26    negating its binding and precedential effect.  *See Actavis*, 427 P.3d at 744.

27

28

1    Nor, in any event, was the Supreme Court's *Ledesma* decision inconsistent with the Court of

2  Appeal's *Actavis* decision.  In *Ledesma*, a student brought claims against a contractor, alleging

3  negligent hiring, retention, and supervision of an employee who had sexually abused her.  *Ledesma*, 5

4  Cal. 5th at 222.  The contractor's liability insurer contended it had no obligation to defend the

5  contractor because its hiring, retention and supervision of its employee were intentional acts.  *Id.*

6  The Supreme Court disagreed.  Although the court recognized "the hiring, retention, and supervision

7  of [the employee] may have been 'deliberate act[s]," it found that "from [the contractor's] point of

8  view" the sexual abuse "could have been 'an unexpected, unforeseen, or undesigned happening or

9  consequence'" and, therefore, was still an "accident" under California law.[7]  *See id.* at 222, 226-29.

10    The outcome in *Ledesma* is thus fully consistent with prior California cases applying the

11  "accident" requirement in liability policies, and did not have a "substantial impact on the reasoning in

12  *Actavis.*"  (*See* Mot. at 21.)  The Court of Appeal in *Actavis* found the alleged misconduct of the

13  insured—"a fraudulent scheme" by Watson "to promote the use of opioids for long-term pain in order

14  to increase corporate profits"—to be intentional.  *See Actavis,* 16 Cal.App.5th at 1032.  Unlike the

15  Supreme Court in *Ledesma*, however, the Court of Appeal found the nature of Watson's alleged

16  misconduct foreclosed any possibility that the resulting injuries at issue—"addiction," "overdoses,"

17  and "death" resulting from "a nation 'awash in opioids'"—were "additional, unexpected,

18  independent, or unforeseen."  *Id.* at 1034.

19    Nor could those terms be applied to any of the purported intervening causes between

20  Watson's alleged intentional misconduct and the alleged bodily injuries.  As the Court of Appeal

21  held, "[t]he role of doctors in prescribing, or misprescribing, opioids is not an independent or

22  unforeseen happening."  *See id.* at 1042.  As a result, in a determination that is fully consistent with

23  *Ledesma* and many prior decisions of the California Supreme Court, the Court of Appeal held

24

25

---

26  [7]    It certainly is possible the Supreme Court would have reached a different conclusion if, as was
      the case with McKesson (*see infra* § IV.B.4, 5), the contractor had been warned multiple times
27    its conduct was causing bodily injury.

28

1    Watson's conduct was not accidental.[8]  *Id.*; *see also Delgado*, 47 Cal.4th at 315 ("an accident … is

2    never present when the insured performs a deliberate act unless some additional, unexpected,

3    independent, and unforeseen happening occurs that produces the damage").

4          Thus, *Actavis* remains good law, and it compels the same result when applied to the

5    allegations here.  As discussed in more detail below, the "Exemplar Suits" allege McKesson, as one

6    of the leading wholesale distributors of pharmaceuticals in the nation, played an indispensable role in

7    facilitating the proliferation of the very same prescription opioids manufactured by companies like

8    Watson and prescribed by doctors like the ones discussed in *Actavis*.  The "Exemplar Suits" also

9    allege that, like Watson, McKesson did so by intentionally disregarding legal restrictions on the

10   manner in which McKesson sold prescription opioids—all in the pursuit of profits.  (*See infra* §

11   IV.B.4.)  Thus, if the injuries caused by prescription opioids were not "additional, unexpected,

12   independent, or unforeseen" with respect to a manufacturer like Watson, they could not have been

13   with respect to a distributor like McKesson solely because McKesson is one step further down in the

14   supply chain, and one step closer to the injured party.

15         The decision in *Actavis* is binding on this Court.  As the Ninth Circuit repeatedly has held,

16   federal courts "follow the decision of the intermediate appellate courts of the state unless there is

17   convincing evidence that the highest court of the state would decide differently."  *Lone Star Sec. &*

18   *Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1199 (9th Cir. 2016) ("[A]bsent convincing

19   evidence that the California Supreme Court would construe the term 'advertise' in this situation

20   differently, we cannot depart from the construction of the California Court of Appeal; neither

21   Appellant offers such evidence.")*; Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1223 (9th Cir. 2015)

22

23

24

25   _____

26   [8]  Contrary to McKesson's assertion (*see* Mot. at 20), the fact that the policies at issue in *Actavis*
        had products exclusions did not impact the Court of Appeal's determination that the allegations
27      in the Opioid Lawsuits against Watson did not arise from accidental conduct.  *Actavis*, 16 Cal.
        App. 5th at 1044-45.

28

1   (same).  The outcome of *Ledesma* does not suggest, much less provide, "convincing evidence" the

2   California Supreme Court would have decided *Actavis* differently.[9]

3             4.      The Complaints In The "Exemplar Suits," Like *Actavis*, Allege Intentional

4                    Conduct That Is Not Covered By The 08/09 NU Policy.

5             Unable to show that Actavis is not the law in California, McKesson argues "the facts and

6   analysis in [*Actavis*] are readily distinguished" because Watson was a manufacturer, not a distributor,

7   of opioids.  (Mot. at 19.)  One need look no further than the allegations in the Exemplar Lawsuits to

8   see this is not the case.  For example, as Summit County asserted, "[t]he Marketing and Distributor

9   Defendants were not two separate groups operating in isolation ….   The Defendants operated together

10  as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription

11  opioids."  (Summit TAC ¶ 762; *see also id.* at ¶ 850 ("For more than a decade, … Purdue, Cephalon,

12  Endo, Mallinckrodt, ***Actavis, McKesson***, Cardinal, and AmerisourceBergen worked together in an

13  illicit enterprise ….") (emphasis added)).

