1   SUSAN KOEHLER SULLIVAN (Bar No. 156418)
       susan.sullivan@clydeco.us
2   BRETT C. SAFFORD (Bar No. 292048)
       brett.safford@clydeco.us
3   CLYDE & CO US LLP
    355 S. Grand Avenue, Suite 1400 Floor
4   Los Angeles, California 90071
    Telephone:  213.358.7600
5   Facsimile:  213.358.7650

6   ROBERT MANGINO (*pro hac vice*)
       robert.mangino@clydeco.us
7   CLYDE & CO US LLP
    200 Campus Drive, Suite 300
8   Florham Park, NJ 07932
    Telephone: 973.210.6700
9   Facsimile: 973.210.6701

10  MICHAEL S. SHUSTER (*pro hac vice*)
       mshuster@hsgllp.com
11  DANIEL M. SULLIVAN (*pro hac vice*)
       dsullivan@hsgllp.com
12  BLAIR E. KAMINSKY (*pro hac vice*)
       bkaminsky@hsgllp.com
13  MARGARET B. HOPPIN (*pro hac vice*)
       mhoppin@hsgllp.com
14  DANIEL M. HOROWITZ (*pro hac vice*)
       dhorowitz@hsgllp.com
15  HOLWELL SHUSTER AND GOLDBERG LLP
    425 Lexington Avenue
16  New York, NY 10017
    Telephone:  646.837.5151
17  Facsimile:  646.837.5150

18  *Attorneys for Third Party Defendant*
    *and Third Party Counterclaim Plaintiff*
19  *ACE Property and Casualty Insurance Company*

20

21                  **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
22                      **SAN FRANCISCO DIVISION**

23  AIU INSURANCE COMPANY and          | CASE NOS. 3:20-cv-07469-JSC
    NATIONAL UNION FIRE INSURANCE      |                 3:20-cv-09356-JSC
24  COMPANY OF PITTSBURGH, PA.,        |
                                       |
25        Plaintiffs and Counterclaim Defendants, | **ACE'S OPPOSITION TO McKESSON'S**
                                       | **MOTION FOR PARTIAL SUMMARY**
26              v.                     | **JUDGMENT AND ACE'S CROSS-MOTION**
                                       | **FOR PARTIAL SUMMARY JUDGMENT**
27  McKESSON CORPORATION f/k/a         | **ON THE DUTY TO DEFEND**
    MCKESSON HBOC, INC.,               |
28                                     | Honorable Judge Jacqueline Scott Corley

---

Defendant, Counterclaim Plaintiff, Third Party Plaintiff, and Third Party Counterclaim Defendant,

v.

ACE PROPERTY AND CASUALTY INSURANCE COMPANY,

Third Party Defendant and Third Party Counterclaim Plaintiff.

Hearing Date:  January 27, 2022
Time:              9:00 a.m.
Courtroom:     Courtroom E, 15th Fl.
Judge:  Hon. Jacqueline Scott Corley
Action Filed:  October 23, 2020

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................ 1

ISSUES TO BE DECIDED ......................................................................................... 1

INTRODUCTION ...................................................................................................... 2

BACKGROUND ........................................................................................................ 4

I.      The Opioid Lawsuits ...................................................................................... 4

II.     The Exemplar Suits ........................................................................................ 4

III.    The ACE Policy ............................................................................................. 6

IV.     McKesson Requests Insurance Coverage For The Opioid Lawsuits But Refuses To
        Provide Evidence of Exhaustion. .................................................................... 7

V.      Litigation Ensues And McKesson Moves For Summary Judgment. ................. 9

ARGUMENT ........................................................................................................... 10

I.      The Exemplar Suits Do Not Seek "Damages" "Because Of" Or "For" "Bodily Injury"
        Sustained by A Person. ................................................................................. 10

        A.      The governmental plaintiffs do not seek compensation for bodily injury, either
                for themselves or on behalf of others. .............................................. 10

        B.      McKesson's argument that "because of" or "for" bodily injury requires merely
                "some causal connection" is contrary to California insurance and tort law. ............. 14

        C.      The cases McKesson cites are inconsistent with California law and cannot
                apply here. ..................................................................................... 17

        D.      McKesson's invocation of other policy provisions fails.......................... 20

II.     The Exemplar Suits Do Not Allege That McKesson's Over-Distribution Of Opioids
        Was Accidental. ............................................................................................ 22

        A.      Under California law, intentional conduct is not considered "accidental"
                simply because the insured did not intend the resulting harm. ................... 22

        B.      The Exemplar Suits allege that McKesson intended to distribute the opioids
                that allegedly caused the governmental plaintiffs' economic harm........... 23

        C.      The only California decision addressing coverage for defense of the opioid
                lawsuits found the alleged conduct to be non-accidental........................... 26

III.    McKesson Undoubtedly Had "Prior Knowledge", Well Before July 1, 2015, About
        The Bodily Injury Alleged In The Exemplar Suits. ..................................... 30

        A.      The ACE Policy's prior-knowledge provision precludes coverage if McKesson
                knew about the ongoing opioid crisis before the policy's inception date. ............... 30

i

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

B.     ACE may rely on extrinsic evidence available to ACE as of April 30 2021, when McKesson first provided evidence of exhaustion. ............................................. 32

C.     McKesson's "prior knowledge" of the opioid crisis is clearly established by undisputed evidence *irrespective* of which evidentiary standard applies. .................. 34

1.     The undisputed evidence available to ACE as of April 2021 overwhelmingly demonstrates McKesson's prior knowledge. ........... 34

2.     The essential facts that establish McKesson's prior knowledge were known to ACE as of July 25, 2019............................................. 40

CONCLUSION.................................................................................................................... 40

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*ACE American Ins. Co. v. Rite Aid Corp.*,
  No. 339-2020 (Del. Oct. 13, 2020) ................................................................................................ 18

4

*Acuity v. Masters Pharm., Inc.*,
  No. C-190176 (Ohio Sept. 21, 2020) ............................................................................................ 18

5

6

*AIU Ins. Co. v. Superior Court*,
  51 Cal. 3d 807 (1990) ........................................................................................................ 11, 13, 14

7

*Albert v. Mid-Century Ins. Co.*,
  236 Cal. App. 4th 1281 (2015) ............................................................................................. 22, 25

8

9

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
  7 Cal. 4th 503 (1994) ........................................................................................................................ 11

10

*Cincinnati Ins. Co. v. Amerisourcebergen Drug Corp.*,
  2015 WL 13808271 (Ohio Ct. C.P. Butler Cnty. Aug. 31, 2015) ......................................... 17

11

*Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*,
  2020 WL 6706791 (Ohio Com. Pl. Sept. 9, 2020) .................................................................... 26

12

13

*Cincinnati Ins. Co. v. Richie Enters., LLC*,
  2014 WL 3513211 (W.D. Ky. July 16, 2014) ...................................................................... 17, 20

14

*Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*,
  829 F.3d 771 (7th Cir. 2016) ..................................................................................................... 18, 19

15

16

*Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co.*,
  954 F.3d 397 (1st Cir. 2020) ........................................................................................................... 31

17

*CNA Cas. v. Seaboard Sur. Co.*,
  176 Cal. App. 3d 598 (1986) .......................................................................................................... 33

18

19

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
  32 Cal. 4th 465 (2004) ..................................................................................................................... 31

20

*Emp'rs Cas. Ins. Co. v. Foust*,
  29 Cal. App. 3d 382 (1972) ............................................................................................................ 15

21

22

*Fire Ins. Exch. v. Superior Ct.*,
  181 Cal. App. 4th 388 (2010) .................................................................................................. 22, 25

23

*Forecast Homes, Inc. v. Steadfast Ins. Co.*,
  181 Cal. App. 4th 1466 (2010) ...................................................................................................... 21

24

25

*French Laundry Partners, LP v. Hartford Fire Ins. Co.*,
  2021 WL 1640994 (N.D. Cal. Apr. 27, 2021) ............................................................................ 10

26

*Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*,
  499 F. Supp. 3d 147 (W.D. Pa. 2020), *vacated by* Order, 19-cv-904 (May 25, 2021) ..... 18, 26

27

28

iii

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

*Giddings v. Indus. Indem. Co.*,
  112 Cal. App. 3d 213 (1980) .................................................................... 12

*Gonzalez v. Fire Ins. Exch.*,
  234 Cal. App. 4th 1220 (2015) ................................................................ 26

*Gov't Emps. Ins. Co. v. Encelewski*,
  1995 WL 25427, (D. Alaska Jan. 13, 1995) ............................................ 16

*Gray v. Zurich Ins. Co.*,
  65 Cal. 2d 263 (1966) .............................................................................. 18

*Hartford Cas. Ins. Co. v. Swift Dist., Inc.*,
  59 Cal. 4th 277 (2014) ............................................................................ 10

*Henstooth Ranch LLC v. Burlington Ins. Co.*,
  293 F. Supp. 3d 1067 (N.D. Cal. 2018) ................................................... 22

*Herrera v. Zumiez, Inc.*,
  953 F.3d 1063 (9th Cir. 2020) ........................................................... 27, 30

*Hogan v. Midland Nat'l Ins. Co.*,
  3 Cal. 3d 553 (1970) ................................................................................ 12

*In re Nat'l Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ....................................... 19

*Kaady v. Mid-Continent Cas. Co.*,
  790 F.3d 995 (9th Cir. 2015) ................................................................... 31

*Legion Indem. Co. v. Carestate Ambulance, Inc.*,
  152 F. Supp. 2d 707 (E.D. Pa. 2001) ...................................................... 15

*Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*,
  602 F. App'x 115 (4th Cir. 2015) ............................................................ 26

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Const. Co.*,
  5 Cal 5th 216 (2018) .......................................................................... 22, 29

*Modern Dev. Co. v. Navigators Ins. Co.*,
  111 Cal. App. 4th 932 (2003) .................................................................. 25

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
  10 Cal. 4th 645 (1995), *as modified* (Aug. 31, 1995) ............................ 30

*Montrose Chem. Corp. v. Superior Court*,
  6 Cal. 4th 287 (1993) ........................................................................ *passim*

*Motorists Mut. Ins. Co. v. Quest Pharms., Inc.*,
  2021 WL 1794754, (W.D. Ky. May 5, 2021), *mot. to amend denied*, 2021 WL
  4513715 (W.D. Ky. Oct. 1, 2021) ............................................................ 17

*Nat'l Union First Ins. Co. v. Ready Pac Foods, Inc.*,
  782 F. Supp. 2d 1047 (C.D. Cal. 2011) ....................................... 12, 13, 15

*National Union Fire Ins. Co. v. Mead Johnson & Co.*,
    735 F.3d 539 (7th Cir. 2013).................................................................................. 16

*Oak Park Calabasas Condominium Ass'n v. State Farm Fire & Cas. Co.*,
    137 Cal. App. 4th 557 (2006) .............................................................................. 16

*Osborne Dev. Corp. v. First Spec. Ins. Corp.*,
    2011 WL 13356061 (S.D. Cal. May 11, 2011)................................................... 26

*Palmer v. Truck Ins. Exch.*,
    21 Cal. 4th 1109 (1999) ...................................................................................... 10

*Quan v. Truck Ins. Exch.*,
    67 Cal. App. 4th 583 (1998) ................................................................................ 23

*Roberts v. A.W. Chesterton Co.*,
    2008 WL 782569 (N.D. Cal. Mar. 24, 2008)..................................................... 28

*S. Cal. Gas Leak Cases*,
    7 Cal. 5th 391 (2019) .................................................................................... 16, 17

*Santo's Italian Café LLC v. Acuity Ins. Co.*,
    --- F. 4th ---, 2021 WL 4304607 (6th Cir. Sept. 22, 2021) ................................ 16

*Saylin v. Cal. Ins. Guar. Ass'n*,
    179 Cal. App. 3d 256 (1986)............................................................................... 33

*State Farm Gen. Ins. Co. v. Frake*,
    197 Cal. App. 4th 568 (2011) ............................................................................. 22

*Street Surfing, LLC v. Great Am. E&S Ins. Co.*,
    2012 WL 12882123 (C.D. Cal. Jan. 18, 2012) .................................................. 33

*Swain v. Cal. Cas. Ins. Co.*,
    99 Cal. App. 4th 1 (2002) ................................................................................... 23

*The Upper Deck Co., LLC v. Fed. Ins. Co.*,
    358 F.3d 608 (9th Cir. 2004)............................................................................... 33

*Travelers Prop. Cas. Co. v. Actavis, Inc.*,
    16 Cal. App. 5th 1026 (2017) ....................................................................*passim*

*Travelers Prop. Cas. Co. v. Anda, Inc.*,
    90 F. Supp. 3d 1308 (S.D. Fla. 2015) ........................................................... 17, 18

*Tzung v. State Farm Fire & Cas. Co.*,
    873 F.2d 1338 (9th Cir. 1989)............................................................................. 21

*Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Prop. Cas. Co.*,
    197 Cal. App. 4th 424 (2011) ......................................................................... 18, 19

*Waller v. Truck Ins. Exch., Inc.*,
    11 Cal. 4th 1 (1995) ............................................................................................ 13

*West v. Am. Tel & Tel. Co.*,
    311 U.S. 223 (1940) .................................................................................. 27, 30

*Westfield Ins. Co. v. Masters Pharm., Inc.*,
    2015 WL 10478081 (Ohio Ct. C.P. Hamilton Cnty. Dec. 17, 2015) .................................... 17

*Woods v. Interstate Realty Co.*,
    337 U.S. 535 (1949) .................................................................................. 28

*Zimmerman v. Allstate Ins. Co.*,
    2013 WL 12114838 (C.D. Cal. 2013) .................................................................. 24

**Statutes**

21 U.S.C. § 811 ........................................................................................ 34

21 U.S.C. § 812 ..................................................................................... 34, 40

21 U.S.C. § 813 ........................................................................................ 34

Cal. Civ. Code § 1641 .................................................................................. 21

Cal. Civ. Code § 3281 .............................................................................. 11, 12

Controlled Substances Act of 1970 ("CSA"), 21 U.S.C §§ 801 ............................................... 34

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980,
    42 U.S.C. §§ 9607 ................................................................................... 14

**Rules**

Cal. Rule of Court 8.1115 .............................................................................. 30

Fed. R. Civ. P. 56 .....................................................................................

