GRETCHEN A. HOFF VARNER (Bar No. 284980)
SYLVIA HUANG (Bar No. 313358)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
ghoffvarner@cov.com; syhuang@cov.com

ANNA ENGH (*pro hac vice*)
SHANNON TUCKER (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
aengh@cov.com; srtucker@cov.com

DAVID LUTTINGER (*pro hac vice*)
CLÉA P.M. LIQUARD (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
dluttinger@cov.com; cliquard@cov.com

*Attorneys for Defendant, Counterclaim Plaintiff, Third-Party Plaintiff, and Third Party Counterclaim
Defendant McKesson Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO

| | |
|---|---|
| AIU INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>Plaintiffs and Counterclaim Defendants,<br><br>v. | Civil Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC<br><br>**McKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS** |

McKESSON CORPORATION f/k/a
MCKESSON HBOC, INC.,

     Defendant, Counterclaim Plaintiff, Third
Party Plaintiff, and Third Party
Counterclaim Defendant,

         v.

ACE PROPERTY AND CASUALTY
INSURANCE COMPANY,

     Third Party Defendant and Third Party
Counterclaim Plaintiff.

**Date and Time: January 27, 2022 at 9:00 a.m.**
**Courtroom:  Courtroom E, 15th Fl.**
**Judge:  Honorable Jacqueline Scott Corley**
**Action Filed:  October 23, 2020**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................1

ARGUMENT ....................................................................................................................3

I.     The Exemplar Suits Seek Damages Because of Bodily Injury...................................3

       A.     Insurers Ignore the Express Language of the Policies and California Law. ......................3

       B.     Insurers' "Economic Damages" Argument Is Contrary to California Law......................8

       C.     Insurers Rely on a Web of Opioid Coverage Cases that Have Been Questioned or
              Abandoned. ........................................................................................................9

II.    The Exemplar Complaints Allege an "Occurrence.".................................................11

       A.     Insurers Overlook the Allegations Against McKesson, Which Sound in
              Negligence. ......................................................................................................16

       B.     Insurers' Extrinsic Evidence Fails to Conclusively Demonstrate There Is No
              Possibility of A Covered "Occurrence.".............................................................18

       C.     Insurers Rely on Inapposite Cases. ......................................................................18

       D.     The Discredited Decision in *Actavis* Does Not Change The Analysis. ...........................19

III.   Under Well-Established California Law, AIG Cannot Establish that the Exemplar Suits
       Arise from Multiple Occurrences. ...........................................................................21

       A.     AIG's "Occurrence" Position Is Unsupported By California Law. ...................................25

       B.     AIG's Attempt to Turn McKesson's Defense Arguments Against It Fails. ....................27

       C.     AIG's Ill-Defined Multiple Occurrence Position Would Render Coverage
              Illusory. ............................................................................................................28

IV.    Insurers Cannot Establish that the "Known Loss" Exclusion Bars Coverage. ..........................29

       A.     Insurers Have Not Established—and Cannot Possibly Establish—that McKesson
              Had Prior Knowledge of Every Bodily Injury Alleged to Have Occurred During
              the Policy Periods. ............................................................................................30

       B.     Knowledge of an Opioid "Epidemic" Does Not Trigger The Known Loss
              Exclusion...........................................................................................................32

       C.     Insurers' Arguments Based on Extrinsic Evidence Are Unavailing................................33

V.     Insurers' Arguments Concerning When Their Defense Duties Arose Lack Merit.......................36

CONCLUSION...............................................................................................................41

i

McKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO
DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

# TABLE OF AUTHORITIES

CASES                                                                        Page(s)

*AIU Ins. Co. v. Super. Ct.*,
   51 Cal. 3d 807 (1990) ...........................................................................................1, 4, 5, 6

*Albert v. Mid-Century Ins. Co.*,
   236 Cal. App. 4th 1281 (2015) ...............................................................................12, 19

*Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*,
   302 F.3d 1049 (9th Cir. 2002) ................................................................................ *passim*

*Atl. Mut. Ins. Co v. J. Lamb, Inc.*,
   100 Cal. App. 4th 1017 (2002) ......................................................................................30

*Bay Cities Paving & Grading, Inc. v. Laws.' Mut. Ins. Co.*,
   5 Cal. 4th 854 (1993) ....................................................................................................26

*Bikram's Yoga Coll. of India, L.P. v. Phila. Indem. Ins. Co.*,
   2015 WL 11199157 (C.D. Cal. Dec. 8, 2015) ..............................................................17

*Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. & Cas. Ins. Co.*,
   2020 WL 5893414 (D. Or. Oct. 5, 2020)....................................................................7, 8

*Carter v. Pulte Home Corp.*,
   52 Cal. App. 5th 571 (2020) .........................................................................................28

*Chemstar, Inc. v. Liberty Mut. Ins. Co.*,
   41 F.3d 429 (9th Cir. 1994) ...................................................................21, 22, 23, 26

*Cincinnati Ins. Co. v. AmerisourceBergen Drug Corp.*,
   2015 WL 13808271 (Ohio Ct. C.P. Aug. 31, 2015) .....................................................10

*Cincinnati Ins. Co. v. Disc. Drug Mart*,
   2020 WL 6706791 (Ohio Ct. C.P. Sept. 9, 2020).........................................................16

*Cincinnati Ins. Co. v. H.D. Smith Wholesale Drug Co.*,
   2015 WL 4624734 (C.D. Ill. Aug. 3, 2015), *rev'd*, 829 F.3d 771 (7th Cir. 2016) ...............8

*Cincinnati Ins. Co. v. Richie Enters. LLC*,
   2014 WL 3513211 (W.D. Ky. July 16, 2014) .................................................................9

*Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*,
   829 F.3d 771 (7th Cir. 2016) ................................................................................ *passim*

*Delgado v. Interinsurance Exch. of Auto. Club of S. Cal.*,
   47 Cal. 4th 302 (2009) ........................................................................................7, 12, 18

*EOTT Energy Corp. v. Storebrand Int'l Ins. Co*,
  45 Cal. App. 4th 565 (1996) ...........................................................23, 24, 25, 29

*Eureka Federal Savings & Loan Association v. American Casualty Co. of Reading*,
  873 F.2d 229 (9th Cir. 1989) ..............................................................................22, 26

*Evanston Ins. Co. v. Ghillie Suits.com, Inc.*,
  2009 WL 734691 (N.D. Cal. Mar. 19, 2009)..................................................21, 26, 27, 28

*Farmers Insurance Exchange v. Hurley*,
  76 Cal. App. 4th 797 (1999) ..................................................................................40

*Fire Ins. Exch. v. Super. Ct.*,
  181 Cal. App. 4th 388 (2010) ................................................................................19

*Gen. Accident Ins. Co. v. W. Am. Ins. Co.*,
  42 Cal. App. 4th 95 (1996) ...................................................................................27

*Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.*,
  499 F. Supp. 3d 147 (W.D. Pa. 2020).........................................................10, 16, 24

*Giddings v. Indus. Indem. Co.*,
  112 Cal. App. 3d 213 (1980) ...................................................................................8

*Gonzalez v. Fire Ins. Exch.*,
  234 Cal. App. 4th 1220 (2015) ..............................................................................19

*Great Am Assurance Co. v. Bishop*,
  2019 WL 1117534 (N.D. Cal. Mar. 11, 2019).....................................................16, 30

*Hartford Accident & Indem. Co. v. Super. Ct.*,
  23 Cal. App. 4th 1774 (1994) ........................................................................3, 39, 40

*Haskel, Inc. v. Super. Ct.*,
  33 Cal. App. 4th 963 (1995) ............................................................................29, 34

*Henstooth Ranch LLC v. Burlington Ins. Co.*,
  293 F. Supp. 3d 1067 (N.D. Cal. 2018) ..................................................................19

*Hollis v. Lexington Ins. Co.*,
  180 F. Supp. 3d 422 (E.D. Va. 2016) .....................................................................25

*The Hous. Grp. v. PMA Cap. Ins. Co.*,
  193 Cal. App. 4th 1150 (2011) ...............................................................................40

*In re Nat'l Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) .......................................................6, 7, 33

iii

*In re Nat'l Prescription Opiate Litig.*,
   2019 WL 4194296 (N.D. Ohio Sept. 4, 2019) ................................................................... 27

*In Re Prudential Lines Inc.*,
   158 F.3d 65 (2d Cir. 1998) ............................................................................................ 25, 26

*Kaady v. Mid-Continent Cas. Co.*,
   790 F.3d 995 (9th Cir. 2015) ........................................................................................ 30, 35

*Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd's London*,
   2001 Cal. Super. LEXIS 220 (Cal. Super. Ct. Sept. 25, 2001) ........................................... 39

*Liberty Mutual Fire Insurance Co. v. JM Smith*,
   602 F. App'x. 115 (4th Cir. 2015) ........................................................................ 15, 20, 35

*Liberty Surplus Ins. Corp. v. Fed. Ins. Co.*,
   2013 WL 12132024 (C.D. Cal. Dec. 12, 2013) ......................................... 22, 23, 24, 25

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*,
   5 Cal. 5th 216 (2018) .......................................................................................... *passim*

*Maples v. Aetna Cas. & Sur. Co.*,
   83 Cal. App. 3d 641 (1978) ............................................................................................ 25

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
   861 F.3d 206 (D.C. Cir. 2018) ........................................................................................ 34

*McGranahan v. Ins. Corp. of New York*,
   544 F. Supp. 2d 1052 (E.D. Cal. 2008) ............................................................................ 12

*Mead Reins. v. Granite State Ins. Co.*,
   873 F.2d 1185 (9th Cir. 1988) ............................................................................. 22, 23, 24

*Medmarc Cas. Ins. Co. v. Avent Am. Inc.*,
   612 F.3d 607 (7th Cir. 2010) ....................................................................................... 9, 10

*Mesa Underwriters Specialty Ins. Co. v. Blackboard Ins. Specialty Co.*,
   400 F. Supp. 3d 928 (N.D. Cal. 2019) ....................................................................... *passim*

*Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*,
   10 Cal. 4th 645 (1995) .................................................................................................... 35

*Montrose Chem. Corp. of Cal. v. Super. Ct.*,
   6 Cal. 4th 287 (1993) .................................................................................................. 1, 34

*Motorists Mut. Ins. Co. v. Quest Pharms., Inc.*,
   2021 WL 1794754 (W.D. Ky. May 5, 2021) .................................................................. 9, 10

iv

*National Union First Insurance Co. v. Ready Pac Foods, Inc.*,
   782 F. Supp. 2d 1047 (C.D. Cal. 2011) ...................................................................8, 9

*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.*,
   6 Cal. App. 5th 1258 (2016) ...................................................................................18

*Northrop Grumman Corp. v. Factory Mutual Insurance Co.*,
   805 F. Supp. 2d 945 (C.D. Cal. 2011) ....................................................................40

*OneBeacon Am. Ins. Co. v. Fireman's Fund Ins. Co.*,
   175 Cal. App. 4th 183 (2009) .................................................................................38

*Powerine Oil Co. v. Super. Ct.*,
   37 Cal. 4th 377 (2005) ...........................................................................................28

*Presley Homes, Inc. v. Am. States Ins. Co.*,
   90 Cal. App. 4th 571 (2001) ............................................................................16, 29

*Rite Aid Corp. v. ACE Am. Ins. Co.*,
   2020 WL 5640817 (Del. Super. Ct. Sept. 22, 2020)........................................10, 24

*Riddell, Inc. v. Super. Ct.*,
   14 Cal. App. 5th 755 (2017) ...................................................................................27

*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*,
   148 Cal. App. 4th 620 (2007) .................................................................................22

*Scottsdale Ins. Co. v. Kaplan Fam. Tr.*,
   2015 WL 7423231 (N.D. Cal. Nov. 23, 2015) .......................................................31

*State Farm Gen. Ins. Co. v. Frake*,
   197 Cal. App. 4th 568 (2011) ................................................................2, 12, 13, 18

*State Farm Fire & Casualty Co. v. Elizabeth N.*,
   9 Cal. App. 4th 1232 (1992)........................................................................22, 23, 24

*State of Oklahoma v. Johnson & Johnson*,
   ---P.3d ----, 2021 WL 5191372 (Okla. Nov. 9, 2021) ...............................6, 7, 33

*Travelers Indem. Co. of Conn. v. Centex Homes*,
   2015 WL 5836947 (N.D. Cal. Oct. 7, 2015)...........................................................40

*Travelers Prop. Cas. Co. of Am. v. Actavis, Inc.*,
   16 Cal. App. 5th 1026 (2017) .................................................................................20

*Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*,
   658 F. App'x 955 (11th Cir. 2016) .........................................................................10

v

McKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO
DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

*Travelers Prop. Cas. Co. v. Anda, Inc.*,
  90 F. Supp. 3d 1308 (S.D. Fla. 2015) .............................................................9, 10

*Watts Indus., Inc. v. Zurich Am. Ins. Co.*,
  121 Cal. App. 4th 1029 (2004) .................................................................................6

*Westfield Ins. Co. v. Masters Pharm., Inc.*,
  2015 WL 10478081 (Ohio Ct. C.P. Dec. 17, 2015)...............................................10

**STATUTES**

21 U.S.C. § 812......................................................................................................................35

Ohio Rev. Code Ann. § 2307.011(C)(2)......................................................................7

**OTHER AUTHORITIES**

California Rule of Court 8.1115(e)(2) .....................................................................21

7 Couch on Ins. § 102:9 (3d ed. 2021)........................................................................36

John K. DiMugno, et al., Commercial General Liability Insurance for Covid-19 Claims §
  12A:2.....................................................................................................................19

vi

MCKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO
DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Under well-settled California law, Insurers ACE Property and Casualty Insurance Company ("ACE") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union" or "AIG," together with ACE, "Insurers") owe McKesson a defense against the Exemplar Suits[1] and all similarly pled Opioid Lawsuits.[2]  To avoid that obligation, each Insurer must "conclusively establish" that the Exemplar Suits "by no conceivable theory raise a single issue which could bring [the suits] within" coverage.  *Anthem Elecs., Inc. v. Pac. Emps. Ins. Co.*, 302 F.3d 1049, 1055-56 (9th Cir. 2002);[3] *Montrose Chem. Corp. of Cal. v. Super. Ct.*, 6 Cal. 4th 287, 299-300 (1993).  Neither Insurer comes close to meeting that "heavy burden."  *Anthem Elecs.*, 302 F.3d at 1056.

