GIBSON, DUNN & CRUTCHER LLP
RICHARD J. DOREN, SBN 124666
   rdoren@gibsondunn.com
MATTHEW A. HOFFMAN, SBN 227351
   mhoffman@gibsondunn.com
MADELEINE F. MCKENNA, SBN 316088
   mmckenna@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213-229-7000
Facsimile:   213-229-7520

WILLKIE FARR & GALLAGHER LLP
CHRISTOPHER J. ST. JEANOS (*pro hac vice*)
   cstjeanos@willkie.com
JOCELYN SHER (*pro hac vice*)
   jsher@willkie.com
787 Seventh Avenue
New York, NY 10019
Telephone:   212-728-8000
Facsimile:   212-728-8100

*Attorneys for Plaintiffs and Counterclaim Defendants AIU Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AIU INSURANCE COMPANY; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>   Plaintiffs and Counterclaim Defendants,<br><br>v.<br><br>MCKESSON CORPORATION f/k/a MCKESSON HBOC, INC.,<br><br>   Defendant, Counterclaim Plaintiff, Third Party Plaintiff, and Third Party Counterclaim Defendant,<br><br>v.<br><br>ACE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>   Third Party Defendant and Third Party Counterclaim Plaintiff. | Case Nos.:   3:20-cv-07469-JSC;<br>             3:20-cv-09356-JSC<br><br>**INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDING SUPPLEMENTAL AUTHORITY**<br><br>Honorable Judge Jacqueline Scott Corley |

McKesson's Memorandum of Law Regarding Supplemental Authority ("MSA"), and related filings, far exceed the scope of the limited supplemental briefing requested by McKesson and permitted by the Court.[1]  Although the Court declined McKesson's request to submit supplemental briefing on whether the Exemplar Suits allege an unforeseen happening and therefore an accident, McKesson's submission focuses on that very issue, instead of the issue it was granted leave to brief—the decision in *Cincinnati Insurance Co. v. Discount Drug Mart, Inc.*, No. 110151, 2021 WL 6142648 (Ohio Ct. App. Dec. 30, 2021) ("*DDM*").  *See* Dkt. 132, *Transcript of Proceedings* ("1/27 Hr'g Tr."), at 73:21–74:6.  However, the submission fails to establish any "unforeseen happening."

### A. *DISCOUNT DRUG MART*, AND OHIO LAW, ARE NOT RELEVANT HERE.

In *DDM*, the Ohio Court of Appeals held that an insurer owed a duty to defend the Track One Lawsuits, including because those lawsuits alleged an accident under Ohio law.  McKesson's submission rests on its newfound assertion that California law's interpretation of "accident" mirrors that of Ohio law—but the equivalence McKesson seeks to draw is clearly false.  *DDM* affirmed a lower court decision holding that, *under Ohio law*, "the policy language for 'occurrence' is unquestionably met as the …Complaint has a cause of action for … Negligence."  *See Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, No. CV-19-913990, 2020 WL 6706791, at *6 (Ohio Ct. App. Sep. 9, 2020).  But, as McKesson conceded, *under California law*, that a claim is labelled "negligence" does not establish the alleged liability arose from an accident.  *See* 1/27 Hr'g Tr. at 6:8-11, 7:15-18 ("[Y]ou're correct that it doesn't matter if there is a count that is styled as a negligence count.  That alone is not enough to get the insured coverage under the occurrence definition."); *see also, e.g.*, *Traveler's Prop. Cas. Co. of Am. v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1043-44 (2017) ("it is not the form or title of a cause of action that determines the carrier's duty to defend").

*DDM* also explained that, *under Ohio law*, "if the injury was not intentionally caused, then it was accidentally suffered."  *DDM*, 2021 WL 6142648, at *11; *see id.* at *12 (although lawsuits alleged DDM engaged in deliberate misconduct, there was still a potential for coverage because

---

[1]  *See* National Union's Notice of Motion and Motion to Strike the Declaration of Gretchen A. Hoff Varner, Including Exhibit K Thereto (Dkt. 135).

1

INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDNG SUPPLEMENTAL AUTHORTIY
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

plaintiffs "do not claim that DDM intended to cause bodily injury to the counties' citizens"). California law follows ***the opposite approach***. Under California law, "whether [the insured] intended to cause injury or mistakenly believed its deliberate conduct would not or could not produce injury is irrelevant to determining whether an insurable accident occurred." *Actavis*, 16 Cal. App.5th at 1041.

Nevertheless, McKesson attempts to argue that *California law is consistent with Ohio law* by misleadingly quoting *Ledesma* to support a purported rule that an "'accident' occurs if either the insured's act or its consequence 'were neither intended nor expected from [the insured's] perspective." MSA 1:16-21 (quoting *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Corp.*, 5 Cal 5th 216, 221 (2018)) (emphasis removed). But the portion of *Ledesma* McKesson quotes is the court's description of *the insured's argument*. In the very next sentence, the *Ledesma* court notes that the framework articulated in *Merced* is consistent with California Supreme Court precedent *and then applies that framework*. *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 226 (2018); *see also Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 50 (1989) (deliberate conduct is an insurable accident *only* if "some additional, unexpected, independent, and unforeseen happening occurs that produces the damage"). *DDM* is not relevant.

