UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIU INSURANCE COMPANY, et al., | Case No.  20-cv-07469-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| MCKESSON CORPORATION, | Re: Dkt. Nos. 79, 110, 111, 114, 115, 135 |
| Defendant. | |

This lawsuit is an insurance coverage dispute between McKesson and three insurers. Before the Court are cross-motions for partial summary judgment on the duty to defend, filed by McKesson and two insurers, National Union Fire Insurance Company of Pittsburgh, PA ("NU") and ACE Property and Casualty Insurance Company ("ACE") (together, "Insurers"), (Dkt. Nos. 79, 111, 115; *see* Dkt. Nos. 112, 113, 116, 117, 118, 119, 120, 122, 123, 124, 133, 134, 136, 137); administrative motions to file under seal, (Dkt. Nos. 110, 114); and a motion to strike, (Dkt. No. 135; *see* Dkt. Nos. 139, 140).[1]  Having carefully considered the initial and supplementary briefing, and having had the benefit of oral argument on January 27, 2022, the Court GRANTS NU and ACE's motions for partial summary judgment and DENIES McKesson's motion.  As explained below, Insurers have established that the two insurance policies at issue have no potential to cover the three underlying suits.  While the suits at least potentially seek damages because of bodily injury, they have no potential to allege that an accident produced the injury.

### BACKGROUND

McKesson, a distributor and seller of prescription drugs, held a number of liability

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

insurance policies with Insurers between 1999 and 2017.  (Dkt. No. 1 ¶¶ 2, 11–12; Dkt. No. 9 at 2 ¶ 2, 4 ¶¶ 11–12, 13 ¶ 11, 14 ¶ 12–13; Dkt. No. 45 at 4 ¶ 13.)  Two policies are at issue in the cross-motions for partial summary judgment.

## I.    INSURANCE POLICIES

### A.    NU Policy

NU Policy No. 5443284 covers the period July 1, 2008 through July 1, 2009.  (Dkt. No. 79-2 at 2–3.)  The policy provides a "duty to defend any Suit" against McKesson "that seeks damages for Bodily Injury . . . covered by this policy, even if the Suit is groundless, false or fraudulent when the applicable . . . Retained Limits have been exhausted by payment of Loss to which this policy applies."  (*Id.* at 33.)[2]  "Bodily Injury means bodily injury, sickness or disease sustained by any person, including death . . . resulting from any of these at any time." (*Id.* at 20.)  The policy applies to bodily injury that "occurs during the Policy Period" and "is caused by an Occurrence."  (*Id.* at 4.)  "Occurrence" with respect to "Bodily Injury" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 24.)  "All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence."  (*Id.*)  "Damages because of Bodily Injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the Bodily Injury."  (*Id.* at 5.)

The policy's "Retained Limit" of $5 million per "Occurrence" is "exhausted by the payment of Loss to which this policy applies."  (*Id.* at 37, 33.)  Defense costs are included in the retained limit.  (*Id.* at 37; *see id.* at 23.)  The retained limit "will apply whether or not there is any available Scheduled Underlying Insurance or Other Insurance."  (*Id.* at 35.)

### B.    ACE Policy

ACE Policy No. XOO G27610390 001 covers the period July 1, 2015 through July 1, 2016.  (Dkt. No. 79-3 at 2.)  The policy provides a "duty to defend" McKesson against "any 'suit' seeking damages for 'bodily injury,' . . . even if groundless, false or fraudulent, to which this

---

[2] The NU policy both capitalizes and emphasizes in bold certain terms defined elsewhere.  The emphases in bold are omitted here.

insurance applies," when the "Retained Limits[] have been exhausted by payment of 'loss.'" (*Id.* at 69.) "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (*Id.* at 23.) The policy applies to bodily injury that "occurs during the 'policy period'" and "is caused by an 'occurrence.'" (*Id.* at 9.) "Occurrence" with respect to "bodily injury" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 25.) "All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence[,]' regardless of the frequency or repetition thereof, or the number of claimants." (*Id.*) "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury[.]'" (*Id.* at 10.)

The policy's "Retained Limit" is $5 million per "Occurrence." (*Id.* at 71.) "The defense and supplemental payment expenses will be included within the 'retained limit' and within the applicable Limits of Insurance of this policy." (*Id.* at 69.) The retained limit "will apply whether or not there is any available 'other insurance.'" (*Id.* at 70.)

## II.    EXEMPLAR SUITS

The parties limit their cross-motions for partial summary judgment to the duty to defend against three "exemplar suits."

### A.    "Track One" Multidistrict Litigation Suits

In October and December 2017, respectively, Cuyahoga and Summit Counties of Ohio filed suit against McKesson and other defendants.[3] The suits were consolidated into an opioid multidistrict litigation ("MDL") in the Northern District of Ohio.[4] (Dkt. No. 79-7 ¶ 7.) In April 2018, the suits were identified as "Track One" bellwether suits and set for trial in October 2019.

---

[3] Defendants Endo Health Solutions Inc. & Endo Pharmaceuticals Inc.'s Notice of Removal at 1, *County of Cuyahoga v. Purdue Pharma L.P., et al.*, No. 17-OP-45004 (N.D. Ohio Nov. 27, 2017), Dkt. No. 1 (indicating complaint filed in state court in October 2017); Defendants Endo Health Solutions Inc. & Endo Pharmaceuticals Inc.'s Notice of Removal at 1, *County of Summit v. Purdue Pharma L.P., et al.*, No. 18-OP-45090 (N.D. Ohio Jan. 22, 2018), Dkt. No. 1 (indicating complaint filed in state court in December 2017).
[4] *In Re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio filed Dec. 12, 2017).

United States District Court
Northern District of California

1    (*Id.* ¶ 9.)

2         The Track One operative complaints assert claims for violations of the federal Racketeer

3    Influenced and Corrupt Organizations ("RICO") Act and the Ohio Corrupt Practices Act

4    ("OCPA"), statutory public nuisance, common law absolute public nuisance, negligence, injury

5    through criminal acts, unjust enrichment, and civil conspiracy.  (Dkt. No. 79-12 ¶¶ 922–81, 993–

6    1115, 1134–78; Dkt. No. 79-14 ¶¶ 907–39, 951–1072, 1091–1137.)  The suits allege that

7    McKesson "fail[ed] to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious

8    orders; and (d) halt shipments of opioids in quantities [it] knew or should have known could not be

9    justified and were indicative of serious overuse of opioids."  (Dkt. No. 79-12 ¶ 502; *see* Dkt. No.

10   79-14 ¶ 518.)  The counties further allege that McKesson "intentionally, unreasonably, and/or

11   unlawfully deceptively marketed and pushed as many opioids onto the market as possible, fueling

12   addiction to and diversion of these powerful narcotics," and breached its duty of care by "choosing

13   not to effectively monitor for suspicious orders," "choosing not to investigate suspicious orders,"

14   "choosing not to report suspicious orders," and "choosing not to stop or suspend shipments of

15   suspicious orders." (Dkt. No. 79-12 ¶ 1049, 1089; Dkt. No. 79-14 ¶¶ 1008, 1046.)  With respect to

16   the negligence claim, the suits note:

17              Plaintiff does not allege that Defendants were negligent for failure to
18              protect from harm.  Rather, Defendants engaged in conduct the
             foreseeable result of which was to cause harm to Plaintiff.  Defendants
19              have engaged in affirmative acts of creating an illegal, secondary
             prescription opioid market by failing to exercise adequate control
20              over the marketing, distribution, and sale of their prescription opioids.

21   (Dkt. No. 79-12 ¶¶ 1091–92; Dkt. No. 79-14 ¶¶ 1048–49.)

22        McKesson settled the Track One suits shortly before trial, in October 2019.  (Dkt. No. 79-7

23   ¶ 12.)

24        **B.    Oklahoma Suit**

25        In May 2020, the State of Oklahoma filed suit against McKesson.  (Dkt. No. 79-16.)  The

26   suit asserts claims for negligence, statutory public nuisance, and unjust enrichment.  (*Id.* ¶¶ 120–

27   37.)  Oklahoma alleges that McKesson "fail[ed] to (a) control the supply chain; (b) prevent

28   diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or

4

should have known could not be justified and were indicative of serious oversupply of opioids."

(*Id.* ¶ 60.)

> By flooding Oklahoma generally with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have known were likely being diverted for illicit and/or non-medical uses, McKesson breached [its] duty.  In doing so, McKesson not only failed to prevent foreseeable harm, but *caused* foreseeable and preventable harm to Oklahoma and its citizens.

(*Id.* ¶ 55.)  "It was foreseeable that filling suspicious orders for opioids and continuing to oversupply them would harm the State of Oklahoma and its citizens."  (*Id.* ¶ 106.)

