United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIU INSURANCE COMPANY, et al., | Case No. 20-cv-07469-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: MCKESSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| MCKESSON CORPORATION, | |
| Defendant. | Re: Dkt. No. 170 |

This lawsuit arises from an insurance coverage dispute. Before the Court is McKesson's motion for partial summary judgment seeking a declaration Plaintiff Insurers owe McKesson a duty to defend. (Dkt. No. 170.)[1] Having carefully considered the briefing, and with the benefit of oral argument on July 25, 2024, the Court DENIES McKesson's motion. McKesson fails to establish the five insurance policies spanning 1999-2004 have any potential to cover the underlying opioid suits because the suits do not allege an accident caused the alleged bodily injury. So, Insurers have no duty to defend.

**BACKGROUND**

On January 26, 2024, the Ninth Circuit affirmed the Court's order granting partial summary judgment in favor of Insurers on the grounds Insurers had no duty to defend McKesson against three Exemplar Opioid Lawsuits under two policies issued to McKesson spanning 2008-2009 and 2015-2016. *See AIU Ins. Co. v. McKesson Corp.*, No. 22-16158, 2024 WL 302182, at *4 (9th Cir. Jan. 26, 2024) ("Having concluded that the Exemplar Suits do not allege an accident, we hold that there is no potential for coverage and thus Insurers have no duty to defend."). The

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Ninth Circuit explained McKesson is entitled to coverage for any "occurrence," an "occurrence" is defined as "an accident," and "an accident" "does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." *Id.* at *1. Because the three Exemplar Suits[2] "described exclusively deliberate conduct" by McKesson, and do not allege "'some additional, unexpected, independent, and unforeseen happening' that may have caused the alleged damage," there is no possibility they allege an accident and therefore Insurers have no duty to defend. *Id.* at *2-4.

Notwithstanding that ruling, McKesson now seeks a declaration "the Exemplar Suits allege at least a potentially covered 'occurrence' within the meaning of that term as defined under the 1999-2004 AIG Policies." (Dkt. No. 170 at 7.) These five 1999-2004 policies differ slightly from the policies at issue in the Ninth Circuit ruling. As defined in the 1999-2004 policies, "occurrence" means "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured." (Dkt. Nos. 170-2 at 8, 170-3 at 9, 170-4 at 9, 170-5 at 8, 170-6 at 10.) In the policies previously adjudicated, "occurrence" "[w]ith respect to bodily injury or property damage" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*See, e.g.*, Dkt. No. 79-3 at 25.) These policies separately exclude "'bodily injury' or 'property damage' expected or intended from the standpoint of the 'insured,'" rather than specifying that exclusion in the definition of occurrence. (*See, e.g.*, Dkt. No. 79-3 at 15.)

**DISCUSSION**

To prevail in seeking a declaratory judgment on the duty to defend, "the insured need only show that the underlying claim *may* fall within policy coverage[.]" *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.* ("*Ledesma*"), 418 P.3d 400, 403 (Cal. 2018). "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's

---

[2]The three Exemplar suits consist of two suits consolidated into the "Track One" opioid multidistrict litigation in the Northern District of Ohio and Oklahoma state's suit against McKesson. (Dkt. No. 79-7 ¶¶ 6-9, 15); *see In Re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio filed Dec. 12, 2017); *Oklahoma v. McKesson Corp.*, Case No. CJ-2020-84 (Bryan Cnty., Okla.).

United States District Court
Northern District of California

favor." *Montrose Chem. Corp. of Cal. v. Superior Court* ("*Montrose*"), 6 Cal. 4th 287, 299-300 (1993) (in bank).

## I.    Accident

The 1999-2004 policies, like the previously adjudicated policies, define occurrence as "an accident." (Dkt. Nos. 170-2 at 8, 170-3 at 9, 170-4 at 9, 170-5 at 8, 170-6 at 10.)  Under "settled" California law, "[a]n accident is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.  This common law construction of the term 'accident' becomes part of the policy and precludes any assertion that the term is ambiguous." *Ledesma*, 418 P.3d at 403 (cleaned up).  Accident "refers to the *conduct of the insured* for which liability is sought to be imposed." *Id.* (cleaned up).  "[A]n accident . . . is never present when the insured performs a deliberate act *unless* some additional, unexpected, independent, and unforeseen happening occurs that produces the damage."  *Id.* at 406 (citation omitted).  "An accident may exist if any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity." *Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.*, 212 Cal. Rptr. 3d 231, 246 (Cal. Ct. App. 2016) (cleaned up). Moreover, accident "does not apply to an act's consequences, but instead applies to the act itself." *State Farm Gen. Ins. Co. v. Frake* ("*Frake*"), 128 Cal. Rptr. 3d 301, 309 (Cal. Ct. App. 2011).