14            Contrary to McKesson's assertion, the Court of Appeal in Actavis did not "recognize[]" that

15  "allegations against pharmaceutical *distributors*—like McKesson—are 'appreciably different.'"  (*See*

16  Mot. at 20.)  Instead, the court merely noted the allegations in the in two prior opioid coverage

17  decisions relating to distributors, and issued by courts in West Virginia and South Carolina, were

18  different than those at issue in *Watson*.  *See Actavis*, 16 Cal. App. 5th at 1043 (discussing *Liberty*

19  *Mut. Fire Ins. Co. v. JM Smith Corp.*  602 F. App'x 115 (4th Cir. 2015) and *Cincinnati Ins. Co. v.*

20  *Richie Enters. LLC*, Civ. A. No. 1:12-CV-00186-JHM-HBB, 2014 U.S. Dist. Lexis 27306 (W.D. Ky.

21

22  [9]   The additional cases cited by McKesson are not to the contrary.  In *Mesa Underwriters Specialty*
         *Ins. Co. v. Blackboard Ins. Specialty Co.*, 400 F. Supp. 3d. 928, 937-938 (N.D. Cal. 2019), the
23       court held that the insurer owed a duty to defend where the court found, unlike in *Actavis*, that
         the complaint contained "factual allegations that could give rise to negligence liability,"
24       including allegations of "negligent hiring and supervision."  Here, the allegations of the
         "Exemplar Suits," like those in *Actavis*, make clear that McKesson's liability could arise only
25       from intentional conduct.  (*See infra*, § IV.B.4.) Similarly, the cases cited on pages 18 and 19 of
         McKesson's brief stand for nothing more than the unremarkable proposition that the court must
26       carefully review the factual allegations in the underlying complaint to determine if they
         potentially give rise to negligence liability.  (*See* Mot. at 18-19 (citing *Conway, LaRoca, and*
27       *Scottsdale*).)

28

                                             23

1    Mar. 4, 2014).)  Those cases did not apply California law.  With respect to *JM Smith*, for example, the

2    Court of Appeal explained that, "under South Carolina law, … 'accidents require that either the act *or*

3    the injury resulting from the act be unintentional'; that is, a deliberate act is an accident if the

4    resulting injury is unintentional."  *Actavis*, 16 Cal. App. 5th at 1043.  The same was true in *Richie*,

5    since Kentucky law also defines "accident" to include intentional acts that result in unintended

6    injuries.  *Id*.  As the Court of Appeal explained, however, "[u]nder California law, in contrast, a

7    deliberate act is not an accident, even if the resulting injury is unintentional …."  *Id.*

8         McKesson also seeks to distinguish the allegations in this case by arguing the "Exemplar Suits

9    … repeatedly allege that McKesson '*should have known*' its acts or omissions in distributing opioids

10   *would lead to harm*."  (Mot. at 18 (emphasis added).)  But, as the California Supreme Court has held,

11   intentional conduct "is not an accident 'merely because the insured did not intend to cause injury.

12   *The insured's subjective intent is irrelevant.*"  *Albert v. Mid-Century Ins. Co.*, 236 Cal. App. 4th

13   1281, 1291 (2015) (emphasis added); *see also Actavis*, 16 Cal.App.5th at 1030 ("[W]hether Watson

14   intended to cause injury or mistakenly believed its deliberate conduct would not or could not produce

15   injury is irrelevant to determining whether an insurable accident occurred.").  Thus, allegations

16   sprinkled throughout the "Exemplar Suits" that McKesson "should have known"—rather than

17   knew—its intentional conduct could cause bodily injury do not render McKesson's alleged

18   intentional misconduct an "accident" under California law.[10]

19   ─────────────────

20   [10] For these reasons, McKesson's reliance on *Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.*,
     499 F.Supp.3d 147, (W.D. Pa. 2020), and *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, 2020

21   WL 6706791 (Ohio Ct. Com. Pl. Sept. 9, 2020) (appeal pending) is unavailing.  The courts in
     those cases found the respective insurers owed a duty to defend the Summit County and

22   Cuyahoga County action because the complaints contained allegations that the respective
     insureds "should have known" that their conduct was resulting in harm.  *See Giant Eagle,  Ins.

23   *Co.*, 499 F. Supp. 3d at 168 (relying on allegations that insured "should have known the opioids
     were being prescribed by 'pill mills'" to find that the underlying lawsuits give rise to a duty to

24   defend); *Discount Drug Mart, Inc.*, 2020 WL 6706791 at *6 (holding the insurer owes a duty to
     defend because "[t]he MDL claim for Absolute Public Nuisance repeatedly uses the phrase

25   "knew or should have known").  As explained above, these allegations about the insured's intent
     to cause harm are irrelevant to determining whether there is an Occurrence under California law.

26   Further, unlike the specific allegations about McKesson's conduct in the Summit TAC and
     Cuyahoga TAC, those complaints contain no specific allegations by which the courts in *Giant*

27   *Eagle* and *Discount Drug* could evaluate whether the alleged conduct of those insureds was
     intentional.  Finally, the *Giant Eagle* decision has since been vacated on the ground that the

28   insured failed to meet its burden to establish that the limits underlying the policies at issue had

─────────────────

24

1    Nor does it matter the "Exemplar Suits" contained counts for nuisance or negligence. The

2  Court of Appeal in *Actavis* affirmed the finding of no coverage even though the Opioid Lawsuits in

3  that case asserted a nuisance claim against Watson. *See Actavis*, 16 Cal. App. 5th at 1043-44.

4  McKesson also represented to the court presiding over a lawsuit brought by the Ohio Attorney

5  General that a claim for absolute public nuisance (a claim also asserted in the "Exemplar Suits")

6  could *only* be based on intentional conduct. (*See* Ex. 13 at 1-2 (Plaintiff "fails to come forward with

7  any evidence of the 'intent' required to survive summary judgment on a claim for absolute nuisance

8  ….").)