**Other Authorities**

6 Witkin, *Summary of California Law* § 1841 (11th ed. 2021) ........................................... 11

57B AM. JUR. 2D, Negligence § 1030 (Aug. 2020 update) .................................................. 19

Black's Law Dictionary (11th ed. 2019) ................................................................. 11

Croskey, et al.,
    Cal. Practice Guide: Ins. Litig., Ch. 7B-C (Aug. 2021) ............................................. 32

1

### NOTICE OF MOTION AND MOTION

2   NOTICE IS HEREBY GIVEN that, on JANUARY 27, 2022, at 9:00 a.m. (PST), pursuant to

3   Fed. R. Civ. P. 56, ACE Property and Casualty Company ("ACE") will and hereby does cross-move

4   for partial summary judgment that it has no duty to defend McKesson Corporation in each of three

5   lawsuits filed against McKesson.[1]  This Motion seeks a declaration that ACE does not owe and never

6   has owed McKesson any defense duty in the Exemplar Suits under the excess Comprehensive

7   General Liability ("CGL") policy issued by ACE to McKesson for the period July 1, 2015 through

8   July 1, 2016 (the "ACE Policy").  Alternatively, this Motion seeks a declaration that, if any duty to

9   defend McKesson in the Exemplar Suits *ever* arose, it was extinguished by July 25, 2019.

10   This Motion is based on the accompanying Memorandum of Points and Authorities, the

11   Declaration of Daniel M. Sullivan, Esq. and the exhibits thereto, the Declaration of Christopher

12   Celentano, the record in this action, and all other matters that may be presented to the Court before or

13   during the hearing of this Motion.

14

### ISSUES TO BE DECIDED

15   A.  Whether coverage of the Exemplar Suits under the ACE Policy is precluded because the
      Exemplar Suits do not "seek damages [because of or for] … 'bodily injury'";
16

17   B.  Whether coverage of the Exemplar Suits under the ACE Policy is precluded because the
      Exemplar Suits do not allege an "Occurrence", which is defined to mean an "accident";

18   C.  Whether coverage of the Exemplar Suits under the ACE Policy is precluded because it is
      undisputed that McKesson "knew", at least "in part", of the purported injury alleged in the
19      Exemplar Suits—the opioid crisis—by July 1, 2015;

20   D.  Whether any duty to defend McKesson in the Exemplar Suits could possibly have arisen
      under the ACE Policy prior to April 31, 2021;
21

22   E.  Whether any duty to defend McKesson in the Exemplar Suits has been extinguished.

23

24   ───────────────────

25   [1]   As in the Motion for Partial Summary Judgment filed by McKesson on April 30, 2021 at ECF
      No. 79 ("McKesson's Motion"), and in the Cross-Motion filed by National Union Fire Insurance
26   Company of Pittsburgh, Pa. ("National Union," together with ACE, "Insurers"), the lawsuits at
      issue in ACE's cross-motion are: (1) *County of Cuyahoga, Ohio v. Purdue Pharma L.P.*, *et al.*,
27   Case No. 17-OP-45004 (N.D. Ohio); (2) *County of Summit, Ohio v. Purdue Pharma L.P., et al.*,
      Case No. 18-OP-45090 (N.D. Ohio); (3) *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84
28   (Bryan Cnty, Okla.). Like McKesson, ACE refers to the lawsuits filed by Cuyahoga and Summit
      counties as the "Track One Suits" and to all three lawsuits collectively as the "Exemplar Suits."

1

## **INTRODUCTION**

2        There is no possibility that the Exemplar Suits are covered by the ACE Policy.  That means

3    that ACE never had a duty to defend McKesson in those lawsuits.  ACE opposes McKesson's Motion

4    and cross-moves for a declaration that ACE has never had a duty to defend McKesson in the

5    Exemplar Suits and that, even if it ever did, any such duty has been extinguished.[2]

6        McKesson cannot satisfy three separate requirements for coverage.  Each failure, on its own,

7    is dispositive of any duty to defend.  Together, they show that McKesson's claims of coverage are far

8    outside the bounds of the CGL policies that McKesson bought.  A finding for McKesson here would

9    not only conflict with California precedent, it would foist onto Insurers (and their other insureds)

10   social expenditures to address an epidemic of addiction and death that McKesson knew of, and knew

11   full well it was furthering, long before the policies here incepted.

12       **First**, the ACE Policy requires that the underlying lawsuits seek "damages," "because of" or

13   "for" "bodily injury."  The Exemplar Suits do not.  Instead, the governmental plaintiffs in those

14   actions seek damages exclusively for their own losses—increased government spending (past and

15   future) that is far removed from the sorts of bodily injuries to individuals covered by the policies.  In

16   fact, the governmental plaintiffs expressly disclaimed seeking damages on behalf of others who

17   suffered bodily injury.  By its terms, the ACE Policy does not extend to such suits.

18       **Second**, the ACE Policy requires that the underlying lawsuits allege that the "bodily injury"

19   was caused by an "occurrence," which it defines to mean an "accident."  California law provides that

20   an "accident" in a CGL insurance policy means an action unintended by the insured; it does not

21   encompass intentional actions, even if the claimant did not intend the *consequences* of those actions.

22   Accordingly, under California law, the Exemplar Suits also allege no "accident."  To the contrary,

23   they allege that McKesson shipped hundreds of millions of opioid pills, over many years, that

24   produced harmful and entirely foreseeable consequences.  McKesson's insistence that the complaints

25   leave open whether it *intended* those consequences is therefore irrelevant for coverage purposes.

26   McKesson does not dispute that it distributed pills intentionally, and that alone forecloses coverage.

27

28

---

[2]   National Union also separately opposes McKesson's motion and cross-motions for summary judgment.  ACE joins sections IV.B of National Union's brief.

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

**Third**, the ACE Policy contains a "prior knowledge" clause, which precludes coverage of lawsuits seeking "damages" for "bodily injury" if, before the July 1, 2015 inception date, the insured knew, in whole or in part, of "the bodily injury" alleged.  According to McKesson, "the bodily injury" alleged is the opioid crisis, and covered damages are sought because of that alleged injury. Insurers disagree that any potentially covered "bodily injury" claims are alleged here.  If McKesson is correct, however, the policy language is clear—the "bodily injury" that would give rise to coverage is the same "bodily injury" that is the subject of the "prior knowledge" clause.  Thus, that clause precludes coverage if McKesson knew, in whole or in part, about the epidemic by July 1, 2015.[3]  And it defies credulity to suggest that McKesson did *not* know about the opioid epidemic—at least "in part"—by July 1, 2015.  For one thing, the Exemplar Suits themselves comprehensively allege McKesson's knowledge of the opioid crisis, which allegedly began *in the 1990s*.  Substantial extrinsic evidence further confirms that McKesson has long been fully aware both of the opioid epidemic and its own role in perpetuating that epidemic.

This Court has held that ACE may rely on the extrinsic evidence it possessed when its duty to defend arose.  (ACE submits that California law allows it to use all evidence available at that time.) Here, no such duty could arise until McKesson demonstrated exhaustion of the applicable $5 million retention through "*payment* of 'loss.'"  ACE Policy (Hoff Varner Decl. Ex. B, ECF No. 79-3), End. 25.  After stonewalling for three years, on April 30, 2021, McKesson finally provided some evidence of payment. ████████████████████████████████████████████ ████████████████████████████████████████

ACE is therefore entitled to use all available evidence as of July 25, 2019 and should be permitted to use all available evidence as of April 30, 2021.  Whatever date one uses, that evidence confirms beyond peradventure that McKesson is not entitled to a defense.  In any event, at a minimum ACE can use all extrinsic evidence with respect to one of the three Exemplar Suits, which was not even filed until May of 2020, and to show as to all three Exemplar Suits that the duty to

---

[3]   By "opioid epidemic," ACE means the phenomenon described with that phrase in the Exemplar Suits: the dramatically increased rates of opioid misuse and addiction across the United States.

1   defend, if it ever arose and whenever it arose, was extinguished as of July 25, 2019, by which point

2   ACE knew much of evidence and most of the rest was publicly available.

3   ## BACKGROUND

4   ### I.   The Opioid Lawsuits

5   Since the 1990s, the United States has grappled with a crisis of addiction to and abuse of

6   prescription opioids that the CDC has described as a "national epidemic."[4]  By 2015 and 2016, opioid

7   addiction and overdoses were the leading cause of death for Americans under age 50, and Americans'

8   life expectancy declined for the first time in decades.  *Summit* Compl. ¶ 7.

9   In addition to the terrible human and societal toll the epidemic has wreaked across the

10   country, the opioid crisis ultimately led federal, state and local governments to incur tremendous

11   costs to deal with its consequences.  *Summit* Compl. ¶¶ 20–21.  As a result, governmental entities

12   including states, counties and municipalities filed what became thousands of lawsuits against opioid

13   distributors, manufactures, and retailers.  The governmental plaintiffs alleged that those companies

14   were responsible for the increased budgetary costs they incurred in responding to the opioid crisis.

15   The wave of governmental litigation began in 2012 with a lawsuit against, among other

16   distributors, one of the other "Big 3" distributors, McKesson's competitor, AmerisourceBergen.

17   McKesson itself was first named as a defendant in early 2016.  *See, e.g.*, Brigman Decl., ECF No. 79-

18   7, ¶ 4; McKesson Ans., ECF No. 9, ¶¶ 19–20.  Eventually McKesson, the largest of the "Big 3"

19   distributors of brand name and generic opioid drugs, was named as a defendant in over 3,000 opioid

20   lawsuits.  *See* Brigman Decl. ¶ 4 & Ex. B.  Most of the opioid lawsuits have been consolidated for

21   pre-trial proceedings in a multidistrict litigation ("MDL") in the Northern District of Ohio.  *Id.* ¶ 7.

22   ### II.   The Exemplar Suits

23   McKesson limited its Motion to the Track One Suits, filed by Summit and Cuyahoga

24   Counties, and the action filed by the state of Oklahoma (the "Oklahoma AG Suit").  McKesson

25

26   [4]   *See, e.g.*, CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr.
29, 2014) https://www.cdc.gov/washington/testimony/2014/t20140429.htm, *cited in* Brigman Ex.

27   G (Third Am. Compl., *County of Summit, Ohio et al. v. Purdue Pharma, L.P. et al.*, No. 17-md-
2804 (N.D. Ohio), ECF No. 1466 (hereinafter "*Summit* Compl.")), ¶ 18 n.3, *and cited in* Brigman

28   Ex. E (Third Am. Compl., *County of Cuyahoga, Ohio et ano. v. Pursue Pharma, L.P. et al.*, No.
17-md-2804 (N.D. Ohio), ECF No. 1631 (hereinafter "*Cuyahoga* Compl.")), ¶ 17 n.7.

4

1   further limited its motion to ACE's policy issued in 2015.  The same limitations apply to ACE's

2   cross-motion.[5]

3   **_The Track One Suits_**.  The Counties in the Track One Suits, since settled, alleged that the

4   opioid crisis "arose from the opioid manufacturers' deliberate marketing strategy together with

5   distributors' equally deliberate efforts to evade restrictions on opioid distribution."  *Summit* Compl.

6   ¶ 3.  In particular, the Counties targeted McKesson's and its co-defendants' "selling and distributing

7   far greater quantities of prescription opioids than they know could be necessary for legitimate

8   medical uses."  *Id.* ¶ 14.  Characterizing the manufacturers' and the distributor's conduct as a

9   concerted "scheme" to dramatically increase the sale of opioids, the Counties alleged that

10  "[m]anufacturers and distributors alike acted without regard for the lives that would be trammeled in

11  pursuit of profit."  *Id.* ¶¶ 3, 9.  They levied eight claims against McKesson, including for violations of

12  the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Ohio Corrupt Practices Act,

13  public nuisance, negligence, injury through criminal acts, unjust enrichment, and civil conspiracy.

14  The Counties sought to recover the economic losses that they allegedly incurred in responding

15  to the opioid crisis.  These "include[e] but [are] not limited to, significant expenses for police,

16  emergency, health, prosecution, corrections, rehabilitation, and other services."  *Id.* ¶ 1063; *see also*

17  *id.* at ¶¶ 37, 781, 905, 938, 973, 1025.  The Track One complaints include no allegations of any

18  specific individual's bodily injuries.  Of equal importance, the Counties' claims require no such

19  showing.  And *none* of the damages they allege are tied to any specific bodily injuries; the Counties

20  do not, for example, seek compensation for treating any specific injury suffered by any identified

21  individual.  Instead, each category of harm identified by the Counties refers to the costs of responding

22  to the opioid crisis *in the aggregate*.  *See, e.g., id.* ¶ 735 ("From 2012 to 2017 to date, the County's

23  Children Services Board has incurred nearly $24 million in costs, and the County's Alcohol, Drug

24  Addiction, and Mental Health Services Board . . . more than $10 million costs related directly to the

25

26  _____

27  [5]  McKesson purports to seek a declaration regarding all suits "similarly pled" as the Exemplar
    Suits, but it does not identify which suits those are or explain what "similarly pled" means.  *See*

28  McKesson Mot. at 1; McKesson Proposed Order, ECF No. 79-22.  The Court should disregard
    McKesson's attempt to procure a ruling beyond the record and what it has attempted to show.

5

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

opioid epidemic.").  In fact, the Counties have repeatedly and specifically *disclaimed* any recovery

for compensation for bodily injury suffered by any of their citizens.  *See infra*, 12 & n.10.

On August 19, 2019, a few months before the scheduled trial of the Track One Suits, the

Counties voluntarily dismissed several claims, including the negligence claim.  On October 21, 2019,

McKesson settled the Track One Suits for $215 million.