*First*, Insurers' assertion that the Exemplar Suits do not seek damages "because of bodily injury" is wrong as a matter of simple common sense and controlling legal precedent.  It is California law that policy language identical to that in the Policies at issue here covers claims by governmental entities for *their own* response costs to address damage to third parties.  *See AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 829 (1990).  In arguing otherwise, Insurers fail to distinguish *AIU* and the Seventh Circuit's seminal opioid coverage decision, *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774 (7th Cir. 2016), misapply California law on "economic loss," and misconstrue the Policies to include narrowing language that is not actually there.

*Second*, Insurers' argument that the Exemplar Suits do not arise out of a potential "occurrence" ignores the allegations of negligent conduct in those suits that trigger a duty to defend and instead focuses on cherry-picked allegations of intentional conduct that, under California law, do not defeat the duty to defend.  The negligence allegations squarely bring this case under controlling Ninth Circuit and

---

[1] As set forth in McKesson's Motion for Partial Summary Judgment, the "Exemplar Suits" refers to three lawsuits: The Oklahoma AG Suit (*Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84 (Bryan Cnty, Okla.)), and the two MDL Track One Lawsuits (*County of Cuyahoga, Ohio v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004 (N.D. Ohio), and *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-OP-45090 (N.D. Ohio)).

[2] "Opioid Lawsuits" refers to all lawsuits filed against McKesson seeking damages for injury allegedly arising out of McKesson's allegedly improper distribution of prescription opioid pharmaceutical products.

[3] Citations and internal quotations are omitted herein unless otherwise noted.

California Supreme Court precedent, which confirm that an "occurrence" and "accident" exists "when *any aspect* in the causal series of events leading to the injury or damage was unintended by the insured," *State Farm Gen. Ins. Co. v. Frake*, 197 Cal. App. 4th 568, 580 (2011) (emphasis added), and can result even "from the insured's own negligence." *Anthem Elecs.*, 302 F.3d at 1055; *see also Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 220-21, 229 (2018), *as modified* (July 25, 2018). Because the Exemplar Suits seek to hold McKesson liable as a result of its allegedly negligent conduct, under California law, Insurers have a duty to defend.

*Third*, under the relevant policy language and California law, the Exemplar Suits form a *single occurrence*; McKesson therefore need satisfy only one $5 million self-insured retention to trigger coverage under the Policies. ACE does not argue to the contrary and while AIG does, the plain language of AIG's policy undermines its position. The AIG policy explicitly aggregates into "one occurrence" all alleged injuries arising from "continuous or repeated exposure to substantially the same general harmful conditions." As is evident from the face of the Exemplar Suit complaints, the alleged injuries to thousands of individual persons detailed in those Suits are alleged to have resulted from the "same general harmful conditions"—namely, McKesson's alleged failure to maintain effective controls against diversion in its distribution of prescription opioids. AIG contends that the "occurrence" is defined at the implausibly granular level of "discrete instances of alleged misconduct" that AIG cannot identify or define with any specificity. Indeed, under AIG's view, to establish a duty to defend—that is, the mere *potential* for coverage—the court would have to determine minute facts as to individual instances of decision-making with respect to McKesson's national distribution of pharmaceutical drugs with the potential outcome that there could be hundreds of "occurrences" and thus hundreds of $5 million retentions to satisfy. That outcome, of course, would render the duty-to-defend general liability insurance that AIG sold to McKesson for ten years virtually worthless. For that reason, it is hardly surprising that AIG does not venture a position as to how many "occurrences" the Exemplar Suits constitute, nor can it explain how it would even arrive at such a conclusion. That silence is telling.

*Fourth*, there is no evidence that prior to the policy periods, McKesson had knowledge of any of the opioid-related injuries to individual persons alleged in the Exemplar Suits and for which McKesson seeks coverage. To overcome this, Insurers take the position that the "bodily injury" at issue for

2

1  purposes of the so-called known-loss exclusion is the entire opioid "epidemic."  That theory, however, is

2  contradicted by the policy language, mischaracterizes the allegations in the Exemplar Suits, and would

3  transform the known-loss exclusion into a "known risk" exclusion, effectively eliminating coverage for

4  mass tort injuries in the products liability realm.

5  *Fifth*, and finally, Insurers strain credulity by suggesting that they had no prior defense

6  obligations because McKesson "never represented" that it had exhausted the $5 million retention prior to

7  filing this motion.  The record indisputably shows that Insurers were aware no later than August 2018

8  that McKesson had incurred five times the amount of the retention in defense costs.  In any event, under

9  California law, Insurers are responsible for defense costs after "*actual* exhaustion" of the retention, not,

10  as Insurers claim, when they receive copies of defense invoices.  *Hartford Accident & Indem. Co. v.*

11  *Super. Ct.*, 23 Cal. App. 4th 1774, 1781–82 (1994) (emphasis added).

12  For all the reasons discussed herein, the Court should grant McKesson's Motion for Partial

13  Summary Judgment on the Duty to Defend and deny Insurers' cross-motions.

## ARGUMENT

### I.     The Exemplar Suits Seek Damages Because of Bodily Injury.

16  Insurers argue that, because the underlying government claimants have not *themselves* sustained

17  bodily injuries, and claim to not seek damages derivatively on behalf of injured persons, the government

18  entities do not seek damages "because of" Bodily Injury, and instead seek ostensibly uncovered

19  "economic loss."  Under controlling California law, however, all that is required is a *causal connection*

20  between the damages sought and the alleged "bodily injury" or "property damage," which is plainly

21  established here.

### A.     Insurers Ignore the Express Language of the Policies and California Law.

23  It is undisputed that the underlying claimants purport to disclaim seeking damages derivatively

24  on behalf of their residents—but, as the Seventh Circuit put it when addressing this argument:  "[S]o

25  what?"  *H.D. Smith*, 829 F.3d at 774.  As was true in that case, nothing in Insurers' Policies requires that

26  the underlying plaintiff be suing on behalf of the person who sustained bodily injuries.  Insurers ignore

27  this point, arguing instead that coverage for an "organization," like McKesson, attaches only when the

28  claimant asserts "derivative claims—such as … a hospital's subrogation claim for medical expenses

3

McKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO
DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

1    specifically paid on behalf of an injured claimant."  ACE Opp. at 20.  Insurers identify no policy

2    language supporting their strained interpretation, and for good reason—there is none.

3            On the contrary, the California Supreme Court long ago rejected this same argument advanced

4    by AIU Insurance Company ("AIG")—an affiliate of National Union and a party to this action—in the

5    controlling decision, *AIU*.  In that case, the California Supreme Court held that the phrase "damages

6    because of [bodily injury or] property damage" encompasses claims asserted by government agencies to

7    recoup their *own* response costs—with no suggestion, let alone a requirement, that the agency must be

8    suing "derivatively" on behalf of individuals.  *See AIU*, 51 Cal. 3d at 829 ("[The insured's]

9    reimbursement of government response costs is monetary 'compensation' for the loss suffered *by the*

10   *agencies*") (emphasis added).  Similar to the arguments Insurers make in this case, AIG and other

11   insurers argued in *AIU* that the government's own economic costs to clean up hazardous waste on a third

12   party's property were not covered "damages because of … property damage." *Id.* at 843.  The Court

13   rejected that position, holding that, "the event precipitating the[] legal action is contamination of

14   property.  The costs that result from such action are therefore incurred 'because of' property damage."

15   *Id.*  In so holding, the Court made clear that the identity of the injured property owner, and the

16   relationship between that owner and the government agencies, were irrelevant.  As the Court concluded:

17   The policies "encompass damages" the insured becomes obligated to pay "because of property damage

18   in general, *regardless of by whom it is suffered*." *Id.* (emphasis added) (the government's costs are

19   incurred "because of" property damage "whether the cleanup at issue in the underlying suits takes place

20   on property owned by [the insured], the state or federal government, or third parties").  The Court also

21   explicitly rejected the argument that the government must *itself* have suffered the property damage in

22   order for its economic damages to come within the CGL policy, concluding that "the mere fact that the

23   governments may seek reimbursement of response costs or injunctive relief without *themselves* having

24   suffered any tangible harm to a proprietary interest does not exclude the recovery of cleanup costs under

25   the 'damages' provision of CGL policies."  *Id.* at 842 (emphasis added).

26           The rule established in *AIU* is that coverage does not depend on the claimant's relationship with

27   the damaged property (or injured persons), but on a causal connection between the damages sought by

28   that claimant and the "bodily injury" or "property damage."  Here, the damages sought by the plaintiffs

4

in the Exemplar Suits easily meet *AIU*'s causal test because the "event precipitating" the plaintiffs' legal action was the bodily injury of their residents, for which the plaintiffs incurred and will incur costs to address. *See AIU*, 51 Cal. 3d at 843; *see also, e.g.*, ECF No. 79-16, *Oklahoma* Compl. ¶ 40 (plaintiffs seeking to recoup for their "substantial costs and losses for prescription opioid-dependency-related health care costs including opioid use disorder treatment services, ambulatory services, inpatient hospital services and emergency department services, among others"); ECF No. 79-14, *Summit* Third Amended Complaint ("TAC") ¶¶ 20, 1025; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 19, 1081 (same).

Insurers attempt to distinguish *AIU*, but those efforts fail.  Insurers contend without support that the governmental entity in *AIU* stood "in the shoes of a property owner[.]"  ACE Opp. at 13.  On the contrary, the *AIU* Court made clear that the governmental entities—like the governmental plaintiffs here—were seeking to recover their own costs for the benefit of the "public fisc[,]" *AIU*, 51 Cal. 3d at 829.  Nothing in *AIU* suggests that the governments there were attempting to recover on behalf of the property owner.

Insurers likewise err in distinguishing *AIU* on the purported basis that the governmental entities in *AIU* sought costs associated with "a *specific* damaged property," while the plaintiffs in the Exemplar Suits are ostensibly "suing to recover for increased budgetary outlays that they attribute to the opioid epidemic as a whole."  ACE Opp. at 13.  The plaintiffs in the Exemplar Suits are seeking to recover costs they incurred to address specific opioid-related injuries within their specific jurisdictions.  *See, e.g.*, ECF No. 79-12, *Cuyahoga* TAC ¶¶ 19, 1081 (seeking to recoup for their alleged "significant expenses for police, emergency, health, … and other services[,]" including "handling of emergency responses to overdoses," "providing addiction treatment," "treating opioid-dependent newborns in neonatal intensive care units," and "burying the dead"); *see also* ECF No. 79-16, *Oklahoma* Compl. ¶ 40; ECF No. 79-14, *Summit* TAC ¶¶ 20, 1025.  The fact that the opioid addiction, use, and abuse that constitute the foundation of the Exemplar Suits are allegedly so widespread as to constitute an "epidemic" does not transform costs for those specific bodily injuries into an uncovered phenomenon.  Indeed, the Oklahoma Supreme Court recently rejected this very characterization of the Oklahoma State AG's claims in its landmark decision *reversing* a finding of nuisance liability against an opioid manufacturer, stating:

The damages the State seeks are not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventative treatment to certain, though numerous, individuals.

*State of Oklahoma v. Johnson & Johnson*, ---P.3d ----, 2021 WL 5191372, at *6 (Okla. Nov. 9, 2021).

Straining to evade their own policy language, Insurers attempt to invoke general tort law principles to suggest that the "damages" covered by the Policies are limited to those paid as "compensation *to an injured person*." ACE Opp. at 11 (emphasis in original). Even were one to set aside the fact that this limitation does not appear in the Policies—and ignores the Policies' coverage grant to "organizations"—Insurers' interpretation is at odds with the definition of "damages" under settled California law. The California Supreme Court held in *AIU* that "damages" in a CGL policy encompassed any "compensation, in money, recovered by a party for loss or detriment it has suffered through the acts of another." *AIU*, 51 Cal. 3d at 826. That is precisely what the plaintiffs in the Exemplar Suits seek here: compensation, in money, to recoup the costs they have expended, allegedly as a result of McKesson's acts.[4]

Insurers likewise miss the mark when they selectively cite to a decision in the Opioid MDL and erroneously conclude that "[t]he MDL Court found the governmental plaintiffs were *not* seeking damages for bodily injuries." ACE Opp. at 19 (emphasis in original). The excerpt Insurers reference addressed the RICO-specific issue of whether the governmental entities' "alleged injury arises *directly* out of a personal injury"—where the court held that "direct" means the governmental entity "*him- or herself*" suffered "personal injury." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *7 (N.D. Ohio Dec. 19, 2018) (emphasis added). By contrast, the Policies here cover all suits seeking damages "*because of*" bodily injury—a broad standard under California law. *See Watts Indus., Inc. v. Zurich Am. Ins. Co.*, 121 Cal. App. 4th 1029, 1041 (2004) ("The [California] Supreme Court … gives a broad construction to the phrase 'because of property damage.'"). In any event, the MDL court found

---

[4] Insurers attempt to sidestep the Policies' organizational clause on the ground that it merely "clarifies" that deaths occurring after the policy period are covered, ACE Opp. at 20, but that effort similarly falls flat. The fact that the provision speaks to the timing of coverage does not mean that it speaks to nothing else; sentences can contain multiple provisions. *H.D. Smith*, 829 F.3d at 774 (confirming that organizational clause covers suits by un-injured claimants who spent their own money to care for another's bodily injuries).

1   that some of the MDL plaintiffs' damages arguably *do* "arise directly out of the personal injury of the

2   citizens because they are effectively claims to recoup the costs of medical expenses." *In re Nat'l*

3   *Prescription*, 2018 WL 6628898, at *9; *see also State of Oklahoma*, 2021 WL 5191372, at *6.

4        Moreover, although the Track One plaintiffs purported to disavow claims for damages

5   derivatively on behalf of their residents (because those claims would be abrogated by the Ohio Product

6   Liability Act), the MDL court determined that McKesson remained potentially liable for plaintiffs'

7   "economic loss" claims, which are defined under Ohio law as "[a]ll expenditures for medical care or

8   treatment, rehabilitation services, or other care … incurred as a result of an injury, death, or loss to

9   person…" Ohio Rev. Code Ann. § 2307.011(C)(2). *See* MDL Order, *In re Nat'l Prescription Opiate*

10  *Litig*, 2018 WL 6628898, at *13–15 (N.D. Ohio Dec. 19, 2018).