The allegations McKesson quotes about what it "should have known" also do not advance its position *under California law*. Unlike Ohio law, California law is concerned only with intent as it pertains to the insured's alleged acts. But none of the allegations cited by McKesson undermines what this court has already recognized—the Exemplar Suits allege McKesson acted intentionally in its distribution of opioids. *See* 1/27 Hr'g Tr. at 6:15-19 ("In this case the insured did something. The insured sold the drugs. … So we're within that realm where there is that intentional act."). For example, allegations that McKesson "should have known" orders for opioids (i) "were suspicious," (ii) "were likely being diverted" or (iii) "could not be justified and were indicative of serious . . . overuse of opioids," have nothing to do with whether McKesson intended its *acts of distributing opioids*. Hoff Varner Dec. ¶ 3. The same is true of allegations that McKesson "should have known" that "the opioids were being prescribed by 'pill mills.'" *Id.*

Nor is the analysis any different for the Oklahoma AG's allegation in the "alternative" noted

2

INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDNG SUPPLEMENTAL AUTHORTIY
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

1  by the Court noted.  *See Oklahoma* at ¶ 74 ("McKesson was acutely aware of the
2  oversupply.  Alternatively, to the extent McKesson failed to properly monitor and track prescription
3  data and/or distribution data, such failures constitute reckless disregard and gross negligence.").  That
4  allegation says nothing about whether McKesson intended its acts of distributing opioids, and that
5  allegation—like those above from Track One—amounts to nothing more than a "general boilerplate
6  pleading of 'negligence' [which] adds nothing to a complaint otherwise devoid of *facts* giving rise to
7  a potential for covered liability."  *Swain v. Cal. Cas. Ins. Co.*, 99 Cal. App. 4th 1, 8 (2002).[2]

## B. MCKESSON CANNOT ESTABLISH AN "UNFORESEEN HAPPENING".

As the Court recognized, McKesson's alleged distribution of opioids was deliberate and, according to the Opioids Lawsuits, resulted in diversion. 1/27 Hr'g Tr. at 6:15-19.  Thus, *under California law*, the only remaining question is whether there was an unforeseen happening that rendered the diversion and addiction allegedly resulting from McKesson's deliberate distribution of opioids an accident for insurance purposes.  *See id.* at 62:11-63:7; Dkt. 111 at 18–19; Dkt 115 at 22–23.  Undeterred, McKesson attempts to argue for a different standard entirely—one that it suggests applies under both Ohio *and* California law—by selectively quoting three California cases that deal with materially different policy language or exclusions not at issue here.  *See* MSA 1:15-3:25 (discussing *Montrose Chem. Corp. of Cal. v. Super. Ct.*, 6 Cal.4th 287 (1993), *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App.4th 1 (1996), and *State of Cal. v. Allstate Ins. Co.*, 45 Cal.4th 1008, 1024 (2009)).  Based on these cases, McKesson asserts that "[w]hether injury was 'expected' or 'intended' depends on the *insured's subjective* state of mind," (emphasis added), and the Insurers must "'conclusively show' that McKesson 'knew' or actually believed that its conduct was '*substantially certain*' to cause bodily injury."  MSA 1:28-2:1, 4:10–13 (emphasis added).

All three cases are inapplicable.  *Montrose* and *Armstrong* considered what the insured "expected or intended" only because the occurrence definitions at issue incorporated a coverage

---

[2]  To the extent McKesson argues that the allegations it cites charge that McKesson engaged in conduct that somehow fell short of an intent to cause injuries, its argument is irrelevant because whether the insured intended the alleged injury has no bearing on whether there is an occurrence under California law.  *See Actavis*, 16 Cal. App.5th at 1041.

3

INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDNG SUPPLEMENTAL AUTHORTIY
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

exclusion for harm "*neither expected nor intended from the standpoint of the insured.*" *Montrose*, 6 Cal. 4th at 292–93 (emphasis added); *Armstrong*, 45 Cal. App. 4th at 68. That language does not appear in the definition of "occurrence" at issue here. Nor is *Allstate* on point. That case did not deal with the "occurrence" requirement at all, but instead considered the "sudden and accidental" exception to a pollution exclusion, *see Allstate*, 45 Cal. 4th at 1016, 1020, and the insured's subjective intent which, under California law, "*is irrelevant*" for determining whether there is an occurrence. *Albert v. Mid-Century Ins. Co.*, 236 Cal. App. 4th 1281, 1291 (2015) (emphasis added).

McKesson also is wrong that the California cases holding that deliberate acts cannot constitute an accident (without some unforeseen happening) are limited to "a narrow class of cases." MSA 2: 4-14. To the contrary, that analysis has been applied for decades to widely diverse circumstances. *See, e.g.*, *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 943 (2003) (failure to build restrooms to accommodate disabled was "caused by the architectural configuration … not by an accident"); *Swain*, 99 Cal. App. 4th at 9-10 (wrongful eviction not an accident); *Miller v. W. Gen. Agency, Inc.*, 41 Cal. App. 4th 1144, 1150 (1996) (misrepresentations by insured, whether "intentional or simply negligent," did not constitute an accident).