### III.    COMMUNICATIONS BETWEEN MCKESSON & INSURERS

#### A.    Tender of Notice

McKesson first notified Insurers of an opioid lawsuit, as relevant here, in February 2016 by tendering notice of a suit filed by the State of West Virginia.  (Dkt. No. 79-7 ¶ 4; Dkt. No. 79-8; Dkt. No. 112 ¶ 3.)  McKesson later gave notice of the thousands of opioid lawsuits against the company that were filed thereafter.  (Dkt. No. 79-7 ¶ 4; Dkt. No 79-9.)  In December 2017, McKesson tendered notice of the Cuyahoga and Summit County suits for defense and indemnity under the policies at issue here.  (Dkt. No. 79-7 ¶¶ 6, 8; Dkt. No. 79-11; Dkt. No. 79-13.)  In May 2020, McKesson tendered notice of the Oklahoma suit.  (Dkt. No. 79-7 ¶ 15.)

#### B.    Duty to Defend

McKesson represents that it has paid more than $230 million to defend against the thousands of opioid lawsuits as of January 2021.  (*Id.* ¶ 18.)  It has paid more than $60 million in defense costs in the opioid MDL for the period July 2018 to October 2019, the substantial majority of which was incurred to defend the Track One lawsuits.  (*Id.* ¶ 19.)  McKesson represents that, to date, Insurers have not defended McKesson against any of the opioid lawsuits, acknowledged a duty to defend, or reimbursed McKesson's defense costs.  (*Id.* ¶ 22.)

Communications between McKesson (or its agents or counsel) and Insurers about the NU and ACE policies have included the following:

- January 2018: NU acknowledged receipt of the Summit County suit notice.  (Dkt. No. 79-18.)  ACE denied coverage for the Cuyahoga County suit.  (Dkt. No. 79-

United States District Court
Northern District of California

20.)  ACE noted in part that "to date, McKesson has not, for any opioid claim, advised [ACE] that any self-insured retention has been exhausted, has not asked for payment of any invoice under any particular policy, and has not sought [ACE]'s approval of defense counsel nor asked [ACE] to appoint defense counsel."  (*Id.* at 3.)

- August 2018: McKesson notified Insurers that the company had "received" opioid lawsuits defense invoices totaling about $25 million and provided the names of all national and regional counsel defending the company in the opioid lawsuits.  (Dkt. No. 110-3; Dkt. No. 79-7 ¶¶ 5, 21.)

- October 2018: McKesson wrote to ACE that it had "incurred" defense costs exceeding the retained limit and requested reimbursement from ACE.  (Dkt. No. 114-6.)

- November 2018: ACE denied that it had a duty to defend the opioid lawsuits.  (Dkt. No. 79-21.)  ACE noted in part that McKesson had informed ACE in August 2018 that the company had received defense invoices totaling about $25 million, and requested additional information, including "an explanation of how any retention[] has been exhausted together with any documentation which may support this assertion," "in order to respond to McKesson's assertion that the retained limit[] has been exhausted by defense costs."  (*Id.* at 3.)  NU wrote to McKesson and noted in part, "We are not aware that McKesson has provided [NU] with any documentation of defense costs to date."  (Dkt. No. 112-3 at 2.)  NU referenced an October 2018 letter in which it had requested from McKesson "information sufficient to substantiate the status of the retention and Limits."  (*Id.*)

- January 2019: McKesson notified Insurers that the company had received opioid lawsuits defense invoices totaling about $56 million, and again provided the names of all national and regional counsel defending the company in the opioid lawsuits.  (Dkt. No. 110-4; Dkt. No. 79-7 ¶¶ 5, 21.)  McKesson included a summary of the defense invoices.  (Dkt. No. 110-4; Dkt. No. 79-7 ¶¶ 5, 21.)

- October 2020: NU denied coverage for the opioid lawsuits.  (Dkt. No. 79-19.)  NU noted in part that "we have not received sufficient information establishing that the retentions and limits underlying the Policies have been satisfied or exhausted. . . . McKesson has not provided anything beyond general statements from its counsel and 'draft' summaries of defense invoices received by McKesson through early 2019."  (*Id.* at 2.)

- March 2021: McKesson notified Insurers that the company had received opioid lawsuits defense invoices totaling about $276 million.  (Dkt. No. 79-7 ¶¶ 5, 21.)

- September 2021: McKesson produced a copy of a July 2019 check for over $52 million in defense costs paid.  (Dkt. No. 114-11.)  McKesson's Rule 30(b)(6) witness testified at deposition that the company "reached $5 million in payments" for defense costs in July 2019.  (Dkt. No. 114-10 at 11:17-24, 35:3-12.)

## IV.   PROCEDURAL HISTORY

NU and insurer AIU Insurance Company ("AIU") filed suit in October 2020, seeking a declaratory judgment that they are not obligated to defend or indemnify McKesson against the opioid lawsuits. (Dkt. No. 1 ¶¶ 49–56.)  McKesson counterclaimed against NU, AIU, and third party ACE, seeking a declaratory judgment that all three are obligated to defend and indemnify McKesson and have breached their insurance contracts.  (Dkt. No. 9 at 17–20.)  ACE counterclaimed against McKesson, seeking a declaratory judgment of no duty to defend or indemnify.  (Dkt. No. 45 at 22–23.)

McKesson filed this motion for partial summary judgment on the duty to defend in April 2021, (Dkt. No. 79), and thereafter moved to stay all discovery and proceedings other than relevant to its motion for partial summary judgment, (Dkt. No. 93).  The Court stayed discovery relevant only to the indemnity issue but allowed the duty to defend issue to proceed.  (Dkt. No. 101.)  NU and ACE then filed cross-motions for partial summary judgment on the duty to defend.[5] (Dkt. Nos. 111, 115.)

---

[5] AIU does not move for summary judgment.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISCUSSION

"The duty to defend is broader than the duty to indemnify." *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.* ("*Swift*"), 326 P.3d 253, 258 (Cal. 2014).

> Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured, or because the actual judgment is for damages not covered under the policy.

*Id.* (cleaned up). "Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf." *Montrose Chem. Corp. of Cal. v. Superior Court* ("*Montrose*"), 861 P.2d 1153, 1157 (Cal. 1993) (in bank). The duty to defend "may exist even where coverage is in doubt and ultimately does not develop." *Id.* Thus, the insurer must defend the insured against "a suit which *potentially* seeks damages within the coverage of the policy." *Id.*

The duty to defend is determined "in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* (cleaned up).

> [T]he duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered. This includes all facts, both disputed and undisputed, that the insurer knows or becomes aware of from any source if not at the inception of the third party lawsuit, then at the time of tender. Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability. Thus, if any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.

*Swift*, 326 P.3d at 258 (cleaned up).

An insurer and insured seeking a declaratory judgment on the duty to defend have different burdens. "[T]he insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.* ("*Ledesma*"), 418 P.3d 400, 403 (Cal. 2018).

"While the duty to defend is broad, it is not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Swift*, 326 P.3d at 258 (cleaned up). "In general, doubt as to whether an insurer owes a duty to defend must be resolved in favor of the insured." *Id.* (cleaned up).

McKesson contends that the exemplar suits are at least potentially covered by the NU and ACE policies because they seek damages for "bodily injury" caused by an "occurrence" and because McKesson has exhausted the retention limit for a single occurrence. Insurers argue that the exemplar suits are conclusively not covered by the policies because McKesson has not exhausted each retention limit for the multiple "occurrences" at issue; because the exemplar suits do not seek damages for "bodily injury" or arise from an "occurrence"; and because McKesson had prior knowledge of the alleged bodily injury. The Court first considers these arguments with reference to the exemplar suit complaints and the policies, apart from extrinsic evidence. *See Montrose*, 861 P.2d at 1157.

## I.    BODILY INJURY

The policies cover damages "for" or "because of" "bodily injury," defining the latter as "bodily injury, sickness or disease sustained by any person, including death . . . resulting from any of these at any time." (Dkt. No. 79-2 at 5, 20, 33; *see* Dkt. No. 79-3 at 10, 23, 69.) Under California law, "words used in an insurance policy are to be interpreted in their ordinary sense, i.e., according to the plain meaning which a layperson would ordinarily attach to them." *Chatton v. Nat'l Union Fire Ins. Co.*, 13 Cal. Rptr. 2d 318, 322 (Cal. Ct. App. 1992). "Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).