Because the inquiry focuses on "the injury-producing acts of the insured," it is irrelevant whether the insured intended the resulting injury. *Ledesma*, 418 P.3d at 405.  "[T]he term 'accident' does not apply to deliberate conduct that directly causes injury, regardless of whether the injury was intended. . . . [T]he term . . . does not apply where an intentional act resulted in unintended harm." *Frake*, 128 Cal. Rptr. 3d at 309, 312.  "[W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." *Navigators*, 212 Cal. Rptr. 3d at 246 (cleaned up). Under California law, "accident" does not require an intent to injure. *See Navigators*, 212 Cal. Rptr. 3d at 246; *Frake*, 128 Cal. Rptr. 3d at 309; *see also AIU Ins. Co.*, 2024 WL 302182, at *2 n.1 (quoting *Frake*, 128 Cal. Rptr. 3d at 309-10) ("[T]he insured's subjective intent is irrelevant with regard to the consequences of his deliberate actions.  Only the intent to act is considered.").

So, the Court's "task is essentially a two-step inquiry: do the complaints in the Exemplar Suits allege anything other than strictly deliberate conduct?  And if not, do they countenance 'some additional, unexpected, independent, and unforeseen happening' which may have produced the damage?" *AIU Ins. Co.*, 2024 WL 302182, at *1.  This Court, affirmed by the Ninth Circuit, already held "the answer to both questions is 'no.'"  *Id*.  "The allegations in the Exemplar Suits describe exclusively deliberate conduct." *AIU Ins. Co.*, 2024 WL 302182, at *2.  And the Exemplar Suits do not allege "'some additional, unexpected, independent, and unforeseen happening' that may have caused the alleged damage." *Id*. at *2.  So, the Exemplar Suits do not allege an occurrence potentially covered by the 1999-2004 policies.  Accordingly, "there is no potential for coverage and thus Insurers have no duty to defend." *Id*. at *4.

McKesson's insistence the additional language in the 1999-2004 policies' definition of "occurrence" means "the insured's subjective intent is relevant" and "an 'occurrence' exists so long as the insurer cannot conclusively prove that the insured intended or had actual knowledge that the injury would result from its actions" (Dkt. No. 170 at 7), is unpersuasive.  The phrase "neither expected nor intended from the standpoint of the insured" in the 1999-2004 policies' definition of occurrence plainly modifies "Bodily Injury or Property Damage."  So, for there to be an occurrence, there must be an "accident" resulting in "Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured."  This language does not change California's "well-settled" definition of "accident" in general liability policies as not including deliberate, intended conduct even if the insured did not intend the injury resulting from the deliberate conduct. *See Navigators*, 212 Cal. Rptr. 3d at 246.

This holding is consistent with California law. *See, e.g.*, *Delgado v. Interinsurance Exch. of Auto. Club of S. California*, 47 Cal. 4th 302, 311 (2009) ("The phrase 'neither expected nor intended from the standpoint of the insured' in earlier comprehensive general liability policies has been construed as modifying the policy term 'injury and damages,' not 'accident.'").  For example, in *Royal Globe Ins. Co. v. Whitaker*, which concerned the same policy language as is at issue here, the court held "[a]n intentional act is not an 'accident' within the plain meaning of the word.  The same roadblock at the definition of 'accident' halts any argument claiming the

4

appellants' assignor intended his act but not the resulting harm." 181 Cal. App. 3d 532, 537 (Ct. App. 1986) (cleaned up); *see also Com. Union Ins. Co. v. Superior Ct.*, 196 Cal. App. 3d 1205, 1209 (Ct. App. 1987) (explaining the inclusion of the phrase "'injury or damage must be neither expected nor intended'" "does not change the meaning of accident or remove the requirement that any injury or damage be accidentally caused."); *United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560, 1564 (Ct. App. 1991) ("In no case has the analysis [of the term 'accident'] relied on the phrase 'neither expected nor intended from the standpoint of the insured' appearing at the end of the standard definition of occurrence."). In construing the definition of "occurrence" found in the 1999-2004 policies, "California courts have agreed that the controlling issue is whether the claimant was injured as the result of an 'accident.' The remainder of the definition merely explains that expected or intended injuries or damage are not 'accidents' within the meaning of the policy." *Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 804-05 (1994) (cleaned up).