9    Further, as McKesson knows, the negligence counts in the "Exemplar Suits" were dismissed

10  by plaintiffs in August 2019, just a few weeks after the earliest date on which the 08/09 NU Policy

11  was first potentially triggered, and before the start of trial in the Track One Lawsuits. (Ex. 14.)

12  Accordingly, McKesson's mere reference to the fact the Track One Lawsuits, as originally pled,

13  contained counts for nuisance and negligence does not satisfy its burden to establish its alleged

14  twenty-year failure to identify and stop the distribution of suspicious orders of opioids was no more

15  than an accident.

16    In all events, the Court of Appeal in *Actavis* was clear that "it is not the form or title of a cause

17  of action that determines the carrier's duty to defend, but the potential liability *suggested by the facts*

18  *alleged or otherwise available to the insurer.*" *Actavis*, 16 Cal. App. 5th at 1043-44 (emphasis

19  added); *see also Gonzalez v. Fire Ins. Exch.*, 234 Cal. App. 4th 1220 (2015) ("[T]here [i]s a

20  'misapprehension that all claims for negligence must at least potentially come within the policy and

21  therefore give rise to a duty to defend. That is not so.'") (quoting *Quan v. Truck Ins. Exchange*, 67

22  Cal. App. 4th 583, 596 (Cal. Ct. App. 1999)); *Swain v. Cal. Cas. Ins. Co.*, 99 Cal. App. 4th 1, 8-9

23  (Cal. Ct. App. 2002) ("[C]overage turns not on the technical legal cause of action pleaded by the third

24

25

26    been exhausted by "payment of defense costs." (Memorandum Opinion at 47, *Giant Eagle Inc.*
   *et al. v. Am. Guarantee & Liab. Ins. Co. et al.*, No. 2:19-cv-00904-RJC (ECF 179) (E.D.Pa. May

27   25, 2021).)

28

1    party but on the facts alleged in the underlying complaint or otherwise known to the insurer.")

2    (internal quotations omitted).

3           The factual allegations of the nuisance and negligence counts in the "Exemplar Suits" leave

4    no doubt McKesson's acts, and the objective accomplished, were not the result of an "accident" under

5    California law.  For example, in support of the *nuisance* claims asserted in the Cuyahoga County

6    Complaint, the government plaintiffs allege that "[i]n the distribution and sale of opioids"

7    McKesson, and the other defendants, "violated and/or aided and abetted the violation of Ohio law …

8    and federal law …."  (Cuyahoga TAC ¶ 1026; *see also* Summit TAC ¶ 985.)  Cuyahoga also asserted

9    McKesson, and the other defendants, "intentionally, unreasonably, and or unlawfully deceptively

10   marketed and pushed as many opioids onto the market as possible, fueling addiction to and diversion

11   of these powerful narcotics," and "resulting in increased addiction …."  (Cuyahoga TAC ¶ 1049; *see*

12   *also* Summit TAC ¶ 1008.)

13          In support of its *negligence* claim, Cuyahoga County asserted McKesson "had a duty not to

14   breach the standard of care established under Ohio law and the [CSA] and its implementing

15   regulations, which require Defendants [including distributors] to report suspicious orders [of opioids]

16   and to maintain systems to detect and report such activity."  (Cuyahoga TAC. ¶ 1085; *see also*

17   Summit TAC ¶ 1043.)  McKesson allegedly breached those duties by "*choosing* not to effectively

18   monitor for suspicious orders"; "*[c]hoosing* not to investigate suspicious orders"; "*choosing* not to

19   report suspicious orders"; and "*[c]hoosing* not to stop or suspend shipment of suspicious orders."

20   (Cuyahoga TAC ¶ 1089 (emphasis added); *see also* Summit TAC ¶ 1046.)

21          The negligence and nuisance claims in the Track One Lawsuits are also based on the very

22   same factual allegations the government plaintiffs assert establish violations by McKesson of the

23   RICO statute, the Ohio Corrupt Practices Act, and Injury Through Criminal Acts, and leave no doubt

24   that McKesson's potential liability did not arise from accidental conduct.  (*See* Cuyahoga TAC

25   ¶¶ 950-981, 993-1016, 1039-81, 1134-50.)  For example:

26        •  Summit County asserts "few realize that this crisis arose from the opioid

27           manufacturers' deliberate marketing strategy *together with distributors' equally*

28

*deliberate efforts to evade restrictions on opioid distribution*.  Manufacturers and distributors alike acted without regard for the lives that would be trammeled in pursuit of profit."  (Summit TAC ¶¶ 2-3 (emphasis added).)

- Summit County also alleged "the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, *distributors*, and pharmacies … who failed to maintain effective controls over the distribution of prescription opioids, and *who instead have actively sought to evade such controls*" and "*despite their actual knowledge of drug diversion rings*."  (*Id.* ¶¶ 14, 566 (emphasis added); *see also* Cuyahoga TAC ¶¶ 14,548.)

- As Summit County explains, the former Head of the DEA's Office of Diversion Control was asked in a *60 Minutes* interview whether he was implying that McKesson and other major distributors "knew that they were pumping drugs into American communities that were killing people."  He responded:  "That's not an implication, that's a fact. That's exactly what they did."  (Summit TAC ¶ 795.)

- Indeed, according to Summit County, "McKesson's *conscious and deliberate disregard of its obligations was especially flagrant*," and, as a result, "[o]n May 2, 2008," just two months before the inception of the 08/09 NU Policy, "McKesson Corporation entered into an Administrative Memorandum of Agreement … to settle those allegations.  (*Id.* ¶ 798 (emphasis added).)

- Yet, according to Summit County, "McKesson was 'neither rehabilitated nor deterred …. Quite the opposite, 'their bad acts continued and escalated to a level of egregiousness not seen before.'"  (*Id.* ¶ 805.)  As a result, "[i]n January 2017, McKesson paid a record $150 million to resolve an investigation by the US. Department of Justice ("DOJ") ….  In addition to the monetary penalty, the DOJ required McKesson to suspend sales of controlled substances from distribution centers in Ohio, Florida, Michigan and Colorado.  The DOJ described these 'staged

1    suspensions' as 'among the most severe sanctions ever agreed to by a [DEA]

2    registered distributor.'"  (*Id.* ¶ 115.)