**_The Oklahoma AG Action_**.  On May 1, 2020, the attorney general of Oklahoma filed an

opioid lawsuit in which McKesson is the only defendant.  Similar to the Counties, the Oklahoma AG

accuses McKesson of having "substantially contributed to fueling the opioid crisis by supplying

massive and patently unreasonable quantities of opioids to communities throughout the United States,

including Oklahoma," and alleges that McKesson "did so for one reason: greed."  Brigman Decl. Ex.

I ("*Oklahoma AG* Complaint") ¶ 4.  According to the Oklahoma AG, "[d]espite being repeatedly

penalized by law enforcement authorities, McKesson has not changed its conduct," but rather "has

engaged in a consistent, nationwide pattern and practice of illegally distributing opioids."  *Id.* ¶ 84.

The action asserts claims for negligence, public nuisance, and unjust enrichment.  *See id.* ¶¶ 120-37.

Like the Counties, the Oklahoma AG seeks damages for increased government spending

associated with the opioid epidemic.  *E.g.*, *id.* ¶ 32 ("McKesson's massive and patently unreasonable

supply of opioids fueled Oklahoma's opioid crisis causing enormous health care, criminal justice,

foster care, NAS, and lost productivity costs, among others.").  *None* of the claims asserted in the

Oklahoma AG action are brought on behalf of any individual who suffered opioid abuse, and *none* of

the injury allegations are tied to specific people.  Rather, to the extent opioid addiction and abuse

allegations are included at all, they are made at the population level to provide context for the

government's associated damages allegations.  *E.g.*, *id.* ¶ 127 ("Since 2000, more than 6,000

Oklahomans have lost their lives from a prescription-opioid overdose."); *id.* ("[I]n 2017, upwards of

500 Oklahoma babies were born suffering from the symptoms of opioid related NAS . . . .").

Discovery in the Oklahoma AG action is ongoing.

**III.    The ACE Policy**

McKesson requests adjudication as to only one policy issued by ACE.  McKesson moves—

and ACE cross-moves—for declaratory relief regarding ACE's duty to defend McKesson in the

Exemplar Lawsuits under ACE's 2015-2016 policy, which incepted on July 1, 2015. *See* ACE Policy § VII.Q.

The ACE Policy extends coverage *only* to: **"those sums in excess of the 'retained limit' that the 'insured' becomes legally obligated to pay *as damages because of 'bodily injury'* . . . to which this insurance applies."** ACE Policy § I.A (emphasis added). Similarly, upon exhaustion of the Retained Limit, ACE has **"the right and duty to defend the 'insured' against any 'suit' *seeking damages for 'bodily injury'* . . . to which this insurance applies[.]"** ACE Policy, End. 25 (emphases added). The Policy does not define the term "damages"; it defines "bodily injury" to mean **"bodily injury, sickness or disease sustained *by a person*, including death resulting from any of these at any time."** *Id.* § VII.C (emphasis added).

The ACE Policy sets forth certain other requirements for coverage. Relevant here, the alleged "bodily injury" must be caused by an **"occurrence"**, which the Policies define as **"an accident, including continuous or repeated exposure to substantially the same general harmful conditions."** *Id.* §§ I.A.1.a, VII.O (emphases added). In addition, the ACE Policy does not apply if, "[p]rior to the 'policy period'"—which began on July 1, 2015, *id.* § VII.Q—the **"'insured' . . . knew that *the* 'bodily injury' . . . had occurred, in whole or in part."** *Id.* § I.A.1.c (emphasis added). For the purposes of that requirement, "bodily injury" is "deemed to have been known to have occurred at the earliest" of several possible times, including when McKesson "[became] aware by any other means that 'bodily injury' . . . has occurred or has begun to occur." *Id.* § I.C. Furthermore**, "If any 'insured' . . . knew, prior to the 'policy period', that the 'bodily injury' . . . occurred, then any continuation, change, or resumption of such 'bodily injury' . . . during or after the 'policy period' will be deemed to have been known prior to the 'policy period'."** *Id.* § I.A.1.c (emphasis added).

IV.     **McKesson Requests Insurance Coverage For The Opioid Lawsuits But Refuses To Provide Evidence of Exhaustion.**

McKesson first provided notice of an opioid lawsuit to its various liability insurance carriers on February 8, 2016. Brigman Decl. ¶ 4. In response, ACE issued letters to McKesson reserving its rights with respect to coverage and explaining that it did not presently have a duty to defend,

including because McKesson had not demonstrated exhaustion of any ACE policy's Retained Limits and because McKesson was not at that time "requesting that [ACE] provide or fund a defense." Ex. A (Nov. 8, 2016), at 3; *see also* Ex. B (May 22, 2017); Ex. E (Dec. 4, 2017), at 4; Ex. G (Sept. 14, 2018).[6]  In December 2017, McKesson provided notice of the Track One Suits and, in May 2020, the Oklahoma AG Suit.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████.

ACE responded with multiple letters that, among other things, requested basic information about exhaustion, explained why there was no duty to defend, and reserved ACE's rights.  *See, e.g.*, Ex. I.  ACE requested that McKesson identify which policy or policies it was claiming coverage under, as well as the "amount of unreimbursed defense costs incurred by McKesson," "an explanation of how any retention(s) have been exhausted together with any documentation which may support this assertion," and the exhaustion date.  *Id.* at 2; Ex. G at 2.  McKesson did not provide ACE with any of the requested information or documentation, including regarding exhaustion of any particular policy's retention.  ACE continued to reserve its rights.  *See* Ex. J (May 1, 2019), at 1; Ex. L (Nov. 5, 2019), at 4.[7]

---

[6]  Unless otherwise indicated, citations to "Ex. __" refer to the materials attached as exhibits to the accompanying Declaration of Daniel M. Sullivan ("Sullivan Decl.").

[7]  McKesson insists that ACE, in fact, did not reserve its rights but denied coverage.  *See* Brigman Decl. ¶ 22.  That is false. ████████████████████████████████████████████████
████████████████████████████████████████████████

8

**V.     Litigation Ensues And McKesson Moves For Summary Judgment.**

On October 23, 2020, National Union and AIU Insurance Company initiated this declaratory relief action seeking a coverage determination in light of McKesson's pending claims.  ACE filed its own action, which was consolidated with this action by Order dated May 19, 2021.  ECF No. 84. Both lawsuits seek declarations that Insurers have no duty to defend or indemnify McKesson for the more than 3,000 opioid lawsuits under any of the nineteen policies issued by Insurers.  McKesson filed counterclaims and a third-party complaint pursuant to which McKesson seeks declarations that Insurers owe a duty to defend and indemnify it in connection with all the opioid lawsuits.

On April 30, 2021, before any discovery, McKesson filed its motion for partial summary judgment on Insurers' duty to defend.  With its motion, McKesson provided a declaration that, for the first time, represented that McKesson had actually paid defense costs in excess of the retained limits.

McKesson moved to stay discovery, and on August 12, 2021 this Court largely denied the motion.  The Court held that the Insurers may use extrinsic evidence up to the date that a duty to defend (if any) would have arisen under the excess insurance policies at issue.  *See* ECF No. 101 ("Aug. 12 Order"), at 6.  Shortly after the Court's order, McKesson finally produced evidence of exhaustion.

# ARGUMENT

An insurer's duty to defend is "not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Hartford Cas. Ins. Co. v. Swift Dist., Inc.*, 59 Cal. 4th 277, 288 (2014). "In an action seeking declaratory relief concerning a duty to defend, 'the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential.'" *Hartford Cas. Ins. Co.*, 59 Cal. 4th at 19 (emphases omitted) (quoting *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993)). Here, the Polices set forth multiple requirements for coverage, and expressly provide that Insurers' duty to defend arises in connection with only those "suits" that meet those requirements. *See* ACE Policy, End. 25. The Exemplar Suits fail to satisfy at least *three* of the coverage requirements set forth in the Policies and are therefore precluded from coverage on three separate grounds. Accordingly, California law requires this Court to deny McKesson's motion for partial summary judgment, and to grant ACE's cross-motion.

## I. The Exemplar Suits Do Not Seek "Damages" "Because Of" Or "For" "Bodily Injury" Sustained by A Person.

### A. The governmental plaintiffs do not seek compensation for bodily injury, either for themselves or on behalf of others.

In California, insurance contracts are interpreted according to the "ordinary rules of contractual interpretation." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999) (quotation marks omitted). Thus, "[w]hen interpreting a policy provision, [the Court] must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Id.* at 1115 (quotation marks and citation omitted); *see also, e.g.*, *French Laundry Partners, LP v. Hartford Fire Ins. Co.*, No. 20-cv-04540-JSC, 2021 WL 1640994, at *2 (N.D. Cal. Apr. 27, 2021) (Corley, M.J.), *appeal docketed*, No. 21-15927 (9th Cir. May 27, 2021) (invoking same principle).

Here, the relevant contractual phrase is "damages" because of or for "bodily injury." The Policy defines "bodily injury" as, in relevant part: "bodily injury, sickness or disease sustained by a person." ACE Policy § VII.C. ACE's duty to defend arises only with respect to a "'suit' seeking damages for 'bodily injury.'" *Id.* End. 25. Thus, if the governmental plaintiffs have not sought "damages" because of or for "bodily injury" "sustained by a person," then there is no coverage.

10

As the California Supreme Court has concluded, "damages" as used in a CGL policy "requires there to be compensation, in money, recovered by a party *for loss or detriment it has suffered* through the acts of another." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 826 (1990) (emphasis added, quotation marks and citations omitted).  In other words, "damages" refers to the compensation sought or obtained for a particular harm suffered by the claimant.  *See* Cal. Civ. Code § 3281 ("Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault *a compensation therefor in money, which is called damages*." (emphasis added)); *see also AIU Ins. Co.*, 51 Cal. 3d at 825 (Section 3281 of the Civil Code "is intended to represent the plain and ordinary meaning of the word 'damages'").

This understanding is consistent with California's definition of tort damages, which are "awarded to compensate *the victim* for injury suffered." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 516 (1994) (emphasis added); *see also* 6 Witkin, *Summary of California Law* § 1841 (11th ed. 2021) (describing types of damages recoveries under California tort law as "compensation *to an injured person* for 'all the detriment proximately caused' *by the injury*" (emphases added)).  Relevant dictionaries accord with this definition.  *See* Black's Law Dictionary (11th ed. 2019) (defining "damages" as "[m]oney claimed by or ordered to be paid to, a person as compensation for loss or injury"); *Webster's New Int'l Dictionary* (3d. ed. 1981) ("estimated reparation in money for detriment or injury sustained") *quoted in AIU*, 51 Cal. 3d at 826; *see also AIU*, 51 Cal. 3d at 826 (relying on Black's and Webster's to define "damages").

Interpreting "damages" based on its plain meaning, as required under California law, coverage under the Policies cannot extend to the Exemplar Suits.  The Policies cover claims for damages for or because of "bodily injury."  But the damages the governmental plaintiffs seek—as to which *they* are the victims—are not for or because of bodily injury but for their *own* distinct *economic* losses allegedly sustained from responding to the opioid crisis.[9]  These downstream, *purely*

---

[9] *E.g.*, *Summit* Compl. ¶ 37 ("Plaintiffs directly and foreseeably sustained all *economic* damages alleged herein.  Defendants' conduct has exacted a financial burden for which the Plaintiffs seek relief." (emphasis added)); *Oklahoma AG* Compl. ¶ 127 ("McKesson's massive and unreasonable distribution of opioids and the resulting opioid abuse and addiction crisis caused the State of Oklahoma, its businesses, communities and citizens to bear enormous *social and economic costs*

*economic losses* are the "detriment" the governmental plaintiffs "suffer[ed]"; and the "damages" they seek to "recover from [McKesson] in fault" correspond to *those* losses—and not to the sorts of bodily injuries to individuals that are covered by the policies.  Cal. Civ. Code § 3281.

Stated simply, the governmental plaintiffs are *not* suing to recover damages on behalf of any constituents, nor do they seek damages for any bodily injuries suffered by any constituent.  Not only do the Exemplar Suits contain *no* allegation of any such injuries, the Counties have repeatedly *disclaimed* any intent to seek recovery for any such injuries.  The MDL Judge has taken them at their word, as this Court should.  *See, e.g.*, Letter from Judge Polster at 2, *In re State of Ohio*, No. 19-3827 (6th Cir. Oct. 1, 2019), ECF No. 23 (explaining that Cuyahoga and Summit Counties "have consistently stated, and I have likewise repeatedly concluded, that the city and county Plaintiffs do not seek recovery based on injuries to individual residents; rather the Plaintiffs seek recovery *for direct injuries suffered by the Plaintiffs themselves*," and citing the MDL docket).[10]

This self-imposed limitation in the Exemplar Suits is dispositive.  In assessing coverage under a CGL policy, courts applying California law analyze whether underlying suits seek "damages" "because of" or "for" an injury by asking whether those suits seek "'the measure of damages to physical property [or for bodily injury] which is within the policy's coverage.'"  *Nat'l Union First Ins. Co. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1056 (C.D. Cal. 2011) (hereinafter, "*Ready Pac*") (quoting *Hogan v. Midland Nat'l Ins. Co.*, 3 Cal. 3d 553, 562 (1970)).  Therefore, where a suit seeks to recover an insured's economic losses, it "falls within the scope of the insurance coverage only where these intangible economic losses provide a measure of damages to physical property [or bodily injury] which is within the policy's coverage."  *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 219 (1980) (quotation marks omitted).  Otherwise, the "well-established" rule—"that CGL

---

including increased health care, criminal justice, and lost work productivity expenses, among others." (emphasis added)).

[10] *See also, e.g.*, *Summit* Compl. ¶ 1033 ("Plaintiffs are asserting *their own rights and interests* and Plaintiffs claims are *not based upon or derivative of the rights of others*." (emphases added)); Pls' Omnibus Mem. in Opp. to Defs.' Motions to Dismiss at 37, No. 17-md-2804 (N.D. Ohio June 22, 2018), ECF No. 654 (emphasizing that the governmental plaintiffs' "damages claims are not for personal injuries, but police and fire services, lost taxes, revenue and funding").