11       Continuing their bid to avoid the clear coverage grant for damages "because of Bodily Injury,"

12  Insurers contend that "the relevant contractual phrase is 'damages' because of *or for* 'bodily injury.'"

13  ACE Opp. at 10 (emphasis added). While Insurers are correct that the term "for bodily injury" appears

14  within the Policies, the Policies' "Insuring Agreement[s]" unambiguously provide coverage for damages

15  "because of Bodily Injury." *See* ECF No. 79-2, AIG Policy at I.A (p. 3 of 86); ECF No. 79-3, ACE

16  Policy at I.A (p. 8 of 99). Insurers cite no support for the notion that this Court should borrow different

17  language from different parts of the Policies to substitute "because of" with "for" in the Insuring

18  Agreements—nor is this consistent with the duty to defend analysis. *See Delgado v. Interinsurance*

19  *Exch. of Auto. Club of S. Cal.*, 47 Cal. 4th 302, 308 (2009) ("The duty to defend exists if the insurer

20  becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage

21  under the insuring agreement."). In any event, McKesson has demonstrated a potential for coverage

22  regardless of whether "because of" or "for" applies, because the governmental plaintiffs have sued to

23  recover money they spent to address bodily injuries sustained by individuals. As one court put it: "these

24  opioid cases do not turn on an expansive reading of the phrase 'because of,' … but rather on a common

25  sense understanding of interrelated events." *Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. &*

26  *Cas. Ins. Co.*, 2020 WL 5893414, at *3 (D. Or. Oct. 5, 2020). As the *Bliss* court observed, decisions in

27  opioid coverage cases to date have "found a duty to defend because, although the plaintiffs in the

28

underlying litigation were seeking damages for economic harms, those harms were causally connected to bodily injuries caused by the insured's acts or omissions."[5]  *Id.* at *4.

**B.    Insurers' "Economic Damages" Argument Is Contrary to California Law.**

Boxed in by their own policy language, Insurers insist they have no duty to defend McKesson because the damages McKesson seeks are "intangible economic losses" that do not provide "a measure of damages" for the bodily injuries alleged in the Exemplar Suits.  ACE Opp. at 12.  The Seventh Circuit in *H.D. Smith* reversed the district court because that court adopted precisely the same "economic loss" arguments and relied on the same flawed reasoning that Insurers advance here.  *See Cincinnati Ins. Co. v. H.D. Smith Wholesale Drug Co.*, 2015 WL 4624734, at *7 (C.D. Ill. Aug. 3, 2015) (concluding that "the complaint in the underlying action seeks damages for economic losses … not for 'bodily injury'"), *rev'd*, 829 F.3d 771 (7th Cir. 2016).  The same result follows under California law.

Courts have concluded that "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a [CGL] policy."  *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 219 (1980).  But those are not the types of damages claimed by the governmental entities in the Opioid Lawsuits.  Rather, the costs the plaintiffs in the Exemplar Suits incurred to address the bodily injuries of their residents—which they now seek to recoup from McKesson—are clearly "a measure of damages" for those injuries.  The cases cited by Insurers only confirm this point.

For instance, Insurers rely heavily on *National Union First Insurance Co. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1056 (C.D. Cal. 2011).  In *Ready Pac*, the insured, a food supplier, sought coverage from its insurer for a claim brought by Taco Bell for lost profits.  Though Taco Bell alleged that certain restaurants had experienced bodily injury or property damage as a result of an E. coli outbreak, the specific issue the court was addressing in *Ready Pac* was Taco Bell's lost patronage claim at restaurants that had *not* experienced the outbreak.  *Id.* at 1055.  The court found that Taco Bell's claim for "lost profits" was "a claim for purely economic loss, and not a measure of property damage or

---

[5] Insurers fare no better when they attempt to analogize to cases involving coverage for costs claimed to address pure "emotional" injuries.  *See* ACE Opp. at 15–16.  The costs at issue here were expended to address *physical* bodily injuries of a type indisputably covered by Insurers' Policies.

personal injury suffered by Taco Bell and its customers." *Id.* The court emphasized that Taco Bell's claim was "*not for economic expenditures incurred by Taco Bell in mitigating damages as a result of the Outbreak*." *Id.* at 1056 (emphasis added). Notably, *Ready Pac* was not a duty-to-defend case, and the insurers made no similar motion concerning Taco Bell's other claimed injuries, which included investigation, cleanup, and replacement costs at restaurants that *did* experience the outbreak. *Id.* at 1050 n.1. The *Ready Pac* court confirmed the continuing authority of *AIU*, underscoring that damages such as response, clean-up, and mitigation costs are damages "because of property damage." *Id.* at 1056.

Far from supporting Insurers' position, *Ready Pac* confirms that the Exemplar Suits seek losses covered by the Policies. Unlike the Taco Bell stores in *Ready Pac* that experienced no outbreak of E. coli, *id.* at 1055–56, the plaintiffs in the Exemplar Suits allege a widespread "outbreak" of opioid injuries in their jurisdictions and are seeking to recover "economic expenditures" they "incurred … in mitigating damages as a result of the Outbreak." *Id.* at 1056. *See, e.g.*, ECF No. 79-16, *Oklahoma* Compl. ¶ 40 (seeking to recoup for their "substantial costs and losses for prescription opioid-dependency-related health care costs including opioid use disorder treatment services, ambulatory services, inpatient hospital services and emergency department services, among others"); ECF No. 79-14, *Summit* TAC ¶¶ 20, 1025; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 19, 1081 (same). Damages sought for things such as ambulance services and inpatient hospital stays are clearly "a measure of … personal injury suffered by" the plaintiffs' residents. *See Ready Pac*, 782 F. Supp. 2d at 1055.

### C.    Insurers Rely on a Web of Opioid Coverage Cases that Have Been Questioned or Abandoned.

Nor does Insurers' reliance on two Kentucky decisions and a Florida case help their cause. *See* ACE Opp. at 17 (citing *Cincinnati Ins. Co. v. Richie Enters. LLC*, 2014 WL 3513211 (W.D. Ky. July 16, 2014), *Travelers Prop. Cas. Co. v. Anda, Inc.*, 90 F. Supp. 3d 1308 (S.D. Fla. 2015), *Motorists Mut. Ins. Co. v. Quest Pharms., Inc.*, 2021 WL 1794754 (W.D. Ky. May 5, 2021)).

The Kentucky district court's conclusion in *Richie*, that an opioid lawsuit brought by West Virginia sought "economic loss" and not "damages 'because of' the citizens' bodily injury," was based on that court's misplaced reliance on the Seventh Circuit decision in *Medmarc*. *See Richie*, 2014 WL 3513211, at *3-5 (citing *Medmarc Cas. Ins. Co. v. Avent Am. Inc.*, 612 F.3d 607 (7th Cir. 2010)).

Subsequent to the *Richie* decision, the Seventh Circuit in *H.D. Smith* rejected any suggestion that the *Medmarc* decision supported a no-coverage result for the opioid lawsuits. *H.D. Smith*, 829 F.3d at 774–75. The Seventh Circuit found that the underlying lawsuit in *Medmarc* was "readily distinguishable" from the opioid lawsuits because *Medmarc* involved "no claim of bodily injury in any form." *Id.* at 775. Similarly, other courts across the country have declined to follow *Richie*. *See Rite Aid Corp. v. ACE Am. Ins. Co.*, 2020 WL 5640817, at *15–16 (Del. Super. Ct. Sept. 22, 2020), *appeal pending* (finding that "[t]he decisions in *Richie* and *Medmarc* either view the alleged facts too narrowly or do not involve claims similar to those asserted in the [Opioid MDL] Track One Lawsuits," and that "several courts since have interpreted the phrase [because of bodily injury] broadly as it relates to insurance policies and have declined to apply the reasoning in *Richie*"); *Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 499 F. Supp. 3d 147, 167 n.11 (W.D. Pa. 2020) (finding that "any reliance [on *Richie*] is misplaced because the district court in *Richie* relied on [*Medmarc*] which has since been distinguished in the context of opioid lawsuits by the Seventh Circuit in *H.D. Smith*"), *vac'd on other grounds*, No. 2:19-cv-00904-RJC (ECF 179) (W.D. Pa. May 25, 2021).

The other two decisions relied on by Insurers, *Anda* and *Motorists Mutual*, both mistakenly relied on *Richie*. *See Anda*, 90 F. Supp. 3d at 1314-15; *Motorists Mutual*, 2021 WL 1794754, at *3-4, *6, *appeal docketed*, No. 21-6043 (6th Cir. Nov. 4, 2021). (*Motorists Mutual* also relied on the same inapplicable authority relied on by the *Richie* court, *see Motorists Mutual*, 2021 WL 1794754 at *4-6). On appeal in *Anda*, the Eleventh Circuit declined to adopt the district court's finding on the "because of bodily injury" point, ruling instead on the "better ground" of a products exclusion (which is not present in Insurers' Policies here). *Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*, 658 F. App'x 955 (11th Cir. 2016).[6]

This Court should instead look to the Seventh Circuit's seminal opioid coverage decision in *H.D. Smith*, in which the Seventh Circuit rejected the very same economic loss arguments Insurers make here

---

[6] The cases Insurers relegate to a footnote are also not persuasive. *Cincinnati Ins. Co. v. AmerisourceBergen Drug Corp.*, 2015 WL 13808271, at *1 (Ohio Ct. C.P. Aug. 31, 2015), relied entirely on the overruled trial court opinion in *H.D. Smith*, and *Westfield Ins. Co. v. Masters Pharm., Inc.*, 2015 WL 10478081, at *2–3 (Ohio Ct. C.P. Dec. 17, 2015), relied on *Richie*, *Anda*, and the overruled trial court opinion in *H.D. Smith*.

and found a duty to defend a distributor (like McKesson) against a similar opioid lawsuit under similar CGL policy language. *H.D. Smith*, 829 F.3d at 774–75. Insurers attempt to undercut *H.D. Smith*, asserting that the Seventh Circuit's analogy to a hypothetical mother's suit is inapt because, while the mother's claim to care for her son's injuries would be "derivative," the plaintiffs' claims in the Exemplar Suits are not. ACE Opp. at 19. As explained above, this "derivative" distinction is legally irrelevant and—like the insurer's arguments in *H.D. Smith*—"untethered to any language in the policy." *H.D. Smith*, 829 F.3d at 774. *H.D. Smith* comports with *AIU*, and both compel a finding here that the plaintiffs in the Exemplar Suits, and in all similarly pled Opioid Lawsuits, seek damages "because of bodily injury" under Insurers' Policies.[7]

## II.    The Exemplar Complaints Allege an "Occurrence."

Insurers assert that the Exemplar Suits do not arise out of an "occurrence" because McKesson "intentionally" "distributed" prescription pharmaceutical opioid medication. ACE Opp. at 2. In other words, Insurers contend that McKesson is not entitled to defense coverage because it engaged in its business of distributing pharmaceutical opioids, which, following numerous third-party acts by doctors, pharmacists, patients, drug dealers, and others, were eventually diverted to illicit use. In so arguing, Insurers cling to a misinterpretation of California law that would convert any deliberate engagement in commercial activity into "intentional" wrongdoing, thereby exempting commercial insureds from virtually all coverage under a conventional general liability policy. Nothing under California law supports such a conclusion. Nor does Insurers' heavy reliance on *Actavis* change that result—the case is inapposite on its facts and reasoning, and to the extent it could have been read to support Insurers' position, it has been overtaken by the California Supreme Court's decision in *Ledesma*.

Insurers attempt to cast McKesson's "deliberate" acts of "distributing" medications, ACE Opp. at 24, as conduct sufficient to exempt coverage, but that theory finds no support in California law. It has

---

[7] Insurers assert that McKesson is not entitled to a ruling with respect to "similarly pled" Opioid Lawsuits because it has not identified which lawsuits are similarly pled. McKesson is not presently seeking a ruling as to the precise set of lawsuits that are similarly pled, and the Court need not resolve that issue at this time. McKesson is simply seeking a ruling that embraces the Exemplar Suits and any and all similarly pled lawsuits, with issues as to which lawsuits qualify as "similarly pled" to be resolved separately following a ruling on the duty to defend.

long been established that only if the alleged harm is the "*direct and immediate* result of an intended …

event" by the insured is there "no accident." *Frake*, 197 Cal. App. 4th at 580 (2011) (emphasis added).

In other words, "an accident may exist *when any aspect in the causal series* of events leading to the

injury or damage *was unintended by the insured* and a matter of fortuity." *Id.* (emphasis added).  Thus,

as the Ninth Circuit has explained:  "Put another way, when the injury ... is an unexpected or unintended

consequence of the insured's conduct, it may be characterized as an accident for which coverage exists."

*Anthem Elecs.*, 302 F.3d at 1055.

California courts have explained the critical distinction between instances where an insured

intends *all* the acts leading to injury ("no occurrence" situations) and instances where the insured intends

certain acts but not others that lead to injury (a covered "occurrence").  Thus, for example, there *is* an

"occurrence" or "accident" when a driver "intentionally speeds and, as a result, negligently hits another

car" even though "the speeding would be an intentional act," because "the act *directly responsible for

the injury*—hitting the other car—*was not intended by the driver* and was fortuitous."  *McGranahan v.

Ins. Corp. of New York*, 544 F. Supp. 2d 1052, 1059 (E.D. Cal. 2008) (emphasis added); *see also Albert

v. Mid-Century Ins. Co.*, 236 Cal. App. 4th 1281, 1291 (2015) (same).  By contrast, an "accident" does

not occur "where the driver was speeding and *deliberately hit* the other car," because there, "the act

*directly* responsible for the injury—hitting the other car—would be intentional and any resulting injury

would be *directly caused by the driver's* intentional act."  *McGranahan*, 544 F. Supp. 2d at 1059

(emphasis added); *accord Albert*, 236 Cal. App. 4th at 1291; *Frake*, 197 Cal. App. 4th 580.

The California Supreme Court recently reaffirmed this longstanding rule, holding in *Ledesma*

that claims against the insured, arising from the alleged sexual abuse by the insured's employee,

constituted an "accident" within the meaning of the CGL policy.  *Ledesma*, 5 Cal. 5th at 220.  The

California high court reasoned that the employee's "molestation was the *act directly* responsible for the

injury, while [the insured's] negligence in hiring, retaining, and supervising him was an *indirect* cause."