Thus, it remains the case that, *under California law*, McKesson can prevail here on summary judgment only if it meets its burden to establish some additional, unexpected, independent, and unforeseen happening that rendered its deliberate conduct accidental for insurance purposes. The only "unforeseen happening" identified by McKesson was the role doctors and other third parties played in diversion. *See, e.g.*, Dkt. 111, at 23:3-38:11. But, the California Court of Appeal already has held that "[t]he role of doctors in prescribing, or misprescribing, opioids is not an independent or unforeseen happening …." *Actavis*, 16 Cal. App. 5th at 1042. The same is true here.

McKesson is alleged to have shipped pills in massive quantities—quantities they knew they were shipping. Dkt. 111 at 23–28; Dkt. 124 at 14. A "nation 'awash in opioids,'" *Actavis*, 16 Cal. App. 5th at 1041, is the natural outcome of that conduct, indeed, the direct and foreseeable outcome, as the Exemplar Suits allege. *See e.g.*, *Cuyahoga* ¶ 17; *Oklahoma* ¶ 127 (referring to the "direct, proximate and foreseeable harm McKesson caused to the State"); *see also* 1/27 Hr'g Tr.at 41:16-20

4

INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDNG SUPPLEMENTAL AUTHORTIY
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC

("There's no way they [McKesson] didn't know that drugs were being diverted. … Of course they knew.")  The Court should thus rule there is no accident here based on its review of the complaints alone.  Any doubt, however, is dispelled by the extrinsic evidence.

For example, the extrinsic evidence establishes that on September 5, 2005, McKesson met with the DEA's Office of Diversion Control, to discuss opioid diversion via rogue internet pharmacies in Florida, Texas, and Colorado.  Dkt. 117-1.  "On October 6, 2005, [the DEA] called [McKesson] to discuss comments the [DEA] had received that McKesson Corp. was not taking the Internet pharmacy problem seriously," and "[o]n October 10, 2005, a DEA investigator … expressed concerns [to McKesson about] hydrocodone sales to United Prescription Services."  *Id.*  Nevertheless, between October 10 and October 21, 2005, McKesson shipped over 2 million dosage units of hydrocodone to rogue internet pharmacies, including United Prescription Services.  *Id.*

In August 2006, the DEA issued an Order to Show Cause asserting "McKesson failed to maintain effective controls [in Florida] *against diversion of [opioids]*," and took similar action thereafter regarding Distribution centers in Texas and Colorado.  *See* Dkt. 117-6 (emphasis added).  And, on May 2, 2008, McKesson agreed to pay the DEA $13.25 million to settle civil charges relating to this conduct (although McKesson continued to deny the allegations).  *Id.*  As the DEA's press release explained, "[t]hree McKesson distribution centers received and filled hundreds of suspicious orders placed by pharmacies participating in illicit Internet schemes …. 'By failing to report suspicious orders from controlled substances that it received from rogue Internet pharmacies, the McKesson Corporation fueled the explosive prescription drug abuse problem we have in this country ….  Dkt. 117-7.  Additional evidence is detailed in Insurers' briefs.  Dkt. 111, at 28:20-39:3.

Notwithstanding its keen awareness of diversion and its own role as a distributor in the opioid epidemic, McKesson asserts it is entitled to coverage under the NU Policy and ACE Policy, which incepted on July 1, 2008 and July 1, 2015 respectively, for bodily injury that resulted from its ongoing distribution because, according to McKesson, the diversion of opioids and the resulting opioid crisis remained an "additional, unexpected, independent, and unforeseen happening."  As the Court noted, McKesson's assertion is "hard[] to swallow."  1/27 Hr'g Tr. at 36:12-16.

| | |
|---|---|
| Dated: February 10, 2022 | WILLKIE FARR & GALLAGHER LLP |
| | By: /s/ Christopher J. St. Jeanos |
| | Christopher J. St. Jeanos (*pro hac vice*) |
| | Jocelyn Sher (*pro hac vice*) |
| | 787 Seventh Avenue |
| | New York, NY 10019 |
| | Telephone:  212-728-8000 |
| | Facsimile:  212-728-8100 |
| | |
| | GIBSON, DUNN & CRUTCHER LLP |
| | |
| | Richard J. Doren |
| | Matthew A. Hoffman |
| | Madeleine F. McKeena |
| | 333 South Grand Avenue |
| | Los Angeles, CA 90071-3197 |
| | Telephone:  213-229-7038 |
| | Facsimile:  213-229-6038 |
| | |
| | *Attorneys for Plaintiffs and Counterclaim Defendants AIU Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa.* |

6

INSURERS' RESPONSE TO MCKESSON'S MEMORANDUM OF LAW REGARDNG SUPPLEMENTAL AUTHORTIY
CASE NOS. 3:20-CV-07469-JSC; 3:20-CV-09356-JSC