The exemplar suits allege opioid abuse, sickness, addictions, overdoses, and deaths. (Dkt. No. 79-12 ¶¶ 19, 661, 671–79, 681, 689, 700 (describing rising rates of "drug overdose deaths," "unintentional drug poisonings," "emergency department visits," "inpatient stays," "chronic Hepatitis C," and "neonatal opioid withdrawal syndrome," all attributed to opioids); Dkt. No. 79-14 ¶¶ 18, 20, 716–34, 742 (same); Dkt. No. 79-16 ¶¶ 16–26, 40–42 (describing "fatal overdoses," "unintentional opioid overdose[s]," people "admitted for opioid use disorder treatment," "[b]abies born with opioid related neonatal abstinence syndrome," "emergency room visits," and "hospital

United States District Court
Northern District of California

9

inpatient stays" attributed to opioids).)  They squarely allege "physical injury to the body" by a substance ingested through the body, and thus at least potentially fall within the "plain and unambiguous" meaning of bodily injury.  *Chatton*, 13 Cal. Rptr. 2d at 323; *see id.* ("'Bodily injury' as commonly understood 'imports harm arising from corporeal contact' and bodily refers to 'an organism of flesh and blood' . . . ." (citation omitted)).

In addition to at least potentially alleging bodily injury, the exemplar suits at least potentially seek damages "because of" or "for" those bodily injuries.  Under the policies, "[d]amages because of Bodily Injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the Bodily Injury."  (Dkt. No. 79-2 at 5; Dkt. No. 79-3 at 10.)  The government plaintiffs allege they bear costs to provide various services to address and mitigate the bodily injury suffered by people in their jurisdictions.  (Dkt. No. 79-12 ¶¶ 732–33, 735–36, 741, 743, 946, 977, 1015, 1035, 1072, 1111, 1148, 1163, 1178; Dkt. No. 79-14 ¶¶ 20, 935, 973, 994, 1025, 1030, 1063, 1068, 1106, 1121, 1136; Dkt. No. 79-16 ¶¶ 40, 127.) The government plaintiffs seek, among other relief, "[a]ctual damages," "[f]orfeiture," "abatement," "recovery of abatement costs," "restitution," "compensatory damages," "disgorgement," and "punitive damages."  (Dkt. No. 79-12 ¶¶ 949, 981, 1016, 1037–38, 1081, 1115, 1150, 1164, 1179; Dkt. No. 79-14 ¶¶ 939, 974, 996–97, 1039, 1072, 1108, 1122, 1137–38; Dkt. No. 79-16 ¶¶ 128, 132, 136; *id.* at 38.)  Actual damages, restitution, and compensatory damages, among other forms of relief, could constitute reimbursement of the government plaintiffs' asserted costs of responding to and providing care for the alleged bodily injury.  Thus, the requested relief at least potentially falls within the "plain and unambiguous meaning" of "damages . . . for care, loss of services or death resulting at any time from the Bodily Injury," (Dkt. No. 79-2 at 5; Dkt. No. 79-3 at 10).  *Chatton*, 13 Cal. Rptr. 2d at 323.  Apart from the policies' definition, California law compels the conclusion that the government plaintiffs' costs of responding to bodily injuries are at least potentially "damages" within the "ordinary, nontechnical meaning."  *AIU*, 51 Cal. 3d at 828.  "[R]eimbursement of response costs . . . constitutes 'loss' or 'detriment,'" and "reimbursement by responsible parties is monetary 'compensation' for such loss."  *Id.*  Here, "the event precipitating the[] legal action" is bodily injury; "[t]he costs that result

from such action are therefore incurred 'because of'" bodily injury.  *Id.* (concluding that government's cleanup costs were incurred "because of" property damage).

Insurers' argument that the government plaintiffs *themselves* suffered no bodily injury contradicts the policies' clearly defining "because of bodily injury" to include damages "claimed by any person or organization."  (Dkt. No. 79-2 at 5; Dkt. No. 79-3 at 10.)  Because bodily injury means harm to the corporeal body, *Chatton*, 13 Cal. Rptr. 2d at 323, and the policies specify that bodily injury is "sustained by a person" or "any person," no "organization" can itself suffer bodily injury under the terms of the policies.  (Dkt. No. 79-2 at 5, 20; Dkt. No. 79-3 at 10, 23.)  The policies nevertheless provide that damages because of bodily injury can include damages claimed by an organization.  *See AIU*, 51 Cal. 3d at 821–22 ("[T]he mutual intention of the parties at the time the contract is formed governs interpretation.  Such intent is to be inferred, if possible, solely from the written provisions of the contract." (citation omitted)).  Accordingly, nothing in the policies limits coverage to suits that seek damages for the plaintiff's own bodily injury.  *See Cincinnati Ins. Co. v. H.D. Smith, L.L.C.* ("*H.D. Smith*"), 829 F.3d 771, 774 (7th Cir. 2016) ("West Virginia alleged that its citizens suffered bodily injuries and the state spent money caring for those injuries . . . .  [Insurer] stress[es] that West Virginia seeks its own damages, not damages on behalf of its citizens.  But so what?  [Insurer's] argument is untethered to any language in the policy." (applying Illinois law)); *cf. AIU*, 51 Cal. 3d at 842–43 ("[T]he mere fact that the governments may seek reimbursement of response costs or injunctive relief without themselves having suffered any tangible harm to a proprietary interest does not exclude the recovery of cleanup costs from coverage under the 'damages' provision . . . .  For similar reasons, in plain and ordinary terms such recovery is 'because of' property damage.").

Insurers' contention that the exemplar suit plaintiffs seek damages only for economic losses is also without merit.  Economic expenditures for "purely prophylactic measures," "designed to prevent" future losses, may not be recoverable.  *AIU*, 51 Cal. 3d at 832–33 (noting, in the hazardous waste context, that measures to "prevent future discharges" of waste are not recoverable costs).  In *National Union Fire Insurance Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.* ("*Ready Pac*"), an insured restaurant suffered damages after an outbreak of food-borne illness.

11

782 F. Supp. 2d 1047, 1049 (C.D. Cal. 2011).  The court held that the restaurant's claim for "lost patronage"—that is, "lost profits" from anticipated customers who decided not to dine at the restaurant due to the food-borne illness—was unrecoverable "purely economic loss."  *Id.* at 1054–57.  The court distinguished lost profits from potentially recoverable "economic expenditures incurred . . . in mitigating damages," including "essential expense[s] incurred in the performance of the work to remedy either the damage done to tangible property at [the] restaurants or the personal injuries suffered by [the restaurant's] customers."  *Id.* at 1055–56.

Here, the exemplar suits are readily distinguishable from the claims for prophylactic costs and lost profits discussed by the *AIU* and *Ready Pac* courts.  The suits, at least potentially and at least in part, seek actual damages for the costs of responding to bodily injury that has already occurred.  Thus, they "rest on allegations of past and present damage" and "concern reimbursement . . . for remedial and mitigative actions."  *AIU*, 51 Cal. 3d at 832–33; *see Ready Pac*, 782 F. Supp. 2d at 1054–57.  Moreover, that damages because of bodily injury must be measured in monetary terms does not transform them into merely economic losses.  *See Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co.*, 407 P.2d 868, 873 (Cal. 1965) (in bank) ("[T]wo issues [] should be carefully distinguished: the first concerns the type of injury covered by the policy, and it was in the context of this question that we stated that only damage to physical or tangible property was recoverable; the second is the method by which the damage to the physical property is to be measured in monetary terms.").

Finally, ACE's reliance on the Delaware Supreme Court's recent decision in *ACE American Insurance Co. v. Rite Aid Corp.* ("*Rite Aid*") is unpersuasive.  2022 WL 90652, at *6–11 (Del. Jan. 10, 2022).  First, *Rite Aid* cited with approval *Cincinnati Insurance Co. v. Richie Enterprises LLC*, *id.* at *7, which distinguished damages "because of" bodily injury from the government plaintiff's claim for "damages for the money it has been required to spend because of the prescription drug abuse epidemic."  No. 1:12–CV–00186–JHM–HBB, 2014 WL 3513211, at *5 (W.D. Ky. July 16, 2014), *altering* 2014 WL 838768, at *7–8 (W.D. Ky. Mar. 4, 2014).  California law, as expressed by the California Supreme Court in *AIU*, draws no such distinction.  Under *AIU*, "when [government plaintiffs] seek reimbursement of their response costs, the basis of

12

1   the claim is harm done to the public fisc." 51 Cal. 3d at 829. "In ordinary terms, such harm

2   constitutes 'loss' or 'detriment,'" and "reimbursement by responsible parties is monetary

3   'compensation' for such loss." *Id.* at 829, 828. Thus, the costs of responding to bodily injury are

4   incurred "because of" bodily injury. *See id.* at 828 (holding that cleanup costs were incurred

5   "because of" property damage).