McKesson's reliance on *Montrose* is misplaced. *Montrose* also involved the same definition of "occurrence" as is at issue on this motion. At the first step of the analysis, the Supreme Court held the complaint did not allege only deliberate conduct; instead, because the complaint did not specify whether the insured's conduct was negligent or deliberate, its allegations raised a possibility the insured would be liable for property damage caused by an accident. 6 Cal. 4th at 304. And the insurers' extrinsic evidence "merely placed in dispute whether [the insured's] actions would eventually be determined not to constitute an occurrence or to fall within one or more of the exclusions contained in the policies." *Id.* For example, the insurers' extrinsic evidence created a dispute as to whether the insured "expected or intended the property damage that allegedly resulted." *Id.* In the *Montrose* policy, as here, if the insured expected or intended the property damage, then it is not an occurrence, even if the insured's conduct was not deliberate. In the 2008-2009 and 2015-2016 polices, even if the insured's conduct was not deliberate (that is, was negligent), there is still no coverage if the insurer proves the insured expected or intended the damage. So, coverage under both policies is the same. *Montrose* in no way disrupted California's settled interpretation of "accident." It is thus unsurprising McKesson fails to cite a single case suggesting it did.

Accordingly, McKesson's motion for partial summary judgment on the grounds the definition of "accident," and therefore the definition of "occurrence," in the 1999-2004 policies differs from that of the previously adjudicated polices is DENIED.

## II.   The Years 1999 to 2004

McKesson next argues even if the definition of "occurrence" in the 1999-2004 policies is as the Ninth Circuit stated, the Exemplar Suits allege at least a potentially covered occurrence because diversion of the opioids McKesson distributed from 1999 to 2004 was an unforeseen, intervening cause of the alleged injuries.  McKesson's argument is unpersuasive.

First, although not entirely clear, McKesson appears to argue the Exemplar Suits do not allege intentional conduct on behalf of McKesson from 1999 to 2004.  (Dkt. No. 170 at 24 ("The Exemplar Suits do not allege that a mere three years [after OxyContin became commercially available in 1996], in 1999, McKesson was shipping 'massive quantities' of opioids or that it was 'inevitable' as a matter of law that injury or diversion would result.").)  Contrary to McKesson's assertion, the Exemplar Suits allege McKesson's intentional distribution of opioids from the mid-1990s onward directly caused the opioid epidemic.  The Track One suits allege "a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associate adverse outcomes."  (Dkt. Nos. 79-12 ¶ 478; 79-14 ¶ 491.)  Successful deceptive marketing dramatically increased opioid sales, leading the number of opioid prescriptions and overdoses to quadruple from 1999 to 2016.  (Dkt. Nos. 79-12 ¶¶ 12, 474, 476, 478-79, 484; 79-14 ¶¶ 12, 487, 489, 491, 497.)  Sales of OxyContin, "the product whose launch in 1996 ushered in the modern opioid epidemic" and constitutes roughly 30% of the analgesics market, rose from $49 million in its first year on the market to $1.6 billion in 2002.  (Dkt. Nos. 79-12 ¶¶ 42, 119; 79-14 ¶¶ 47, 131.)  As deceptive marketing increased demand for opioids after 1996, McKesson facilitated the opioid crisis by supplying "far more opioids tha[n] could have been justified to serve [the opioid] market."  (Dkt. Nos. 79-12 ¶ 480; 79-14 ¶ 493.)

The Oklahoma suit alleges a positive correlation between the increase in prescription opioid sales and the increase in Oklahoma's overdose deaths from 1997 to 2006.  (Dkt. No. 79-16

United States District Court
Northern District of California

¶ 18.)  The complaint further alleges McKesson's distribution of "substantial amounts of prescription opioids to providers and retailers in Oklahoma" contributed to the seven-fold increase of unintentional opioid overdose rates and four-fold increase in prescription opioid sales from 1994 to 2006.  (*Id*. ¶¶ 12, 19, 21.)  So, the Exemplar Suits allege exclusively intentional conduct by McKesson from 1999 to 2004 caused the alleged injuries.

As the Exemplar Suits allege exclusively deliberate conduct, *Aiu Ins. Co.*, 2024 WL 302182, at *1, there is a potential for coverage only if "they countenance some additional unexpected, unforeseen, or undesigned happening" may have caused the alleged damage.  *Id.* (cleaned up).  The Ninth Circuit already held "they do not."  *Id*.  "The alleged injuries in the Exemplar Suits stem from opioid addiction, overdoses, and death, which the complaints exhaustively demonstrate were the direct result of McKesson's alleged scheme to increase the sale of opioids."  *Id*. at *3 (cleaned up).  "McKesson may not have intended to cause injury, or mistakenly believed its deliberate conduct would not or could not produce injury, but such injuries were not unexpected or unforeseen in light of McKesson's intentional acts."  *Id*. (cleaned up).

The crux of McKesson's argument is diversion of McKesson's opioid shipments was an unforeseen, intervening cause of the Exemplar Suits' alleged injuries from 1999 to 2004.  At the hearing, McKesson argued diversion by "underhanded" physicians and pharmacists who were writing and filling illegitimate prescriptions was the particular unforeseen, intervening cause of the alleged injuries from 1999 to 2004.  The Ninth Circuit has already "reject[ed] this argument."  *AIU Ins. Co.*, 2024 WL 302182, at *3 ("[T]he role of doctors in prescribing, or misprescribing, opioids is not an independent or unforeseen happening.  The same is true here for the doctors, pharmacists, and drug users upon whom McKesson seeks to lay blame."  (cleaned up)).  Diversion of McKesson's oversupply of opioids from 1999 to 2004 was not an unforeseen, intervening cause but "the functionally inevitable and entirely foreseeable result[] of the deliberate conduct McKesson is alleged to have engaged in" from the mid-1990s onward.  *Id*. at *4.