3         Simply put, any fair reading of the factual allegations in the Track One Lawsuits flatly

4    contradicts McKesson's assertion that those suits "squarely allege 'an accident.'"  (*See* Mot. at 18.)

5    Instead, like *Actavis*, the factual allegations against McKesson do not create a potential for liability

6    for an accident because they are based, and can only be read as being based, on McKesson's

7    deliberate and intentional conduct.

8         The Oklahoma AG Action is no different.  While it too includes counts titled nuisance and

9    negligence, the factual allegations of the complaint tell a much different story.  The Oklahoma AG

10   alleged that "[w]hen it comes to opioids, history has taught one clear and simple lesson for centuries:

11   If you oversupply, people die.  [McKesson] ignored this and distributed what can only be called a

12   major oversupply of opioids into Oklahoma.  As a foreseeable result, Oklahomans have suffered and

13   died, and the State has been harmed."  (ECF No. 79-16, Brigman Decl. Ex. I, Oklahoma AG Action ¶

14   6.)  According to the Oklahoma AG, "McKesson contributed to fueling [the] devastating opioid crisis

15   in Oklahoma through its reprehensible conduct in driving up the supply of highly addictive narcotics

16   all for the sake of lining their pockets."  (*Id.* ¶ 53; *see also* ¶¶ 74-75, 82 (although "McKesson was

17   acutely aware of the oversupply" of opioids in Oklahoma, McKesson "continued to pump massive

18   quantities of opioids into the Oklahoma supply chain despite its obligations to control the supply,

19   prevent diversion, report and take steps to halt suspicious orders").)

20           5.    The Extrinsic Evidence Confirms The Claims Against McKesson Are Not

21                 Based On Accidental Conduct.

22           (i)    *National Union Can Rely On Extrinsic Evidence Available To It Prior*

23                  *To April 30, 2021.*

24         The allegations of the "Exemplar Suits" alone are enough to determine that they do not trigger

25   a duty to defend under the 08/09 NU Policy.  However, as the Court held, "[u]nder California law, an

26   insurer can 'rely on facts known to it, which were extraneous to the allegations in the complaint, to

27   defeat its duty to provide a defense [if] such facts [are] *undisputed* and [] *conclusively* demonstrate

28

1   that there was no potential for coverage.'"  (Stay Order at 6 (emphasis in original).)  The Court also

2   held National Union may rely upon all extrinsic evidence available to it up until the moment

3   McKesson established exhaustion of the Retained Limits and triggered potential coverage under the

4   08/09 NU Policy.  *See id.*  As discussed below, that date is April 30, 2021.

5        The 08/09 NU Policy states that National Union will have a duty to defend only "when" the

6   "applicable limits listed in the Schedule of Retained Limits have been exhausted *by payment of Loss*

7   to which this policy applies …."  (08/09 NU Policy, End. 1 § 3(III)(A) (emphasis added).)  Under

8   California law, McKesson has the burden to establish exhaustion through the payment of loss and,

9   until it did so, coverage under the 08/09 NU Policy was not even arguably triggered.  *See Farmers*

10  *Ins. Exch. v. Hurley*, 76 Cal. App. 4th 797, 803, 90 Cal. Rptr. 2d 697 (1999*), as modified on denial of*

11  *reh'g* (Dec. 17, 1999) (language requiring an underlying policy be "exhausted by payment of

12  judgments or settlements" could not be interpreted "in any way other than to mean that the full limits

13  of the policy must actually be paid"); *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 805 F.

14  Supp. 2d 945, 954 (C.D. Cal. 2011) (insured has duty to establish exhaustion to trigger coverage from

15  an excess insurer).

16       Thus, even if McKesson is correct that the claims asserted against it in the "Exemplar Suits"

17  arose from a single cause, McKesson could not have triggered even the potential of coverage under

18  the 08/09 NU Policy until it established it had *paid* an amount sufficient to exhaust the Retained

19  Limits below the 08/09 NU Policy.  McKesson asserts it satisfied its burden on August 31, 2018,

20  when its counsel sent an email stating, "[w]ith regard to defense costs, as of August 28, 2018,

21  McKesson has received defense invoices totaling approximately $25 million in connection with the

22  opioid lawsuits."  (Mot. at 8.)  But, that email said nothing about *payment*.  (*See id*.)

23       Nor did McKesson's subsequent communications say anything about the payment of legal

24  fees, even after National Union specifically asked for such information and made clear it was

25  necessary to establish exhaustion.  (*See* Brigman Decl., Ex H; CJS Decl. Exs. 4, 8.)  Instead, it was

26  not until McKesson filed the Motion on April 30, 2021 that it first asserted it actually had *paid* any

27  defense costs (*see* Brigman Decl. ¶ 18), and thus first triggered the potential for coverage under the

28

1    08/09 NU Policy. *See Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd's London*,

2    2001 Cal. Super. LEXIS 220, at *3 (Cal. Super. Ct. Sept. 25, 2001) (insurance policy is not triggered

3    where insured "has not yet proved that the underlying limits have been properly exhausted").

4    National Union, therefore, can rely on all extrinsic evidence available to it prior to April 30, 2021.

5            Regardless, contrary to McKesson's assertion it had exhausted a single $5 million Each

6    Occurrence Retained Limit by August 2018 (*see* Mot. at 8), McKesson now concedes it did not pay a

7    total of $5 million in defense costs prior to July 25, 2019.  (*See* Ex. 15, Transcript of the Deposition

8    of Sean Fleury, dated September 14, 2021, at 29:22-24 ("Q.  When had McKesson paid $5 million?