1  policies do not provide coverage for . . . economic losses"—applies. *Waller v. Truck Ins. Exch., Inc.*,

2  11 Cal. 4th 1, 26–27 (1995).  Here, economic losses are the only "damages" suffered by the

3  government plaintiffs, and the only relief they seek.  Those economic losses are not and do not

4  purport to be "a measure" of bodily injury or compensation for it.  Those losses therefore are not

5  covered by the Policies.

6       McKesson heavily relies on *AIU Insurance*, 51 Cal. 3d 807, but misreads that decision.

7  Applying the definition of "damages" set forth above, the California Supreme Court found that

8  coverage for "damages because of property damage" extended to certain environmental cleanup

9  costs, even though the damaged property was owned by the insured, not the underlying plaintiff.  *Id.*

10  at 842–43.  McKesson cites this case for the proposition that the governmental plaintiffs here need

11  not have suffered bodily injury for coverage to attach.  *See* McKesson Mot. at 11–13.  But *AIU*

12  confirms only that coverage sometimes extends to suits in which a governmental plaintiff in effect

13  stands in the shoes of a property owner, seeking to recover the costs associated with remediating

14  environmental damage to a specific property.  It says nothing about the nature of the injury for which

15  compensation must be sought.   Here, the governmental plaintiffs are *not* seeking costs associated

16  with decontaminating a specific damaged property or treating a specific injured person—they are

17  solely and expressly suing to recover for increased budgetary outlays that they attribute to the opioid

18  epidemic as a whole.

19       Other courts have found that the *AIU* decision does not abrogate the general rule that coverage

20  extends only to damages that provide a measure of harm to specific property or persons.  As the

21  Central District of California explained in *Ready Pac*, 782 F. Supp. 2d 1047, coverage extended to

22  the underlying suit in *AIU* because the underlying plaintiff sought damages that "equated to the

23  'measure' of the harm recoverable for the damage to the tangible property."  *Id.* at 1056.  As the *AIU*

24  court itself explained, "the event precipitating [the] legal action [was] contamination of property,"

25  and the underlying plaintiffs sought cleanup costs to remedy *that* contamination to *that* property.

26  *AIU*, 51 Cal. 3d at 843.  Conversely, "prophylactic costs" *not* meant to specifically remedy the

27  specific contamination at issue were "*not* incurred 'because of property damage.'"  *Id.* (emphasis

28  added).  Those costs, therefore, were not covered.

1     The line drawn in *AIU* was further clarified in *Montrose Chemical Corp.*, 6 Cal. 4th 287,

2   another case involving environmental cleanup costs.  There, the California Supreme Court explicitly

3   contrasted remediation costs with damages for purely economic losses.  The Court explained that

4   although "environmental contamination alleged under CERCLA"[11] satisfies the "damages because of

5   property damage" coverage requirement, "a suit seeking recovery for injuries to intangible economic

6   interests *is not* a suit 'of the nature and kind' covered by [such a] policy."  *Id.* at 303 (emphasis

7   added) (citing *AIU*, 51 Cal. 3d at 842).

8     These principles are dispositive here.  For coverage to attach, the governmental plaintiffs must

9   seek to recover compensation for (or because of) "bodily injury . . . sustained by a person," ACE

10   Policy § VII.C, just as the plaintiffs in *AIU* sought damages measured by, and tied directly to, the

11   remediation cost for specific property damage.  The damages the governmental plaintiffs seek do not

12   qualify.  Instead, the governmental plaintiffs seek compensation *only* for the budgetary impacts of the

13   opioid crisis—downstream economic losses they themselves suffered.  And they specifically disclaim

14   damages for bodily injuries suffered by any specific individual.  Thus, there can be no coverage.

15         B.     McKesson's argument that "because of" or "for" bodily injury requires merely
16                "some causal connection" is contrary to California insurance and tort law.

17     Against the straightforward coverage analysis laid out above, McKesson advances a theory

18   that would expand the policies beyond their terms, indeed beyond any reasonable bounds.  McKesson

19   acknowledges that the plaintiffs are seeking to recover only for their alleged "costly responses to the

20   opioid crisis," and not for any bodily injuries.  McKesson Mot. at 5–6.  According to McKesson,

21   however, all that is needed is that there be "*some causal connection* between the alleged damages

22   claimed by plaintiffs and the alleged bodily injury."  *Id.* at 11 (emphasis added).

23     McKesson's expansive interpretation is wrong.  It ignores the meaning of "damages," which,

24   as discussed above, refers to the measure of the harm suffered by *the victim* for a *specific* harm.  It

25   contradicts several lines of California case law.  And it would push the bounds of coverage beyond

26

27   _____

28   [11]   The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42
         U.S.C. §§ 9607 *et seq.*, was the basis of the underlying suit in both *Montrose* and *AIU*.

1    the ability of insurers to rationally assess the risks covered by the CGL policies they issue and to

2    price premiums accordingly.

3    Start with the case law.  McKesson's position would obliterate the principled distinctions

4    drawn by California courts—for example, between downstream economic losses and compensation

5    for injury to a particular property or person—set forth above.  As one example, in *Ready Pac*, Taco

6    Bell sought insurance coverage for its economic losses due to lost patronage stemming from an

7    outbreak of E. coli.  Like McKesson, Taco Bell argued that the policies covered those losses because

8    "*but for* the E. coli outbreak that caused bodily injury and property damage, it would not have

9    suffered lost revenue and profits from a decline in patronage."  *Compare* 782 F. Supp. 2d at 1054

10   (emphasis added), *with* McKesson Mot. at 12 ("The Exemplar Suits . . . were precipitated by . . .

11   opioid-related injuries allegedly suffered by thousands of individuals across the country.").  But that

12   attenuated causal link—"some causal connection," to use McKesson's phrase—was insufficient to

13   establish coverage because Taco Bell did not seek "the measure of damages" "directly affected by the

14   Outbreak."  *Ready Pac*, 782 F. Supp. 2d at 1055.  As the Court rightly added, to hold otherwise

15   would "expand[] the coverage of the policy so as to provide coverage for almost any liability where

16   bodily injury is a factor."  *Id.* at 1057.  McKesson's theory shares the same defect.

17   Consider, too, decisions addressing coverage disputes involving "emotional injuries"

18   sustained when the plaintiff witnessed or learned of *someone else's* bodily injury—so-called

19   bystander cases.  In such cases, the emotional injuries of the bystanders are clearly caused by the

20   bodily injuries of third parties—there is certainly "some causal connection."  Under McKesson's

21   theory, that link between the emotional harm and the third party's bodily injury would suffice to

22   extend coverage.  But the coverage decisions do not so hold.  Instead, courts determine coverage by

23   evaluating whether *the bystander's* "emotional" injuries could *themselves* be considered bodily

24   injuries.  *See, e.g.*, *Emp'rs Cas. Ins. Co. v. Foust*, 29 Cal. App. 3d 382 (1972) (evaluating whether

25   parents' emotional distress caused by child being struck by a car qualified as "bodily injury").[12]

26

27   [12]  *See also, e.g.*, *Legion Indem. Co. v. Carestate Ambulance, Inc.*, 152 F. Supp. 2d 707, 718–19
     (E.D. Pa. 2001) (no coverage for negligent-infliction-of-emotional-distress claims under
28   Pennsylvania law because the harm did not qualify as bodily injury, even though damages were

1    Analyzing whether the bystander's emotional injury counts as "bodily injury" would be unnecessary

2    if "some causal connection" to the bodily injury experienced by third parties were sufficient.

3         Not only does McKesson's approach contradict existing case law, its total departure from the

4    requirement that damages be tethered to specific *bodily injury* would create unmanageable and

5    unbounded risks that would threaten the insurance industry, as well as the businesses that depend on

6    it.  Other courts have rejected such an approach.  *See, e.g.*, *Santo's Italian Café LLC v. Acuity Ins.*

7    *Co.*, --- F. 4th ---, 2021 WL 4304607, at *7 (6th Cir. Sept. 22, 2021) ("Efforts to push coverage

8    beyond its terms creates a mismatch, an insurance product that covers something no one paid for and,

9    worse, runs the risk of leaving insufficient funds to pay for perils that insureds did pay for.").

10        If coverage extended to downstream economic loss claims asserted by governmental plaintiffs

11   solely because their budgetary outlays have "some causal connection" to bodily injuries suffered by

12   their residents, insurers could be forced to fund a breathtakingly broad array of government services.

13   "[F]rom an actuarial standpoint," it would be difficult—if not impossible—"to set appropriate

14   premiums to guard against the risk."  *Oak Park Calabasas Condominium Ass'n v. State Farm Fire &*

15   *Cas. Co.*, 137 Cal. App. 4th 557, 565 (2006); *see also National Union Fire Ins. Co. v. Mead Johnson*

16   *& Co.*, 735 F.3d 539, 547–48 (7th Cir. 2013) (Posner, J.) (rejecting "expanding coverage to remote

17   consequences" because doing so would "make it very difficult for an insurer to estimate liability and

18   thus fix a premium"); *Santo's Italian Café*, 2021 WL 4304607, at *5 ("There are many questions

19   surrounding the restaurant's interpretation of this policy.  And the answers to each of them suggest

20   the policy has no such application here.").

21        California courts recognize the importance of those considerations.  California tort law does

22   not permit recovery of all economic losses downstream of an accident.  *See S. Cal. Gas Leak Cases*, 7

23   Cal. 5th 391, 405 (2019) (rejecting tort liability for "purely economic losses" because, among other

24   things, such damages would be "massive and indeterminate"); *id.* at 403 ("Concerned about line-

25   drawing problems and potentially overwhelming liability, courts across the country have rejected

26   _____

27   caused by plaintiff "having watched her husband die"); *Gov't Emps. Ins. Co. v. Encelewski*, No.
     A94-0211 CIV (HRH), 1995 WL 25427, at *3–4 (D. Alaska Jan. 13, 1995) (analyzing whether

28   *plaintiff's* "physical manifestations" of emotional distress from learning of son's motorcycle
     accident qualifies as "bodily injury").

16

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

recovery for purely economic losses stemming from man-made calamity."). In the *Gas Leak Cases*, the California Supreme Court rejected such an expansive theory of tort liability in part *because* "insurance companies [could not otherwise] feasibly offer [defendants] comprehensive coverage — or even fix a sensible premium based on actuarial measurement." *Id.* at 405. The same concerns militate in favor of enforcing the line drawn by the contractual language and reflected in California case law: Compensation for bodily injuries—including the measure of compensation for such injuries—may be covered, but suits seeking to recover for "purely economic losses stemming" from the nationwide opioid epidemic are not. *See id.* at 403.

C.   The cases McKesson cites are inconsistent with California law and cannot apply here.

Lacking support in California law, McKesson points out that some courts *not* in California, and *not* applying California law, have adopted its view that opioid lawsuits seek damages "because of bodily injury" simply because those lawsuits allege some causal link to some bodily injury. *See* McKesson Mot. at 15–16. Those decisions should not guide the Court's analysis here.

**First**, other courts have held the opposite, finding that the opioid lawsuits are "not seeking damages 'because of' the citizens' bodily injury; rather, [they are] seeking damages because [they] ha[ve] been required to incur costs due to . . . alleged distribution of drugs in excess of legitimate medical need." *Cincinnati Ins. Co. v. Richie Enters., LLC*, No. 12-CV-00186-JHM-HBB, 2014 WL 3513211, at *6 (W.D. Ky. July 16, 2014); *see also Motorists Mut. Ins. Co. v. Quest Pharms., Inc.*, No. 5:19-cv-00187-TBR, 2021 WL 1794754, at *3–6 (W.D. Ky. May 5, 2021), *mot. to amend denied*, 2021 WL 4513715 (W.D. Ky. Oct. 1, 2021); *Travelers Prop. Cas. Co. v. Anda, Inc.*, 90 F. Supp. 3d 1308, 1314–15 (S.D. Fla. 2015) ("Any reference to the drug abuse and physical harm to West Virginia citizens merely provides context explaining the economic loss to the State."), *aff'd on other grounds*, 658 F. App'x 955 (11th Cir. 2016).[13] The governmental plaintiffs, these courts held,

---

[13] *Accord Cincinnati Ins. Co. v. Amerisourcebergen Drug Corp.*, No. CV20212103912, 2015 WL 13808271, at *1 (Ohio Ct. C.P. Butler Cnty. Aug. 31, 2015); *Westfield Ins. Co. v. Masters Pharm., Inc.*, No. A 1400064, 2015 WL 10478081, at * 2–3 (Ohio Ct. C.P. Hamilton Cnty. Dec. 17, 2015).

1  "do[] not assert claims 'for bodily injury' or 'because of bodily injury'"; instead, the claims are *'for'*

2  *and 'because of' economic harm to the State*." *Anda*, 90 F. Supp. 3d at 1318 (emphasis added).

3  **Second**, two of the decisions McKesson cites are currently on interlocutory appeal to the

4  Supreme Court of Ohio and Supreme Court of Delaware and another was vacated (on alternative

5  grounds) on a motion for reconsideration. *See Acuity v. Masters Pharm., Inc.*, No. C-190176 (Ohio

6  Sept. 21, 2020) (interlocutory appeal); *ACE Am. Ins. Co. v. Rite Aid Corp.*, No. 339-2020 (Del. Oct.

7  13, 2020) (interlocutory appeal); *Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F. Supp. 3d

8  147 (W.D. Pa. 2020), *vacated by* Order, 19-cv-904 (May 25, 2021), ECF 180.