*Id.* at 225 (emphasis added).  In so holding, the *Ledesma* court distinguished *Delgado* (a case cited by

Insurers) and other cases where the insured was sued for intentional assault, reasoning that in those

cases, the "insured's intentional tortious conduct was the *immediate cause of injury*."  *Id.* at 225

(emphasis added) (citing *Delgado*, 47 Cal. 4th at 315-16).  By contrast, in *Ledesma*, as here, although

12

the insured's conduct was among the alleged causes of the injury, the fact that the insured's "mere negligence *contributed in some way* to the acts of abuse" did not render the insured's conduct non-accidental.  *Id.* at 229 (emphasis added).

Moreover, when analyzed at the duty-to-defend stage—as is the case here—all that an insured must establish is the mere *possibility* that some "aspect in the causal series of events leading to the injury or damage was unintended by the insured."  *Frake*, 197 Cal. App. 4th at 580.  In that context, the Ninth Circuit held in *Anthem Electronics* that allegations that an insured-distributor supplied defective circuit boards constituted an "accident," reasoning that there was a "possibility of a covered occurrence because [the failures] may have 'happen[ed] without intent or through carelessness.'"  *Anthem Elecs.*, 302 F.3d at 1056.  Notably, even though the complaint there "said nothing affirmative about the defects being accidental," the Ninth Circuit explained that "[t]he *possibility that the defects were unexpected* is enough to trigger the insurers' duty to defend."  *Id.* (emphasis added).  The Ninth Circuit was also unpersuaded by the insurers' evidence that the insured-distributor knew its circuit boards were defective at the time it supplied them, finding that the extrinsic evidence was not "undisputed" and did not "conclusively eliminat[e] the potential for coverage," but "merely placed in dispute whether [the insured's] actions would eventually be determined not to constitute an occurrence," thus requiring summary judgment for the insured on the duty to defend.  *Id.* at 1060.

Applying those principles here, there is *at least* the "*possibility*" that the injuries alleged in the Exemplar Suits "happen[ed] without intent or through carelessness," *id.* at 1056 (emphasis added), and that *some* "aspect in the causal series of events leading to the injury or damage was unintended by the insured."  *Frake*, 197 Cal. App. 4th at 580.  Indeed, the Exemplar Suits expressly allege that McKesson "acts as a middleman in the pharmaceutical drug supply chain," ECF No. 79-16, *Oklahoma* Compl. ¶ 3, with intervening conduct by several third parties following its acts or omissions, including by pharmacies,[8] doctors,[9] and others (including criminal black market activity by intervening third

---

[8] *See, e.g.*, ECF No. 79-14, *Summit* TAC ¶¶  610, 613-14, 620-27; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 588-89, 593-602; ECF No. 79-16, *Oklahoma* Compl. ¶ 98.

[9] *See, e.g.*, ECF No. 79-14, *Summit* TAC ¶¶ 5, 175, 466, 477, 568, 575, 616; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 379, 454, 465, 591; ECF No. 79-16, *Oklahoma* Compl. ¶¶ 15, 98.

parties),[10] all of which combines to result in various discrete bodily injuries.  *See, e.g.*, *id.* ¶ 18 ("The increase in deaths in Oklahoma paralleled the increase in prescribing of opioids …"); *id.* ¶ 98 ("prescribers and pharmacists in Oklahoma have been convicted of crimes involving drug diversion"); ECF No. 79-14, *Summit* TAC ¶ 466 ("in 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001"); *id.* ¶ 477 (describing doctors arrested and charged with illegal prescription drug distribution); *id.* ¶ 568 (describing a pain clinic that was "diverting massive quantities of OxyContin"); *id.* ¶ 706-08 (describing Summit County prescribers who were "convicted of crimes involving drug diversion," including one doctor "convicted of illegally distributing some 30,000 tablets of" prescription opioids, and another who was "indicted for a pattern of illegal prescribing involving hundreds of thousands of doses" of prescription opioids, including "after the doctor learned of fatal overdoses").  The recognition in the Exemplar Suits of intervening tortious and/or criminal conduct by third parties outside of McKesson's control is fatal to Insurers' arguments.  *See Ledesma*, 5 Cal. 5th at 229 (injurious conduct by third parties "may be deemed an unexpected consequence of [the insured's] independently tortious acts of negligence"); *see also Anthem Elecs.*, 302 F.3d at 1055 ("[W]hen the injury … is an unexpected or unintended consequence of the insured's conduct, it may be characterized as an accident for which coverage exists.").

Moreover, the underlying allegations against McKesson plainly sound in negligence, and the California Supreme Court has repeatedly emphasized that such allegations are well within the scope of covered "occurrences" under CGL policies.  *See Ledesma*, 5 Cal. 5th at 221–22 ("a policy providing a defense and indemnification for bodily injury caused by 'an accident' promises coverage for liability resulting from the insured's negligent acts") (alterations omitted).  Thus, for example, the State of Oklahoma alleges that "McKesson *negligently* or recklessly failed to control its supply lines to prevent diversion," and that "[*a*] *reasonably-prudent distributor* of controlled substances would have anticipated the danger of opioid oversupply and diversion and protected against it."  ECF No. 79-16, *Oklahoma* Compl. ¶ 89 (emphasis added).  *See also id.* at ¶ 123 ("McKesson's *negligent* acts include, among other things: failing to monitor and/or report suspicious orders of opioids; failing to guard against diversion of

---

[10] *See, e.g.*, ECF No. 79-14, *Summit* TAC ¶¶ 468, 491; ECF No. 79-12,  *Cuyahoga* TAC ¶¶ 29, 478; ECF No. 79-16, *Oklahoma* Compl. ¶¶ 15, 114.

opioids; failing to reasonably and properly train its employees related to the distribution of opioids …

and failing to provide effective controls and procedures for guarding against theft and diversion.")

(emphasis added); ECF No. 79-14, *Summit* TAC ¶ 1052 ("A *reasonably prudent* opioid … distributor

should have anticipated an injury to Plaintiffs as a probable result of … distributing, and selling

prescription opioids in this manner.") (emphasis added); ECF No. 79-12, *Cuyahoga* TAC ¶ 486

("Defendants had a duty to *exercise reasonable care* in delivering dangerous narcotic substances.")

(emphasis added).

Indeed, the Fourth Circuit rejected the very argument Insurers press here in *Liberty Mutual Fire*

*Insurance Co. v. JM Smith*, 602 F. App'x. 115 (4th Cir. 2015), another opioid coverage case.  In finding

that the opioid complaint alleged a potentially covered "occurrence," triggering the insurer's duty to

defend, the court reasoned that the underlying suit "presses allegations against thirteen different

defendants who may have been causing harm, but the chain of causation is hardly direct."  *Id.* at 121.

The court explained that the "complaint claims the defendants distributed drugs to pharmacies, which

then filled physicians' prescriptions for patients, some of whom were or became abusers, resulting in

harm to the abusers and, as a result, to the state.  This is hardly the same as visible damage being openly

visited as a direct result of the defendant's negligence."  *Id.*  The court also found that "[t]he number of

defendants, all of which were distributing drugs and any one of which could have caused the alleged

injuries, further blurs the connection between any intentional actions by the defendants and the alleged

harm."  *Id.*  The same result follows here under California law.  *See Mesa Underwriters Specialty Ins.*

*Co. v. Blackboard Ins. Specialty Co.*, 400 F. Supp. 3d 928, 938 (N.D. Cal. 2019) (nuisance claim alleged

an "accident" even though insured may have "intentionally caus[ed] some of the injuries alleged"

because other conduct "is not alleged to have been undertaken with the knowledge that it would cause

all the injuries alleged").

As explained below, Insurers attempt to obscure that simple analysis by cherry-picking

allegations from the underlying complaints, extrapolating from fragments of disputed extrinsic evidence,

and relying on a handful of decisions that serve only to prove McKesson's case.  None of the arguments

are availing.

### A.     Insurers Overlook the Allegations Against McKesson, Which Sound in Negligence.

Insurers selectively quote from the Exemplar Suits to create the false impression that the Exemplar Suits were predicated on alleged intentional wrongdoing.  But Insurers cannot "parse the claims" in this manner, "dividing those that are at least potentially covered from those that are not." *Presley Homes, Inc. v. Am. States Ins. Co.*, 90 Cal. App. 4th 571, 576 (2001).  "Because an insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered, the Court *does not look to whether noncovered acts predominate* in the third party's action, but rather to whether there is *any potential* liability under the policy."  *Great Am Assurance Co. v. Bishop*, 2019 WL 1117534, at *5 (N.D. Cal. Mar. 11, 2019) (Corley, J) (emphasis added).  "Even if some of the allegations in a complaint concern intentional conduct, so long as there are also factual allegations that *could* give rise to negligence liability, the insurer has a duty to defend."  *Mesa*, 400 F. Supp. 3d at 938 (N.D. Cal. 2019) (emphasis added).

Here, it is plainly the case that the Exemplar Suits contain "factual allegations that *could* give rise to negligence liability."  *Id.* (emphasis added).  Indeed, each of the Exemplar Suits contains a distinct negligence count and alleges, for example, that McKesson breached its "duty to exercise reasonable care" by "filling and failing to report orders that they knew or *should have known* were likely being diverted for illicit and/or non-medical uses," ECF No. 79-16, *Oklahoma* Compl. ¶ 55 (emphasis added), and by "failing to … halt shipments of opioids in quantities it knew or *should have known* could not be justified," *id.* ¶ 60 (emphasis added).  *See also* ECF No. 79-14, *Summit* TAC ¶¶ 14, 518; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 14, 502.

Insurers also fail to distinguish recent decisions in other opioid coverage cases that found an "occurrence" as to *the very same* Track One Lawsuits at issue here.  *See Giant Eagle*, 499 F. Supp. 3d at 169–70; *Cincinnati Ins. Co. v. Disc. Drug Mart*, 2020 WL 6706791, at *6 (Ohio Ct. C.P. Sept. 9, 2020) ("The MDL claim for Absolute Public Nuisance repeatedly uses the phrase 'knew or should have known.'  This language is the language of negligence.").  Even assuming Insurers are correct that the Track One Lawsuits contain more "specific" allegations against McKesson than they do against other distributors, AIG Opp. at 24 n.10, that is irrelevant to the "occurrence" analysis, which focuses on the

potential that any factual allegations "could give rise" to covered conduct.  *See Mesa*, 400 F. Supp. 3d at 938.

Nor is it the case that the nuisance claims against McKesson allege solely intentional conduct. *See, e.g.*, ECF No. 79-16, *Oklahoma* Compl. ¶¶ 129-133 (alleging that "McKesson's massive and *unreasonable* distribution of opioids … constitute unlawful acts and/or *omissions of duties*") (emphasis added); *see also* ECF No. 79-14, *Summit* TAC ¶¶ 975-1039; ECF No. 79-12, *Cuyahoga* TAC ¶¶ 1017-1081.  Indeed, the Track One Plaintiffs were poised to attempt to prove their nuisance theories with evidence of alleged negligent conduct in the lead up to the Track One Trial.  *See In re Nat'l Prescription Opiate Litig.*, 17-md-2804, ECF No. 2715-2 at 17 (N.D. Ohio Oct. 4, 2019) (plaintiffs' proposed jury instructions providing that nuisance claim can be proved by either intentional conduct or unintentional conduct that violates a legal requirement, and that even "[i]ntentional" conduct "does not mean that the Defendants intended to create a nuisance, but that Defendants intended to do what it did").  AIG points out that McKesson argued in a different underlying opioid suit that "absolute nuisance" under Ohio law requires a showing of "intentional" conduct, AIG Opp. at 25, but that argument was never addressed by the court and cannot be used as a basis to say that McKesson was "conclusively" the direct and immediate cause of harm to thousands of individuals.  *Anthem Elecs.*, 302 F.3d at 1054–55.  That McKesson has pressed unsuccessfully to impose a higher burden of proof on plaintiffs in the underlying litigation proves only that McKesson is vigorously defending itself against the underlying allegations.

Likewise, although Insurers are correct that the Track One plaintiffs voluntarily dismissed their negligence claim on August 19, 2019 before the Track One case settled, that is immaterial.  In determining whether Insurers' duty to defend arose, the court assesses the operative complaint at the time the duty potentially arose.  *See Bikram's Yoga Coll. of India, L.P. v. Phila. Indem. Ins. Co.*, 2015 WL 11199157, at *5 (C.D. Cal. Dec. 8, 2015).  Insurers' duty to defend arose, *at the latest*, on July 25, 2019, *see infra* Sect. V, which was before the Track One plaintiffs dismissed their negligence claims.  In any event, the plaintiffs continued to press their *nuisance* claims up to the point of settlement, and maintained their allegations that McKesson "should have known" its acts or omissions would lead to harm.

### B.    Insurers' Extrinsic Evidence Fails to Conclusively Demonstrate There Is No Possibility of A Covered "Occurrence."

Insurers attempt to recharacterize snippets of deposition testimony and documents from the underlying cases to show McKesson's alleged "intentional" conduct, but the effort does not come close to conclusively dispelling the mere possibility that "any aspect in the causal series of events leading to the injury or damage was unintended by [McKesson]." *Frake*, 197 Cal. App. 4th at 580.  For example, Insurers rely on testimony by a McKesson corporate representative confirming that McKesson was aware of its "responsibility" under the Controlled Substances Act to report suspicious orders, AIG Opp. at 32, ECF No. 112-16, St. Jeanos Decl., Ex. 21; acknowledging that "abuse" of prescription drugs is a "problem" in the United States, AIG Opp. at 34; ECF No. 112-4,St. Jeanos Decl., Ex. 7; and recognizing that the "use and abuse" of prescription drugs was "on the national radar" AIG Opp. at 31.  It is self-evident that merely being aware of legal obligations and risks presented by certain highly-regulated products does not amount to wrongdoing, nor is it evidence that McKesson's conduct was the direct and immediate cause of injury to thousands of downstream individuals with whom it has no direct contact.