6           Second, the Court is not persuaded that the California Supreme Court would agree with

7   *Rite Aid*'s interpretation of the insurance policy language. The policy at issue covered damages

8   "claimed by any person or organization for care, loss of services or death resulting at any time

9   from the 'personal injury'"; "personal injury" was defined to include "bodily injury." 2022 WL

10  90652 at *2. The *Rite Aid* court interpreted the policy language to cover damages for bodily injury

11  "only when asserted by 1) the person injured, 2) a person recovering on behalf of the person

12  injured, or 3) people or organizations that treated the person injured or deceased, who demonstrate

13  the existence of and cause of the injuries." *Id.* at *6. The dissent, however, maintained that "the

14  policy language is broader than the Majority's rule." *Id.* at *13 (Vaughn, J., dissenting).

15          I disagree with the Majority's view that the policy covers only
        personal injury claims asserted by the person injured, a person
16      recovering on behalf of the person injured, or people or organizations
        that treated the person injured or deceased, who demonstrate the
17      existence and cause of the injuries. The policy does not contain such
        language. The policy covers damages claimed by any organization
18      for the care of a person injured by Rite Aid.

19  *Id.* Here, the language at issue is materially identical: the policies cover "damages claimed by any

20  person or organization for care, loss of services or death resulting at any time from the Bodily

21  Injury." (Dkt. No. 79-2 at 5; Dkt. No. 79-3 at 10.) This Court agrees with the dissenting view in

22  *Rite Aid*. Nothing in the policy language limits coverage to claims asserted by the person injured,

23  a person recovering on behalf of the person injured, or an organization that treated the person

24  injured and demonstrates the existence and cause of the "specific" injuries. *Rite Aid*, 2022 WL

25  90652, at *8. Rather, the policies cover damages claimed by any organization for care resulting at

26  any time from the bodily injury. *See AIU*, 51 Cal. 3d at 822 ("[T]he mutual intention of the parties

27  . . . is to be inferred, if possible, solely from the written provisions of the contract . . . [and]

28  controls judicial interpretation."); *cf. H.D. Smith*, 829 F.3d at 774 ("[Insurer's] argument is

13

untethered to any language in the policy.").

* * *

The exemplar suits seek, at least potentially and at least in part, forms of relief that might reimburse the government plaintiffs' costs of responding to and providing care for the bodily injury suffered by people in their jurisdictions.  McKesson has established that the exemplar suits at least potentially meet the "bodily injury" requirement for coverage.  Insurers have not established conclusively that the exemplar suits do not meet the "bodily injury" requirement for coverage.  *See Ledesma*, 418 P.3d at 403.

## II.        OCCURRENCE

The policies cover bodily injury that "is caused by an occurrence."  (Dkt. No. 79-2 at 4; Dkt. No. 79-3 at 9.)  With respect to bodily injury, an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Dkt. No. 79-2 at 24; Dkt. No. 73-9 at 25.)  Under "settled" California law, "[a]n accident is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause. This common law construction of the term 'accident' becomes part of the policy and precludes any assertion that the term is ambiguous."  *Ledesma*, 418 P.3d at 403 (cleaned up).

Accident "refers to the *conduct of the insured* for which liability is sought to be imposed." *Id.* (cleaned up).  "[A]n accident . . . is never present when the insured performs a deliberate act *unless* some additional, unexpected, independent, and unforeseen happening occurs that produces the damage."  *Id.* at 406 (citation omitted).  "An accident may exist if any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity."  *Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.*, 212 Cal. Rptr. 3d 231, 246 (Cal. Ct. App. 2016) (cleaned up).

Moreover, accident "does not apply to an act's consequences, but instead applies to the act itself."  *State Farm Gen. Ins. Co. v. Frake* ("*Frake*"), 128 Cal. Rptr. 3d 301, 309 (Cal. Ct. App. 2011).  Because the inquiry focuses on "the injury-producing acts of the insured," it is irrelevant

United States District Court
Northern District of California

whether the insured intended the resulting injury.[6]  *Ledesma*, 418 P.3d at 405.  "[T]he term 'accident' does not apply to deliberate conduct that directly causes injury, regardless of whether the injury was intended. . . .  [T]he term . . . does not apply where an intentional act resulted in unintended harm."  *Frake*, 128 Cal. Rptr. 3d at 309, 312.  "[W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury."  *Navigators*, 212 Cal. Rptr. 3d at 246 (cleaned up).  In this respect, California law differs from the laws of other states that some courts have applied in opioid-related insurance disputes.[7]  *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.* ("*Discount Drug Mart*"), for example, applied Ohio law, under which an accident exists unless there was intent to injure, which may be inferred from intent to act if the two are intrinsically tied.  No. 110151, 2021 WL 6142648, at *11–12 (Ohio Ct. App. Dec. 30, 2021).  The *Discount Drug Mart* court concluded that intent to injure could not be inferred from the opioid distributor's intent to act—that is, its intent to distribute opioids—because the two were not intrinsically tied.  That conclusion is not relevant to California law, under which "accident" does not require an intent to

---

[6] The Court notes that the Ninth Circuit's contrary suggestion in *Anthem Electronics, Inc. v. Pacific Employers Insurance Co.* does not accurately convey current California law.  302 F.3d 1049 (9th Cir. 2002).  That case held that the underlying suits potentially alleged an accident because the "breakage and failures of [] circuit boards" were "unexpected happenings" from the manufacturer's perspective.  *Id.* at 1055.  That holding is fully consistent with *Ledesma*, because the underlying suits alleged the breakage was the event that produced the damage.  *See Ledesma*, 418 P.3d at 406.  However, the opinion went on to state: "[A]t bottom, an occurrence is simply an unexpected consequence of an insured's act . . . .  [A]ccidents need not crash or clatter; they need only be unexpected consequences."  *Anthem Elecs.*, 302 F.3d at 1055.  To the extent that the language of unexpected or unintended "consequences" encompasses unintended *injuries*, then it is plainly contradicted by the California courts' more recent explanations of California law.  "[T]he term 'accident' does not apply where an intentional act resulted in unintended harm."  *Frake*, 128 Cal. Rptr. 3d at 312; *see Navigators*, 212 Cal. Rptr. 3d at 246.

[7] *See Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*, 602 F. App'x 115, 120 (4th Cir. 2015) (applying South Carolina law, under which an accident exists if "either the act or the injury resulting from the act [was] unintentional"); *Cincinnati Ins. Co. v. Richie Enters. LLC*, No. 1:12–CV–00186–JHM–HBB, 2014 WL 838768, at *4–7 (W.D. Ky. Mar. 4, 2014) (applying Kentucky law, under which an injury is "fortuitous" if the insured did not intend the harm and its creation was beyond the insured's control), *altered on other grounds*, 2014 WL 3513211 (W.D. Ky. July 16, 2014); *see also The Travelers Prop. Cas. Co. of Am. v. Actavis, Inc.*, 225 Cal. Rptr. 3d 5, 19–20 (Cal. Ct. App. 2017) (distinguishing California law from South Carolina and Kentucky law), *petition for review granted*, 410 P.3d 1221 (Cal. 2018), *and dismissed*, 427 P.3d 744 (Cal. 2018).

1   injure.  *See Navigators*, 212 Cal. Rptr. 3d at 246; *Frake*, 128 Cal. Rptr. 3d at 309.[8]

2          The exemplar suits bring both non-negligence and negligence claims.  "Even a single claim

3   that does not predominate, but for which there is potential coverage, will trigger the insurer's duty

4   to defend."  *Fire Ins. Exch. v. Superior Ct.*, 104 Cal. Rptr. 3d 534, 537 (Cal. Ct. App. 2010).  The

5   question under California law is whether each claim rests on an allegation that McKesson

6   "perform[ed] a deliberate act"; if so, "an accident . . . is never present . . . *unless* some additional,

7   unexpected, independent, and unforeseen happening occur[red] that produce[d] the damage."

8   *Ledesma*, 418 P.3d at 406 (citation omitted).

9          **A.   Deliberate Conduct**

10             **1.   Non-Negligence Claims**

11         Non-negligence claims form the greater part of the exemplar suits.  The Track One

12  complaints bring claims for violations of the federal RICO Act and the OCPA, statutory public

13  nuisance, common law absolute public nuisance, injury through criminal acts, unjust enrichment,

14  and civil conspiracy.  (Dkt. No. 79-12 ¶¶ 922–81, 993–1081, 1134–78; Dkt. No. 79-14 ¶¶ 907–39,

15  951–1039, 1091–1137.)  The Oklahoma complaint brings claims for statutory public nuisance and

16  unjust enrichment.  (Dkt. No. 79-16 ¶¶ 129–37.)