By 1999, it was foreseeable McKesson's alleged failure to maintain effective controls against diversion of its opioid shipments would lead to diversion, which would result in the Exemplar Suits' alleged injuries.  In 1970, Congress determined "[o]pium and opiate, and any salt,

compound, derivative, or preparation of opium or opiate" have "a high potential for abuse" and "[a]buse of [opium and opiate drugs] may lead to severe psychological or physical dependence." Pub. L. 91-513, October 27, 1970, 84 Stat. 1236, 1247-50.  Since 1970, McKesson has had a Congressionally mandated duty to maintain effective controls against diversion of opioids.  *Id.* at 1254; *see also* 21 U.S.C. §§ 823(b)(1).  Congress imposed this duty to protect against opioid diversion because "the improper use of controlled substances ha[s] a substantial and detrimental effect on the health and general welfare of the American people."  Pub. L. 91-513, 84 Stat. at 1242; *see also* 21 U.S.C. § 801(2).  So, from at least 1970 onward, it was objectively foreseeable 1) failure to maintain effective controls against diversion would lead to diversion, and 2) diversion of McKesson's opioid shipments would result in the Exemplar Suits' alleged injuries.

The Exemplar Suits specifically allege McKesson failed to maintain effective controls over opioid distribution, actively sought to evade such controls, and further failed to report and/or take steps to halt suspicious opioid orders.  (Dkt. Nos. 79-12 ¶ 14, 79-14 ¶ 14; *see* Dkt. No. 79-16 ¶ 4.) Indeed, McKesson's own deposition testimony confirms it was McKesson's policy to fulfill suspicious orders as of July 2000.  (Dkt. No. 112-4 at 5.)[3]  The diversion of an order deemed suspicious, but nonetheless shipped pursuant to McKesson's policy, is not an unforeseen, intervening event.  Resolving all doubts in McKesson's favor, *see Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 287 (2014), the Exemplar Suits do not allege it is "a matter of fortuity" McKesson's suspicious opioid shipments would be diverted.  *Navigators*, 212 Cal. Rptr. 3d at 246 (cleaned up).

Further, diversion due to McKesson's alleged failure to maintain effective controls against diversion was not an unforeseen, intervening cause of the alleged opioid addiction, overdose, and

---

[3] Under California law, an insurer can "rely on facts known to it, which were extraneous to the allegations in the complaint, to defeat its duty to provide a defense [if] such facts [are] *undisputed* and [] *conclusively* demonstrate that there was no *potential* for coverage."  *Haskel, Inc. v. Superior Court*, 39 Cal. Rptr. 2d 520 (Cal. Ct. App. 1995) (emphasis in original); *see Montrose*, 861 P.2d at 1159-62.  It is undisputed it was McKesson's policy in July 2000 to fulfill suspicious orders. Because the deposition testimony shows McKesson intentionally fulfilled orders deemed suspicious, it conclusively demonstrates McKesson's conduct does not qualify as an accident and diversion was not objectively unforeseeable.

United States District Court
Northern District of California

death from 1999 to 2004. By 1970 it was so obvious an opioid distributor's failure to maintain effective controls against diversion would result in diversion, which would "substantial[ly] and detrimental[ly] effect [] the health and general welfare of the American people," that Congress classified opioids as Schedule II substances with "a high potential for abuse." Pub. L. 91-513, 84 Stat. 1236, 1247-50. So, it was "functionally inevitable and entirely foreseeable" McKesson's intentional failure to maintain effective controls against diversion caused the ruinous opioid diversion described in the Exemplar Suits. *AIU Ins. Co.*, 2024 WL 302182, at \*4. As a matter of law, diversion of McKesson's opioid shipments was not an unforeseen, intervening cause of the Exemplar Suits' alleged injuries from 1999 to 2004.

Accordingly, McKesson's motion for partial summary judgment on the grounds the Exemplar Suits potentially allege an accident caused any bodily injury occurring during the 1999 to 2004 policy periods is DENIED.

## CONCLUSION

For the reasons stated, McKesson's motion for partial summary judgment is DENIED. The Court sets a further case management conference for August 22, 2024 at 1:30 p.m. via Zoom video. An updated joint case management conference statement is due one week in advance.

This Order disposes of Docket Nos. 170 and 172.

**IT IS SO ORDERED.**

Dated: July 30, 2024

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California