9    A.  *In July of 2019, McKesson reached $5 million in payments*.") (emphasis added); *see also* Ex. 16

10   (McKesson check, dated July 25, 2019).)  Even if July 25, 2019 was the key date for purposes of the

11   extrinsic evidence analysis, the vast majority of extrinsic evidence discussed below was available

12   prior to that date (*see* CJS Decl. ¶¶ 2, 23-52)—and, the only reason *all* of it was not available to

13   National Union is because McKesson withheld it from AIG.  (*See supra* § III.C.)

14           Further, any extrinsic evidence that first became publicly available after July 25, 2019 was

15   certainly available to National Union when it received notice of the filing of the Oklahoma AG

16   Action, and also can be relied upon to extinguish any duty to defend McKesson for the Track One

17   Lawsuits that may have arisen prior to December 18, 2019, when all of that extrinsic evidence was

18   publicly available.  *See Montrose Chemical Corp. v. Superior Ct.*, 6 Cal.4th 287, 295 (N.D. Cal.

19   1993) ("the existence of a duty to defend turns… upon those facts known by the insurer at the

20   inception of a third party lawsuit").

21                    (ii)    *The Extrinsic Evidence Available To National Union Prior To April*

22                            *30, 2021 Establishes Non-Accidental Conduct By McKesson.*

23           Deposition discovery in the Track One Lawsuits began in July 2018, and moved quickly.  (*See*

24   Brigman Decl. ¶ 19.)  As McKesson explains, in roughly a year, more than 500 depositions were

25   taken, and 80 expert reports were submitted.  (*Id.* n.3.)  Discovery culminated with the parties filing

26   numerous summary judgment motions in the spring and early summer of 2019 that attached hundreds

27

28

1   of documents, sworn testimony from multiple witnesses, and substantial excerpts from expert reports.

2   (*See, e.g.*, Ex. 1 at 42.)  As explained below, those motions and the attached evidence—all of which

3   were available to National Union by April 30, 2021—made clear that the government plaintiffs

4   alleged McKesson's misconduct was not accidental.

5           The Burgeoning Opioid Crisis In 2001.  By 2001, the Opioid Crisis had started, was becoming

6   well known to the opioid industry, and had become the focus of Congressional Hearings.  (*See* Ex

7   18.)  Nathan Hartle, McKesson's former Vice President of Regulatory Affairs and Compliance, and

8   its 30(b)(6) witness, admitted McKesson was aware of the crisis and related concerns:

9           Q.  Does McKesson acknowledge that the use and abuse of OxyContin was on the

10              national radar at least as early as August 28, 2001, with a Congressional hearing?

11          A.  Yes.

12  (Ex. 7, Transcript of the Deposition of Nathan J. Hartle, dated July 31, 2018 ("7/31/18 Hartle Tr."),

13  at 134:11-15, 17.)  Indeed, in June 2001, in what was the first opioid lawsuit, Purdue, the creator of

14  OxyContin and a central figure in the opioid crisis, was sued by the Attorney General of West

15  Virginia for its role in creating the opioid crisis.  (*See* Ex. 19, Complaint, *West Virginia v. Purdue*

16  *Pharma L.P. et al.*, No. 01-cv-00557 (S.D. W.V.  Jun. 21, 2001).)  News reports discussed that

17  lawsuit and, more generally, the growing problem of opioid diversion in the United States.  (*See* Ex.

18  20.)

19          McKesson's Duties Under The CSA.  McKesson, like all opioid distributors, is subject to the

20  CSA, which Congress enacted to "control the supply and demand of controlled substances."  *See*

21  *Gonzales v. Raich*, 545 U.S. 1, 19 (2005).  The DEA is vested with the sole authority to enforce the

22  CSA and, through its Office of Diversion Control, guards against the diversion of controlled

23  substances, such as opioids.  *See* 21 U.S.C. § 826.  The DEA seeks to ensure that CSA Registrants,

24  including McKesson, satisfy their obligations to block suspicious orders of controlled substances.

25  (*See* Ex. 17 at 13.)  McKesson's corporate testimony established it was fully aware of its CSA

26  obligations to stop suspicious orders and guard against the diversion of opioids, and of the harmful

27  effects on the public health that would result if it did not do so:

28

1    Q.  McKesson is aware since 1970 that it was engaging in the business of distributing

2           Schedule II controlled substances which have a high potential for abuse, agreed?

3    A.  Agreed. …

4    Q.  Does McKesson believe that opioid sales are related to opioid deaths?

5    A.  The volume of opioids in the market and diversion is related to opioid deaths, certainly.

6           …

7    Q.  All right. Does McKesson acknowledge that it has a duty to maintain effective control

8           against diversion of opium pills as mandated by Congress?

9    A.  We do. …

10    Q.  And you agree that that's a responsibility that you have as a distributor?

11    A.  To report suspicious orders, yes.

12  (Ex. 7, 7/31/18 Hartle Tr., at 46:2-14, 52:22-53:3, 294:11-17; Ex. 21, Transcript of the Rule

13  30(b)(6) deposition of McKesson, by Nathan J. Hartle, dated August 1, 2018, at 111:13-17.)

14    <u>McKesson's Initial Suspicious Order Monitoring System</u>.  Despite its understanding of its

15  CSA duties, the evidence adduced by plaintiffs in the Track One Lawsuits established that until

16  2006, the sole SOMS system McKesson utilized to identify and report suspicious orders of

17  controlled substances, including opioids, was found in Section 55 of the McKesson Drug Operations

18  Manual.  (*See* Ex. 22; Ex. 23, Transcript of the Deposition of Gary Hilliard, dated January 10, 2019,

19  at 163:20-164:1.)  McKesson conceded, however, it still shipped orders of opioids identified as

20  suspicious under Section 55:

21    Q.  My question is, is under the Section 55 policy adopted by McKesson --

22    A.  Right.

23    Q.  —in July of 2000, you were shipping suspicious orders after reporting them to the

24           DEA?

25    A.  Yes.

26  (Ex. 7, 7/31/18 Hartle Tr., at 130:22-131:5.)