9  **Third**, the reasoning of the cases McKesson cites is untenable because almost all rely on a

10  faulty premise in the Seventh Circuit's decision in *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*,

11  829 F.3d 771 (7th Cir. 2016).  In *H.D. Smith*, the Court's analysis of the CGL policy at issue turned

12  on its view that the contractual phrase "damages *because of* 'bodily injury' . . . provides broader

13  coverage than . . . damages '*for* bodily injury.'" *Id.* at 774.  The Court applied the purportedly

14  "broader" meaning of "because of" and found that coverage extended to an opioid lawsuit.

15  The *H.D. Smith* distinction between "because of" and "for" bodily injury cannot apply here.

16  The Polices use those terms interchangeably to describe the alleged injuries for which compensation

17  must be sought, *i.e.*, compensation only for "bodily injuries," not for any other injuries a plaintiff may

18  assert. *See, e.g.*, ACE Policy at § I.A, I.C.2, I.D., IV.B ("because of 'bodily injury'"); *id.* at VII.J,

19  End. 12, End. 25 ("for 'bodily injury'"); *see also, e.g.*, *Motorists*, 2021 WL 1794754, at *6 (finding

20  the phrases "because of" and "for" bodily injury were used interchangeably in a CGL policy and

21  rejecting coverage of an opioid lawsuit).  California courts also treat "because of" and "for" as

22  interchangeable terms in insurance policies and have rejected any distinction between them.[14]  In any

23  event, even if the *H.D. Smith* distinction *did* apply here, it would benefit ACE, not McKesson,

24

---

25  [14]  *See, e.g.*, *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 272 (1966) (stating that insurer's promise that
       policy covers "damages *because of bodily injury*" "would lead the insured reasonably to expect
26     the insurer to defend him against suits seeking damages *for bodily* injury" (emphases added));
       *Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Prop. Cas. Co.*, 197 Cal. App. 4th 424,
27     432–33 (2011) ("[B]ecause the [underlying] complaint neither alleged any facts giving rise to a
       claim for *damages because of bodily injury* nor did it allege any bodily injury (or property
28     damage), Ulta did not become legally obligated to pay *damages for bodily injury*, and the policy
       was not triggered." (emphases added)).

18

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

1   because duties to defend arise under the Policies in connection with "suits seeking damages *for*

2   *'bodily injury.'*" ACE Policy, End. 25 ¶ (emphasis added).

3       *H.D. Smith*'s analysis is wrong for another reason. The court explained its conclusion as

4   follows: (i) "damages because of 'bodily injury'" would encompass a suit brought by a mother to

5   recover her costs in providing her son with care for drug addiction, and (ii) "[l]egally, the result is no

6   different merely because the plaintiff is a state instead of a mother." 829 F.3d at 774. But "suits for

7   medical expenses paid on behalf of an injured spouse or child are derivative." 57B AM. JUR. 2D,

8   Negligence § 1030 (Aug. 2020 update). By contrast, the Exemplar Suits emphatically do *not* assert

9   derivative claims, or claims for compensation for their citizen' injuries. *See supra*, 11-12. Thus, the

10  governmental plaintiffs in the Exemplar Suits are *not* situated similarly to the mother in *H.D. Smith*.

11      **Finally**, McKesson cites an opinion from the MDL which, McKesson asserts, "recognized

12  th[e] causal connection" between injuries from opioid addiction and the governmental plaintiffs'

13  economic outlays. McKesson Mot. at 12 (citing *In re Nat'l Prescription Opiate Litig.*, 2018 WL

14  6628898, at *9 (N.D. Ohio Dec. 19, 2018)). This opinion has nothing to do with insurance coverage.

15      If the opinion is relevant at all, it undermines McKesson's position. The MDL Court

16  evaluated a motion to dismiss plaintiffs' civil RICO claims. *Id.* at *7–8. RICO does not allow

17  recovery for "personal injuries and pecuniary losses flowing from those personal injuries," and the

18  moving defendants argued the governmental plaintiffs were seeking such a recovery. *Id.* at *7

19  (quotation marks omitted). The Court denied the motion to dismiss because it concluded that "[n]one

20  of Plaintiffs' thirteen categories of costs arose directly out of a personal injury to Plaintiffs

21  themselves"; instead, "'*[p]laintiffs' damages claims are not for personal injuries*, but police and fire

22  services, lost taxes, revenue and funding.'" *Id.* at *8 (emphasis added) (quoting Pls' Omnibus Mem.

23  in Opp. to Motions to Dismiss, *supra* n.10). Thus, the MDL Court found the governmental plaintiffs

24  were *not* seeking damages for bodily injuries.[15]

---

26  [15] McKesson points to a single statement in the opinion, in which the MDL Court acknowledged
    that, in the RICO context, "provision of medical treatment and emergency response services"
27  costs could potentially be said to "arise directly out of the personal injury of the citizens." *Id.* at
    *9. But the Court declined to so hold. Moreover, the Counties' complaints are explicit that even
28  *those* cost categories rely on increases in budgetary line items, not costs to compensate for any

1

        D.      McKesson's invocation of other policy provisions fails.

2       McKesson next turns to other policy provisions, none of which has any bearing on the

3 question at hand.  McKesson first observes that the Policies at issue here include a provision that

4 states, "Damages because of 'bodily injury' include damages claimed by any person or organization

5 for care, loss of services or death resulting at any time from the 'bodily injury.'"  ACE Policy § I.D.

6 McKesson argues that this language "makes clear that the Policies provide coverage if an

7 organization incurs damages because *persons other than the claimant* sustain such injuries."

8 McKesson Mot. at 13.  McKesson is wrong.

9       This provision achieves two things.  It clarifies that certain damages—*i.e.*, those "for care,

10 loss of services or death"—that result from the bodily injury *after* the policy period are still covered

11 despite the requirement of the Insuring Agreement that the bodily injury must have occurred "*during

12 the 'policy period.'"  See ACE Policy § I.A.1.b; Nat'l Union Policy § I.C.2 (emphasis added).

13      The provision also extends coverage to certain kinds of derivative claims—such as a parent's

14 claim for her child's medical costs, a spouse's loss-of-consortium claim, or a hospital's subrogation

15 claim for medical expenses specifically paid on behalf of an injured claimant.  This clause does not

16 change the fact that coverage extends only to these narrowly specified damages resulting from "*the

17 'bodily injury'*" for which other damages could be sought.  Instead, it expressly tethers even these

18 derivative claims to "the bodily injury."  It does not purport to, and cannot be read to, extend

19 coverage to *all* economic-loss claims, let alone to economic loss claims at best remotely connected to

20 bodily injuries suffered by unspecified third parties (especially where, as here, the underlying

21 plaintiffs *disclaim* damages for specific bodily injuries).  *See, e.g.*, *Richie Enters. LLC*, 2014 WL

22 3513211, at *6 (rejecting use of comparable provision to expand coverage to opioid lawsuit).

23      McKesson's misreading of the derivative provision, coupled with its overly expansive reading

24 of the basic coverage grant, would transform one or the other into meaningless surplusage.

25 According to McKesson, derivative claims—like any claim with "some causal connection" to a

26 _____
        specific individual's opioid injuries.  *See, e.g.*, *Cuyahoga* Compl., ¶¶ 730–751 ("[T]he County
27      allocates substantial portions of its budget to prevent, treat, and assist in recovery from opioid
        addiction, and also spends substantial sums to prevent fatal opioid overdoses.  But for
28      Defendants' misconduct, Cuyahoga County would not have spent the massive amounts it has
        spent and will continue to spend in the future.").

bodily injury—are *already* covered by the grant of coverage for "damages" "because of" or "for" bodily injury.  If McKesson's reading of the coverage grant were correct, there would be no need for the express recognition of derivative claims in the derivative provision.  By the same token, McKesson's overbroad reading of the derivative provision, as an extension of coverage for *any* claim of economic loss connected to a third party's bodily injury, would swallow the terms of the coverage grant.  Neither of McKesson's interpretations is reasonable—or consistent with California law.  Instead, Insurers' reading of the two provisions makes each complementary of the other, as California principles of contract construction require.  *Cf.* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

Separately, McKesson notes that the 2017-18 policy issued by ACE to McKesson includes an opioid exclusion.  That is irrelevant.  California courts have held that it is "against public policy to view modification[s] of the policy as creating a negative inference" for interpreting prior iterations of the policy.  *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1481 (2010); *see also Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1340–41 (9th Cir. 1989) ("[A]ccepting such an argument would discourage remedial action and thereby violate public policy . . . .").  Nor is the exclusion otherwise pertinent here—it broadly eliminates coverage for any suit "arising out of or in any way related to" opioids.  Thus, it bars coverage even where—unlike in the Exemplar Suits—the underlying plaintiff *herself* suffered bodily injury from opioid use.[16]

\*     \*     \*

Because the Exemplar Suits seek damages for the governmental plaintiffs' economic losses, and not "because of" or "for" a "bodily injury," there is no potential for coverage under the ACE Policy.

---

[16]  *Jon Davler, Inc. v. Arch Ins. Co.*, 229 Cal. App. 4th 1025, 1035 (2014) ("[C]ourts generally have interpreted the phrase 'arising out of' very broadly, even where the phrase appears in an exclusion." (quotation marks omitted)).

21

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

1

2

## II.   The Exemplar Suits Do Not Allege That McKesson's Over-Distribution Of Opioids Was Accidental.

3

Even if the Exemplar Suits do seek "damages" "for bodily injury" (and they do not)

4

McKesson is entitled to coverage only if the alleged "bodily injury" was caused by an "accident."

5

McKesson cannot satisfy this independent requirement in the coverage clause.

6

A.   Under California law, intentional conduct is not considered "accidental" simply because the insured did not intend the resulting harm.

7

8

California case law states that "the word 'accident' in the coverage clause of a liability policy

9

refers to the *conduct of the insured* for which liability is sought to be imposed." *Liberty Surplus Ins.*

10

*Corp. v. Ledesma & Meyer Const. Co.*, 5 Cal 5th 216, 221 (2018).  The key question is whether the

11

conduct alleged—regardless of the results—consists of action that the insured intended to undertake.

12

As the California Court of Appeal has put it, "[w]hen an insured intends the acts resulting in the

13

injury or damage, it is not accident merely because the insured did not intend to cause injury.  The

14

insured's subjective intent is irrelevant." *Albert v. Mid-Century Ins. Co.*, 236 Cal. App. 4th 1281,

15

1291 (2015) (quotation marks omitted); *see also Fire Ins. Exch. v. Superior Ct.*, 181 Cal. App. 4th

16

388, 392 (2010) ("Where the insured intended all of the acts that resulted in the victim's injury, the

17

event may not be deemed an 'accident' merely because the insured did not intend to cause injury.").

18

The sole exception is for injuries "caused by some additional, unexpected, independent and

19

unforeseen happening." *Travelers Prop. Cas. Co. v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1030

20

(2017).  But this exception does not change the principle that "the term 'accident' does not apply

21

where an intentional act resulted in unintended harm." *State Farm Gen. Ins. Co. v. Frake*, 197 Cal.

22

App. 4th 568, 582 (2011).  For example, in *Frake*, the insured struck his friend while the two were

23

engaged in horseplay and the friend sustained injuries that the insured did not intend.  Because the

24

injuries sustained by the friend were alleged to be the "direct result of the strike," the court held that

25

there was no "unforeseen happening" to "transform his intentional conduct into an accident." *Id.* at

26

580–81; *see also Henstooth Ranch LLC v. Burlington Ins. Co.*, 293 F. Supp. 3d 1067, 1074 (N.D.

27

Cal. 2018), *aff'd*, 770 F. App'x 804 (9th Cir. 2019) (rejecting claimant's argument that alleged

28

property damage was an "accident" because its actions were "negligent" and confirming that "the correct question is whether claimant's restorative or remedial work was intentional").

B.   The Exemplar Suits allege that McKesson intended to distribute the opioids that allegedly caused the governmental plaintiffs' economic harm.

The complaints in the Exemplar Suits do not allege accidental conduct by McKesson.  Rather, the Track One Suits allege that the "[opioid] crisis arose from the opioid manufacturers' *deliberate* marketing strategy together with distributors' equally *deliberate* efforts to evade restrictions on opioid distribution," and that "Manufacturers and distributors alike acted without regard for the lives that would be trammeled in pursuit of profit."  *Summit* Compl. ¶ 3 (emphases added); *Cuyahoga* Complaint ¶ 3.  Similarly, Oklahoma alleges that McKesson "substantially contributed to fueling the opioid crisis by *supplying* massive and patently unreasonable quantities of opioids," and "*ignored* its duties and responsibility to prevent oversupply and diversion of opioids," and that McKesson "did so for one reason: greed."  *Oklahoma AG* Compl. ¶ 4 (emphases added).  There is no viable argument that the Exemplar Suits allege that McKesson systematically distributed tens of billions of opioid pills across the United States, for decades, *by accident*.

McKesson's attempt to fashion such an argument fails.  Although McKesson appears to accept that the causes of action in the Exemplar Suits for violations of RICO and the Corrupt Practices Act, or for civil conspiracy, do not allege an accident, McKesson relies on the fact that the Exemplar Suits include causes of action for "negligence."  McKesson Mot. at 18.

But a plaintiff's mere use of the term "negligence" to label its claim is insufficient, by itself, to make alleged conduct "accidental" for the purposes of insurance coverage.  California law is clear that "coverage turns not on 'the technical legal cause of action pleaded by the third party' but on the '*facts* alleged in the underlying complaint' or otherwise known to the insurer."  *Swain v. Cal. Cas. Ins. Co.*, 99 Cal. App. 4th 1, 8–9 (2002) (emphasis added).  Accordingly, a "general boilerplate pleading of 'negligence' adds nothing to a complaint otherwise devoid of *facts* giving rise to a potential for covered liability."  *Id.*; *see also, e.g., Quan v. Truck Ins. Exch.*, 67 Cal. 4th 583, 596 (1998) ("'Negligent' or not, in this case the insured's conduct alleged to have given rise to

claimant's injuries is necessarily nonaccidental, not because any 'harm' was intended, but simply because the conduct could not be engaged in by 'accident.'"); *Zimmerman v. Allstate Ins. Co.*, 2013 WL 12114838, at *12 (C.D. Cal. 2013) ("[L]ooking to the facts alleged rather than the cause of action pled, the focus is on whether the alleged conduct causing the damage could have been 'accidental.'").  Here, the negligence claims are based on the *exact same conduct*—the alleged overdistribution of opioids—that support the other claims against McKesson in the Exemplar Suits, such as the RICO and Corrupt Practices Act counts.[17]

In fact, the Track One suit complaints state explicitly that the negligence claims in those suits are *not* premised on any accidental act or accidental "failure" by McKesson:

> Plaintiff does not allege that Defendants were negligent for failure to protect from harm.  Rather, Defendants *engaged in conduct the foreseeable result* of which was to cause harm to Plaintiff.  Defendants *have engaged in affirmative acts* of creating an illegal, secondary prescription opioid market by failing to exercise adequate control over the marketing, distribution, and sale of their prescription opioids.