### C.    Insurers Rely on Inapposite Cases.

AIG relies on *Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.*, 6 Cal. App. 5th 1258 (2016), but the court there was analyzing the *duty to indemnify* the insured based on adjudicated facts in the underlying lawsuit against the insured.  *Id.*  As to the *duty to defend*—which is all that is at issue on these cross motions—the *Moorefield* court held that the insurer had a duty to defend throughout the case, finding that the claim that the insured was responsible for the flooring failure was "potentially covered," and emphasizing that there were allegations of potential accidental causes.  *Id.* at 1285.  The other decisions relied on by Insurers similarly highlight how far afield their arguments are from the circumstances at issue in this case.  For example, Insurers cite cases where an insured intentionally struck a friend during horseplay (*Frake*, 197 Cal. App. 4th at 571), intentionally struck, battered, and kicked the injured party under the mistaken belief he was acting in self-defense (*Delgado*, 47 Cal. 4th at 306), and intentionally constructed a home extending across the property line directly intruding on a neighbor's property under the mistaken belief that they had the right to do so (*Fire Ins. Exch. v. Super.*

*Ct.*, 181 Cal. App. 4th 388, 396 (2010)).[11]  Not surprisingly, in these cases, unlike here, the courts found that the harms were the *direct result* of the deliberate actions of the insureds and that there was no aspect of the causal chain leading to the damage that was "unexpected" by the insured.

### D.  The Discredited Decision in *Actavis* Does Not Change The Analysis.

Finally, Insurers' heavy reliance on *Actavis* is misplaced.  The circumstances at issue there are materially different from this case:  *Actavis* did not involve similar policies, similar allegations, or a similarly situated insured.  Moreover, as commentators have observed, the California Supreme Court's decision in *Ledesma* casts doubt on the viability of *Actavis*.[12]  And whatever value the case may have had following *Ledesma* was undermined when the trial court in the underlying litigation at issue in *Actavis* concluded after trial that there was no causal connection between the manufacturer's conduct and opioid-related harms.

In conclusory fashion, Insurers lump together the allegations at issue in the Exemplar Suits with those at issue in *Actavis*, but the barest of efforts to read the complaints reveals striking differences.  The two complaints at issue in *Actavis* are based almost solely on alleged fraudulent marketing conduct by manufacturers, including counts of consumer fraud–deceptive practices, false statements, false claims, conspiring to defraud, misrepresentations in connection with sales, insurance fraud, and false advertising.  *See* ECF No. 79-5, Chicago Compl.; ECF No. 79-6, California Compl.  As the *Actavis* court put it, these allegations are of "'a common, sophisticated, and highly deceptive marketing campaign' aimed at increasing sales of opioids and enhancing corporate profits that can only describe deliberate, intentional acts."  *Travelers Prop. Cas. Co. of Am. v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1040 (2017).

---

[11] The other cases cited by Insurers are likewise inapposite.  *See, e.g.*, *Henstooth Ranch LLC v. Burlington Ins. Co.*, 293 F. Supp. 3d 1067, 1074 (N.D. Cal. 2018) (no "accident" where insureds intentionally engaged in restoration efforts that directly caused further erosion of the land); *Gonzalez v. Fire Ins. Exch.*, 234 Cal. App. 4th 1220, 1235 (2015) (no "accident" where insured not only failed to rescue the injured party, but engaged in intentional acts resulting in immediate harm to the party); *Albert*, 236 Cal. App. 4th at 1292 (no "accident" where insured hired contractor to prune his neighbor's tree under the mistaken belief that it was his own).

[12] *See* John K. DiMugno, et al., Commercial General Liability Insurance for Covid-19 Claims § 12A:2 n.2 (noting that *Ledesma*'s holding "that negligent hiring and supervision constitutes an accident cast doubt on the result and reasoning in *Actavis*").

Insurers acknowledge, as they must, that the *Actavis* court itself found these allegations against the manufacturers to be "appreciably different" from the allegations of negligence and unintentional conduct made against distributor defendants (like McKesson) in *JM Smith*, where the court found a duty to defend. *Actavis*, 16 Cal. App. 5th at 1042. The underlying allegations against McKesson do not describe solely intentional, affirmative actions that directly resulted in bodily injury. Rather, as described above, the allegations relevant here focus on McKesson's alleged failure to maintain appropriate controls for opioid distribution in the face of red flags that allegedly would have led a "reasonably prudent distributor" to act differently. ECF No. 79-16, *Oklahoma* Compl. ¶ 89, *see also id.* at ¶ 123; ECF No. 79-14, *Summit* TAC ¶ 1052; ECF No. 79-12, *Cuyahoga* TAC ¶ 486.

Insurers rely extensively on the *Actavis* court's finding that, with respect to an opioid *manufacturer*, none of the opioid injuries were "an additional, unexpected, independent, and unforeseen happening[,]" ACE Opp. at 27, but they do not attempt to explain how *McKesson's* conduct directly caused the alleged opioid-related injuries. Nor could they; as described above, the Exemplar Suits include allegations of negligent errors and omissions by a multitude of intervening independent third parties—and even criminal black market activities—that are alleged to produce injuries and harms to numerous classes of downstream opioid users. *See California v. Purdue Pharma L.P.*, No. 30-2014-00725287, at p. 15 (Cal. Super. Ct. Nov. 1, 2021); Hoff Varner Reply Decl. Ex. F (hereinafter "*California v. Purdue*") (the opioid plaintiffs "have themselves … described the opioid crisis as multifaceted, with contributing actors including manufacturers, distributors, pharmacies, doctors, the illegal drug trade, the FDA, the DEA, and the State of California").

Indeed, Insurers' heavy reliance on *Actavis* appears particularly misplaced in light of the California Superior Court's recent ruling in the underlying litigation at issue in *Actavis* itself, where the court entered judgment for the opioid manufacturer defendants based on a lack of evidence substantiating a causal link between the opioid manufacturers' conduct and the alleged opioid-related injuries. *See California v. Purdue*, at pp. 19-20; Hoff Varner Reply Decl. Ex. F. Given that Insurers rely principally on *Actavis* for their argument that McKesson directly caused the alleged opioid injuries with no "additional … happening," the underlying *Actavis* court's finding that plaintiffs failed to

substantiate the alleged causal connection on their nuisance claim renders Insurers' position wholly without factual or legal support.

Insurers suggest that because *Actavis* was not de-published, modified, or vacated following *Ledesma*, it is still good law, but this is not correct as a matter of California law and procedure.  By operation of California Rule of Court 8.1115(e)(2), when a companion case (here, *Actavis*) is held pending disposition of the master case (here, *Ledesma*), the companion case loses its binding and precedential effect "to the extent it is inconsistent with" the California Supreme Court's decision in the master case.  *Actavis* is thus no longer good law to the extent it holds—contrary to *Ledesma*—that there is no "occurrence" as long as the insured's conduct is deliberate, regardless of whether the insured's conduct was merely negligent and not directly responsible for the injury.  *See Ledesma*, 5 Cal. 5th at 225–26 (finding an "accident" where insured engaged in "deliberate act[s]" that were merely negligent and not "directly responsible for the injury," and distinguishing cases where "the insured's intentional tortious conduct was the immediate cause of injury").  In all events, there was no need to modify *Actavis* on remand because the court's "no coverage" holding concerning the policies' product exclusions was undisturbed by *Ledesma*.[13]  Nor, as Insurers contend, is this Court "bound" to apply *Actavis*, ACE Opp. at 30—although it *is* bound to apply *Ledesma*.  *See Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 432 (9th Cir. 1994) (federal court not bound by California appellate court decisions if it believes the California Supreme Court would decide otherwise).

### III.    Under Well-Established California Law, AIG Cannot Establish that the Exemplar Suits Arise from Multiple Occurrences.

In its bid to eviscerate coverage by contending that there are "hundreds" of "occurrences"—and thus purporting to require McKesson to pay "hundreds" of $5,000,000 self-insured retentions—AIG misstates the governing rule under California law and cites to decisions that provide no support for its position.  Indeed, neither of the two principal cases on which AIG attempts to rely, *Evanston* and *Eureka*, involves the same policy language at issue here, and *Eureka* does not even involve a CGL

---

[13] As discussed in McKesson's Motion, ECF No. 79 at 20-21, the products exclusions in the *Actavis* policies—not present in Insurers' policies—served as an independent basis for the court's "no duty to defend" ruling.

policy.  At bottom, AIG's position—that McKesson must pay hundreds of millions of dollars in costs and identify "hundreds" of "discrete acts" before it can tap its insurance—would render the duty to defend coverage AIG sold McKesson all but worthless.  Nothing under California law supports such a conclusion.  In that regard, it is notable that ACE does not join AIG's "multiple occurrence" argument.

It is well settled under California law that, "[w]hen all injuries emanate from a common source or process, there is only a single occurrence for purposes of policy coverage." *Liberty Surplus Ins. Corp. v. Fed. Ins. Co.*, 2013 WL 12132024, at *5 (C.D. Cal. Dec. 12, 2013); *accord Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 631 (2007).  Under that rule, "[i]t is irrelevant that there are multiple injuries or injuries of different magnitudes, or that the injuries extend over a period of time." *Liberty Surplus*, 2013 WL 12132024, at *5.  For that reason, courts in California and in this Circuit have consistently found a single occurrence where—as is the case here—multiple injuries arise out of an alleged continuous course of conduct by the insured.

Thus, for example, in *Liberty Surplus*, the insureds were alleged to have "engaged in a pattern or practice" of race discrimination in connection with rental properties and were sued in three different lawsuits, including by the United States which identified 39 individuals who complained of discrimination.  *Id.* at *1.  The policy language at issue there, like the AIG Policy, defined "occurrence" as "an accident, including continuous or repeated-exposure to substantially the same general harmful conditions."  *Id.* at *5.  In light of that definition and California law, the court concluded that the allegations constituted a single occurrence because the insureds subjected their "tenants to 'the same general harmful conditions'—i.e., racially discriminating by creating inhabitable living conditions, entering the tenants' properties without notice, damaging their personal property, and making derogatory statements." *Id.*  The court explained that "[s]uch a pattern of conduct constitutes one occurrence for insurance policy purposes."  *Id.* (citing *Chemstar*, 41 F.3d at 433; *Mead Reins. v. Granite State Ins. Co.*, 873 F.2d 1185, 1188 (9th Cir. 1988)).

Similarly, in *State Farm Fire & Casualty Co. v. Elizabeth N.*, the California Court of Appeal considered whether multiple instances of negligent care and supervision by the insured, which allowed several children to be repeatedly molested, constituted a single occurrence.  *Elizabeth N.*, 9 Cal. App. 4th 1232, 1234, 1238 (1992).  Based again on "occurrence" language similar to that in AIG's Policy, the

22

McKESSON'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO
DEFEND AND OPPOSITION TO INSURERS' CROSS-MOTIONS, Case Nos.: 3:20-cv-07469-JSC; 3:20-cv-09356-JSC

court rejected the argument that each instance of the insured's negligence yielded a separate occurrence, holding instead that "the multiple injuries suffered by each child resulted from repeated exposure to substantially the same general conditions" and thus constituted a single occurrence.  As the court explained:  "Even if each injury Byron inflicted on a child resulted from a new negligent act by Lynn [the insured], *each act of negligence by Lynn was substantially the same*—a failure to care for and supervise the child adequately."  *Id.* (emphasis added).

The Ninth Circuit came to the same conclusion in *Chemstar*, where the court held that the claims of 28 separate homeowners complaining about "unsightly pits" in plaster used inside their homes constituted a single occurrence because the damage to each home resulted from the insured's "failure to warn" that the plaster was for exterior use only.  *Chemstar, Inc.*, 41 F.3d at 431–32.  The Ninth Circuit rejected the insurer's argument that, because "circumstances unique to each home" were required to create the pitted plaster, the damage "arose from a combination of distinct causes."  *Id.* at 432.  In so holding, the Ninth Circuit relied on its earlier decision in *Mead Reinsurance*, where the court held that eleven separate lawsuits against the City of Richmond alleging excessive force by its police department constituted a single occurrence.  There again, under policy language similar to that contained in AIG's Policy, the court held that "the alleged policy of condoning police brutality" constituted the "occurrence."  *Mead Reins.*, 873 F.2d at 1188.

In *EOTT Energy*, the California Court of Appeal adopted this same analysis and conclusion.  *See EOTT Energy Corp. v. Storebrand Int'l Ins. Co.*, 45 Cal. App. 4th 565, 575 (1996).  There the court concluded that 653 separate incidents of thefts of fuel from the insured constituted a single occurrence where "there was a systematic and organized scheme to steal ... diesel fuel products," which caused the insured's loss.  *Id.* at 578.  The court rejected the insurer's argument (and reversed the trial court's holding) that each theft was a separate occurrence because the thefts were made by different individuals at 653 different times.  In so holding, the court relied on *Elizabeth N.*, *Chemstar*, and *Mead Reinsurance*, among others.  *Id.* at 577.

The analyses and outcomes of those cases are equally applicable here.  The Exemplar Suits allege injuries that "emanate from a common source or process," *Liberty Surplus*, 2013 WL 12132024, at *5—namely, McKesson's alleged failure to maintain effective controls for opioid distribution.  As

pled by the government plaintiffs, McKesson allegedly "created and maintained" a public nuisance through its purported failure to maintain effective controls for opioid distribution.  ECF No. 79-14, *Summit* TAC ¶ 999; *see also* ECF No. 79-16, *Oklahoma* Compl. ¶ 130 ("McKesson's massive and unreasonable distribution of opioids … has contributed to the creation of the opioid crisis in Oklahoma that constitutes a public nuisance.  McKesson contributed to the creation of a condition that affects entire communities…").  And while there were separate instances of distribution of prescription opioids over a period of years, that is of no consequence because in each case the alleged harms arise from a "continuous or repeated exposure to substantially the same general harmful conditions"—the alleged failure to maintain effective controls against diversion of pharmaceutical opioids.  ECF No. 79-2, AIG Policy at VII.S.1 (p. 23 of 86).  *See Liberty Surplus*, 2013 WL 12132024, at *5; *Elizabeth N.*, 9 Cal. App. 4th at 1238.  Like the alleged patterns of discrimination, breaches of duty, and other continuous conduct at issue in *Liberty Surplus*, *Elizabeth N.*, *Chemstar*, *Mead*, and *EOTT*, the alleged "pattern of conduct" here—McKesson's alleged lack of controls against diversion—"constitutes one occurrence for insurance policy purposes."  *Liberty Surplus*, 2013 WL 12132024, at *5.