17         These claims are based on allegations that McKesson engaged in deliberate conduct.  The

18  complaints describe "a supply chain scheme" in which distributors undertook "deliberate efforts to

19  evade restrictions on opioid distribution," creating "a man-made crisis."  (Dkt. No. 79-12 ¶¶ 9, 3;

20  Dkt. No. 79-14 ¶¶ 9, 3; Dkt. No. 79-16 ¶ 1.)  "[T]he crisis was fueled and sustained by those

21  involved in the supply chain of opioids . . . who failed to maintain effective controls over the

22

23  _____

    [8] Relying on *Montrose*, McKesson contends an accident exists because Insurers cannot
24  conclusively show McKesson knew its conduct was certain to cause bodily injury.  (*See* Dkt. No.
    134 at 3–7.)  This contention is incorrect.  The policy at issue in *Montrose* specifically defined
25  "occurrence" as "an accident, including continuous or repeated exposure to conditions which
    results in property damage *neither expected nor intended from the standpoint of the insured*."  861
26  P.2d at 1155 (emphasis added); *accord California v. Allstate Ins. Co.*, 201 P.3d 1147, 1162 (Cal.
    2009).  Thus, the policy itself—not California law—dictated that an accident existed unless the
27  insured expected and intended the injury.  The policies at issue here have no such language.
    Moreover, that the California Supreme Court in *Ledesma* did not so much as cite *Montrose* shows
28  that *Montrose* does not control the "accident" inquiry.

United States District Court
Northern District of California

distribution of prescription opioids, and who instead have actively sought to evade such controls." (Dkt. No. 79-12 ¶ 14; Dkt. No. 79-14 ¶ 14.)  "Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids."  (Dkt. No. 79-14 ¶ 762.)  Distributors "have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market."  (Dkt. No. 79-12 ¶ 14; Dkt. No 79-14 ¶ 14; *see* Dkt. No. 79-16 ¶ 4.)  McKesson "intentionally, unreasonably, and/or unlawfully . . . pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics."  (Dkt. No. 79-12 ¶ 1049; Dkt. No. 79-14 ¶ 1008.)  "McKesson contributed to fueling this devastating opioid crisis in Oklahoma through its reprehensible conduct in driving up the supply of highly addictive narcotics all for the sake of lining their pockets."  (Dkt. No. 79-16 ¶ 53.)  "[I]f you oversupply, people die.  [McKesson] ignored this and distributed what can only be called a major oversupply of opioids into Oklahoma," "for one reason: greed."  (*Id.* ¶¶ 6, 4.)

The allegations that McKesson engaged in a scheme to evade the law and increase profits "can only describe intentional, deliberate acts."  *The Travelers Prop. Cas. Co. of Am. v. Actavis, Inc.* ("*Actavis*"), 225 Cal. Rptr. 3d 5, 17 (Cal. Ct. App. 2017), *petition for review granted*, 410 P.3d 1221 (Cal. 2018), *and dismissed*, 427 P.3d 744 (Cal. 2018).[9]  In *Actavis*, the California Court of Appeal addressed whether an insurer had a duty to defend Watson, an opioid manufacturer, against suits brought by government plaintiffs.  *Id.* at 9–11.  The underlying suits alleged that

---

[9] Contrary to McKesson's contention, *Ledesma* is not inconsistent with *Actavis* and did not abrogate it.  The cases apply the same standard.  *See Ledesma*, 418 P.3d at 406 ("[A]n accident . . . is never present when the insured performs a deliberate act *unless* some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (citation omitted)); *Actavis*, 225 Cal. Rptr. 3d at 10 ("'[A]ccident' . . . has been interpreted to exclude the insured's deliberate acts unless the injury was caused by some additional, unexpected, independent, and unforeseen happening.").  The California Supreme Court dismissed its review of *Actavis* after issuing *Ledesma*.  *Actavis*, 427 P.3d 744 (Cal. 2018) ("Review in the above-captioned matter, which was granted and held for *Liberty Surplus Insurance Corp. v. Ledesma and Meyer Construction Co.* (2018) . . . 418 P.3d 400, is dismissed.").

17

Watson "engaged in a 'common, sophisticated, and highly deceptive marketing campaign' designed to expand the market and increase sales of opioid products by promoting them for treating long-term chronic, nonacute, and noncancer pain." *Id.* at 9.  Between the three suits at issue, Watson sought defense coverage for claims of public nuisance; consumer fraud—deceptive practices; consumer fraud—unfair practices; misrepresentations in connection with sale or advertisement of merchandise; false statements to the city plaintiff; false claims; recovery of city costs of providing services; insurance fraud; and unjust enrichment. *Id.* at 13.  As a threshold matter, the court determined that those claims "are based, and can only be read as being based," on "deliberate and intentional conduct." *Id.* at 10; *see Ledesma*, 418 P.3d at 406.  Similarly here, the exemplar suits' claims of RICO Act violations, OCPA violations, public nuisance, injury through criminal acts, unjust enrichment, and civil conspiracy are based on specific allegations of deliberate conduct.

### 2.     Negligence Claims

Each of the exemplar suits includes a negligence claim.  (Dkt. No. 79-12 ¶¶ 1082–1115; Dkt. No. 79-14 ¶¶ 1040–72; Dkt. No. 79-16 ¶¶ 120–28.)  The Track One complaints allege that McKesson breached its duty of care by:

> Distribut[ing] . . . opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;
>
> Distribut[ing] . . . opioids without maintaining effective controls against the diversion of opioids;
>
> Choosing not to effectively monitor[,] . . . investigate[,] . . . report[,] . . . [or] stop or suspend shipments of suspicious orders; and
>
> Distribut[ing] opioids prescribed by "pill mills" when [McKesson] knew or should have known the opioids were being prescribed by "pill mills."

(Dkt. No. 79-12 ¶ 1089; Dkt. No. 79-14 ¶ 1046.)  The complaints specify:

> Plaintiff does not allege that Defendants were negligent for failure to protect from harm.  Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiff. Defendants have engaged in affirmative acts of creating an illegal, secondary prescription opioid market . . . .

(Dkt. No. 79-12 ¶¶ 1091–92; Dkt. No. 79-14 ¶¶ 1048–49.)  "Defendants were negligent by . . .

United States District Court
Northern District of California

distributing[] and selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that resulted in a foreseeable and unreasonable risk of harm to Plaintiff." (Dkt. No. 79-12 ¶ 1093; Dkt. No. 79-14 ¶ 1050.)  The factual allegations supporting the negligence claims include:

> [T]he failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.
>
> [Defendants] fail[ed] to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified . . . .
>
> Defendants . . . flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market . . . .
>
> [Defendants] should have been on notice that the diversion of opioids was likely occurring . . . .
>
> Defendants' unlawful conduct includes . . . [d]istributing and selling . . . opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."
>
> Defendants controlled the systems they developed to prevent diversion, and whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.
>
> A reasonably prudent . . . distributor should have anticipated an injury to Plaintiff as a probable result of . . . distributing[] and selling prescription opioids in this manner.

(Dkt. No. 79-12 ¶¶ 480, 502, 540, 652, 1027, 1031, 1062, 1095; Dkt. No. 79-14 ¶¶ 493, 518, 557, 689, 986, 990, 1020, 1052.)

Similarly, the Oklahoma complaint alleges that McKesson "fell below the standard of care" by "failing to monitor and/or report suspicious orders of opioids; failing to guard against diversion of opioids; failing to reasonably and properly train its employees related to the distribution of opioids; supplying the market of opioids in an unreasonable and unsafe way; and failing to provide effective controls and procedures for guarding against theft and diversion." (Dkt. No. 79-16 ¶¶ 122–23.)  McKesson had "knowledge of the dangers of opioids and the substantial likelihood that sales in such volumes were for abuse," but "continued to supply the

opioid market and sell opioids into the supply chain." (*Id.* ¶¶ 124, 128.)  McKesson "knew or should have known that Oklahoma would foreseeably suffer injury."  (*Id.* ¶ 126.)  The factual allegations supporting the negligence claim include:

> [McKesson] fill[ed] and fail[ed] to report orders that they knew or should have known were likely being diverted for illicit and/or non-medical uses . . . .

> [McKesson] fail[ed] to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified . . . .

> McKesson . . . knew or should have known that its failure to comply with its obligations under state law would have serious consequences for Oklahoma and its citizens.

> [McKesson] flooded communities with opioids in quantities that it knew or should have known exceeded any legitimate market . . . .

> McKesson knew, or should have known, that the amount of opioids that it delivered into Oklahoma was far in excess of what could be consumed for medically-necessary purposes . . . .

> McKesson knew or should have known that a substantial amount of the opioids dispensed in and around the State of Oklahoma were being dispensed based on invalid or suspicious prescriptions.