27

28

1          The DEA's Distributor Initiative.  Although the requirements of the CSA largely stayed the

2    same since their initial creation in the 1970s, diversion trends have continually changed over the last

3    50 years.  (Ex. 17 at 62-63.)  As a result, the DEA's focus and what it told CSA Registrants about

4    how to avoid diversion also changed.  For example, a significant diversion trend that emerged in the

5    early 2000's was rogue internet pharmacies.  (*Id.*)  That trend, and the growing national health crisis

6    from diverted opioids, led to a change in how the DEA approached anti-diversion efforts.  As a result,

7    in August 2005, the DEA's Office of Diversion Control, through Deputy Assistant Joseph

8    Rannazzisi, launched its "Distributor Initiative" to warn distributors that it was unacceptable to ignore

9    their obligations to guard against diversion.  (*Id.* at 63-64.)

10          On September 1, 2005, DEA officials met with McKesson as part of the Distributor Initiative.

11   (*See* Ex. 17 at 63-64.)  That meeting included a review of a PowerPoint warning about the potential

12   diversion risks of pharmacies with no "brick and mortar" presence.  (*See id.*)  The meeting also

13   focused on the diversion risks posed by specific opioids, including Hydrocodone and Alprazolam—

14   which Deputy Assistant Rannazzisi later referred to as "Lifestyle Drugs," and the DEA specifically

15   warned McKesson it believed several of its clients were rogue internet pharmacies involved in the

16   diversion of such opioids.  (Ex. 17 at 64.)

17          McKesson allegedly ignored the DEA's warnings.  "On January 3, 2006, a meeting was held

18   at the Office of Diversion Control … between representatives of McKesson Corp. and the [DEA]."

19   (Ex. 24.)  In attendance, among others, were Joseph Rannazzisi and Kyle Wright from the DEA, and

20   Donald Walker, Senior VP, McKesson Distribution Operations, and outside counsel representing

21   McKesson.  (*Id.*)  As an internal DEA memorandum explains, "[t]he purpose of the meeting was to

22   discuss [McKesson's] delivery of over two million dosage units of hydrocodone to pharmacies

23   located in … Florida … alleged to be Internet Pharmacies."  (*Id.*)

24          The DEA memorandum also references a call from the DEA to McKesson to express

25   concerns that McKesson was not taking the concerns about rogue internet pharmacies seriously, and

26   another call in which the DEA warned McKesson about diversion concerns relating to a pharmacy

27   called United Prescription Services.  (*Id.*)  Despite those warnings, McKesson shipped more than 2

28

1   million dosage units of Hydrocodone to internet pharmacies in Florida, including United Prescription

2   Services, between October 10 and October 21, 2005.  (*Id.*)  As the DEA explained:  "Through the

3   course of the above discussions, McKesson Corp., by their own admission, was unable to provide an

4   plausible explanation for the sales of over two million dosage units of hydrocodone, in a [12] day

5   period, to pharmacies previously identified by DEA to McKesson Corp."  (*Id.*)

6          The DEA's Distributors' Initiative continued.  In what became known as "Dear Registrant"

7   letters, Deputy Assistant Rannazzisi again warned Distributors about their CSA obligations to guard

8   against diversion, the risk that the Distributors' failure to do so was leading to mass diversion, and

9   that mass diversion was fueling the opioid crisis.  For example, on September 27, 2006, the DEA sent

10  a letter to McKesson and other Distributors reminding them that "the abuse … of controlled

11  prescription drugs is a serious and growing health problem in this country."  (Ex. 25; *see also* Ex. 17

12  at 60.)

13         McKesson's corporate testimony also made clear it was aware of the serious health problem

14  that diversion and the growing opioid crisis were creating in the United States:

15      Q.  So as of September 27, 2006, the DEA is advising McKesson – not advising, but

16          referencing the fact that there was a prescription drug abuse problem in the United

17          States of America.  That's in the very first paragraph.  Does McKesson acknowledge

18          that?

19      A.  Yes.

20      Q.  The next sentence says, "As each of you is undoubtedly aware, the abuse, nonmedical

21          use, of controlled prescription drugs is a serious and growing health problem in the

22          country."  Does McKesson agree and acknowledge that fact as of 2006?

23      A.  Yes. …

24      Q.  As of 2007, McKesson is recognizing that opioid painkillers kill more than cocaine and

25          heroin combined, agreed?

26      A.  Agree.

27  (Ex 7, 7/31/18 Hartle Tr., at 165:23-166:14, 220:22-221:1.)

28

1        __McKesson's Lifestyle Drug Monitoring Program.__  In May 2007, in response to the Distributor

2   Initiative, McKesson implemented its Lifestyle Drug Monitoring Program ("LDMP"), which focused

3   on the sale of the four "lifestyle drugs" referenced by Deputy Assistant Rannazzisi, including

4   hydrocodone.  (Ex. 27; *see also See* Ex. 26 at 224 (discussing LDMP formation).)  Under the LDMP,

5   a monthly 8,000 dosage unit threshold was set for every McKesson customer, and once that threshold

6   was met, a review process was supposed to be triggered in an effort to determine if an order was

7   "suspicious."  (Ex. 27 at 355252-255; *see also* Ex. 26 at 188 (describing LDMP operation.)  But,

8   according to the government plaintiffs, that is not how the LDMP actually operated.  For example,

9   testimony from McKesson's regulatory employees confirms that pharmacy customers were routinely

10  permitted to exceed the 8,000 monthly dosage thresholds prior to a due diligence review being

11  completed by McKesson.  (Ex. 29; *see also* Ex. 28 at 81.)

12                  (iii)   __McKesson's 2008 Settlement With The DOJ__.

13       On May 2, 2008, the DOJ announced "McKesson ha[d] agreed to pay $13,250,000 in civil

14  penalties for alleged violations of its obligations under the Controlled Substances Act."  (Ex.