*Summit* Compl. ¶¶ 1048–49 (emphases added); *Cuyahoga* Compl. ¶¶ 1091–92; *see also Oklahoma AG* Compl. ¶ 5 ("Not wanting to kill the golden goose (a highly addictive product), Defendant did not stop or report suspicious orders of opioids that were clearly far too large and/or not for legitimate medical uses.")

Furthermore, those claims specifically allege only *intentional* acts, such as "*Distributing* and *selling* opioids in ways that facilitated and encouraged their flow into the illegal, secondary market; *Distributing* and *selling* opioids without maintaining effective controls against the diversion of opioids; *Choosing* not to effectively monitor for suspicious orders," among other things.  *Summit* Compl. ¶ 1046 (emphases added); *Cuyahoga* Compl. ¶ 1089; *see also Oklahoma AG* Compl. ¶ 124 ("Despite its knowledge of the dangers of opioids . . . McKesson continued to *supply* the opioid market and *sell* opioids into the supply chain." (emphases added)).  The Exemplar Suits even allege that McKesson's "failures" are the result of deliberate conduct.  For example, the governmental plaintiffs single out McKesson to allege that its "*deliberate* disregard of its obligations was *especially*

---

[17]  Even if the existence of claims under a negligence label mattered, the negligence claims in the Track One Suits were dismissed on August 19, 2019—less than a month after the earliest date on which McKesson could have exhausted its $5 million retention.  *See infra* § III.V.

*flagrant*," because McKesson entered a settlement agreement with the DEA in 2008 regarding its failures to comply with the Controlled Substances Act, yet subsequently "continued to fail to report suspicious orders." *Cuyahoga* Compl. ¶¶ 844–45 (emphases added).

Notwithstanding that the Exemplar Complaints do *not* allege the gross overdistribution of opioids occurred *accidentally*, McKesson argues that the Exemplar Suits allege an accident because they "repeatedly allege that McKesson 'should have known' its acts or omissions in distributing opioids would lead to harm." McKesson Mot. at 18. But even as paraphrased by McKesson, those allegations refer only to *the harm* (or potential for harm) which resulted from McKesson's intentional conduct. *See, e.g.*, *Summit* Compl. ¶ 990 ("Each of the Defendants controlled the systems they developed to prevent diversion, including whether they filled orders they knew or should have known were *likely to be diverted or fuel an illegal market*." (emphasis added)).[18] But, as the case law recited above makes abundantly clear, McKesson's "subjective intent" regarding the resulting harms its intentional conduct would cause "is irrelevant." *Albert*, 236 Cal. App. 4th at 1291.

*Albert* and *Fire Insurance Exchange* illustrate this principle. In *Albert*, there was no "accident" when an insured cut down a neighbor's trees mistakenly believing they were on the insured's property. Even though the neighbor sued the insured *for negligence*, the court held there was no accident because "absolutely no facts exist, in the complaint or otherwise, indicating that some unforeseen accident (such as a slip of the chainsaw) caused the damage to the trees." 236 Cal. App. 4th at 1292. Similarly, in *Fire Insurance Exchange*, an insured built a house that touched upon a five-foot strip of land that the insureds mistakenly believed was on their side of the property line. Notwithstanding that mistaken belief, the court held the underlying complaint did not allege an "accident" because the insureds "intended to build the house where they built it[,] . . . *the act of construction was intentional* and not an accident even though they acted under a mistaken belief that they had the right to do so." 181 Cal. App. 4th at 396 (emphasis added); *see also Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 943 (2003) (holding complaint under the ADA did not allege an accident because the insured "intended for the bathrooms to be configured as they were").

---

[18]  *See also, e.g.*, *Summit* Compl. ¶¶ 493, 518, 520, 557, 986, 1012, 1020 1046, 1054, 1062.

As in those cases, the Exemplar Suits allege no "slip of the chainsaw" by McKesson. McKesson is accused of fueling the opioid crisis by *shipping* tens of millions of opioid pills across the country over the course of decades.  That is intentional conduct, which is not transformed into accidental conduct by allegations that in distributing those pills for a profit, McKesson "failed" to protect against harm that it "should have known" about.  *See Gonzalez v. Fire Ins. Exch.*, 234 Cal. App. 4th 1220, 1234 (2015) (negligence claim "[did] not constitute an 'accident'" because the "alleged failure to rescue [plaintiff] from the situation [could] only be characterized as a deliberate, intentional act"); *see also Osborne Dev. Corp. v. First Spec. Ins. Corp.*, 2011 WL 13356061, at *8 (S.D. Cal. May 11, 2011) (Claimant's "lack of foresight" regarding the "negative[] impact" of its project "design and construction" "[did] not turn [claimant's] intentional conduct into an accident").

None of the cases McKesson cites, holding that opioid lawsuits allege accidental conduct, are applicable.  *See* McKesson Mot. at 19.  The applicable law in each of those cases was different from California law.  Those decisions found an accident was potentially alleged because of allegations that the defendant merely should have known about *the harm* to governmental plaintiffs.  *See Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*, 602 F. App'x 115, 120 (4th Cir. 2015) (under South Carolina law, "accidents require that *either* the act *or the injury* resulting from the act be unintentional" (emphases added)); *Giant Eagle*, 499 F. Supp. 3d at 168-69 (applying Pennsylvania law that governmental suits were potentially accidental based on whether "the *injuries* at issue . . . were the natural and expected results of Giant Eagle's distribution and sale of prescription opioids" (emphasis added)); *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, 2020 WL 6706791, at *6 (Ohio Com. Pl. 2020) (holding accident was alleged under Ohio law because complaint stated insured "should have known" about resulting harms).  As explained above, under California law it is irrelevant whether the insured intended the harm its actions caused.  That critical doctrinal distinction means that California law compels a different result.  Indeed, as described in the next section, the *only* opioid coverage decision under California law to date held that there was *no alleged accident* and thus *no coverage*.

C.   <u>The only California decision addressing coverage for defense of the opioid lawsuits found the alleged conduct to be non-accidental.</u>

Even if the California law addressing the "accident" requirement did not dispose of this case—and it does—the California Court of Appeal has made its application to opioid lawsuits straightforward.  In *Actavis*, 16 Cal. App. 5th 1026, the Court rejected an opioid manufacturer's duty-to-defend claim for two opioid lawsuits on the ground that there was no "accident" alleged as a matter of law.  Specifically, the Court held, first, that the underlying lawsuit on its face alleged "deliberate conduct" by the insured.  Second, the Court explained, the alleged injuries—"(1) a nation 'awash in opioids'; (2) a nationwide 'opioid-induced "public health epidemic"'; (3) a resurgence in heroin use; and (4) increased public health care costs"—could not be characterized as having been caused by "an additional, unexpected, independent, and unforeseen happening." *Id.* at 1040–42. *Actavis* is binding and directly on point.[19]

McKesson is aware that *Actavis* dooms its position.  So it attempts to distinguish or set aside that decision, but to no avail.

**First**, McKesson argues that *Actavis* does not apply because it dealt with claims against a manufacturer of opioids, rather than a distributor, on allegations of fraudulent and deceptive acts that could not have supported a negligence claim.  McKesson Mot. at 20.  True, but irrelevant.  The critical facts in *Actavis* were that the underlying suit alleged intentional, not accidental, conduct, and that the resulting injuries were foreseeable.  As described above, the same is true of the Exemplar Suits' allegations against McKesson.  The negligence counts are all premised on McKesson's *intentional* overdistribution of opioids.  The allegation that McKesson "should have known" about the harms that overdistribution would cause is unrelated to the fact that the distribution itself was not "accidental."

Moreover, McKesson has not even attempted to argue that the injuries alleged in the Exemplar suits were caused by an "unforeseen happening."  Any such argument would be foreclosed by *Actavis*, which relied on allegations that the plaintiffs' injuries were foreseeable to hold that no

---

[19] *See West v. Am. Tel & Tel. Co.*, 311 U.S. 223, 247 (1940) (holding intermediate state court decision "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."); *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1066 (9th Cir. 2020) (applying the Court of Appeal's "controlling interpretation of state law" absent "persuasive data" "that the California Supreme Court would decide otherwise").

"accident" was alleged by the opioid lawsuit complaints.  Indeed, the Court rejected the insured's attempt to dispute that its conduct in manufacturing and flooding the market with opioids would not foreseeably result in harm, reasoning that "[t]he role of doctors in prescribing, or misprescribing, opioids is not an independent or unforeseen happening."  *Actavis*, 16 Cal. App. 5th at 1042; *id.* at 1041 ("It is not unexpected or unforeseen that a massive marketing campaign to promote the use of opioids for purposes for which they are not suited would lead to a nation 'awash in opioids.'").  Like the complaints in *Actavis*, the Exemplar Suit complaints are explicit that the harms the governmental plaintiffs allegedly suffered were the foreseeable and direct result of McKesson's alleged over-distribution of opioids.[20]

**Second**, McKesson argues that *Actavis* is inapplicable because the Court held, in the alternative, that a policy exclusion also precluded coverage.  McKesson Mot. at 20–21.  McKesson's argument is a non sequitur.  The result in *Actavis* rested on two independently adequate grounds.  One of those grounds was that the underlying complaints were "based on allegations that [the insured] engaged in deliberate conduct."  *Actavis*, 16 Cal. App. 5th at 1040.  That the *Actavis* court had additional reasons to deny coverage does not impact the precedential value of the court's analysis of the accident issue.  *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum."); *Roberts v. A.W. Chesterton Co.*, 2008 WL 782569, at *2 (N.D. Cal. Mar. 24 2008) (rejecting as "unpersuasive" argument that case had no precedential value because ruling was made on "an alternative ground").

**Third**, McKesson argues that *Actavis* "lost its binding and precedential effect" because it "cannot be reconciled" with the California Supreme Court's holding in *Ledesma*, 5 Cal. 5th 216.

---

[20]  *E.g.*, *Summit* Compl. ¶ 502 ("By flooding Ohio with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent *a foreseeable risk of harm*." (emphasis added)); *id.* ¶ 1050 ("Defendants were negligent by marketing, distributing, and selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that *resulted in a foreseeable and unreasonable risk of harm to Plaintiffs*.") (emphasis added); *Oklahoma AG* Compl. ¶ 6 ("When it comes to opioids, history has taught one clear and simple lesson for centuries: If you oversupply, people die.  Defendant ignored this and distributed what can only be called a major oversupply of opioids into Oklahoma.  *As a foreseeable result*, Oklahomans have suffered and died, and the State has been harmed.") (emphasis added).

28

McKesson Mot. at 21.  In *Ledesma*, the Court held the insurer had a duty to defend a claim of negligent hiring against a company whose employee, several years later, engaged in sexual misconduct.  *Ledesma*, 5 Cal. 5th at 222.  McKesson argues that *Ledesma* undermines *Actavis*'s reasoning because the Court rejected the insurer's "theory that there was no occurrence as long as the insured's conduct was deliberate, whether or not the insured intended the resulting harm."  McKesson Mot. at 21.  McKesson misreads *Ledesma*.

*Ledesma* did not reject or rewrite the longstanding principle of California law that the focus of the accident inquiry is whether the insured's conduct was deliberate.  Instead, the Court invoked the caveat, referred to above, that deliberate acts that lead to *unforeseeable* harm may be considered accidents.  Thus, in *Ledesma* the insured's "hiring, retention, and supervision" of the employee, the Court recognized, "may have been 'deliberate acts.'" *Ledesma*, 5 Cal. 5th at 226.  However, the employee's later acts of molestation could, from the perspective of the employer, "be considered an 'additional, unexpected, independent, and unforeseen happening . . . that produce[d] the damage." *Id.* (modifications in original).  *That* is why the Court found a duty to defend.

*Actavis* engaged in the same analysis as the *Ledesma* Court; the allegations at issue were simply different.  In *Actavis*, after determining that (as in *Ledesma*) the alleged conduct was intentional, the Court considered (just as *Ledesma* did) whether the injuries alleged were caused by an "unforeseen happening" from the perspective of the insured.  Thus, the Court asked whether the opioid crisis was the "indirect unintended resul[t]" or "the direct result of 'the flood of opioids that entered the market' resulting from [the insured's] alleged scheme to increase the sale of opioid products." *Actavis*, 5 Cal. App. 5th at 1040.  The Court held the latter.  That *Ledesma* found an employee's act of sexual molestation years after the insured hired him to be an "unforeseen happening" does not contradict *Actavis*'s holding that the opioid lawsuits allege no such unforeseen happening.  The facts of the two cases could hardly be more distinct.  Accordingly, McKesson has no basis to argue that *Actavis* "cannot be reconciled" with *Ledesma*.  McKesson Mot. at 21.

In a last ditch effort to evade *Actavis*, McKesson points to the procedural history of the case. The California Supreme Court initially granted a petition for review, 410 P.3d 1221 (2018), but ultimately dismissed and remanded without issuing an opinion, 427 P.3d 744 (2018).  Under Cal.

29

1   Rule of Court 8.1115(e)(2), *Actavis* remains "citable and has binding or precedential effect, except to

2   the extent it is inconsistent with the decision of the Supreme Court or is disapproved by that Court."