Indeed, this case presents an even *stronger* basis for a single occurrence ruling than the cited opinions because, unlike those cases, this Court must decide only whether Insurers have a duty to defend.  That is, whether McKesson has established the bare *potential* for coverage and whether Insurers can "conclusively establish" that there is "no conceivable theory" under which the Exemplar Suits are covered.  *Anthem Elecs.*, 302 F.3d at 1055–56.  Applying the duty to defend analysis, several courts have found that the same conduct by an opioid distributor under the same policy language and some of the same opioid lawsuits at least "potentially support[ed] a finding of a single occurrence" on the duty to defend.  *Giant Eagle*, 499 F. Supp. 3d at 169–70; *see also Rite Aid*, 2020 WL 5640817, at *16 (finding that "the Track One Lawsuits and similar Opioid Lawsuits allege one occurrence").

Largely ignoring this long-established authority, AIG contends that the "occurrence" is the "immediate cause of the alleged bodily injuries," which it describes as "hundreds" of "discrete breaches of McKesson's" obligations under the Controlled Substances Act.  AIG Opp. at 14, 15.  That position cannot be squared with the numerous decisions cited above, none of which focus on an "immediate cause," but rather look to the "common source or process" and whether the harms were the result of

24

"substantially the same general harmful conditions." *Liberty Surplus*, 2013 WL 12132024, at *5. Indeed, AIG's argument cannot be reconciled with its own policy language which aggregates into a single occurrence "[a]ll ... exposure to substantially the same general harmful conditions." ECF No. 79-2, AIG Policy at VII.S.1 (p. 23 of 86).[14]   None of AIG's arguments are to the contrary and in fact lead to the bizarre conclusion that McKesson would have to pay upwards of $500 million dollars in costs before it could tap the $45 million limits under AIG's Policy.

A.      **AIG's "Occurrence" Position Is Unsupported By California Law.**

AIG cites a total of four decisions to support its tendentious interpretation of California law, none of which is availing.  AIG relies on the Court of Appeal decision in *Maples* for the purported standard for determining the number of occurrences, but that case analyzed the phrase "accidents which occur during the policy period"—the court did not evaluate any definition of "occurrence," let alone consider the issue of whether there were single or multiple occurrences.  *Maples v. Aetna Cas. & Sur. Co.*, 83 Cal. App. 3d 641, 642-43, 645 (1978).  Here, AIG's Policy is not limited to covering only "accidents" that "occur during the policy period," and the *Maples* court did not evaluate the "occurrence" language at issue in the AIG Policy.  The case is entirely inapposite.

Equally off base is AIG's reliance on the Second Circuit decision in *Prudential Lines*.  AIG Opp. at 12 (quoting *In Re Prudential Lines Inc.*, 158 F.3d 65, 67-68 (2d Cir. 1998)).  To the extent that out-of-state and Circuit decision applying New York law under a "protection and indemnity" contract has any relevance to interpreting California law, it has no bearing on this case because that decision did not analyze the CGL occurrence language found in AIG's Policy, which aggregates into a single occurrence all harms arising out of the "same general conditions."  In fact, the Second Circuit itself expressly confirmed that its decision would have "*limited application* to ... cases involving CGL policies," because

---

[14] It is telling that AIG interprets similar standard-form occurrence definitions in support of batching losses into a single occurrence when AIG would benefit from that outcome.  *E.g.*, *Hollis v. Lexington Ins. Co.*, 180 F. Supp. 3d 422, 426 (E.D. Va. 2016) (AIG affiliate successfully contended that multiple injuries from fireworks explosion alleged to have arisen from 19 negligent acts was a single occurrence, where occurrence limit was lower than aggregate limit).  As the California Court of Appeal astutely observed in *EOTT Energy* in finding a single occurrence and rejecting the insurer's multiple occurrence position: "We have little doubt what [the insurer's] position would be in this matter" if the "shoe would be on the other foot"; that is, if a single occurrence position had been *beneficial* to the insurer.  45 Cal. App. 4th at 575 n.10.

CGL policies typically "contain" a clause "under which 'all personal injury ... arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.'" *Prudential Lines*, 158 F.3d at 82 n.9 (emphasis added).

Likewise, the Ninth Circuit's decision in *Eureka* is of no assistance to AIG.  AIG Opp. at 12 (citing *Eureka Federal Savings & Loan Association v. American Casualty Co. of Reading*, 873 F.2d 229, 231, 234–35 (9th Cir. 1989)).  The claims at issue in *Eureka* were covered under a D&O claims-made policy—not a CGL policy like the one at issue here; the policy in *Eureka* did not cover "occurrences" like the policies here; and the *Eureka* court did not analyze whether there were single or multiple occurrences.  The California Supreme Court has admonished that the "language of ... occurrence policies" is "significantly different from" claims-made policies in the context of analyzing multiple claims or occurrences and specifically distinguished *Eureka* as having not "decid[ed], or even discuss[ed], whether the claims could be 'related'" under a provision aggregating "related acts, errors or omissions"—a provision that has a similar function to the aggregating language in AIG's Policy.  *Bay Cities Paving & Grading, Inc. v. Laws.' Mut. Ins. Co.*, 5 Cal. 4th 854, 864, 871, 858 (1993).  The Ninth Circuit itself later distinguished *Eureka* in *Chemstar*, observing that even the *Eureka* court did "not foreclose the possibility ... that ... separate [actions] may be aggregated as a single loss in an appropriate fact situation."  *Chemstar*, 41 F.3d at 433.

AIG's citation to *Evanston* fares no better.  AIG Opp. at 13 (citing *Evanston Ins. Co. v. Ghillie Suits.com, Inc.*, 2009 WL 734691 (N.D. Cal. Mar. 19, 2009)).  The *Evanston* court correctly affirmed "the general rule that where a series of related acts of negligence results in an injury, those acts are considered a single 'occurrence' for the purpose of determining coverage limits under an insurance policy."  *Evanston*, 2009 WL 734691, at *7.  The court, however, concluded that the facts there presented two separate occurrences because there were two different causes resulting in the two suits catching fire.  *Id.* at *11 & n.10.  Unlike the AIG Policy here, the *Evanston* policy did not contain the favorable batching language providing that "[a]ll such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence."  ECF No. 79-2, AIG Policy at VII.S.1 (p. 23 of 86).  Moreover, the court in *Evanston* rejected the *insurer's* argument that coverage was limited to $1 million for all injuries arising out of the ghillie suits and declined to impose a

1   coverage-*limiting* interpretation of a limits-of-liability provision,  *Id.* at *11.  As the court reasoned:

2   "Clearly such a result was not contemplated by [the insured] when it entered into the policy."[15]  *Id.*  The

3   court's decision in *Evanston* in fact supports McKesson's position because, like the insurer there, AIG

4   attempts to persuade this Court to adopt an interpretation of the Policy that would eviscerate coverage—

5   here, by requiring McKesson to satisfy "*hundreds*," AIG Opp. at 15, of $5 million retentions before

6   AIG's duty to defend is triggered.  Such a result clearly "was not contemplated by [McKesson] when it

7   entered into the policy."  *Evanston*, 2009 WL 734691, at *11.  In that regard, it is telling that AIG does

8   not cite a single California decision where a court adopted a multiple occurrence theory with the result

9   that an insured was required to satisfy multiple—let alone "hundreds"—of retentions before it could

10  avail itself of general liability insurance.  *See Bay Cities*, 5 Cal. 4th at 862 ("Courts have generally

11  rejected insurers' attempts to apply multiple deductibles to single claims or related claims by third

12  parties against insureds.").

13       **B.     AIG's Attempt to Turn McKesson's Defense Arguments Against It Fails.**

14       AIG points out that McKesson argued in the underlying suits that the Track One "Plaintiffs'

15  alleged injuries arise from 'repetitive discrete violations,'" which AIG contends supports its multiple

16  occurrence position.  *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194296, at *13 (N.D. Ohio

17  Sept. 4, 2019).  As an initial matter, Judge Polster refused to adopt McKesson's arguments and found

18  "persuasive" plaintiffs' position that the alleged injuries arose from "continuing violations."  *Id.*  In any

19  event, the duty to defend is determined by comparing the terms of the policies to the *allegations* of

20  liability against McKesson, *Riddell, Inc. v. Super. Ct.*, 14 Cal. App. 5th 755, 765 (2017), and assessing

21  whether there is a "bare possibility of coverage."  *Gen. Accident Ins. Co. v. W. Am. Ins. Co.*, 42 Cal.

22  App. 4th 95, 102 (1996).  Here, the allegations in the Exemplar Suits provide that McKesson's conduct

23  is "ongoing and persistent" and "does *not* concern a discrete event."  ECF No. 79-14, *Summit* TAC

24  ¶¶ 992–93 (emphasis added); ECF No. 79-12, *Cuyahoga* TAC ¶¶ 1033–34 (emphasis added).  The fact

25

26  ---

[15] It bears noting that AIG reads the case exactly backwards when it contends that the court "rejected"

27  the policyholder's argument.  AIG Opp. at 13.  The court in *Evanston* found *in favor of the policyholder*,
    who, consistent with its reasonable expectations under a per-occurrence policy limit of $1 million,

28  sought a multiple occurrences ruling.  *Evanston*, 2009 WL 734691, at *4.

1    that McKesson made arguments to the contrary in defending itself against the underlying actions only

2    proves McKesson's point, as McKesson made those arguments precisely to rebut the underlying

3    plaintiffs' argument that the opioid complaints *did not* allege "repetitive discrete violations" by

4    McKesson and instead alleged a "continuing violation."  *See* ECF No. 112-1, St. Jeanos Decl., Ex. 1 at

5    41.

6        **C.    AIG's Ill-Defined Multiple Occurrence Position Would Render Coverage Illusory.**

7        Finally, AIG fails to identify under its standard form language precisely what the "occurrence" *is*

8    or how many "occurrences" make up the Exemplar Suits—despite having the burden to demonstrate that

9    its coverage-limiting interpretation of the "occurrence" applies.  *See Evanston*, 2009 WL 734691, at *8.

10   This failure alone is fatal to its position.  *See Powerine Oil Co. v. Super. Ct.*, 37 Cal. 4th 377, 390–01,

11   (2005) ("ambiguities [in a policy] are generally construed against the party who caused the uncertainty

12   to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage").  But

13   perhaps even more devastating to AIG's position is the fact that its invocation of "hundreds" of

14   occurrences would render virtually worthless the ten years of insurance AIG sold McKesson—an

15   untenable result.

16       AIG suggests vaguely that the "occurrence" could be "hundreds of discrete acts" relating to

17   McKesson's alleged failures to detect and stop suspicious orders, AIG Opp. at 2, 15, such as

18   McKesson's alleged "decision" in 2005 to make certain shipments of Hydrocodone to Florida, or the

19   alleged decision by a Colorado employee in 2008 not to submit a suspicious order report.  AIG Opp. at

20   15, 17.  AIG concludes that such decisions "occurred hundreds of times" so that "hundreds" of

21   occurrences result and thus hundreds of $5 million retentions must be satisfied.  AIG Opp. at 15, 17–18.

22   Setting aside the fact that AIG does not even attempt to explain the causal connection between a

23   decision made at a Colorado distribution center and injuries to Oklahomans and residents of Summit and

24   Cuyahoga Counties in Ohio, if each of the "hundreds" of alleged failures to identify suspicious orders is

25   its own occurrence, McKesson would be required to pay hundreds of millions, *if not billions*, in self-

26   insured retention payments before it could recover the $45 million in limits under the AIG policy.  It

27   goes without saying that such a position renders the coverage meaningless.

28

1    Moreover, under AIG's theory, McKesson would have to present evidence, and the court would

2    have to make factual findings, regarding the nature and number of the "hundreds" of instances of alleged

3    "misconduct" before McKesson could obtain a defense.  Such a procedure would stand the duty to

4    defend on its head, denying McKesson the "immediate[]" defense to which it is entitled under

5    longstanding California law, *see Presley Homes*, 90 Cal. App 4th at 576, all while forcing it to fight a

6    lengthy, expensive, and highly prejudicial "two-front war."  *Haskel, Inc. v. Super. Ct.*, 33 Cal. App. 4th

7    963, 979 (1995).[16]

8    Such an outcome cannot be squared with McKesson's reasonable expectations under the broad

9    defense coverage and "occurrence" definition AIG wrote.  As a distributor that supplies pharmaceutical

10   products nationwide, McKesson's expectation in purchasing products liability coverage is that it would

11   be defended in and covered for liability from a mass tort-type action arising from the products it

12   distributes.  These reasonable expectations are consistent with AIG's Policy, which contains broad

13   aggregating language in the definition of "occurrence," and which was indisputably written to provide

14   coverage for suits claiming injury from products, AIG Opp. at 2, 11, like the suits at issue here.

15   McKesson clearly did not intend to purchase CGL coverage that would subject it to "hundreds" of $5

16   million retentions, AIG Opp. at 15, for similarly pled lawsuits that arise from a single, common cause.

17   *See EOTT*, 45 Cal. App. 4th at 575 ("In our view, [the insured's] objectively reasonable expectation

18   would embrace the conclusion that multiple claims, all due to the same cause or a related cause, would

19   be considered a single loss to which a single deductible would apply.").

20   **IV.   Insurers Cannot Establish that the "Known Loss" Exclusion Bars Coverage.**

21   Insurers' efforts to preclude coverage under the so-called "known loss" provision are equally off

22   the mark.  Insurers purport to invoke the exclusion on the basis that McKesson "knew" of an

23   "epidemic," but even assuming that is true, it does not establish McKesson's knowledge of the *bodily*

---

[16] The duty to defend exists when there is a mere potential for coverage because the duty is triggered during litigation of the underlying suit, when engaging in "time consuming" speculation about whether the claim is actually covered would deny the insured the precise benefit it purchased with its premiums: "the mounting and funding of a defense."  *Carter v. Pulte Home Corp.*, 52 Cal. App. 5th 571, 586 n.8 (2020).  Imagine the mischief if an insurance company were permitted to avoid its duty to defend by delaying any commitment to defend until well into a lawsuit, then using the insured's arguments made to defend itself against liability as a "gotcha" basis to avoid its obligations to defend.