> McKesson . . . persisted in a pattern of distributing commonly abused and diverted opioids in places—and in such quantities, and with such frequency—that it knew or should have known these opioids were being over-prescribed and consumed for non-medical purposes.

(*Id.* ¶¶ 55, 60, 71, 80, 88, 106, 107.)

The exemplar suits' negligence claims are based on alleged deliberate conduct.  The claims allege McKesson breached the duty of care by its affirmative acts: "distributing[] and selling opioids."  (Dkt. No. 79-12 ¶ 1093.)  The plaintiffs challenge McKesson's manner of engaging in those acts: "Defendants were negligent by . . . distributing[] and selling opioids *in a way* that created and fostered an illegal, secondary prescription opioid market . . . ."  (*Id.* (emphasis added).)  As alleged, distributing and selling opioids are deliberate acts, comparable to the insured's retention, hiring, and supervision of an employee in *Ledesma*.  418 P.3d at 406; *id.* at 410 (Liu, J., concurring).  Indeed, the Track One complaints carefully explain that the negligence claims rest on alleged deliberate conduct:

20

1

> Plaintiff does not allege that Defendants were negligent for failure to protect from harm.   Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiff.

2

3   (Dkt. No. 79-12 ¶ 1091.)  Moreover, the deliberate act of distributing opioids is central to each of

4   the negligence claims.  While the claims additionally allege that McKesson failed to report and

5   failed to halt suspicious orders, these allegations are secondary to the alleged injury-producing act

6   of distributing opioids.  Put differently, the complaints do not assert that failing to report

7   suspicious orders constitutes negligence *in the absence of* McKesson filling those suspicious

8   orders.  To the contrary, the complaints assert that failing to report and halt suspicious orders

9   facilitated McKesson's "flooding" and "oversupplying" the opioids market.  (*Id.* ¶ 540; Dkt. No.

10  79-14 ¶ 557; Dkt. No. 79-16 ¶¶ 6, 55.)  McKesson "*s[old] and distribut[ed]* far greater quantities

11  of prescription opioids than they [knew] could be necessary for legitimate medical uses, *while*

12  failing to report, and to take steps to halt suspicious orders when they were identified, thereby

13  exacerbating the oversupply of such drugs and fueling an illegal secondary market."  (Dkt. No. 79-

14  12 ¶ 14 (emphasis added); Dkt. No 79-14 ¶ 14 (emphasis added); *see* Dkt. No. 79-16 ¶ 4.)  For this

15  reason, none of the government plaintiffs could prevail on its negligence claim without proving

16  that McKesson sold, distributed, and shipped opioids.

17       McKesson emphasizes that the exemplar suit complaints are replete with "should have

18  known" language.  According to McKesson, this language means the complaints allege McKesson

19  may not have intended the injuries and therefore they were produced by accident.  This argument

20  conflates the issues of whether the injury was foreseeable and whether the "injury-producing acts

21  of the insured" were deliberate.  *Ledesma*, 418 P.3d at 405.  These issues are distinct under

22  principles of tort law.

23       "Negligence is conduct that creates or fails to avoid unreasonable risks of foreseeable harm

24  to others."  Dan B. Dobbs et al., *Dobbs' Law of Torts* § 126 (2d ed., June 2021 update).

25  Negligence may be based on affirmative acts or on omissions, because either form of conduct may

26  present an unreasonable risk of foreseeable harm.  *See id.* ("[T]he emphasis in negligence cases is

27  on unreasonably risky conduct . . . .  Conduct is often an affirmative act such as driving too fast.

28  But conduct can include omissions or failures to act."); Restatement (Second) of Torts § 284 (Am.

United States District Court
Northern District of California

Law Inst. 1965, Oct. 2021 update).  In contrast to negligence, intentional torts are "based upon conduct that is coupled with either a purpose that is legally wrong or a certainty that legally cognizable harm will result."  *Dobbs' Law of Torts* § 159; *see* Restatement (Second) of Torts § 282 cmt. b.  Thus, the core distinction between negligence and intentional torts is whether the conduct was done with the purpose of causing harm or with a certainty that harm would result, not whether the conduct was deliberate.  *See Dobbs' Law of Torts* § 126 ("[I]ntentional conduct and even intentional risk-taking is analyzed under negligence rules unless the defendant has a purpose to invade the plaintiff's legally protected interests or a certainty that such an invasion will occur."); *Donnelly v. S. Pac. Co.*, 118 P.2d 465, 468 (Cal. 1941) ("A negligent person has no desire to cause the harm that results from his carelessness.  And he must be distinguished from a person guilty of willful misconduct, such as assault and battery, who intends to cause harm.").  An alleged tortfeasor might engage in deliberate conduct that has an unreasonable risk of foreseeable harm; her intentional act does not transform the negligence into an intentional tort.  *See Ledesma*, 418 P.3d at 406 (explaining that negligent hiring, retention, and supervision of employee are based on deliberate acts).  A purpose to cause harm or a certainty that harm will result creates an intentional tort.

This distinction between negligence and intentional torts explains why California courts do not simply check the causes of action to determine whether an underlying complaint alleges an accident.  *See Swain v. Cal. Cas. Ins. Co.*, 120 Cal. Rptr. 2d 808, 812 (Cal. Ct. App. 2002) ("[C]overage turns not on the technical legal cause of action pleaded by the third party but on the facts alleged in the underlying complaint or otherwise known to the insurer."); *Quan v. Truck Ins. Exch.*, 79 Cal. Rptr. 2d 134, 143 (Cal. Ct. App. 1998) ("[T]he insureds' 'negligence' versus 'intentional tort' distinction misses the point.").  "Negligence" is not synonymous with "accident," because a claim for negligence may be based on alleged deliberate conduct that presents an unreasonable risk of foreseeable harm.  *See Allstate Ins. Co. v. Barnett*, No. C–10–0077 EMC, 2011 WL 3954880, at *2 (N.D. Cal. Sept. 7, 2011) ("[Plaintiff's] attempt to equate negligence with an accident is not persuasive."); *Quan*, 79 Cal. Rptr. 2d at 143 ("The insured may have 'negligently' embraced and kissed claimant in the sense that he violated some duty of care in

doing so, but . . . [it was] nevertheless intentional conduct . . . .").  Thus, the distinction also explains why courts applying California law have found that some claims for negligence do not allege an accident.  *See Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1364–65 (9th Cir. 1991) ("[A]n intentional termination is not an 'occurrence' under the policy because it is not an accident. Even where the wrongful termination spawns emotional suffering and negligence claims, California courts have refused to consider these losses 'accidental.'" (cleaned up)); *e.g.*, *Upasani v. State Farm Gen. Ins. Co.*, 173 Cal. Rptr. 3d 784, 788 (Cal. Ct. App. 2014) (holding that claims including negligence per se and negligent infliction of emotional distress were based only on alleged "nonaccidental, intentional, and purposeful" acts); *Merced Mut. Ins. Co. v. Mendez*, 261 Cal. Rptr. 273, 279–81 (Cal. Ct. App. 1989) (holding that claims including negligent assault and battery and negligent infliction of emotional distress were based only on alleged deliberate conduct).

In the negligence context, "knew or should have known" language often refers to the foreseeability of the alleged harm.  The degree of foreseeability of the alleged harm is one factor in determining whether a duty of care exists.  *See Burgess v. Superior Court*, 831 P.2d 1197, 1200 (Cal. 1992) (in bank) ("Whether a defendant owes a duty of care is a question of law.  Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." (citation omitted)); *Huang v. The Bicycle Casino, Inc.*, 208 Cal. Rptr. 3d 591, 600–01 (Cal. Ct. App. 2016).  Thus, the phrase indicates that the alleged tortfeasor either knew the risk of harm, meaning the harm was subjectively and actually foreseen, or that she should have known the risk of harm, meaning the harm was foreseeable under the objective reasonable person standard.  *See Dobbs' Law of Torts* § 159 ("What the actor should have foreseen often depends a great deal on the knowledge and information he has or should have as a reasonable person.  The term *should have known* . . . is one way of saying that the reasonable person standard governs the question of unreasonable risk and foreseeability.").