15  30.)  According to the press release, the DOJ alleged McKesson had violated the CSA from 2005 to

16  2007:

17        [McKesson] failed to report to DEA suspicious sales of [prescription opioids] it made to

18        pharmacies that filled orders from illegal 'Internet pharmacies' that sell drugs online to

19        customers who do not have a legal prescription. …. Three McKesson distribution centers

20        received and filled hundreds of suspicious orders placed by pharmacies participating in

21        illicit Internet schemes, but failed to report the orders to DEA. They did so even after a

22        Sept. 1, 2005, meeting at which DEA officials met with and warned McKesson officials

23        about excessive sales of their products to pharmacies filling illegal online prescriptions.

24        As a result, millions of dosage units of controlled substances were diverted from legitimate

25        channels of distribution.

26  (*Id.*)

27

28

1        <u>McKesson's Controlled Substance Monitoring Program</u>.  According to the government

2    plaintiffs, in late 2007, after internet pharmacies essentially disappeared because of a change in

3    federal law, brick & mortar "pill mills" became the  primary diversion trend.  (*See* Ex. 17 at 61.)   In

4    addition, the opioid crisis continued to worsen and remained the Nation's primary health care crisis.

5    (*See* Summit TAC ¶ 7.)  As a result, while the DEA's Distributor Initiative continued, its focus on

6    how to combat diversion again changed.

7        For example, in September 2007, at the DEA's Pharmaceutical Industry Conference, the DEA

8    continued to warn Distributors and others about the growing opioids crisis and their obligations under

9    the CSA to help avoid diversion.  (Ex. 17 at 71-72.)  In addition, on December 27, 2007, DEA

10   Deputy Assistant Rannazzisi sent another "Dear Registrant" letter to Distributors, announcing its "do

11   not ship" and "know your customer" guidance.   (Ex. 31; *see also* Ex. 17 at 60.)  The letter also

12   explained to Distributors that their SOMS should be updated to include due diligence before shipping,

13   so as to distinguish illegitimate pharmacies from legitimate ones and block suspicious orders.  (*Id.*)

14       In response, and because the DOJ settlement required McKesson to implement enhanced

15   controls over its distribution of controlled substances, (*see* Ex. 32 § II.a-f.), McKesson launched a

16   new SOMS program in 2008 known as the "Controlled Substance Monitoring Program" or "CSMP."

17   (Ex. 33; Ex. 34; *see also* Ex. 26 at 116, 187-88 (describing creation of CSMP).)  The CSMP was

18   intended to set monthly thresholds that applied to all opioids, and to allow McKesson to stop any

19   suspicious orders before they were shipped.  (*See id.*)

20       <u>McKesson's Alleged Continued Violations Of The CSA</u>.  According to the government

21   plaintiffs, McKesson again found a way to flout its CSA obligations by avoiding the requirements of

22   its new CSMP.  Discovery established manufacturers like Purdue had not only launched the

23   marketing scheme to drastically increase the utilization of Opioids, and their profits, but realized it

24   would be necessary to obtain cooperation from the distributors for their scheme to work.  As plaintiffs

25   alleged, Purdue recognized that "over 80% of the … drug market [was] controlled by four players:

26   McKesson, Bergen, Cardinal, and Amerisource."  (Ex. 35.)  To ensure those Distributors continued to

27

28

1 | ship massive amounts of its opioids, Purdue began to build relationships with these "wholesaler

2 | trading partners." (*Id.*)

3 |     As Purdue explained, "responsibility for making the decision to ship rests with the supplier.

4 | … That is why we must collaborate."  (Ex. 36.)  As a result, in 2008, Purdue "arrange[d] a meeting

5 | with [McKesson and other distributors] to talk about DEA's latest plans to squeeze the wholesalers

6 | and distributors on [shipments to] 'pain clinics." (Ex. 37.)  Purdue made clear it was important for

7 | manufacturers and distributors to "pledge to remain in close contact with each other whenever there

8 | may be a questionable order" to "protect ourselves and our registrations regarding suspicious order

9 | discovery and reporting." (Ex. 36.)

10 |     As part of that effort, Purdue met twice with McKesson in 2009 about its SOMS, and

11 | proposed a "collaborative effort" regarding suspicious order monitoring going forward.  (*See* Ex. 38.)

12 | In return, McKesson stated it "was in 100% agreement with Purdue and … recognized that this

13 | collaborative effort was the right thing to do." (*Id.* at 4474440.)  As McKesson explained, "we

14 | ultimately protect ourselves." *Id.*  McKesson and Purdue met again in 2010 for the purpose of

15 | "further cooperation [and] to develop coordinated protocols for communication in the identification

16 | of patterns of interest to all of us." (Ex. 39.)  Notably, McKesson held these meetings and agreed to

17 | collaborate with Purdue despite the fact that, on May 10, 2007, Purdue and certain top executives

18 | pled guilty to charges relating to the marketing of OxyContin, and agreed to pay a $635 million

19 | penalty.  (*See* Ex. 40.)

20 |     According to the government plaintiffs, because of its meetings and its cooperation with

21 | Purdue and others, McKesson found a way to exploit loopholes in its CSMP, and to ensure there was

22 | no interruption in the supply chain.  For example, in a document disseminated to McKesson's

23 | pharmacy customers when introducing the CSMP (and just after its May 2, 2008 settlement with the

24 | DEA and DOJ), McKesson confidently stated that its CSMP "*ensures that you as a McKesson

25 | customer can continue with business as usual*"—an odd assurance given its recent multi-million

26 | settlement with the DOJ for over-distributing opioids.  (Ex. 41 (emphasis added); *see also* Ex. 42

27 | (advising McKesson employees to "[r]efrain from using the word 'suspicious' in communications"

28 |

1   because "[o]nce McKesson deems an order and/or customer suspicious, McKesson is required to

2   act.").)