3   McKesson cites only *Ledesma* to argue that *Actavis* has lost its binding effect; as just shown,

4   McKesson misreads *Ledesma*.  Moreover, as the Ninth Circuit has instructed, an intermediate

5   appellate court's decision—like the California Court of Appeal's decision in *Actavis*—is binding

6   even "more so where, as in this case, the highest court has refused to review the lower court's

7   decision."  *Herrera*, 953 F.3d at 1069–70 (quoting *West*, 311 U.S. at 237).

8           *Actavis* remains good law, this Court is bound to apply it, and it defeats coverage here.

9    **III.    McKesson Undoubtedly Had "Prior Knowledge", Well Before July 1, 2015,**
10            **About The Bodily Injury Alleged In The Exemplar Suits.**

11          The Exemplar Suits do not seek "*damages because of [or for] 'bodily injury'*" at all.  *See*

12   *infra* § I.  However, should this Court disagree—and, specifically, should the Court adopt

13   McKesson's view that economic losses linked to population-level allegations of "opioid-related"

14   "sickness, disease and death" *do* constitute covered bodily injury claims, McKesson Mot. at 10—then

15   coverage under the ACE Policy is indisputably precluded by the prior-knowledge clause.  McKesson

16   cannot plausibly deny it knew about the opioid epidemic by July 1, 2015.  Moreover, any such denial

17   is clearly refuted by a substantial volume of undisputed evidence—much of which is referred to and

18   quoted in the Exemplar Suit complaints—which demonstrates that McKesson knew not only about

19   the epidemic, but also about the epidemic's public health, social, and economic costs, and that

20   McKesson's own conduct was perpetuating the epidemic and contributing to those costs.

21          A.    The ACE Policy's prior-knowledge provision precludes coverage if McKesson
22                knew about the ongoing opioid crisis before the policy's inception date.

23          The ACE Policy provides that coverage applies "only if," "[p]rior to the 'policy period,' no

24   'insured' . . . knew that the 'bodily injury' . . . had occurred, in whole or in part."  ACE Policy

25   § I.A.1.c.  This prior-knowledge clause is a prerequisite to coverage that is different from California's

26   common law known-loss rule, which precludes coverage "when a *loss* is known or apparent" to the

27   insured before the policy is issued.  *Montrose Chem. Corp. v. Admiral Ins. Co*., 10 Cal. 4th 645, 690

28   (1995), *as modified* (Aug. 31, 1995) (quotation marks omitted) (emphasis added).  Instead, the ACE

Policy's prior-knowledge clause is not tied to the insured's knowledge of any specific *loss*, but rather knowledge that "*the 'bodily injury'*" alleged in the underlying suit "had occurred, *in whole or in part*" before July 1, 2015.  ACE Policy § I.A.1.c (emphases added).

As the policy makes clear, the prior-knowledge clause applies to the same bodily injury—"*the* 'bodily injury'"—that the insured contends brings an underlying suit within the coverage grant. *Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995 (9th Cir. 2015) ("Use of the definite article 'particularizes the subject which it precedes' and indicates that the claimed damage must be the same as the known damage."); *see also Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co.*, 954 F.3d 397, 406 (1st Cir. 2020) (affirming district court holding that coverage was precluded by the prior-knowledge clause based on a "close read" of the damage allegations in the underlying complaint); *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 475 (2004) ("[T]he same word used in an instrument is generally given the same meaning unless the policy indicates otherwise.").

Here, the alleged "bodily injury" that McKesson asserts triggers coverage does not include *any* specific bodily injuries.  *E.g.*, McKesson Mot. at 12 ("The Exemplar Suits against McKesson were precipitated by bodily injury—*i.e.*, opioid-related injuries allegedly suffered by *thousands of individuals across the country*" (emphasis added)); *see also supra* at 11-12.  McKesson cannot dispute that there are no allegations, let alone claims, of any individualized bodily injuries.  Instead, the Exemplar Suits attribute the governmental plaintiffs' costs to the opioid epidemic itself.  *See, e.g.*, *Cuyahoga* Compl. ¶¶ 22, 700–710.  That crisis is "the bodily injury" that the governmental plaintiffs allege caused them to incur extraordinary social costs.  Thus, if McKesson "knew" about *that* bodily injury "in whole or in part" by the inception date, then coverage is barred by the "prior-knowledge" clause.

McKesson's position thus depends on reconciling two irreconcilable propositions: that generalized allegations of governmental expenditures arising from the opioid crisis *are* "bodily injury'" claims under the coverage grant, even though they contain no allegations of any specific injuries to an identified individuals, but that the prior-knowledge clause simultaneously *requires* knowledge of individualized "bodily injuries" which are *not* alleged in the underlying lawsuits. McKesson's argument gives a single term in the ACE Policy—"bodily injury" —two conflicting

31

interpretations.  And it ignores policy language clearly providing that coverage does *not* extend to suits alleging "bodily injury" about which McKesson knew—"in whole or in part"—as of the policy's inception date.  Ultimately, therefore, McKesson's (necessarily) overbroad interpretation of "bodily injury" exposes it to knowledge evidence it cannot evade or refute—evidence that it knew full well about the opioid epidemic long before July 1, 2015.

   B. <u>ACE may rely on extrinsic evidence available to ACE as of April 30 2021, when McKesson first provided evidence of exhaustion.</u>

  California law permits Insurers to rely on extrinsic evidence—in addition to the allegations in the underlying lawsuits—to "establish the ultimate question of coverage." *Montrose Chem. Corp.*, 6 Cal. 4th at 289–99.

  What extrinsic evidence this Court may consider implicates two issues.  **First**, competent extrinsic evidence is measured from the time that Insurers' obligation—if any—would have been triggered.  *See* Croskey, et al., Cal. Practice Guide: Ins. Litig., Ch. 7B-C (Aug. 2021) ("[T]he time [insurers] 'acquired the duty'" "probably means the point in time a liability insurer is required to act on the insured's behalf.").  This Court has already held that, as excess and not primary insurers, ACE and National Union would acquire that duty "at the point when the retention is exhausted, not at the inception of the underlying litigation."  Aug. 12 Order, at 6.  Under its policy, ACE's duty to defend does not arise until McKesson has exhausted its retention by "payment of 'loss'" equating to $5 million.  ACE Policy End. 25.

  Although McKesson claimed to have exhausted the retention as early as August 31, 2018, it never represented (let alone provided evidence) that it had made payments exhausting the retention until April 30, 2021, by way of a declaration filed in support of McKesson's Motion.  *See* Brigman Decl. ¶ 18.  And McKesson did not provide any document demonstrating exhaustion until September 2021. ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ In the circumstances here,

32

however, the Court should find that no duty-to-defend was triggered until April 30, 2021, when McKesson first provided *any* evidence of exhaustion (*i.e.,* Brigman's representation that McKesson had paid amounts in excess of the retention).[21]   McKesson cannot claim it was unaware ACE was seeking material showing exhaustion, since ACE repeatedly asked for such material, but was ignored. *See supra* at 7-8.   To allow McKesson to deliberately withhold requested information to strategically limit ACE's ongoing claims investigations would reward gamesmanship on the part of insureds.

**Second**, although few courts have addressed the question, ACE submits that competent extrinsic evidence that the Exemplar Suits are precluded from coverage encompasses not only "facts known to" Insurers "at the time they 'acquired [any] duty [to defend],'" Order, ECF 101 (Aug. 12, 2021) (citing *Saylin v. Cal. Ins. Guar. Ass'n*, 179 Cal. App. 3d 256, 264 (1986)), but also encompasses extrinsic evidence "*available*" at that time.   Courts have stated the latter formulation, and this Court should apply it here. *See The Upper Deck Co., LLC v. Fed. Ins. Co.*, 358 F.3d 608, 611 (9th Cir. 2004) (emphasis added); *see also, e.g.*, *CNA Cas. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 610 (1986); *Street Surfing, LLC v. Great Am. E&S Ins. Co.*, 2012 WL 12882123, at *4 (C.D. Cal. Jan. 18, 2012) ("[A]n insurer's duty to defend is determined by the allegations on the face of the third party complaint, and from extrinsic evidence available to it at the time.").   Moreover, any evidence cited in this motion that ACE did not know confirms and elaborates on facts contained in the evidence ACE *did* know or alleged in the Exemplar Suits. *Compare infra* §§ III.C.1 & III.C.2.

In any event, all the extrinsic evidence cited herein, which is attached to the accompanying Declaration of Daniel M. Sullivan, can and should be considered.   For one thing, the evidence was available before May 1, 2020 when the Oklahoma AG suit was filed.   Indeed, vast majority of evidence was publicly available by July 25, 2019, and the rest became available the following month. Thus, if the Court were to hold that ACE had a duty to defend McKesson in any of the Exemplar Suits at any point *before* July 25, 2019, the extrinsic evidence would be relevant to show that the duty

---

[21]   The Court could reasonably conclude that the ACE's duty to defend cannot have been triggered until September 2021, when McKesson first provided actual documentation, but the point is academic because all extrinsic evidence was public long before April 2021.

1    was extinguished as of that date.[22]  Therefore, ACE is cross-moving in the alternative to establish

2    that, at a minimum, extrinsic evidence has extinguished any duty to defend it ever acquired.

3              C.    McKesson's "prior knowledge" of the opioid crisis is clearly established by
                     undisputed evidence *irrespective* of which evidentiary standard applies.
4

5              A large volume of undisputed evidence demonstrates that McKesson was well-aware of the

6    nation's opioid crisis—at the very least, "in part"—long before July 1, 2015.  Moreover, that

7    knowledge is clearly established, *irrespective* of whether this Court considers all evidence available

8    to ACE as of April 31, 2021 or July 25, 2019, or only evidence subjectively "known" to ACE.[23]

9              **1.    The undisputed evidence available to ACE as of April 2021
                       overwhelmingly demonstrates McKesson's prior knowledge.**
10

11             The federal laws and regulations that allow McKesson to distribute prescription opioids make

12   abundantly clear their high potential for abuse and addiction.  *See, e.g.,* Controlled Substances Act of

13   1970 ("CSA"), 21 U.S.C §§ 801 *et seq.*; *see also Summit* Compl. ¶¶ 501–18 (describing the "closed-

14   system of distribution" and associated registration requirements and anti-diversion obligations

15   imposed by the CSA and its implementing regulations); Ex. MM (hereinafter, "Red Flags Report"), at

16   5, 27-30 (same).  "Due to concerns about their addictive properties," Congress and the DEA have

17   generally designated prescription opioids as Schedule II controlled substances.  *Summit* Compl.

18   ¶ 129; *see also* 21 U.S.C. §§ 811–13.  Schedule II substances have both a "high potential for abuse"

19   and a "currently accepted medical use"; "abuse of the drug or other substances may lead to severe

20   psychological or physical dependence."  21 U.S.C. § 812; *Summit* Compl. ¶ 45 n.5.

21             The opioid epidemic arose against this regulatory backdrop.  Starting in the *late 1990s*, opioid

22   distribution rose dramatically, as did abuse and addiction.  *E.g.*, *Summit* Compl. ¶¶ 719–222;

23

24   [22]   *E.g.*, *Montrose Chem. Corp.*, 6 Cal. 4th at 295 ("The defense duty is a continuing one, arising on
             tender of defense and lasting until . . . it has been shown that there is *no* potential for coverage . . .
25           ."); *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal. App. 4th 205, 219 (1st Dist.
             2001) ("If subsequent discovery established that [there is no potential for coverage], the duty to
26           defend would, arguably, cease.").

27   [23]   As set forth in the accompanying Declaration of Christopher Celentano, ACE has confirmed that
             certain documents cited herein were known to and considered by ACE or outside coverage
28           counsel on its behalf before July 25, 2019.

1   *Oklahoma AG* Compl. ¶ 29 (chart showing increases in opioid "sales," "deaths" and "treatment

2   admissions" from 1999-2010); *id.* ¶ 22 ("As the supply of prescription opioids increased, the number

3   of people dying from unintentional overdose also increased[.]"); Red Flags Report, 21-22.

4          If McKesson was not already fully aware of the national opioid crisis, by 2005 the federal

5   government ensured that it was.  Beginning that year, the DEA "conducted individual, in-person

6   meetings with certain wholesale distributors, reviewing each distributor's legal responsibilities under

7   the CSA," "providing specific examples from the distributor's own customers" of suspicious orders,

8   and "warn[ing]" distributors that "failing to exercise effective controls against diversion could result"

9   in revocation of their registration to distribute controlled substances.  *Id.* at 31-32.  The DEA held

10  one-on-one meetings with McKesson on September 1, 2005 and January 3, 2006.  *See* Ex. U (2008

11  DOJ Press Release) (at the September 1 meeting, DEA officials "warned McKesson officials about

12  excessive sales of their products to pharmacies filling illegal online prescriptions."); Ex. O (2006

13  DEA Memo), at 1 ("The purpose of the [January 3] meeting was to discuss the delivery of over two

14  million dosage units of hydrocodone to pharmacies located in the Tampa, Florida area alleged to be

15  Internet Pharmacies.");  Ex. R (2007 McKesson Presentation), at 6 ("Clear message from DEA" at

16  January 2006 meeting); *see also* National Union Br. § IV.B.5(i)-(ii).

17         Next came a series of formal written notices and administrative investigations.  In a

18  September 27, 2006 letter sent "to *every commercial entity registered to distribute controlled

19  substances*"—including McKesson—the DEA advised these companies of what they already knew,

20  namely, "that they are 'one of the key components of the distribution chain . . . [and that t]his

21  responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and

22  detrimental effect on the health and general welfare of the American people.'"  Ex. P (hereinafter,

23  "2006 DEA Letter"); *Summit* Compl. ¶ 524 (same) (quoting 2006 DEA Letter)).  This letter, from

24  McKesson's principal regulator, also directly addressed the ongoing opioid crisis, and McKesson's

25  knowledge of it: "*As each of you is undoubtedly aware*, the abuse (nonmedical use) of controlled

26  prescription drugs is a *serious and growing health problem in this country*."  2006 DEA Letter, at 1

27  (emphasis added).  Fifteen months later, the DEA again admonished distributors including McKesson

28

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC

1  that that they "must each abide by[] statutory and regulatory duties to 'maintain effective controls

2  against diversion.'"  *Summit* Compl. ¶ 525 (quoting 2007 DEA Letter); Ex. Q (2007 DEA Letter).