*injuries*—the opioid use, abuse, and related diseases—that are at the heart of the Opioid Lawsuits. Moreover because the known-loss exclusion operates as an exclusion to coverage, *see, e.g.*, *Mesa*, 400 F. Supp. 3d at 939, it must be "interpreted narrowly against the insurer and in favor of the insured." *Bishop*, 2019 WL 1117534, at *3 (Corley, J.). "[A]n insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1039 (2002). "[I]t is well-settled that an insurer must provide a defense where an exclusion arguably applies but may reasonably be interpreted to be inapplicable to the alleged facts." *Mesa*, 400 F. Supp. 3d at 937.

Insurers cannot establish that the known-loss exclusions apply here because they cannot identify any "undisputed," "conclusive" evidence, *Lamb*, 100 Cal. App. 4th at 1038, that McKesson had knowledge, prior to the start of the AIG Policy (July 1, 2008), or ACE Policy (July 1, 2016), of *every* bodily injury alleged in the Exemplar Suits, which include alleged injuries that occurred *after* the start of those policy periods.

### A. Insurers Have Not Established—and Cannot Possibly Establish—that McKesson Had Prior Knowledge of Every Bodily Injury Alleged to Have Occurred During the Policy Periods.

As Insurers acknowledge, for the so-called known-loss exclusion to bar coverage, the insured must have known—before the policy period—about the existence of *precisely the same* "bodily injury" for which it seeks coverage. *See Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 998–99 (9th Cir. 2015) ("[A]n insured's knowledge of one type of damage to property doesn't automatically constitute knowledge of any and all damage to the property"; affirming that "the claimed damage must be the same as the known damage"). Here, the relevant "bodily injuries" for which McKesson seeks coverage, and the bodily injuries that trigger the Insurers' duty to defend, are the opioid use, abuse, and related death and diseases allegedly suffered by residents of Oklahoma and the Ohio counties during the Insurers' policy periods. *See Mesa*, 400 F. Supp. 3d at 940 ("each discrete injury claimed must be evaluated separately" for purposes of the known loss exclusion). To invoke the known-loss exclusion, Insurers must therefore show that McKesson knew—before the two relevant policy periods—about "each

1  discrete injury" or instance of addiction, overdose, death, and opioid abuse alleged in the underlying

2  suits that occurred during the policy periods.  *Id.*

3      As long as McKesson lacked knowledge of even one instance of sickness, disease, or death that

4  occurred during Insurers' policy periods, Insurers are obligated to defend the Exemplar Suits in their

5  entirety.  This District's recent decision in *Mesa Underwriters* is instructive.  There, the court found the

6  known-loss exclusion did not apply even where the insured "may have been aware of *some* of the bodily

7  injuries and property damage alleged before [the insurer's] coverage began," because "many of the

8  alleged injuries and property damage occurred *after* the policy's inception"; the court found that "[t]hese

9  allegations raised a potential for coverage of new, distinct injuries and property damage not alleged to

10  have been known to [the insured] prior to [the insurer's] policy period."  *Mesa*, 400 F. Supp. 3d at 940

11  (emphasis added); *see also Scottsdale Ins. Co. v. Kaplan Fam. Tr.*, 2015 WL 7423231, at *4 (N.D. Cal.

12  Nov. 23, 2015) (known loss exclusion inapplicable where insured was likely on notice of "some"

13  violations alleged, but insurer "ha[d] not established beyond any doubt that the known-loss provisions in

14  the policy apply to *all* of the claims" in underlying action) (emphasis in original).

15      Here, as in *Mesa*, McKesson could not possibly have known about every injury alleged in the

16  Exemplar Suits before the start of the relevant policy periods (indeed, McKesson did not know about

17  *any* of the discrete injuries).  At a minimum, at least some alleged injuries for which the Exemplar Suits

18  seek damages first occurred *after* the start of the relevant policy periods.  *See, e.g.*, ECF No. 79-16,

19  *Oklahoma* Compl. ¶ 20 (alleging that "an average of 32 Oklahomans died every month from an

20  unintentional prescription-opioid overdose" over timespan encompassing ACE's policy period); ¶ 24

21  (alleging that in 2009—midway through AIG's policy period—"45 out of every 100,000 Oklahomans

22  had to be admitted for opioid use disorder treatment"); ECF No. 79-12, *Cuyahoga* TAC ¶ 700 (alleging

23  that "[e]very week in 2016"—during the ACE Policy period—"an average of twelve Cuyahoga County

24  residents lost their lives to a drug overdose," for a total of "656 lives lost in 2016"); ECF No. 79-14,

25  *Summit* TAC ¶ 719 ("In the City of Akron, the Police Department responded to 2,114 overdoses in 2016

26  …").  McKesson could not possibly have known *before* the policy periods about the bodily injuries

27  alleged in the Exemplar complaints that occurred *after* the Policies incepted; Insurers are therefore

28

obligated to defend.  *See Mesa*, 400 F. Supp. 3d at 936 ("If even a single claim in a multiple-claim complaint is potentially covered, the insurer has a duty to defend the entire action").

### B.    Knowledge of an Opioid "Epidemic" Does Not Trigger The Known Loss Exclusion.

Insurers do not attempt to prove that McKesson knew of any "discrete injury," let alone all such injuries.  *Mesa*, 400 F. Supp. 3d at 940.  Instead, their sole focus is on showing that McKesson "knew about the opioid *epidemic* by July 1, 2015," but knowing of a general public health phenomenon does not show that McKesson knew of any bodily injury before the policy periods.  ACE Opp. at 30 (emphasis added); s*ee also* ACE Opp. at 12, 30, 31.  An "epidemic" is not itself a "bodily injury" as that term is defined in the Policies or as commonly understood.  An "epidemic" describes the prevalence of a certain condition.  "Bodily injury," by contrast, as defined in the Policies, is a "sickness or disease sustained by any person, including death."  ECF No. 79-2, AIG Policy at VII.C (p. 19 of 86); ECF No. 79-3, ACE Policy at VII.C (p. 22 of 99).  One does not stay home from work or visit the doctor because they are suffering from an "epidemic."  But one does seek medical care and treatment for addiction to prescription painkillers and related sicknesses, disease, or death.  Thus, whatever knowledge McKesson may have had in 2015 about an "epidemic" is immaterial and cannot be a basis for denying coverage.

Insurers argue that McKesson is therefore left in an "irreconcilable" position because, as they contend, the Exemplar Suits only assert—and McKesson is only seeking coverage for—"generalized allegations of governmental expenditures arising from the opioid crisis."  ACE Opp. at 31.  That mischaracterizes both McKesson's claim and the underlying Exemplar Suits.  Most obviously, Insurers' theory ignores the fact that the residents who suffered the opioid-related injuries described in the Exemplar Suits—*e.g.*, the 656 Cuyahoga County residents who died from opioid overdose in 2016, *Cuyahoga* TAC ¶ 700—are specific people who allegedly suffered specific harms within a particular locale and time period.  The plaintiffs in the Exemplar Suits are not seeking to recoup costs for the entire "nationwide opioid epidemic," ACE Opp. at 17; rather, they seek to recoup costs incurred to address the opioid-related sickness, disease, death, and other injuries to individuals within their jurisdictions.  *See* ECF No. 79-12, *Cuyahoga* TAC ¶ 708 (alleging that "an estimated 10,120 to 18,700 Cuyahoga residents were abusing or dependent upon opioids in 2015" and estimating the "annual costs associated with treatment" for those individuals); *see also id.* at ¶ 734 (alleging that "[t]he cost of providing treatment

32

beds in Cuyahoga County alone jumped from $4.9 million in 2014 to $9.9 million in 2017"); *id.* at ¶ 739 ("Cuyahoga County EMS has had to administer thousands of doses of naloxone" to individuals, including "1,903 doses of naloxone in 2015" and "5,100 doses in 2016"); ECF No. 79-14, *Summit* TAC ¶ 719; ECF No. 79-16, *Oklahoma* Compl. ¶¶ 20, 24.

As the Supreme Court of Oklahoma recently observed in an opioid lawsuit involving manufacturer defendants: "The damages the State seeks are not for a communal injury but are instead more in line with a private tort action *for individual injuries sustained* from use of a lawful product and in providing medical treatment or preventative treatment to *certain, though numerous, individuals*." *State of Oklahoma*, 2021 WL 5191372, at *6 (emphasis added). The MDL court made a similar finding relating to the Track One Suits. *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *9 (finding that some of plaintiffs' damages claims arguably "arise directly out of the *personal injury of the citizens* because they are effectively claims to recoup the costs of medical expenses") (emphasis added).

Nor is the fact that the Exemplar Suits may not "specific[ally]" enumerate "identified individuals" of any consequence. ACE Opp. at 31. Nothing in the Policies purports to limit coverage to only those lawsuits where each "individual" alleged to have suffered bodily injury is "identified" in the complaint. If that were the case, it is difficult to see how Insurers' umbrella coverage—which they are keen to emphasize is "excess" of a $5 million retention and thus designed to cover large losses—could ever be invoked to cover mass tort suits.

### C.    Insurers' Arguments Based on Extrinsic Evidence Are Unavailing.

Insurers rely heavily on extrinsic evidence that they contend shows McKesson's knowledge of the opioid epidemic, presenting a confused web of fact-specific issues concerning what evidence was available to Insurers when, and why they might be permitted to rely on it under different theories as to when their duty to defend arose. *See* AIG Opp. at 28-30; ACE Opp. at 32-34. But these knowledge-based evidence and arguments—against which McKesson is vigorously defending itself in the underlying actions—are irrelevant for purposes of the known-loss exclusion because they are not "undisputed" and do not "conclusively establish" that McKesson was aware before the policy periods of *bodily injuries* in the Exemplar plaintiffs' jurisdictions that occurred after the Policies incepted. *Anthem Elecs.*, 302 F.3d at 1055, 1060 (evidence that "merely placed in dispute whether [the insured's] actions

1   would eventually be determined … to fall within one or more of the [policy] exclusions," requires

2   summary judgment for insured).  Even if all of Insurers' extrinsic evidence were considered, summary

3   judgment in McKesson's favor would still be appropriate.[17]

4       For instance, Insurers rely on DEA Show Cause Orders concerning certain McKesson

5   distribution facilities in Florida and Maryland; McKesson's settlement with DEA and DOJ concerning

6   facilities in Florida, Maryland, Texas, and Colorado; and McKesson's "agreement in principle" with

7   DEA and DOJ concerning McKesson's suspicious order reporting practices.  But these proceedings

8   concerned McKesson's regulatory requirements to *report* to DEA so-called "suspicious orders," which

9   proves nothing about McKesson's "knowledge" or even "likelihood" of harm.  *See* ECF No. 117-6,

10  Daniel Sullivan Decl., Ex. T at 1, 14 (discussing Show Cause Orders concerning alleged "fail[ures] to

11  report … sales as suspicious orders to DEA when discovered, as required by and in violation of 21

12  C.F.R. § 1301.74(b) and 21 U.S.C. § 842(a)(5)").  As the DEA has explained, for an order to be

13  "suspicious" requires a "far lower" standard of proof "than the amount of evidence needed to show that

14  something is '*likely*'" to be diverted to illegal channels.  *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861

15  F.3d 206, 215 (D.C. Cir. 2018) (emphasis added).  An order is "suspicious" based merely on "'[t]he

16  apprehension or *imagination of the existence of something wrong* based on *inconclusive* or *slight*

17  *evidence*.'"  *Id.* (quoting decision of Acting Administrator of DEA, 80 Fed. Reg. at 55,478) (emphasis

18  added).  For that reason alone, none of the DEA actions Insurers discuss establishes that the allegedly

19  suspicious orders of prescription opioids were even "likely" to be diverted to improper uses—let alone

20  that any diversion actually occurred, then resulted in harm to someone, and that McKesson knew of that

21

22  ---

[17] In addition, this Court should summarily reject Insurers' suggestion that this Court consider not just
23  the extrinsic evidence actually *known* to Insurers at the time their defense duty arose, but also all
    evidence *available* to them at that time.  *See* ACE Opp. at 33.  Binding California Supreme Court
24  precedent limits the inquiry to those facts actually "known by the insurer …"  *Montrose*, 6 Cal. 4th at
    295.  Insurers' request "confuses the principles surrounding the creation of a defense obligation."
25  *Haskel*, 33 Cal. App. 4th at 977.  Insurers "were either aware of" the evidence they now seek to use "at
    the time of the tender or they were not."  *Id.*  If they did not actually have any evidence conclusively
26  demonstrating no possibility of coverage at the time their defense duties arose, they had an obligation to
    provide an immediate defense, and breached that duty.  *See id.*  What Insurers cannot do is rely on
27  information now that was not actually known to them "to retroactively justify their refusal to provide
    that defense."  *Id.*
28

precise harm before Insurers' policy periods.  Nor do Insurers explain how these regulatory proceedings concerning distribution centers in Florida, Maryland, Texas, and Colorado demonstrate knowledge of injuries to residents in Ohio and Oklahoma during the relevant policy periods.  *See Kaady*, 790 F.3d at 998–99 ("[A]n insured's knowledge of one type of damage to property doesn't automatically constitute knowledge of any and all damage to the property; the claimed damage must be related to the known damage.").

Nor are Insurers helped by their argument that the known-loss exclusion bars coverage because McKesson distributed controlled substances that, as defined by federal statute, have a "high potential for abuse."  *See* ACE Opp. at 34; 39–40; *see also* 21 U.S.C. § 812.  The fact that McKesson may have known prior to the policy periods of the *risk* of opioid "abuse" is irrelevant to the known-loss analysis.  Generalized knowledge that prescription medications carry a *risk* of addiction is not tantamount to knowledge that individuals within a specific jurisdiction sustained injuries at a particular time.  As the California Supreme Court emphasized, the fact that such injuries may appear "inevitable" in hindsight does not change that analysis.  *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 690 (1995) ("Even where subsequent damage might be deemed inevitable, such 'inevitability' does not alter the fact that at the time the contract of insurance was entered into, the event was only a *contingency or risk* that might or might not occur within the term of the policy."); *cf. JM Smith*, 602 F. App'x. at 120– 22 (finding alleged general knowledge of drug abuse in opioid distribution area and failure to detect diversion does not show knowledge of causing harm).  Indeed, if knowledge of a mere risk associated with a product were sufficient to preclude coverage when the product injures someone, then no product distributor would ever be entitled to coverage, because virtually every product carries some known risk.