So it is here.  The exemplar suits' "knew or should have known" language refers to the foreseeability of the alleged harm.  According to the complaints, McKesson knew or should have known that incoming orders "were suspicious," that shipments went to "pill mills," that the

quantities "could not be justified" and "exceeded any legitimate market," that "diversion . . . was likely occurring," and that its conduct "would have serious consequences."  (Dkt. No. 79-12 ¶¶ 480, 502, 540, 652, 1089; Dkt. No. 79-14 ¶¶ 493, 518, 557, 689, 1046; Dkt. No. 79-16 ¶¶ 55, 60, 71, 80.)  Each of these allegations refers to whether McKesson foresaw harm or a reasonable person would have foreseen harm: "A reasonably prudent . . . distributor should have anticipated an injury to Plaintiff as a probable result of . . . distributing[] and selling prescription opioids in this manner."  (Dkt. No. 79-12 ¶ 1095; Dkt. No. 79-14 ¶ 1052; *see* Dkt. No. 79-16 ¶ 126 ("[McKesson] knew or should have known that Oklahoma would foreseeably suffer injury.").)  Thus, the "knew or should have known" language shows that the complaints allege the harm was foreseeable.  It is not dispositive of whether the complaints allege that the injury-producing conduct was deliberate.  *See Ledesma*, 418 P.3d at 406; *Merced*, 261 Cal. Rptr. at 279 (rejecting "argument that in construing the term 'accident,' chance or foreseeability should be applied to the resulting injury rather than to the acts causing the injury").  The latter question is distinct because, as California law makes clear, lack of intent to cause injury is not relevant to whether the event that produced the injury was accidental.  *See Actavis*, 225 Cal. Rptr. 3d at 18 ("[W]hether Watson intended to cause injury or mistakenly believed its deliberate conduct would not or could not produce injury is irrelevant to determining whether an insurable accident occurred."); *Albert v. Mid–Century Ins. Co.*, 187 Cal. Rptr. 3d 211, 219 (Cal. Ct. App. 2015) ("When an insured intends the acts resulting in the injury or damage, it is not an accident merely because the insured did not intend to cause injury.  The insured's subjective intent is irrelevant." (cleaned up)); *Frake*, 128 Cal. Rptr. 3d at 309 ("the term 'accident' does not apply to an act's consequences, but instead applies to the act itself" (cleaned up)).

As explained above, the negligence claims allege that McKesson's "injury-producing acts" were deliberate: shipping and distributing opioids.  *Ledesma*, 418 P.3d at 405.  By way of contrast, they do not allege that McKesson intended to ship opioids to one location but, printing the wrong packing label, shipped them to a different location.  Nor do they allege that McKesson intended to ship aspirin but, pulling the wrong box off the shelf, shipped opioids instead.  Rather, the negligence claims allege that McKesson distributed opioids.  *See Albert*, 187 Cal. Rptr. 3d at 219

United States District Court
Northern District of California

24

1  ("[P]laintiff . . . deliberately hired a contractor to trim the trees . . . .  [S]he intended for them to be

2  pruned.").  Thus, the negligence claims, like the other claims, rest on allegations of deliberate

3  conduct.

4     **B.     Additional, Unexpected, Independent, and Unforeseen Happening**

5       Because all the claims in the exemplar suits rest on allegations of deliberate conduct, there

6  is "no insurable accident under the policies unless some additional, unexpected, independent, and

7  unforeseen happening produced the injuries for which the complaints seek a remedy."  *Actavis*,

8  225 Cal. Rptr. 3d at 18 (cleaned up); *see Ledesma*, 418 P.3d at 406.  To determine whether an

9  additional, unexpected, independent, and unforeseen happening is alleged to have produced the

10  injury, "the relevant perspective is that of the insured."  *Ledesma*, 418 P.3d at 408 n.10.  The

11  insured's acts "must be considered the starting point of the series of events leading" to the injury.

12  *Id.* at 406.  "[W]e emphasize that whether [the insured] intended to cause injury or mistakenly

13  believed its deliberate conduct would not or could not produce injury is irrelevant to determining

14  whether an insurable accident occurred."  *Actavis*, 225 Cal. Rptr. 3d at 18.  "Instead, we look to

15  whether the [complaints] allege, directly or by inference, it was [the insured's] deliberate conduct,

16  or an additional, unexpected, independent, and unforeseen happening, that produced the alleged

17  injuries."  *Id.*

18       The exemplar suit complaints allege that it was McKesson's conduct, not an additional,

19  unexpected, independent, and unforeseen happening, that produced the alleged injuries.  The

20  complaints focus on the "massive" quantities of McKesson's opioids shipments, (Dkt. No. 79-16

21  ¶¶ 4, 32, 39, 47), and allege that the injuries flowed from the sheer quantities of distribution:

22
23     > Defendants funneled far more opioids into communities across the
     > United States than could have been expected to serve legitimate
     > medical use.

24
25     > The conclusion that Defendants were on notice of the problems of
     > abuse and diversion follows inescapably from the fact that they
     > flooded communities with opioids in quantities that they knew or
26     > should have known exceeded any legitimate market . . . .

27     > The volume of opioids distributed in Ohio communities . . . is so high
     > as to raise a red flag that not all of the prescriptions being ordered
     > could be for legitimate medical uses.
28

> Defendants . . . were fully aware of doctors and clinics whose prescribing activities were questionable.  Yet . . . Defendants did nothing to stop the pill mills from operating, and to the contrary encouraged their activities by . . . continuing to supply excessive quantities of opioids.
>
> Defendants[] moved approximately 396 million units of these opioids into Cuyahoga County between 2006 and 2014. . . .  [T]hese totals equate to more than 35 pills for every man, woman and child in the county each year.
>
> [T]he unconscionable proliferation of opioids contributed to the public health emergency now unfolding in the County . . . .

(Dkt. No. 79-12 ¶¶ 538, 540, 653, 714, 715, 719 (indicating McKesson shipped 62.5 million units of opioids into Cuyahoga County between 2006 and 2014), 728; Dkt. No. 79-14 ¶¶ 555, 557, 690, 693; Dkt. No. 79-16 ¶¶ 75, 80, 97.)

> Defendants . . . suppl[ied] opioids beyond even what this expanded market could bear, funneling so many opioids into Summit County that they could only have been delivering opioids for diversion and illicit use.

(Dkt. No. 79-14 ¶ 715.)

> Oklahomans are overdosing, becoming incarcerated, going into the foster care system, and being born dependent on opioids.  This is what happens when opioids are oversupplied.

(Dkt. No. 79-16 ¶ 30; *see id.* ¶¶ 76, 86.)  Thus, McKesson's distribution itself is alleged to have produced the injuries.

The complaints allege that opioids from McKesson's distribution were diverted, that is, routed from legitimate to illegitimate uses.  But they specify that the quantities of McKesson's distribution so vastly exceeded legitimate use that the opioids *must* have been diverted.  According to the complaints, diversion was expected and foreseen due to the quantities of distribution: "The volume of opioids distributed . . . is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses."  (Dkt. No. 79-12 ¶ 653; Dkt. No. 79-14 ¶ 690; Dkt. No. 79-16 ¶ 97.)  Accepting McKesson's position (without deciding the issue) that the opioid lawsuits arise from a single occurrence, (Dkt. No. 79 at 28–32), the diversion alleged in the complaints must be analyzed as a whole.  Thus, what matters is whether diversion of routine massive shipments over a period of years was expected and foreseen, not whether diversion of any

26

particular shipment was expected and foreseen.  As a whole, the alleged diversion was essentially inevitable because McKesson allegedly regularly shipped more opioids than could have been needed to treat legitimately prescribed people.  Resolving all doubts in McKesson's favor, *see Swift*, 326 P.3d at 258, the complaints do not allege it is "a matter of fortuity" that a steady stream of massive quantities of opioids, over a period of years, would be diverted.  *Navigators*, 212 Cal. Rptr. 3d at 246 (cleaned up).  Therefore, as alleged in the complaints, and resolving all doubts surrounding those allegations in McKesson's favor, diversion was not an additional, unexpected, independent, and unforeseen happening as a matter of law.

*Actavis* supports the Court's conclusion.  There, the underlying complaints alleged that Watson, an opioids manufacturer, undertook "a massive marketing campaign to promote the use of opioids for purposes for which they are not suited." 225 Cal. Rptr. 3d at 18.  The complaints alleged that opioids were diverted after manufacture from legitimate to illegitimate channels, resulting in sickness, addictions, and deaths.  The court concluded that the alleged diversion was not an additional, unexpected, independent, and unforeseen happening as a matter of law, because Watson's alleged deceptive marketing campaign made diversion expected and foreseen:

> It is not unexpected or unforeseen that a massive marketing campaign to promote the use of opioids for purposes for which they are not suited would lead to a nation "awash in opioids." . . .  Watson argues . . . [that] for its opioid products to end up in the hands of abusers, it was necessary for doctors to prescribe the drugs to abusers. . . .  The role of doctors in prescribing, or misprescribing, opioids is not an independent or unforeseen happening.  The [complaints] allege: " . . . Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information . . . ."