3       <u>McKesson Is Again Fined By The DOJ For CSA Violations</u>.  In an August 2014 letter, the

4   DOJ and DEA informed McKesson they were again investigating McKesson's compliance with the

5   CSA, this time relating to its Aurora, Colorado distribution center—one of 28 distribution centers that

6   McKesson operated across the U.S. at that time.  (Ex. 43; *see also* Ex 44.)  The letter provided several

7   examples of what led to the investigation.  For example, the letter explained that although McKesson

8   had received, reviewed, and filled almost 1.6 million orders of controlled substances from its Aurora

9   distribution center between May 2, 2008 and June 23, 2013, a period of about five years, it had

10  submitted only sixteen SORs as required by its CSMP.  (*Id.*)  To put that in perspective, from June

11  24, 2013 to November 30, 2013, a period of just five months, and shortly *after* McKesson learned that

12  the DEA and DOJ were investigating Aurora, McKesson submitted 2,447 SORs.  (Ex. 43)

13      The DEA's and DOJ's investigation continued for three more years and encompassed twelve

14  McKesson distribution centers in eleven states.  (*See* Exs. 45, 46.)  McKesson's corporate testimony

15  made clear just how serious the DOJ's findings were:

16      Q.  Here's what I want to ask:  You knew that the DEA was *recommending a fine in excess*

17          *of a billion dollars* because of the conduct that took place in Aurora.  You knew that,

18          correct?

19      A.  Correct.

20      Q.  And in your job you also knew that the – at some point *the DEA had said, "this conduct*

21          *is so bad, we need to have a criminal – there needs to be criminal prosecution*."  You

22          knew that, right?

23      A.  I knew that was suggested.

24  (Ex. 21, Transcript of the Rule 30(b)(6) deposition of McKesson, by Nathan J. Hartle, dated August

25  1, 2018, at 424:16-25;425:1-7 (emphasis added).)

26      In 2017, McKesson finalized a settlement with the DEA and DOJ.  (Ex. 46*.*)  As part of that

27  settlement, McKesson admitted it committed wrongdoing from 2009 to 2017 (including during the

28

1   policy period of the 08/09 NU Policy) in connection with its distribution of opioids, including

2   violations of the May 2, 2008 settlement, the CSA, and related regulations, and agreed to pay a $150

3   million penalty.  (*Id.*)

4                                    *       *       *

5          Given the allegations and evidence against McKesson in the Opioid Lawsuits, it is difficult to

6   imagine McKesson can establish its conduct over the past decade—for which it agreed to pay more

7   than $163 million in civil fines to the DEA and DOJ, and has now agreed to pay more than $8 billion

8   to the government plaintiffs to settle (Ex. 47)—was an accident; no more than the result of an

9   innocent series of "unexpected, or unforeseen" mistakes.  Because McKesson's conduct did not result

10  from an "accident," it is not entitled to coverage for the "Exemplar Suits," or any of the Opioid

11  Lawsuits, under the 08/09 NU Policy.

12         **C.      There Is No Coverage Under The 08/09 NU Policy Because McKesson Had Prior**

13                 **Knowledge Of The Bodily Injury Alleged In The "Exemplar Suits."**

14         The 08/09 NU Policy applies "only if … prior to" July 1, 2008, McKesson did not "kn[o]w

15  that the Bodily Injury [at issue in the Opioid Lawsuits] … had occurred in whole or in part.  If such

16  an Insured … knew, prior to the Policy Period, that the Bodily Injury … had occurred, then any

17  continuation, change, or resumption of such Bodily Injury … during or after the Policy Period will be

18  deemed to have been known prior to the Policy Period."  (08/09 NU Policy, § I(C)(1).)  For the

19  reasons set forth in detail in Argument, Section III of ACE's brief, which is incorporated by reference

20  herein, and for the reasons set forth in Section IV.B.5 above, the extrinsic evidence disclosed during

21  discovery establishes that McKesson had knowledge of—indeed, was specifically warned by the

22  DEA about—the very Bodily Injury that McKesson now asserts triggers coverage under the 08/09

23  NU Policy.

24         **D.      There Is No Coverage Under The 08/09 NU Policy Because The "Exemplar Suits"**

25                 **Do Not Seek Damages For Bodily Injury.**

26         The 08/09 NU Policy states that National Union "will have the right and duty to defend any

27  suit against [McKesson] that seeks damages for Bodily Injury …."  (08/09 NU Policy, End. I, §

28

39

3(III)(A).)  "Bodily Injury" is defined as "bodily injury, sickness, or disease sustained by any person, including death or mental anguish resulting from any of these …." (*Id*. at § VII(C).)  Under California law, McKesson has the burden of proving that the damages claimed in the Opioid Lawsuits are "damages … because of Bodily Injury" and thus covered by the AIG Policies.  *See The Purdy Co. of Cal. v. the Travelers Ins. Co.*, No. 97- 56106, 1999 WL 68628, at *2 (9th Cir. Feb. 11, 1999) ("[t]he burden is on an insured to establish that ... the basis of its claim is within the basic scope of insurance coverage").  For the reasons set forth in detail in Argument, Section I of ACE's brief, which is incorporated by reference herein, McKesson cannot do so and is thus not entitled to coverage for the "Exemplar Suits," or any of the Opioid Lawsuits, under the 08/09 NU Policy.

## V.   <u>CONCLUSION</u>

For all the reasons set forth above, National Union respectfully submits it is entitled to an order from the Court denying McKesson's Motion and granting its Cross-Motion.

Dated:  October 20, 2021

WILLKIE FARR & GALLAGHER LLP

By:   <u>/s/ Christopher J. St. Jeanos</u>
Christopher J. St. Jeanos (*pro hac vice*)
Jocelyn Sher (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:   212-728-8000
Facsimile:   212-728-8100

GIBSON, DUNN & CRUTCHER LLP

Richard J. Doren
Matthew A. Hoffman
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213-229-7038
Facsimile:   213-229-6038

*Attorneys for Plaintiffs and Counterclaim Defendants AIU Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa.*