3      In addition, in 2006 and 2007, the DEA issued multiple Orders to Show Cause ("OTSC's")

4  and administrative warrants against McKesson, seeking to revoke registrations issued to certain

5  McKesson distribution facilities for alleged violations of their anti-diversion obligations under the

6  CSA.  *See, e.g.*, Red Flags Report, at 33-34 (August 2006 OTSC against Florida facility and

7  November 2007 OTSC against Maryland facility); Ex. JJ, Tab 11 (2018 Covington Letter to U.S.

8  House Committee), at 2 & n.2 (administrative inspection warrants and OTSC's); Ex. R, at 6 (Oct.

9  2006 OTSC); Ex. T (2008 Settlement), at 1-2.  McKesson, through counsel, regularly communicated

10  with the DEA about these investigations.  *See, e.g.*, Ex. JJ, Tab 1, at 1 (April 5, 2007 meeting

11  regarding OTSC against Florida facility and subpoenas); *id.* Tab 2.

12      On May 2, 2008, McKesson executed a settlement agreement with DEA and DOJ, pursuant to

13  which McKesson agreed to pay a $13,250,000 civil penalty to settle allegations that it had "failed to

14  maintain effective controls . . . against diversion" of controlled substances at facilities in Florida,

15  Maryland, Texas and Colorado.  Ex. T at 1-2; Ex. U, at 1 (McKesson distribution centers "received

16  and filled hundreds of suspicious orders placed by pharmacies participating in illicit internet schemes

17  . . . [t]hey did so even after a Sept. 1, 2005 meeting at which DEA officials met with and warned

18  McKesson officials about excessive sales of their products to pharmacies filling illegal online

19  prescriptions . . .  [a]s a result, millions of dosage units of controlled substances were diverted from

20  legitimate channels.")  McKesson also expressly "agree[d] to maintain a compliance program

21  designed to detect and prevent diversion of controlled substances."  Ex. T, at 3.

22      Despite these government outreach and enforcement efforts, the opioid crisis continued to

23  escalate.  By 2011, the federal government had declared it a "U.S. Epidemic."  Ex. W; *see also* Ex. V

24  ("Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans

25  than heroin and cocaine combined" (quoting CDC Director Thomas Frieden)).

26      McKesson was not deterred by the worsening situation, nor by the terms of its own 2008

27  settlement agreement.  Beginning in March 2013, the DEA and DOJ (acting through multiple United

28  States Attorney's offices nationwide) again launched multiple investigations into McKesson

distribution facilities.  *See, e.g.*, Ex. Z (McKesson 2014 10-K), at 104-105 ("subpoenas" and DOJ investigation in West Virginia); Ex. AA (McKesson 2014 Q3 10-Q), at 18 (DOJ investigation into Colorado distribution center); Ex. BB (McKesson 2015 10-K, at 100 (subpoena from West Virginia Attorney General "seeking information about the Company's distribution of controlled substance"); Ex. Wash.GG (*Washington Post*), at PDF Page 2 (describing two-year investigation by "nine [DEA] field divisions working with 12 U.S. attorney's offices across 11 states" in 2013 and 2014);  Ex. DD (2017 Settlement), at ¶¶ 1-7 (Listing two DEA "Administrative Inspection Warrants" and "numerous administrative subpoenas" and "cyclic inspections" conducted at twelve McKesson "distribution centers nationwide", in California, Colorado, Florida, Illinois, Maryland, Massachusetts, Michigan, Nebraska, New Jersey, Ohio, Virginia and Wisconsin).

In March of 2015—several months *before* the ACE Policy's inception date—McKesson reached an "agreement in principle" with DOJ and DEA to settle multiple allegations of violations of its obligations under the CSA and its 2008 settlement agreement for $150 million.  *See* Ex. CC (McKesson 2016 10-K), at 15.  The parties reached a "tentative settlement" in September of that year, *see* Ex. GG, at 6, and finalized the deal in January 2017.  *Id..* (Final agreement included $150 fine and four warehouse suspensions); Ex. EE (2017 DOJ Press Release) ("McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs"); Ex. FF (2017 DEA Press Release) ("Largest Settlement In DEA History"); *Summit* Compl. ¶¶ 798-801 ("On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders" at 12 distribution centers."); *Oklahoma AG* Compl. ¶ 77 ("McKesson acknowledged that from 2009-2017 'it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious' . . . less than a decade after DEA and DOJ, in 2008, punished McKesson for its flagrant noncompliance with the CSA."); Red Flags Report, at 242 ("As part of the settlement, the company accepted responsibility for failure to abide by the terms of the 2008 settlement, including by failing to report suspicious orders to the DEA that should have been identified as suspicious"); Ex. DD.

1    In response to reports published by *The Washington Post* and other media organizations, the

2  Energy and Commerce Committee of the U.S. House of Representatives (the "House Committee")

3  launched a bipartisan investigation "into the distribution of prescription opioids" in May 2017.  *See*

4  Red Flags Report, at 5; Ex. HH (Committee Memo), at 3.  In the course of its investigation, the

5  House Committee obtained multiple documents from McKesson and several other distributors and, in

6  May 2018, conducted hearings entitled "Combating the Opioid Epidemic: Examining Concerns

7  About Distribution and Diversion."  *Id.*  In December 2018, the House Committee published a 325-

8  page report entitled "Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement

9  Concerns in West Virginia," Ex. MM, together with partially-redacted copies of certain documents

10  obtained in its investigations.  *See* Ex. JJ.  The Red Flag Report recounts multiple specific examples

11  of McKesson's failure to adhere to its anti-diversion obligations and protocols and of opioid over-

12  distribution.  *E.g.* Red Flag Report, at 225 ("In 2007, McKesson shipped an average of 9,650

13  hydrocodone pills a day to Sav-Rite No. 1 pharmacy in Kermit, West Virginia.  This was 36 times the

14  threshold amount set by the LifeStyle Drug Monitoring Program", which McKesson had informed

15  the DEA had been implemented nationwide by letter dated June 12, 2007); *see also* Ex. JJ, Tab 2.

16    This extensive history of government education, investigation, and enforcement against

17  McKesson demonstrates—without more—that McKesson "knew" at least "in part" about the opioid

18  epidemic, as well as the harm to individuals McKesson's distribution of opioids was causing.  Indeed,

19  the Track One plaintiffs expressly alleged that—of the Track One defendants—"McKesson's

20  conscious and deliberate disregard of its obligations was especially flagrant."  *Summit* Compl. ¶ 798.

21    But there is more.  McKesson has repeatedly stated that it knows about the opioid epidemic,

22  understands the legal and regulatory anti-diversion requirements, and acknowledges its history of

23  repeatedly violating those requirements and thereby contributing to the epidemic.  As early as April

24  2007, McKesson's Senior Vice President of Distribution Operations gave a presentation to "the entire

25  distribution network leadership managers and staff, 110 persons" at McKesson's National Operations

26  Conference.  Ex. JJ, Tab 2, at 1.  He noted that "[a]buse of prescription drugs has risen 66% since

27  2000," and that "Opioid painkillers kill more than cocaine and heroin combined."  Ex. R, at 2.  And

28  in a letter to McKesson customers dated April 4, 2008, McKesson's President and Senior Vice

President confirmed that: "The abuse of prescription drugs, particularly controlled substances, has become a serious problem among millions of Americans." Ex. S at 1. Also in 2008, the Healthcare Distribution Management Association ("HDMA"), a trade organization in which McKesson executives served as board members, *see Summit* Compl. ¶¶ 522, 535 & n.153, published "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances." *Id.* ¶¶ 545, 854; *see also* Ex. X, at 16-18 (describing guidelines and publication process) & App. A (guidelines). Lest there be any doubt about the reason for the guidelines, the HDMA explicitly stated that they were *"prepared in recognition of a growing problem of misuse and diversion of Controlled Substances*." Ex. X, App. A at 1 (emphasis added).

McKesson's awareness of the problem persisted. An October 22, 2013 presentation to McKesson's board of directors by McKesson's President, Senior Vice President, and Assistant General Counsel, specifically noted that "Prescription Drug Abuse is an Epidemic in the U.S.," and that "Prescription drug abuse is a nationwide problem, to which all members of the industry must respond." Ex. Y at 6, 15. And in testimony delivered to the House Committee on May 18, 2018 McKesson's Chairman, President and CEO again confirmed that "the impact the opioid epidemic has had on our nation is devastating." Ex. II at 1.

If there were any doubt, McKesson's corporate representatives dispelled it in sworn deposition testimony in the Track One Suits. Specifically, those McKesson witnesses confirmed that McKesson has known about the epidemic *since at least 2006*.[24] They also confirmed that McKesson knew about the correlation between the amount of opioids distributed and the abuse that would flow directly from that distribution.[25]

---

[24] *See* Ex. LL (Hartle Dep. Tr.) at 166:6-14 (Q: "The next sentence [of the DEA's September 27, 2006 Letter] says, 'As each of you is undoubtedly aware, the abuse nonmedical use, of controlled prescription drugs is a serious and growing health problem in the country.' Does McKesson agree and acknowledge that fact as of 2006?" . . . A: "Yes."); Ex. KK (Boggs Dep. Tr.) at 35:23-36:9 (Q: "And were [the DEA letters] and the meetings that DEA had with McKesson . . . prompted by DEA's recognition that the diversion of pharmaceutical opioids was occurring and contributing to the opioid crisis or epidemic?" . . . A: "I think that that would be [a] fair assessment, yes.").

[25] Hartle admitted on behalf of McKesson that, "Using common sense and basic logic, you could assume the more pills that are out there, the more potential for diversion there could be." Ex. LL, at 268:12-15. When asked, "The more pills that get diverted, what happens?", Hartle responded,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.     The essential facts that establish McKesson's prior knowledge were known to ACE as of July 25, 2019.

Even if the Court were to limit its consideration to materials that ACE can demonstrate were known to ACE as of July 25, 2019, *all* of the key undisputed facts recited above would still be established.  *See* Celentano Decl. (listing materials known and considered by ACE as of that date).

For starters, McKesson's position as a "Big 3" distributor of controlled substances that "have a high potential for abuse" is public knowledge and was set forth in the Exemplar Suits.  21 U.S.C. § 812; *Summit* Compl. ¶ 45 n.5; Ex. GG.  And the Track One Complaints alleged that McKesson has knowingly shipped excessive quantities of opioids into Ohio and other states for many years.  *See, e.g.*, *Cuyahoga* Compl. ¶¶ 719–721 (65 million opioids to Ohio in 2006 and 100 million in 2014).

In addition, the history of the DEA's direct education and enforcement actions against McKesson dating back to 2005 are alleged at length in the Exemplar Suits, described in the Red Flags Report, and reflected in multiple documents long known to ACE, including the DEA's September 2006 and December 2007 letters, the DOJ press release announcing the 2008 settlement with McKesson, reporting by *The Washington Post*, and McKesson's own SEC filings.  The same applies to McKesson's 2017 settlement agreement, including the $150 million fine and other penalties imposed, and McKesson's acknowledgement of responsibility for alleged violations dating back to 2009.  *See, e.g.*, *Summit* Compl. ¶¶ 798-805; Ex. MM, at 33-34; Ex. GG.  Indeed, ACE cited opioid lawsuit allegations regarding the 2008 and 2017 settlements in its reservation-of-rights letters to McKesson.  *See* Ex. D (June 20, 2017), at 2-3, 4.  And, of course, the Exemplar Suits allege the several-decade history of the opioid crisis itself.

Taken together, the allegations in the Exemplar Suits and the undisputed facts known to ACE before any duty to defend McKesson could possibly have arisen demonstrate that McKesson has known about the nationwide opioid crisis since long before July 1, 2015.

### CONCLUSION

The Court should deny McKesson's Motion and grant ACE's Cross-Motion.

---

"You can assume that there's more abuse."  *Id.* at 267:15-16.  McKesson advised its insurers, including ACE, when this testimony became publicly available.  *See* Ex. K.

40

1      DATED:  October 20, 2021      HOLWELL SHUSTER & GOLDBERG LLP

2                                By:    /s/ *Michael S. Shuster*

3                                    Michael S. Shuster (*pro hac vice*)
Daniel M. Sullivan (*pro hac vice*)
Blair E. Kaminsky (*pro hac vice*)
Margaret B. Hoppin (*pro hac vice*)
Daniel M. Horowitz (*pro hac vice*)

425 Lexington Avenue
New York, New York 10017
Tel: (646) 837-5151
Fax: (646) 837-5150

Email: mshuster@hsgllp.com
Email: dsullivan@hsgllp.com
Email: bkaminsky@hsgllp.com
Email: mhoppin@hsgllp.com
Email: dhorowitz@hsgllp.com

CLYDE & CO US LLP

Susan Koehler Sullivan
Brett C. Safford
355 S. Grand Avenue, Suite 1400
Los Angeles, California 90071
Tel: (213) 358-7600
Fax: (213) 358-7650
Email: susan.sullivan@clydeco.us
Email: brett.safford@clydeco.us

Robert Mangino (*pro hac vice*)
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Tel: (973) 210 6700
Fax: (973) 210 6701
Email: robert.mangino@clydeco.us

*Attorneys for Third Party Defendant and Third Party*
*Counterclaim Plaintiff ACE Casualty and Property*
*Insurance Company*

ACE'S OPPOSITION TO McKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND
CASE NOS. 3:20-CV-07469-JSC, 3:20-CV-09356-JSC