In any event, the risk of addiction to prescription opioids and the increasing rates and prevalence of addiction were equally known by Insurers when they sold broad general liability policies to McKesson year after year.  *See* ACE Opp. at 40 (stating that McKesson's distribution of "controlled substances that 'have a high potential for abuse' is public knowledge" and that "the history of the DEA's direct education and enforcement actions against McKesson dating back to 2005 are … reflected in multiple documents long known to ACE, including the DEA's September 2006 and December 2007 letters, the DOJ press release announcing the 2008 settlement with McKesson … and McKesson's own

35

1  SEC filings."); *see also* ECF No. 94 at 6, Insurers' Opp. to Mot. to Stay (acknowledging that opioid

2  lawsuit *from 2001* and contemporaneous news articles concerning the "opioid crisis" were "available to

3  the Insurers") (emphasis added).  Insurers cannot sell broadly applicable general liability policies to

4  McKesson for more than two decades, knowing of the risks of addiction and rising instances of

5  addiction, then later purport to deny coverage on the basis that McKesson knew of those same risks and

6  general facts.  *See* Steve Plitt et al., 7 Couch on Ins. § 102:9 (3d ed. 2021) ("the known loss doctrine

7  does not apply if the insurer also knew of the circumstances on which it bases the defense").

8  **V.    Insurers' Arguments Concerning When Their Defense Duties Arose Lack Merit.**

9         Finally, Insurers try to nullify their defense obligations by claiming that coverage came into

10  force only after McKesson provided a declaration confirming its payment of defense costs in April 2021,

11  *see* AIG Opp. at 29–30, or after McKesson provided a check evincing defense cost payments in

12  September 2021, ACE Opp. at 9—notwithstanding that Insurers had earlier denied coverage and

13  notwithstanding that McKesson had repeatedly informed Insurers that it had incurred tens of millions of

14  dollars in defense payments.  Insurers' position, that coverage is triggered not by McKesson's payment

15  of the retention but by its proof of such payment, has never been adopted by any court, is at odds with

16  the policy language, and defies common sense.

17         This Court held in its August 12, 2021 Order that Insurers' duty to defend was triggered at the

18  time McKesson exhausted the Policies' retention.  ECF No. 101 at 6.  It is undisputed that the Policies

19  are subject to a $5 million "per occurrence" retention, the retention is "exhausted by payment of loss,"[18]

20  defense costs erode the retention, and that, as of July 25, 2019,[19] McKesson had paid more than $5

21  million in defense of the two Track One Suits alone.[20]  For the reasons discussed above in Part III, the

22  Exemplar Suits (the two Track One Suits and the Oklahoma AG Suit) arise from a single occurrence and

23

24  _____

25  [18] ECF No. 79-2, AIG Policy at End. 1 (p.32 of 86), ECF No. 79-3, ACE Policy at End. 25 (p. 68 of 99).

26  [19] *See* ECF No. 112, St. Jeanos Decl., Ex. 16 (McKesson check showing payment of opioid defense costs).

27  [20] McKesson disputes AIG's statement that "[t]he AIG *Policies*" contain a $5 million retained limit, AIG Opp. at 7 (emphasis added), to the extent AIG refers to any policy apart from the 2008-09 AIG Policy at

28  issue in this motion.

are thus subject to a single $5 million retention.  Accordingly, Insurers' duty to defend arose *at least* as of July 2019 as to the Exemplar Suits.

In fact, McKesson paid more than $5 million in defense costs toward all of the Opioid Lawsuits (not just the Track One Suits) much earlier—by no later than *August 2018*.  McKesson's present motion does not seek a ruling that all other Opioid Lawsuits are similar to the Exemplar Suits, but McKesson will subsequently show that the allegations in virtually all of the Opioid Lawsuits are similar to the Exemplar Suits and constitute the same "occurrence."  For that reason, the $5 million retention was satisfied—and Insurers' defense obligations came into force—as to all such Opioid Suits no later than August 2018.  For purposes of these cross-motions, however, all that is at issue is the Exemplar Suits, and McKesson has indisputably shown payments of $5 million in defense of the Track One Suits as of July 25, 2019, triggering Insurers' duty to defend those suits and the Oklahoma AG Suit (the latter of which Insurers do not dispute is similarly pled to the Track One Suits).[21]

Those straightforward facts are not disputed, yet Insurers attempt to dodge their defense obligations, contending that their duty to defend arose only when McKesson established proof of payment.  AIG Opp. at 29.  Fatal to that position is the fact that the Policy language is exactly to the contrary.  The Policies impose on Insurers the "duty to defend ... when the applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of Loss to which this policy applies."  ECF No. 79-2, AIG Policy at End. 1 (p. 32 of 86).[22]  Thus, under the plain language of the Policies, the only inquiry is "when" did McKesson make "payment of the Loss."  *Id.*  As to the Exemplar Suits, it is undisputed that that point was no later than July 2019 (and, as will be shown in subsequent proceedings,

---

[21] Insurers mistakenly suggest that July 2019 is the date McKesson reached $5 million in defense cost payments with respect to *all Opioid Lawsuits*.  It should be apparent to Insurers based on the voluminous financial records McKesson has provided that McKesson reached $5 million in defense cost payments as to *all* Opioid Lawsuits much earlier.  Insurers point out that McKesson's deponent testified at one point during his deposition that, "[i]n July of 2019, McKesson reached $5 million in payments," without specifying what lawsuits he was referring to, *see* AIG Opp. at 30.  Mr. Fleury later clarified (in testimony that Insurers omit from their brief) that he was referring to the payments made with respect to the Track One Lawsuits, and that it was *those suits* for which McKesson reached $5 million in defense payments in July 2019.  *See* Hoff Varner Reply Decl., Ex. G, Fleury Tr. 96:13-97:10; 105:15-20, 106:11-20.

[22] The ACE Policy language is materially similar.  ECF No. 79-3, ACE Policy at End. 25 (p. 68 of 99).

was in fact August 2018, by which point McKesson had spent more than $5 million in defense costs toward all Opioid Lawsuits pending at the time).  Insurers attempt to read into their Policies the requirement that McKesson provide invoices or other documentary "evidence" of payment, but nothing in the Policies conditions Insurers' obligations on the receipt of invoices or other financial records, and Insurers cannot retroactively rewrite their Policy language to suit their coverage denial.

Similarly, Insurers blink reality when they suggest that McKesson "never represented" "that it had made payments exhausting the retention."  ACE Opp. at 32.  McKesson advised Insurers through counsel on August 31, 2018 that it had incurred defense costs totaling approximately $25 million—five times the retention—and provided a list of billing matters to which costs had been billed.  *See* ECF No. 112, St. Jeanos Decl., Ex. 3.  On October 18 and 22, 2018, McKesson's counsel sent letters to AIG and ACE unambiguously informing Insurers that "McKesson has incurred defense costs for the opioid lawsuits exceeding the retained limit," and demanding that Insurers honor their defense obligations and "begin *reimbursing* McKesson for the defense costs in connection with the opioid litigation."  *See* ECF No. 116-8, Ex. H to ACE Cross-motion; Hoff Varner Reply Decl., Ex. H. at 1 (emphasis added).  Again on January 31, 2019, McKesson's counsel reported to Insurers that the company had incurred defense invoices totaling approximately $56 million in connection with the Opioid Lawsuits, and provided an accounting record with invoice-specific detail concerning the more than 1,000 invoices received to date. ECF No. 112, St. Jeanos Decl., Ex. 5.  McKesson also informed Insurers on July 25, 2019 that, "as of June 20, 2019, McKesson has received defense invoices totaling approximately $91.5 million in connection with the opioid lawsuits."  ECF No. 116-11, Ex. K to ACE Cross-motion.  Insurers were, at the very least, on constructive notice of exhaustion by July 25, 2019.  *See OneBeacon Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 175 Cal. App. 4th 183, 200 (2009) (insurer's defense duties "may arise upon receipt of 'constructive notice' of the contractual duty to defend").  Insurers acknowledge some of these communications, but contend that the repeated updates they received about McKesson's significantly increasing defense costs and demands for "reimbursement," were not sufficient because the communications "said nothing about *payment*."  AIG Opp. at 29.  Needless to say, it strains the bounds of credibility to suggest that an insurer can hide behind what can at best be characterized as an idiosyncratic interpretation of its insured's communications to avoid its duty to defend.

Insurers' position is also contrary to California law.  The relevant California decision concerning when Insurers' defense obligations arise upon exhaustion is *Hartford Accident & Indemnity Co. v. Superior Court*, 23 Cal. App. 4th 1774, 1781–82 (1994).  There, the California Court of Appeal found that if an excess insurer wrongfully refused to assume the insured's defense upon exhaustion—as is the case here—and a dispute about exhaustion ensued, the excess insurer would be required to reimburse defense costs "during the period between *actual exhaustion of policy limits* and proof of exhaustion." *Id.*; *see also id.* at 1979–80 ("[A]n excess carrier has a duty to defend after the primary coverage is exhausted unless the excess policy provides to the contrary.") (emphasis added).  *Hartford* confirms that an insurer is ultimately responsible for all defense costs incurred after exhaustion, even if proof of exhaustion occurs thereafter.  Any contrary result would require an insured to provide defense invoices (potentially containing privileged information) to an insurer that had wrongfully denied coverage, lest the insurer later claim that, even though it had denied coverage (as Insurers did here), its defense obligations were never triggered because it was not in receipt of defense invoices.  Nothing under California law would support such a result.

Nor are the handful of cases cited by Insurers to the contrary.  Insurers claim to cite to a California Superior Court decision for the proposition that an "insurance policy is not triggered where [the] insured 'has not yet proved that the underlying limits have been properly exhausted,'" but the court made no such ruling.  AIG Opp. at 30 (quoting *Kaiser Aluminum & Chem. Corp. v. Certain Underwriters at Lloyd's London*, 2001 Cal. Super. LEXIS 220, at *3 (Cal. Super. Ct. Sept. 25, 2001)).  The language that Insurers quote is not from the court's order, as Insurers suggest in their brief, but was taken from the insurer's *proposed* order on its motion for summary judgment, which the *Kaiser* court *denied*.  *See* Hoff Varner Reply Decl., Ex. I (copy of insurers' proposed order, filed Sept. 25, 2001), and Ex. J at 1–2 (copy of court order issued Oct. 31, 2001, denying insurers' motion and finding that "upon exhaustion of the aggregate limits of [the underlying policies], [the insurers'] obligation to provide coverage under its Policies … commences").

The other decisions Insurers rely on are likewise inapposite.  *Farmers Insurance Exchange v. Hurley*, 76 Cal. App. 4th 797, 800-01 (1999), concerned a statute that explicitly required proof of payment to trigger underinsured motorist coverage.  Similarly, *Northrop Grumman Corp. v. Factory*

39

*Mutual Insurance Co.*, 805 F. Supp. 2d 945, 954-55 (C.D. Cal. 2011), involved an "all risks" policy that contained detailed conditions for establishing exhaustion before excess coverage could be triggered, and the dispute centered around whose burden it was to meet those conditions.  The AIG and ACE Policies at issue here contain no similar requirements.

Insurers' position that California policyholders are required to provide invoices proving payment of the retention to trigger an insurer's duty to defend is inconsistent with *Hartford* and would effectively hold policyholders hostage while their insurers pored over a multitude of invoices instead of defending the insured.  Both AIG and ACE effectively denied coverage when they failed to defend McKesson after it satisfied the retention, and they thus had no basis to demand detailed defense cost information from McKesson.[23]  An insurer's refusal to pay "defense fees or costs during the course of the underlying litigation" is the "equivalent of a defense denial."  *The Hous. Grp. v. PMA Cap. Ins. Co.*, 193 Cal. App. 4th 1150, 1157 (2011).  An insurer that refuses to defend "loses all right to control the defense, including, necessarily, the right to control financial decisions such as the rate paid to independent counsel or the cost-effectiveness of any particular defense tactic or approach."  *Travelers Indem. Co. of Conn. v. Centex Homes*, 2015 WL 5836947, at *4 (N.D. Cal. Oct. 7, 2015).[24]  For all of these reasons, Insurers' bid to minimize their coverage obligations fail.

---

[23] Despite ACE's assertion to the contrary, ACE Opp. at 8 n.7, ACE did deny its duty to defend.  *See* ECF No. 116-9 at 2, Sullivan Decl., Ex. I (Nov. 29, 2018 letter from ACE's counsel to McKesson's counsel stating that "[i]t is Chubb's position that it has no duty to defend or pay defense costs under any of its policies because the claims asserted in the Opioid Lawsuits do not seek damages 'because of' or 'for' 'bodily injury.'").  ACE's attempts to backtrack its denial of coverage are particularly specious given that ACE now contends the lack of coverage is clear from the allegations in the opioid complaints themselves, *see* ACE Opp. at 23, which were available to ACE back in 2016.

[24] AIG's related suggestion that McKesson refused to cooperate with AIG or to provide it with information during AIG's five-year long claims "investigation," AIG Opp. at 7, 9, is wholly without merit.  AIG now contends that it had information *as early as 2016* indicating no potential for coverage, but, rather than proceeding in good faith to seek a "no coverage" declaration at that time—or, in the alternative, providing McKesson with the immediate defense to which it was entitled—AIG conducted a years-long sham investigation of the claims during which time McKesson made available to AIG voluminous information about the Opioid Lawsuits.  *See* ECF No. 93-1, Liquard Decl. in Supp. of Mot. to Stay Disc. & Proceedings, ¶¶ 25-27.

**CONCLUSION**

For all the foregoing reasons, McKesson respectfully requests that this Court grant McKesson's motion for partial summary judgment and issue a declaration that (1) the Exemplar Suits, and any Opioid Lawsuits alleging similar claims, are potentially covered by the Policies; (2) such suits arise from a single "occurrence," which is McKesson's alleged failure to maintain effective controls for opioid distribution; (3) McKesson's defense cost payments for such suits have satisfied the Policies' "per occurrence" Retained Limits; and thus, (4) Insurers have a present obligation to pay or reimburse defense costs for the Exemplar Suits and any similarly pled Opioid Lawsuits.

DATED: December 3, 2021           COVINGTON & BURLING LLP


                                  By:    */s/ Gretchen A. Hoff Varner*
                                         Gretchen A. Hoff Varner

                                  *Attorney for Defendant, Counterclaim Plaintiff,*
                                  *Third-Party Plaintiff, and Third Party Counterclaim*
                                  *Defendant McKesson Corporation*