*Id.* at 18–19.  Similarly here, the alleged quantities of McKesson's distribution make the alleged diversion expected and foreseen as a matter of law.  *Cf. Navigators*, 212 Cal. Rptr. 3d at 246–48 (finding that moisture emitted from concrete under tiles was not an additional, unexpected, independent, and unforeseen happening after insured installed the tiles knowing about the moisture); *Albert*, 187 Cal. Rptr. 3d at 213–15, 218–19 (finding no additional, unexpected, independent, and unforeseen happening, "such as a slip of the chainsaw," after insured directed contractors to prune trees).  The complaints do not allege facts that create doubts which, if

resolved in McKesson's favor, permit a conclusion that the alleged diversion was an additional, unexpected, independent, and unforeseen happening.

The Court's conclusion also accords with *Ledesma* although it reaches a different result. There, a construction company hired an employee for a project at a middle school. *Ledesma*, 418 P.3d at 402.  The company later received notice of allegations that, several years into the project, the employee had molested a child from the middle school. *See Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 834 F.3d 998, 1000 (9th Cir. 2016) (order certifying question to California Supreme Court); *Liberty Ins. Corp. v. Ledesma & Meyer Constr. Co.*, No. CV 12-00900-RGK (SPx), 2013 WL 12143958, at *1 (C.D. Cal. Jan. 23, 2013) (district court's summary judgment order).  The California Supreme Court held that, after the company had hired the employee, the employee's molestation could have been an additional, unexpected, independent, and unforeseen happening from the company's point of view. *Ledesma*, 418 P.3d at 408.

The employee's conduct is not comparable to the diversion alleged here.  As alleged in the complaints, diversion was effectively inevitable due to the volume of opioids McKesson was distributing.  McKesson's alleged conduct facilitated diversion in ways that made it expected and foreseen as a matter of law: McKesson allegedly shipped more opioids than could have been legitimately used, routinely and over a period of years.  Those allegations are more akin to a scenario in which the construction company kept renewing the employee's contract despite hearing repeated, credible rumors that he had assaulted a new child each month.  The allegations at issue in *Ledesma* were much more limited and permitted a conclusion that the assault was an additional, unexpected, independent, and unforeseen happening after the company hired the employee.

Moreover, apart from diversion, the complaints do not allege other facts that would create the potential for coverage by suggesting that an alternative additional, unexpected, independent, and unforeseen happening produced the alleged injuries.  For example, in *Navigators*, the court determined that the underlying complaint primarily asserted a theory that the installed flooring tiles failed due to excess moisture vapor from the concrete underneath the tiles.  212 Cal. Rptr. 3d at 246–48.  That theory did not allege an additional, unexpected, independent, and unforeseen

28

1   happening after the deliberate act of installing the tiles: "After installation of the flooring, nothing

2   else happened that might have caused the flooring to fail." *Id.* at 247.  However, the complaint

3   also alleged facts that could support alternative theories, including that the tiles failed due to roof

4   leaks or a design defect. *Id.* at 252–54.  Those theories might rely on an additional, unexpected,

5   independent, and unforeseen happening after installing the tiles. *Id.*; *see Actavis*, 225 Cal. Rptr. 3d

6   at 16 (discussing *Navigators*).  Thus, the facts alleged in the complaint created the potential for

7   coverage.  Here, unlike in *Navigators*, the exemplar suit complaints do not allege facts that would

8   indicate an additional, unexpected, independent, and unforeseen happening that produced the

9   injuries.

10       In sum, the exemplar suits bring claims based on alleged deliberate conduct—McKesson's

11   distribution of opioids—and allege that conduct produced the government plaintiffs' injuries.  *See*

12   *Ledesma*, 418 P.3d at 406.  Because the claims are based on deliberate conduct, they do not allege

13   an accident "*unless* some additional, unexpected, independent, and unforeseen happening occurs

14   that produces the damage." *Id.* (citation omitted).  Resolving all doubts in McKesson's favor, *see*

15   *Swift*, 326 P.3d at 258, the complaints do not allege facts suggesting diversion was an additional,

16   unexpected, independent, and unforeseen happening that produced the injuries, nor do they allege

17   other facts suggesting an alternative additional, unexpected, independent, and unforeseen

18   happening produced the injuries.

19                                              * * *

20       The exemplar suits do not allege an "accident" within the meaning of California law.

21   Therefore, Insurers have established conclusively that the exemplar suits do not meet the

22   "occurrence" requirement for coverage, and there is no potential for coverage of the three

23   exemplar suits under the two policies at issue.  *See Ledesma*, 418 P.3d at 403.  Insurers have no

24   duty to defend McKesson against the exemplar suits that cannot possibly be covered by the

25   policies, and, thus, Insurers are entitled to partial summary judgment on the duty to defend.

26       The Court need not reach the parties' alternative arguments as to whether McKesson

27   exhausted the policies' retention limits or had prior knowledge of the alleged bodily injury.

28

United States District Court
Northern District of California

## III.    ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

Also pending before the Court are two administrative motions to file under seal.  NU seeks to file under seal five exhibits in connection with its cross-motion for partial summary judgment. (Dkt. No. 110.)  ACE seeks to file under seal seven exhibits as well as the portions of its cross-motion for partial summary judgment that reflect information from those exhibits.  (Dkt. No. 114.) Both are requested on the grounds that the documents were designated confidential by McKesson under the stipulated protective order approved by the Court, (Dkt. No. 91); in ACE's case, some of the documents were written by ACE in response to materials designated confidential by McKesson.

There is a presumption of public access to judicial records and documents.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  Courts generally apply a "compelling reasons" standard when considering motions to seal, recognizing that "a strong presumption in favor of access is the starting point."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up).  Civil Local Rule 79-5 supplements the "compelling reasons" standard.  *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-04810-HSG, 2020 WL 2838812, at *1 (N.D. Cal. June 1, 2020).  "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."  N.D. Cal. Civ. L.R. 79-5(c).

> For any document a party ("Filing Party") seeks to seal because that document has been designated as confidential by another party or non-party (the "Designating Party"), the Filing Party must, instead of filing an Administrative Motion to File Under Seal, file an Administrative Motion to Consider Whether Another Party's Material Should Be Sealed.
> . . . .
> (3) Within 7 days of the motion's filing, the Designating Party must file a statement and/or declaration . . . .  A failure to file a statement or declaration may result in the unsealing of the provisionally sealed document without further notice to the Designating Party.

*Id.* at 79-5(f).

Here, Insurers' reference to the stipulated protective order does not establish compelling reasons to seal the documents at issue.  *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1021 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020).  Nor has

United States District Court
Northern District of California

1   McKesson, as the designating party, filed any statement or declaration to support a finding of

2   compelling reasons.  Accordingly, the administrative motions to file under seal are DENIED.

3   Unless the designating party files a renewed motion to seal within 5 days of the date of this order

4   the Court will unlock the prior docket entry so that the material previously filed under seal is

5   available on the public docket.  *See* N.D. Cal. Civ. L.R. 79-5(f), 79-5(g)(2).

6   **IV.     MOTION TO STRIKE**

7          At the January 27, 2022 hearing on the parties' cross-motions for summary judgment, the

8   Court granted ACE and McKesson the opportunity to brief the recently decided cases *Rite Aid* and

9   *Discount Drug Mart*, respectively, in five pages or less.  (Dkt. No. 132 at 71:15-25, 72:1-3, 72:17-

10  23.)  The Court granted each the opportunity to respond to the other's supplemental brief, again in

11  five pages or less.  (*Id.* at 72:20–73:1.)  NU moves to strike portions of McKesson's supplemental

12  brief, which includes five pages of argument on *Discount Drug Mart*, (Dkt. No. 134 at 3–7),

13  followed by a declaration of counsel and an exhibit, (Dkt. Nos. 134-1, 134-2).  (Dkt. No. 135.)

14         McKesson's supplemental brief is within the scope of briefing *Discount Drug Mart*.  The

15  motion to strike is therefore DENIED.

16                                    **CONCLUSION**

17         For the reasons explained above, NU and ACE's motions for partial summary judgment on

18  the duty to defend are GRANTED.  McKesson's motion for partial summary judgment on the duty

19  to defend is DENIED.  The administrative motions to file under seal are DENIED.  NU's motion

20  to strike is DENIED.

21         The Court will hold a further case management conference by Zoom video on May 5, 2022

22  at 1:30 p.m.  An updated joint case management conference statement is due one week in advance.

23         This Order disposes of Docket Nos. 79, 110, 111, 114, 115, 135.

24         **IT IS SO ORDERED.**

25  Dated: April 5, 2022

26

27  _____

28  JACQUELINE SCOTT CORLEY
    United States District Judge

United States District Court
Northern District of California